SUSAN JANE M. BROWN (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, OR.  97232
brown@westernlaw.org
Ph: (503) 914-1323
Fax: (541) 485-2457

KRISTEN L. BOYLES (WSB #23806) *Application pro hac vice pending*
TODD D. TRUE (WSB #12864) *Application pro hac vice pending*
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA.  98104
kboyles@earthjustice.org
ttrue@earthjustice.org
Ph: (206) 343-7340
Fax: (206) 343-1526

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| PACIFIC RIVERS, CASCADIA WILDLANDS, COAST RANGE ASSOCIATION, KLAMATH-SISKIYOU WILDLANDS CENTER, OREGON WILD, and THE WILDERNESS SOCIETY,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES BUREAU OF LAND MANAGEMENT, an administrative agency of the United States Department of Interior, and the UNITED STATES DEPARTMENT OF INTERIOR.<br><br>Defendants. | Civ. Case No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF<br><br>(Administrative Procedure Act, Oregon & California Lands Act, National Environmental Policy Act) |

## INTRODUCTION

1.      This is an action for declaratory judgment and injunctive relief against the United States Bureau of Land Management ("BLM") and the United States Department of Interior for their final Records of Decision[1] for the Resource Management Plans for Western Oregon, issued on August 5, 2016, revising the previous Resource Management Plans ("RMPs") of the Western Oregon BLM Districts of Salem, Eugene, Roseburg, Coos Bay, and Medford, and the Klamath Falls Resource Area of the Lakeview District (the "RMP Revisions"), and the associated final Environmental Impact Statement ("FEIS").

2.      The RMP Revisions drastically change the science-based management of BLM forest lands in southwest Oregon.  These changes include, but are not limited to, reducing the size of Riparian Reserves and eliminating Aquatic Conservation Strategy ("ACS") elements previously in place on these federal lands pursuant to the Northwest Forest Plan ("NWFP").[2]  The elements of the ACS that the RMP Revisions eliminate include protections for key watersheds, riparian reserves, required watershed analysis, and the duty to meet and maintain Aquatic Conservation Strategy objectives at all spatial and temporal scales.  The RMP Revisions and FEIS also fail to adequately explain these and other departures from the previous, science-based land management plan, the Northwest Forest Plan.

3.      Specifically, plaintiffs seek (1) a declaration that the final Records of Decision and revised Resource Management Plans for Western Oregon violate the Oregon and California

---

[1] The BLM issued two separate records of decision on August 5, 2016, the "Northwest and Coastal Oregon ROD" and the "Southwestern Oregon ROD."  They are referred to herein collectively as the "RODs."  Both are available at: http://www.blm.gov/or/plans/rmpswesternoregon/rod/index.php

[2] Record of Decision and Standards & Guidelines for Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl (USDA/USDI Apr. 13, 1994)(hereinafter "NWFP ROD").

Lands Act ("O&C Act"), 43 U.S.C. §§ 1181a-j, and the Federal Land Policy and Management

Act, 43 U.S.C. §§ 1701–1782; (2) a declaration that the FEIS and final Records of Decision

violate the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and its

implementing regulations; and, (3) a declaration that the final Records of Decision and Resource

Management Plans ("RMPs") violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 551

et seq..

4.      For these violations of law, plaintiffs seek an order declaring the final FEIS and RODs

invalid and vacating the final FEIS, RODs, and RMP Revisions.

5.      Plaintiffs will also seek such preliminary and permanent injunctive relief against the

implementation of the final RODs and RMP Revisions as may be necessary to preserve the status

quo, ensure correction of illegal final agency action, and prevent unlawful agency action that is

likely to cause irreparable harm to the environment and plaintiffs' interests.

### JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 2201

(declaratory relief), and 2202 (injunctive relief).

7.      Venue is properly vested in this Court under 28 U.S.C. § 1391(e) as the Oregon State and

district offices of the Bureau of Land Management that prepared and recommended approval of

the RODs for the RMP Revisions are located in this District, the lead plaintiff and several other

plaintiffs reside in this District, the lands giving rise to the causes of action are located in this

District, and the consequences of the defendants' violations of the law giving rise to plaintiffs'

claims have occurred or will occur in this District.

### PARTIES

8.      Plaintiff PACIFIC RIVERS is a non-profit organization organized under the laws of the

State of Oregon, headquartered in Portland, Oregon, with about 713 members extending throughout the western states.  It is comprised of individuals who have lived, used, enjoyed, and valued the area to be affected by the RMP Revisions for many years.  Pacific Rivers' mission is to protect and restore rivers, their watersheds, and the native species that depend on them.  The organization does this for the benefits that healthy watersheds provide to present and future generations – and for the intrinsic virtues of rivers themselves.

9.     Plaintiff CASCADIA WILDLANDS ("Cascadia") is an Oregon non-profit organization based in Eugene, Oregon.  Cascadia's mission is to defend the forests, waters, and wildlife of the Cascadia bioregion, including western Oregon, by monitoring environmentally destructive projects and educating, organizing, and advocating for a more compassionate and responsible relationship with the ecosystems we live in.  Cascadia and its members participate in government decision-making processes that impact public lands managed by BLM and throughout Oregon.

10.     Plaintiff COAST RANGE ASSOCIATION ("CRA") is a non-profit organization dedicated to the goals of protecting the forests of the Oregon Coast Range from unwise use and fostering new visions of environmental stewardship, long-term sustainability, and biological diversity that include healthy populations of the species that occur naturally throughout the Coast Range.  CRA represents members who enjoy fishing and other recreation in the Umpqua River Basin, as well as business members and individuals whose livelihood depends on the tourist industry in this area, which is, in turn, dependent on the healthy forests and watersheds and thriving native species in the Basin.

11.     Plaintiff KLAMATH-SISKIYOU WILDLANDS CENTER ("KS Wild") is a non-profit organization incorporated in Oregon with an office in Ashland, Oregon. KS Wild has 3,500 members in over 10 states, with most of its members concentrated in southern Oregon and

northern California. On behalf of its members, KS Wild advocates for the forests, wildlife, and waters of the Rogue and Klamath Basins.  KS Wild works to protect and restore the extraordinary biological diversity of the Klamath-Siskiyou region of southwest Oregon and northwest California and has been actively engaged throughout the planning process for the Western Oregon Plan Revisions.

12.     Plaintiff OREGON WILD is a non-profit corporation organized under the laws of the State of Oregon.  Oregon Wild is headquartered in Portland, Oregon, with field offices in Eugene, Bend, and Enterprise.  Oregon Wild's mission is to protect and restore Oregon's wild lands, wildlife, and water as an enduring legacy.  Oregon Wild's primary goals include permanent protection of roadless areas and mature and old-growth forests.  Oregon Wild has approximately 17,000 individual and organizational members and supporters.

13.     Plaintiff THE WILDERNESS SOCIETY ("TWS") is a non-profit national membership organization that works to protect wilderness and to inspire Americans to care for their wild places.  Founded in 1935, TWS is headquartered in Washington, D.C. with over 300,000 members nationwide.  TWS uses public education, scientific analysis, and advocacy to work towards its mission.  Approximately 43,000 of the 300,000 members reside in Oregon, California, and Washington.

14.     Plaintiffs and their members use BLM public lands that will be managed under the RMP Revisions for recreational, scientific, aesthetic, and commercial purposes.  Plaintiffs have members who reside near, visit, or otherwise use and enjoy BLM public lands in Oregon in a variety of ways, including recreation, hunting and fishing, wildlife viewing and education, and aesthetic and spiritual enjoyment.  Plaintiffs and their members derive recreational, scientific, aesthetic, and conservation benefits of and enjoyment from the Oregon BLM lands.  The past,

present, and future enjoyment of these benefits by plaintiffs and their members has been, is

being, and will continue to be irreparably harmed by defendants' disregard of their statutory

duties and by the unlawful injuries imposed on United States BLM lands by their actions.

15.     Plaintiffs and their members have participated in the public process surrounding the RMP

Revisions, including by attending meetings and submitting comments and administrative

protests.  Plaintiffs have encouraged members of the public to participate in this process through

their newsletters, websites, and presentations.

16.     The aesthetic, conservation, recreational, commercial, scientific, informational, and

procedural interests of plaintiffs and their respective members have been, are being, and, unless

the relief prayed for herein is granted, will continue to be adversely affected and irreparably

injured by defendants' failure to comply with federal law as described below.  Plaintiffs have no

adequate remedy at law.

17.     Defendant UNITED STATES BUREAU OF LAND MANAGEMENT ("BLM"), an

agency within the United States Department of the Interior, is charged with the management of

the public lands administered by Secretary of the Interior, including the Oregon and California

lands and public domain lands located in the State of Oregon.

18.     Defendant UNITED STATES DEPARTMENT OF THE INTERIOR ("Interior") is a

Cabinet-level Department within the United States federal government.  The Department of

Interior oversees the BLM's management of the O&C and other lands in Oregon.

## BACKGROUND

## I.     THE NORTHWEST FOREST PLAN, ITS DEVELOPMENT, AND REQUIREMENTS.

19.     The northern spotted owl and marbled murrelet are avian species that are both dependent

on old-growth forests for survival and reproduction.  Over the past century, the vast majority of

their habitat has been lost, primarily to commercial logging, road construction, and development.

20.     Concerns over the continued viability of the spotted owl and marbled murrelet, and the years of controversy over management of their old-growth forest habitat in the Pacific Northwest, led the Forest Service and BLM to develop regional forest management standards and guidelines for these forests.  In 1991, upon uncovering "a remarkable series of violations of the environmental laws," and "a deliberate and systematic refusal … to comply with the laws protecting wildlife," the U.S. District Court for the Western District of Washington issued an injunction halting any additional timber sales in old-growth forests on Forest Service land in western Oregon and Washington.  Seattle Audubon Soc'y v. Evans, 771 F. Supp. 1081, 1089-90 (W.D. Wash.), aff'd, 952 F.2d 297 (9th Cir. 1991).  The following year, this Court enjoined BLM from proceeding with further timber sales in suitable spotted owl nesting habitat pending compliance with NEPA.  Portland Audubon Soc'y v. Lujan, 795 F. Supp. 1489 (D. Or. 1992), aff'd sub nom. Portland Audubon Soc'y v. Babbitt, 998 F.2d 705 (9th Cir. 1993).

21.     To resolve the controversy over management of these lands, President Clinton convened a forest conference and directed the land management agencies to craft a comprehensive, long-term management strategy that is "scientifically sound, ecologically credible, and legally responsible."  To meet this goal, the agencies assembled a team of leading scientists, called the Forest Ecosystem Management Assessment Team ("FEMAT"), to develop ecosystem management strategies.  FEMAT evaluated ten alternative land management options and compared their consequences in depth.

22.     In April 1994, the Secretaries of Agriculture and Interior signed a record of decision adopting the Northwest Forest Plan, selecting what had come to be known as "Option 9" as the management plan for lands under their jurisdiction within the range of the owl.  NWFP ROD

(Apr. 13, 1994).  The Northwest Forest Plan has been heralded as the first science-based ecosystem management strategy for federal lands.  The NWFP contained standards and guidelines for managing both Forest Service and BLM public lands (including lands covered by the RMP Revisions), created old-growth and Riparian Reserves, and provided for continued timber harvest.  Its Record of Decision amended the existing forest plans for 19 national forests and in 1995 was officially incorporated into the then newly developed RMPs for BLM districts within the range of the northern spotted owl.

23.     Both the timber industry and several environmental organizations challenged the Northwest Forest Plan.  The U.S. District Court for the Western District of Washington upheld the Plan against these challenges, and the Ninth Circuit affirmed.  Seattle Audubon Soc'y v. Lyons, 871 F. Supp. 1291, 1303-05 (W.D. Wash. 1994), aff'd sub nom. Seattle Audubon Soc'y v. Moseley, 80 F.3d 1401 (9th Cir. 1996).  In rejecting the timber industry's challenge to the agencies' authority to adopt an ecosystem plan that covered lands administered by both the Forest Service and BLM, the district court noted that both agencies' planning and management statutes required an integrated, scientific approach; both agencies had to comply with NEPA's mandate to consider ecosystem effects; and both agencies had to comply with the Endangered Species Act.  The court held that "[g]iven the current condition of the forests, there is no way the agencies could comply with the environmental laws *without* planning on an ecosystem basis." Id. at 1311 (emphasis in original). The court also held that the Northwest Forest Plan complied with the Oregon and California Lands Act.  Seattle Audubon Soc. v. Lyons, 871 F. Supp. at 1314 ("The management decision made here in regard to the O&CLA lands was a lawful exercise of the Secretary's discretion.  If this ruling were to be reversed on appeal, the ROD would have to be reconsidered because of the loss of important LSOG and Riparian Reserves.")

24.    As the ROD for the Northwest Forest Plan explained:

> One of the purposes of the Endangered Species Act is the preservation of ecosystems upon which endangered and threatened species depend. A forward-looking land management policy would require that federal lands be managed in a way to minimize the need to list species under the ESA. Additional species listings could have the effect of further limiting the O&C Lands Act's goal of achieving and maintaining permanent forest production. This would contribute to the economic instability of local communities and industries, in contravention of a primary objective of Congress in enacting the O&C Lands Act. That Act does not limit the Secretary's ability to take steps now that would avoid future listings and additional disruptions.
> . . .
> Protection of watersheds and regulating streamflow are explicit purposes of forest production under the O&C Lands Act. Riparian reserves, including those established on O&C lands by this decision, are designed to restore and maintain aquatic ecosystem functions. Together with other components of the aquatic conservation strategy, riparian reserves will provide substantial watershed protection benefits. Riparian reserves will also help attain and maintain water quality standards, a fundamental aspect of watershed protection. Both riparian reserves and late-successional reserves will help regulate streamflows, thus moderating peak streamflows and attendant adverse impacts to watersheds.

NWFP ROD at 49-50.

25.    The effectiveness and legality of the Northwest Forest Plan depends on its application to both Forest Service and BLM lands; the Northwest Forest Plan provides "coordinated management direction for the lands administered by the Forest Service and BLM within the range of the spotted owl [that will also] protect and enhance late successional and old-growth forest ecosystems." *USFWS, Northwest Forest Plan Biological Opinion* at 2 (Feb. 10, 1994).

26.    Two key assumptions behind the biological analysis of the NWFP were that (1) "[r]iparian and Late-Successional Reserves (LSRs) will retain reserve status and will not be available for timber production other than as provided in Alternative 9" and (2) "[a]lternative 9 applies to Forest Service and BLM lands; all future actions on these lands would be consistent with Alternative 9, as adopted in the Record-of-Decision (ROD)." Id. at 4.

27.    The Northwest Forest Plan includes the Aquatic Conservation Strategy to address clean

water and the habitat needs of salmonids and other aquatic and terrestrial species on federal lands within the range of the northern spotted owl.  In upholding the NWFP, the district court cautioned that "[i]f the plan as implemented is to remain lawful, the monitoring, watershed analysis, and mitigating steps called for by the ROD will have to be faithfully carried out, and adjustments made if necessary."  Seattle Audubon Soc'y v. Lyons, 871 F. Supp. at 1322.

28.     The ACS has four basic components: (1) a system of key watersheds or refugia comprising watersheds with the best aquatic habitat or the greatest potential for recovering at-risk fish stocks; (2) Riparian Reserves along streams where certain activities are constrained by enforceable standards & guidelines; (3) watershed analysis to be used to tailor activities to specific watershed needs; and (4) a comprehensive, long-term watershed restoration program. *Northwest Forest Plan Standards and Guidelines,* B-12; *FEMAT*, V-32.

29.     The ACS establishes substantive protections for forests benefiting water quality in two ways.  First, binding standards and guidelines restrict certain activities within Riparian Reserves and key watersheds.  See *Northwest Forest Plan Standards and Guidelines,* C-7, C-30 – C-38. Second, FEMAT recognized the need to also constrain: (1) some activities outside Riparian Reserves; and, (2) the cumulative impacts of activities throughout a watershed.  *FEMAT*, V-29. To achieve this objective, the ACS has nine objectives that require all aquatic habitat to be maintained and restored to properly functioning conditions. Forest managers are required to manage federal forests and watersheds consistent with these objectives.  *Northwest Forest Plan Standards and Guidelines,* B-11; *FEMAT*, V-30 to-31.  The Northwest Forest Plan Record of Decision (at Attachment A, at I, B-1, B-9 to B-10) gave the ACS objectives binding force as standards and guidelines and explicitly required that federal lands shall be managed to attain the ACS objectives.  "Both FEMAT and the [Northwest Forest Plan] contemplate that projects must

be consistent with ACS objectives." PCFFA v. NMFS, No. 04-1299RSM, Order on Report and Recommendation, slip op. at 4 (W.D. Wash. March 30, 2007).

30.    Although Riparian Reserves are associated with near-stream water quality and aquatic species, processes, and functions, the Northwest Forest Plan expressly adopted wide stream buffers and intended for these wide Riparian Reserves to serve the additional purpose of providing for the persistence and benefit of a number of other, non-aquatic species such as the northern spotted owl, marbled murrelet, marten, red tree vole, vascular plants, bryophytes, amphibians, bats, birds, mammals, mosses, arthropods, fisher, 19 mollusks, 12 species of lichen, 23 species of fungi, and 130 additional species.

31.    Many of these species also were covered by the NWFP's "Survey and Manage" program, which required the BLM (and Forest Service) to survey for and establish no-entry habitat buffers for a number of rare species.  The RMP Revisions eliminate the Survey and Manage program, and move a small percentage of Survey and Manage species into the Bureau's Special Status Species Program, a decision that has thrice been adjudicated as insufficient to protect these species.  *Oregon Natural Resources Council Action v. Veneman*, No. 02-983-AA (D. Or. 2002) (*S&M I*); *Northwest Ecosystem Alliance v. Rey*, 380 F. Supp. 2d 1175 (W.D. Wash. 2005) (*S&M II*); *Conservation Northwest v. Sherman*, 674 F. Supp. 2d 1232 (W.D. Wash. 2009) (*S&M III*).

32.    The ACS and Northwest Forest Plan together provide critical protection for aquatic species now listed as endangered or threatened.  The FEMAT scientists first convened in April 1993 and assessed the likelihood of having the continued persistence of old-growth dependent species, well-distributed throughout their historical range, on federal lands over the next 100 years.  FEMAT at IV-40.  They were instructed to assume that the Aquatic Conservation Strategy would be fully implemented.  NWFP FSEIS at 3 & 4-192.  For the salmon species

considered, the likelihood of their continued survival on these lands over the next 100 years was only 65%. FEMAT Table V-11, at V-69.

33.    Only when the Riparian Reserves and other mitigation measures were added into the protections of the ACS did the Northwest Forest Plan result in an 80% or greater likelihood of continued existence of salmon and steelhead. NWFP FSEIS at 3 & 4-196; App. J2-47-48. The BLM's RMP Revisions eliminate these provisions.

## II.    LITIGATION REGARDING BLM LANDS IN WESTERN OREGON FOLLOWING ADOPTION OF THE NORTHWEST FOREST PLAN.

34.    Immediately following the 1994 adoption of the Northwest Forest Plan, timber industry groups filed a lawsuit in the United States District Court for the District of Columbia challenging its implementation. AFRC v. Clarke, Civil No. 94-1031-TPJ (D.D.C.).

35.    Almost a decade later, following two rulings by the district court dismissing the timber industry plaintiffs' claims, and while an appeal to the D.C. Circuit was pending, the then-Secretary of the Interior entered into a settlement agreement with the timber industry plaintiffs.

36.    Under the 2003 settlement agreement, BLM agreed to revise its resource management plans in western Oregon and to develop in the revisions an alternative that would allow for substantial increases in the land available for timber harvest. AFRC v. Clarke, Civil No. 94-1031-TPJ (D.D.C.), Settlement Agreement, (filed Oct. 17, 2003) No. 02-5024 (D.C. Cir.) ("Settlement Agreement"), available at

http://www.blm.gov/or/plans/wopr/settlement/files/settlement_agreement_image.pdf.

37.    In the 2003 settlement agreement, BLM committed to finalize its revision of the resource management plans for the six Western Oregon districts by December 31, 2008, in a process that would come to be known as the Western Oregon Plan Revisions ("2008 WOPR"). Settlement Agreement ¶ 3.5. The Secretary further committed that: "At least one alternative to be

considered in each proposed revision will be an alternative which will not create any reserves on O&C lands except as required to avoid jeopardy under the Endangered Species Act. All plan revisions shall be consistent with the O&C Act as interpreted by the 9th Circuit Court of Appeals." Id.

38.    BLM began the process of revising its resource management plans in western Oregon with a formal scoping process under NEPA, conducted during September and October 2005, and BLM's Analysis of the Management Situation, released in October 2005. BLM released the scoping report and planning criteria in February 2006. BLM issued the draft environmental impact statement in August 2007 and made it available for public comment until January 2008. BLM received approximately 29,500 comments on the draft environmental impact statement. Final Environmental Impact Statement for the Revision of the Resource Management Plans of the Western Oregon Bureau of Land Management at 1-15, available at http://www.blm.gov/or/plans/wopr/index.php.

39.    In October 2008, the BLM published the Final Environmental Impact Statement for the revised RMPs and a Record of Decision for the 2008 WOPR. BLM initially exempted the WOPR ROD from administrative protest because the Assistant Secretary of the Interior for Land and Minerals Management was the responsible official who signed the decision.

40.    On October 29, 2008, five conservation group plaintiffs filed a complaint in this Court seeking: (1) a declaration that BLM's decision to preclude an administrative protest violated the law; and, (2) injunctive relief against issuance of any Record of Decision on the Western Oregon Plan Revisions until the required protest period was allowed. Oregon Wild v. Shepard, Civ. No. 08-1280-MO, Complaint (D. Or. filed Oct. 29, 2008). The Plaintiffs subsequently moved for a preliminary injunction to protect their interests.

41.     In response, the BLM reversed course and provided an opportunity for the public to file administrative protests of the 2008 WOPR FEIS and proposed RMPs.  The Plaintiffs in Oregon Wild v. Shepard availed themselves of this administrative review process.  The BLM subsequently denied all administrative protests.  See Director's Protest Resolution Report, Western Oregon Resource Management Plan Revisions (Dec. 29, 2008), available at http://www.blm.gov/pgdata/etc/medialib/blm/wo/Planning_and_Renewable_Resources/oregon.P ar.57250.File.pdf/Western_Oregon_Plan_Revisions_Directors_Protest_Resolution_Report.pdf.

42.     On December 30, 2008, BLM finalized the 2008 WOPR by signing the six Records of Decision amending the Resource Management Plans for the BLM Salem, Eugene, Roseburg, Medford, and Coos Bay Districts, and the Klamath Falls Resource Area of the Lakeview District. See, e.g., BLM, Salem Record of Decision (Dec. 2008) available at http://www.blm.gov/or/plans/wopr/rod/index.php.

43.     On July 16, 2009, facing four separate lawsuits challenging the 2008 WOPR, including two by current plaintiffs, Pacific Rivers Council v. Shepard, No. 09-0058-ST (D. Or.), and Oregon Wild v. Shepard, No. 09-0060-PK (D. Or.), BLM withdrew the 2008 WOPR RODs, explaining that the decisions were legally deficient under the ESA.  As BLM had withdrawn the challenged actions, on July 31, 2009, the parties in Pacific Rivers Council v. Shepard, No. 09-0058-ST (D. Or.), and Oregon Wild v. Shepard, No. 09-0060-PK (D. Or.), stipulated to dismissal without prejudice.

44.     Several timber industry organizations challenged that withdrawal in federal district court in Washington, D.C., and on March 31, 2011, that district court vacated and remanded the July 16, 2009 decision to withdraw the 2008 WOPR RODs.  Douglas Timber Operators v. Salazar, No. 09-1704-JCB (D.D.C. March 31, 2011).  The district court ultimately ruled in favor of the

timber Plaintiffs on March 31, 2011, thus reinstating the 2008 WOPR as the guiding land management plan for the BLM's O&C lands.

45.     Once the 2008 WOPR was reinstated, the conservation Plaintiffs refiled their challenge to it and its FEIS, RODs, and RMPs. Pacific Rivers Council v. Shepard, Civ. No. 11-442-HU (D. Or. filed April 8, 2011).  The conservation Plaintiffs challenged several aspects of the 2008 WOPR, including BLM's failure to consult with the National Marine Fisheries Service and United States Fish and Wildlife Service as required by the Endangered Species Act ("ESA").  On May 16, 2012, the conservation Plaintiffs prevailed on this claim in the district court, and on March 1, 2013, they prevailed in an appeal to the Ninth Circuit filed by timber industry Intervenors.  Pacific Rivers Council v. Shepard, No. 12-35570, slip opinion (9th Cir. Mar. 1, 2013).  The BLM did not contest liability in either the lower or appellate court.

46.     As a result of the Ninth Circuit's decision in Pacific Rivers Council v. Shepard, the 2008 WOPR was vacated and the Northwest Forest Plan (as reflected in the 1995 BLM RMPs as amended) was once again the controlling land management plan for the BLM's O&C and public domain lands in western Oregon.

47.     Functionally, the 2008 WOPR was never implemented, and the O&C lands have been managed according to the multi-agency ecosystem-wide approach contained in the Northwest Forest Plan since 1994.

## III.    THE CURRENT PLANNING EFFORT FOR WESTERN OREGON BLM LANDS.

48.     In December 2010, BLM commenced a second Western Oregon Plan Revision effort. The purpose of this second planning process was to withdraw BLM forests from the "comprehensive…common management approach to [federal] lands administered throughout the region" embodied in the Northwest Forest Plan.  BLM said revisions to its RMPs were necessary because "[t]here has been a substantial, long-term departure from the timber outcomes predicted

under the 1995 RMPs" and "[t]here is new scientific information and policies related to the northern spotted owl, including a revised Recovery Plan and a new designation of critical habitat." June 2013 Purpose and Need Statement, available at

http://www.blm.gov/or/plans/rmpswesternoregon/files/purpose.pdf.

49.    The decision to undertake a further revision effort is voluntary and not required by the Settlement Agreement in AFRC v. Clarke.

50.    The BLM released its Notice of Intent to revise its RMPs in March 2012, and conducted public scoping through June 2012.  Plaintiffs provided timely scoping comments.

51.    On April 24, 2015, BLM issued a draft environmental impact statement ("DEIS") for the RMP Revisions and took public comment on the DEIS through July, 15, 2015.  Plaintiffs provided timely comments on the DEIS.

52.    On April 15, 2016, BLM released the final EIS and proposed RMPs for the current RMP Revisions.  The proposed RMP Revisions eschewed all of the objective, mandatory Standards and Guidelines of the Northwest Forest Plan and replace them with "Management Objectives" and "Management Direction."  The BLM's duty to comply with these Management Objectives and Management Direction is substantially discretionary without clear guidance, let alone mandatory requirements.

53.    Among other measures, the proposed RMP Revisions reduce the size of streamside buffers, eliminate requirements that currently limit logging in Late Successional Reserves, increase timber harvest while relying on controversial "regeneration" logging of mature forests, allow for logging of "known locations" of species currently protected by the Survey and Manage program under the NWFP, eliminate the requirement to determine the presence or absence of Survey and Manage species, abolish Key Watersheds for salmon recovery and municipal

drinking water, withdraw the BLM from collaborative Adaptive Management Area efforts, and reduce the size of BLM-identified Areas of Critical Environmental Concern in which the BLM wishes to now emphasize timber production.

54.    On May 12, 2016, the Plaintiffs in this action filed timely administrative protests of the FEIS and proposed RMP Revisions.  On August 5, 2016, the BLM denied these protests and signed the Records of Decision that are the subject of this action.  According to the BLM, these RODs make no material change to the proposed RMP Revisions that were the subject of the plaintiffs' protests.

55.    This lawsuit followed.

**IV.    LAWS GOVERNING WESTERN OREGON BLM LANDS.**

56.    Among other federal laws, including but not limited to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701–1782, the Clean Water Act, the Endangered Species Act, and the National Environmental Policy Act, the O&C lands are managed in accordance with the Oregon and California Lands Act ("O&C Act").

57.    The O&C Act governs railroad grant lands in southern Oregon that Congress revested in the federal government due to the railroad company's breach of its statutory duties.  In the Act, Congress sought to put an end to wasteful and destructive logging practices that clearcut large forest areas for short-term gains without safeguarding forests, watersheds, and other natural resources.

58.    Thus, the Act provides that:

> such portions of the revested [O&C] grant lands...which have heretofore or may hereafter be classified as timberlands...shall be managed...for permanent forest production, and the timber thereon shall be sold, cut and removed in conformity with the principal [sic] of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational [facilities].

43 U.S.C. § 1181a.

59.     The Act instituted a conservation ethic, marking the first federal statute to impose

multiple-use, sustain-yield constraints on timber cutting.  As the district court in in <u>Lyons</u>

explained, "management under the [O&C Act] must look not only to annual timber production

but also to protecting watersheds, contributing to economic stability, and providing recreational

facilities."  871 F. Supp. at 1314.

60.     Over the years, a number of federal courts have interpreted the O&C Act.  While

<u>Headwaters v. BLM</u> held that "[t]he BLM did not err in construing the O&C Act as establishing

timber production as the dominant use" of the O&C lands,  914 F.2d 1174, 1183-84 (9th Cir.

1990), this decision is limited to its particular facts, facts that arose before the northern spotted

owl was listed as a threatened species.  As such, <u>Headwaters v. BLM</u> must be interpreted

consistent with, for example, the subsequent decision in <u>Portland Audubon Society v. Babbitt</u>

that held there was no unavoidable conflict between the O&C Act and an injunction temporarily

halting old-growth logging pending compliance with NEPA, even though the BLM's logging

projections (stated as minimum logging volumes under the O&C Act) could not be met under the

injunction.  998 F.2d 705, 709 (9th Cir. 1993).

61.     Reviewing and applying both <u>Headwaters</u> and <u>Babbitt</u>, <u>Seattle Audubon Society v. Lyons</u>

held that the Northwest Forest Plan did not violate the O&C Act, noting that "management under

the [O&C Act] must look not only to annual timber production, but also to protecting

watersheds, contributing to economic stability, and providing recreational facilities."  871 F.

Supp. 1291, 1314 (W.D. Wash. 1994) <u>aff'd sub nom.</u> <u>Seattle Audubon Soc'y v. Moseley</u>, 80

F.3d 1401 (9th Cir. 1996).

62.     Not all BLM public forest lands governed by the RMP Revisions are O&C lands; some

lands are "public domain" lands, or lands that have never left federal ownership. These lands are managed in accordance with FLPMA.

63.    In addition, all BLM lands must be managed to comply with the Endangered Species Act and the Clean Water Act, among other federal statutes. As BLM has recognized, part of its responsibility in managing these lands is to avoid managing them in a way that heads to additional ESA listings or violations of the Clean Water Act.

CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF

Violation of the Oregon & California Lands Act and Federal Land Policy and Management Act:
Failure to Protect Natural Resources, Watersheds, Stream Flow, and
Contribute to Economic Stability of Local Communities

64.    Plaintiffs incorporate by reference all preceding paragraphs.

65.    The Oregon and California Lands Act states that land "shall be managed...for permanent forest production, and the timber thereon shall be sold, cut, and removed in conformity with the principal [principle] of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facilities." 43 U.S.C. § 1181a.

66.    The Federal Land Policy and Management Act requires that all BLM lands, including the public domain lands and the O&C lands affected by the RMP Revisions, be managed for multiple uses and to protect a wide range of natural resource values. *See, e.g.,* 43 U.S.C. § 1701; *see generally id.* §§ 1701–1782.

67.    BLM is thus obligated to protect multiple resource values on its lands under both the O&C Act and FLPMA, authorized to adopt appropriate rules under FLPMA and has closely related substantive legal responsibilities under several different statutes, including the Clean Water Act, 33 U.S.C. § 1251 et seq., and the Endangered Species Act, 16 U.S.C. § 1531 et seq.,

all of which apply to its decision to reduce riparian and other protections from those required by the Northwest Forest Plan.

68.    When BLM amended its resource management plans to incorporate the Northwest Forest Plan, it did so following FEMAT's scientific review of the various management options.  In particular, the ACS – including the Riparian Reserve buffers and corresponding Standards and Guidelines – resulted from that scientifically-based process.

69.    The wide riparian reserves adopted in 1994 were required to meet a wide variety of ecological objectives that must still be met by the RMP Revisions.  The RMP Revisions greatly reduce stream buffers to meet only a subset of those objectives, leaving many purposes unaddressed, apparently unmet, and the failure to meet or address these purposes is not rationally explained in the FEIS and ROD.

70.    In 2004, the Forest Service and BLM issued a decision that significantly weakened the Northwest Forest Plan's ACS.  See Pacific Coast Federation of Fishermen's Ass'ns v. National Marine Fisheries Services, 482 F. Supp. 2d 1248, 1260-61 (W.D. Wash. 2007) ("PCFFA IV").  The amendment would have eliminated the requirements that the Forest Service and BLM find that each action proceeding under the Plan will meet, attain, not retard, or not prevent attainment of the ACS objectives.  In a challenge to the adequacy of the biological opinions analyzing the amendment and its final supplemental environmental impact statement, the district court set aside the ACS amendment for failure to use the best available science and failure to disclose the views of dissenting FEMAT scientists.

71.    In addition, as the Supreme Court has explained, when changing an existing policy, an agency must: 1) display awareness that it is changing its position; 2) provide a rational explanation for the change; and 3) provide a rational explanation for disregarding facts and

circumstances that underlay or were engendered by the prior policy. Encino Motorcars, LLC v.
Navarro, No. 15-415, 2016 WL 3369424, at *7 (2016).

72.    Overall, the RMP Revisions, among other actions, reduce the size of streamside buffers,
eliminate requirements that currently limit logging in Late Successional Reserves, increase
timber harvest while relying on controversial "regeneration" logging of mature forests, allow for
logging of "known locations" of species currently protected by the Survey and Manage program
under the NWFP, eliminate the requirement to determine the presence or absence of Survey and
Manage species, abolish Key Watersheds for salmon recovery and municipal drinking water,
withdraw the BLM from collaborative Adaptive Management Area efforts, and reduce the size of
BLM-identified Areas of Critical Environmental Concern in which the BLM wishes to now
emphasize timber production. These actions, individually and together, will cause increased
degradation of forests, forest watersheds, streamflows, and the health of numerous species of fish
and wildlife including a number of species listed for protection under the Endangered Species
Act.

73.    The RMP Revisions deviate from the carefully-crafted and judicially-approved multi-
agency land management plan and mandatory standards and guidelines for managing Pacific
Northwest public forest lands – the Northwest Forest Plan – without adequate explanation. The
RMP Revisions do not offer a rational account for how they will fulfill BLM's legal obligations
to provide for the health, diversity, and productivity of these forest lands or how they will protect
watersheds without all the elements of the ACS and the other provisions of the NWFP.

74.    The FEIS for the RMP Revisions also explicitly acknowledges that increased timber
harvest on O&C lands over the current harvest level as proposed will increase economic
instability and introduce additional volatility into an already capricious local and regional timber

market.  In fact, the RMP Revisions will facilitate increased timber harvest on O&C lands, by as much as 75 million board feet, or 37 percent, as compared to current harvest levels.  According to the BLM, this increase in timber harvest will exacerbate instability in many southwest Oregon communities that the O&C Act was designed to prevent.

75.    The BLM has failed to offer a rational explanation for why the RMP Revisions, which will degrade watersheds, water quality, streamflows, and the health of terrestrial and aquatic species and increase economic instability in communities in Southwest Oregon, complies with both the O&C Act and the Federal Land Policy and Management Act.

76.    Plaintiffs have a right to review under the APA, 5 U.S.C. § 702, and this Court must hold unlawful and set aside agency actions that is arbitrary, capricious, an abuse of discretion, and not in accordance with law, id. § 706.

SECOND CLAIM FOR RELIEF

Violation of the National Environmental Policy Act:
Failure to Analyze Direct, Indirect, and Cumulative Impacts

77.    Plaintiffs incorporate by reference all preceding paragraphs.

78.    NEPA is the "basic national charter for protection of the environment."  40 C.F.R. § 1500.1.

79.    Among other things, NEPA requires all agencies of the federal government to prepare a "detailed statement" that discusses the environmental impacts of, and reasonable alternatives to, all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  This statement is commonly known as an environmental impact statement ("EIS").

80.    The EIS process is intended "to help public officials make decisions that are based on understanding of environmental consequences" and to "insure that environmental information is

available to public officials and citizens before decisions are made and before actions are taken."

40 C.F.R. § 1500.1(b)-(c).

81.     NEPA requires that an EIS analyze "direct effects," which are "caused by the action and

occur at the same time and place," as well as "indirect effects which...are later in time or farther

removed in distance, but are still reasonably foreseeable."  40 C.F.R. § 1508.8.

82.     An EIS must also assess the cumulative impacts, i.e., those resulting "from the

incremental impact of the action when added to other past, present, and reasonably foreseeable

future actions...Cumulative impacts can result from individually minor but collectively

significant actions taking place over a period of time."  40 C.F.R. §§ 1502, 1508.7-1508.8.

83.     BLM is a federal agency subject to NEPA, and under BLM regulations, "[a]pproval of a

resource management plan is considered a major Federal action significantly affecting the quality

of the human environment."  43 C.F.R. § 1601.0-6.

84.     The RMP Revisions and ROD are major federal actions significantly affecting the human

environment requiring an EIS.

85.     The RMP Revisions, FEIS, and ROD violate NEPA in at least the following ways:

    A.     Failure to disclose the direct, indirect, and cumulative effects to terrestrial and

    aquatic species, including to their ability to persist over time and move across the

    landscape, from the BLM's elimination of the ACS and all of its components and from

    BLM's elimination of other mandatory standards, guidelines and management

    requirements under the NWFP;

    B.     Failure to disclose the direct, indirect, and cumulative effects of the RMP

    Revisions on unroaded areas, which were formerly protected by "Key Watershed"

    designations of the Northwest Forest Plan;

C.      Failure to disclose the direct, indirect, and cumulative effects on other federal lands managed by other federal entities of BLM's departure from the Northwest Forest Plan;

D.      Failure to disclose the direct, indirect, and cumulative effects on other federal lands managed by nonfederal entities of BLM's departure from the Northwest Forest Plan;

E.      Failure to accurately portray or account for the climate impacts of increased logging and the forgone climate and economic benefits of forest conservation.

86.    Defendants' failure in the FEIS to consider and evaluate the direct, indirect, and cumulative impacts of the RMP Revisions violate and continue to violate NEPA and its implementing regulations.

87.    Plaintiffs have a right to review under the APA, 5 U.S.C. § 702, and this Court must hold unlawful and set aside agency actions found to be arbitrary, capricious, an abuse of discretion, and not in accordance with law, id. § 706.

PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court:

A.      Adjudge and declare that BLM violated NEPA, the Oregon & California Lands Act, and the APA when it issued the Record[s] of Decision for the RMP Revisions;

B.      Vacate the Record of Decision for the RMP Revision;

C.      Enjoin BLM from offering, approving, or allowing any action based on the RMP Revisions and/or inconsistent with the Northwest Forest Plan;

D.      Grant such restraining orders and/or preliminary injunctive relief as plaintiffs may from time to time request to ensure that the BLM public lands do not suffer irreparable harm

pending resolution of the merits of this action;

E.     Award plaintiffs their reasonable fees, expenses, costs, and disbursements,

including attorneys' fees associated with this litigation under the Equal Access to Justice Act,

28 U.S.C. § 2412;

F.     Grant plaintiffs such further and additional relief as the Court may deem just and

proper.

Respectfully submitted this 8th day of August, 2016.

    /s/ Susan Jane M. Brown
SUSAN JANE M. BROWN, OSB #054607
Western Environmental Law Center
4107 NE Couch St.
Portland, OR.  97232
brown@westernlaw.org
Ph: (503) 914-1323
Fax: (541) 485-2457

KRISTEN L. BOYLES (WSB #23806)
TODD D. TRUE (WSB #12864)
*Applications pro hac vice pending*
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA.  98104
kboyles@earthjustice.org
ttrue@earthjustice.org
Ph: (206) 343-7340
Fax: (206) 343-1526

*Attorneys for Plaintiffs Pacific Rivers, Cascadia
Wildlands, Coast Range Association, Klamath-
Siskiyou Wildlands Center, Oregon Wild, and The
Wilderness Society*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRCP 7.1, Plaintiffs state that they have not issued shares to the public and have no affiliates, parent companies, or subsidiaries issuing shares to the public.

Respectfully submitted this 8th day of August, 2016.

   /s/ Susan Jane M. Brown

SUSAN JANE M. BROWN, OSB #054607
Western Environmental Law Center
4107 NE Couch St.
Portland, OR.  97232
brown@westernlaw.org
Ph: (503) 914-1323
Fax: (541) 485-2457

KRISTEN L. BOYLES (WSB #23806)
TODD D. TRUE (WSB #12864)
***Applications pro hac vice pending***
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA.  98104
kboyles@earthjustice.org
ttrue@earthjustice.org
Ph: (206) 343-7340
Fax: (206) 343-1526