SUSAN JANE M. BROWN (OSB #054607)
brown@westernlaw.org
Western Environmental Law Center
4107 NE Couch St.
Portland, OR.  97232
(503) 914-1323 | Phone
(541) 485-2457 | Fax

KRISTEN L. BOYLES (WSB #23806)
*(Admitted Pro Hac Vice)*
kboyles@earthjustice.org
JAIMINI PAREKH (CSB #309983)
*(Admitted Pro Hac Vice )*
jparekh@earthjustice.org
TODD D. TRUE (WSB #12864)
*(Admitted Pro Hac Vice)*
ttrue@earthjustice.org
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA.  98104
(206) 343-7340 | Phone
(206) 343-1526 | Fax

*Attorneys for Plaintiffs*

THE HONORABLE JOLIE A. RUSSO

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| PACIFIC RIVERS, CASCADIA WILDLANDS, COAST RANGE ASSOCIATION, KLAMATH-SISKIYOU WILDLANDS CENTER, OREGON WILD, THE WILDERNESS SOCIETY, PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, INSTITUTE FOR FISHERIES RESOURCES, and UMPQUA WATERSHEDS,<br><br>                                    Plaintiffs,<br><br>        v.<br><br>U.S. BUREAU OF LAND MANAGEMENT; NATIONAL MARINE FISHERIES SERVICE; U.S. FISH AND WILDLIFE SERVICE; U.S. DEPARTMENT OF INTERIOR; | No. 6:16-cv-01598-JR<br><br>PACIFIC RIVERS *ET AL.* MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND DECLARATORY RELIEF |

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION

U.S. DEPARTMENT OF COMMERCE,

                                    Defendants,

and

ZUBER & SONS LOGGING, LLC;
TURNER LOGGING, INC.; ROSEBURG AREA
CHAMBER OF COMMERCE,

                        Defendant-Intervenors.

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

JURISDICTION ...................................................................................................................2

BACKGROUND ..................................................................................................................3

I.      THE NORTHWEST FOREST PLAN, ITS DEVELOPMENT, AND
        REQUIREMENTS....................................................................................................3

II.     THE CHALLENGED 2016 REVISED RMPS .........................................................6

STANDARD OF REVIEW ..................................................................................................7

ARGUMENT ........................................................................................................................7

I.      THE FEIS FAILED TO ANALYZE THE DIRECT, INDIRECT, AND
        CUMULATIVE EFFECTS OF SECEDING FROM THE NORTHWEST
        FOREST PLAN, IN VIOLATION OF NEPA. ........................................................7

II.     NMFS AND FWS VIOLATED THE ESA BY FAILING TO USE THE BEST
        AVAILABLE SCIENCE AND FAILING TO EXPLAIN THE DISREGARD OF
        THAT SCIENCE IN THEIR CONSULTATIONS. .................................................14

        A.      NMFS and FWS Previously Made No-Jeopardy Findings Based on Full
                Compliance with ACS Standards, Guidelines, and Objectives. ....................15

        B.      Court Decisions Affirmed that Projects Must Be Consistent with the ACS
                Objectives To Protect Salmonids from Jeopardy...........................................19

        C.      A Prior Agency Attempt to Weaken the ACS Was Held Unlawful. ..............21

        D.      NMFS and FWS 2016 Biological Opinions .................................................22

                1.      NMFS failed to explain why the agency departed from the
                        protections of the interagency Northwest Forest Plan. ....................22

                2.      NMFS improperly delayed consideration of impacts from
                        construction of new roads to future project specific consultations,
                        failing to consider all of the impacts of the revised RMPs. ...............27

                3.      NMFS determined that the revised RMPs will cause populations of
                        listed fish and habitat to slowly decline, reversing the upward trend
                        created by the interagency NWFP, yet failed to explain how this
                        trend will not harm salmon recovery. ..............................................29

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - i-

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

4.      FWS failed to explain why the agency departed from the
        protections of the interagency Northwest Forest Plan. .............................31

III.    THE REVISED RMPS VIOLATE THE O&C ACT. ......................................................32

CONCLUSION...........................................................................................................................35

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Cascadia Wildlands Project v. FWS,*
  No. CV-02-747-RE (D. Or. Aug. 7, 2002) ............................................................21

*Encino Motorcars, LLC v. Navarro,*
  136 S. Ct. 2117 (2016).........................................................................12, 34

*Federal Communications Comm. v. Fox Television Stations,*
  556 U.S. 502 (2009)............................................................................7, 22, 24

*Headwaters v. BLM, Medford District,*
  914 F.2d 1174 (9th Cir. 1990) ...............................................................33

*Humane Soc'y of the U.S. v. Locke,*
  626 F.3d 1040 (9th Cir. 2010) ...............................................................27

*Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983)...............................................................................7

*Oregon Nat. Res. Council Fund v. Brong,*
  492 F.3d 1120 (9th Cir. 2007) ...............................................................8

*Oregon Wild v. Shepard,*
  No. 09-0060-PK (D. Or.) (July 31, 2009).................................................2

*Organized Village of Kake v. U.S. Dep't of Agric.,*
  795 F.3d 956 (9th Cir. 2015) ...............................................................12, 22, 24, 27

*PCFFA v. NMFS* (*PCFFA I*),
  No. C97-775R, (W.D. Wash. May 29, 1998) ..........................................17, 21, 30,

*PCFFA v. NMFS (PCFFA II),*
  71 F. Supp.2d 1063 (W.D. Wash. 1999).................................................19, 20

*PCFFA v. NMFS* (*PCFFA III*),
  C00-1757R, Order (W.D. Wash. Dec. 7, 2000).........................................19

*PCFFA v. NMFS,*
  265 F.3d 1028 (9th Cir. 2001) ...............................................................20, 31

*PCFFA v. NMFS* (*PCFFA IV*),
  No. C04-1299-RSM (W.D. Wash. March 28, 2006).....................................21

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

*PCFFA v. U.S. Bureau of Reclamation*,
  426 F.3d 1082 (9th Cir. 2005) ...............................................................32

*Portland Audubon Soc'y v. Lujan*,
  712 F. Supp. 1456 (D. Or. 1989) .................................................9, 10, 14

*Portland Audubon Soc'y v. Lujan*,
  884 F.2d 1233 (9th Cir. 1989) ..................................................................9

*Portland Audubon Soc'y , v. Lujan*,
  795 F. Supp. 1489 (D. Or. 1992). ....................................................3, 5, 8, 9, 10

*Portland Audubon Soc'y v. Babbitt*,
  998 F.2d 705 (9th Cir. 1993) ....................................................................3
*PRC v. Shepard*,
  2011 WL 7562961 (D. Or. Sep. 29, 2011) *report and recommendation
  adopted as modified*, 2012 WL 90032 (D. Or. March 30, 2012)...........2, 6

*PRC v. Shepard*,
  No. 09-0058-ST (D. Or.) (Aug. 3, 2009) .................................................2

*Seattle Audubon Soc'y v. Evans*,
  771 F. Supp. 1081 (W.D. Wash. 1991),................................................3, 10

*Seattle Audubon Soc'y v. Evans*,
  952 F.2d 297 (9th Cir. 1991) ....................................................................3

*Seattle Audubon Soc'y v. Lyons*,
  871 F. Supp. 1291 (W.D. Wash. 1994),................................4, 8, 11, 13, 14, 33

*Seattle Audubon Soc'y v. Moseley*,
  80 F.3d 1401 (9th Cir. 1996) ....................................................................4

*Seattle Audubon Soc'y v. Moseley*,
  798 F. Supp. 1494 (W.D. Wash. 1992)................................................10, 11, 13

*Sierra Club v. Marsh*,
  816 F.2d 1376 (9th Cir. 1987) ................................................................15

*Tennessee Valley Auth. v. Hill*,
  437 U.S. 153 (1978).................................................................................15

*Washington Toxics Coalition v. Envtl. Prot. Agency*,
  413 F.3d 1024 (9th Cir. 2005) ................................................................15

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

**Statutes**

5 U.S.C. § 551(13) ..................................................................................................... 2

5 U.S.C. § 706(2)(A) .................................................................................................. 7

16 U.S.C. § 1536(a)(2) ........................................................................................ 15, 16

43 U.S.C. § 1181a ............................................................................................ 2, 32, 33

**Regulations**

50 C.F.R. § 402.14(a) ............................................................................................... 16

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - v-

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

# GLOSSARY

| | |
|---|---|
| ACS | Aquatic Conservation Strategy |
| AR | Administrative Record |
| BiOp | Biological Opinion |
| BLM | U.S. Bureau of Land Management |
| DEIS | Draft Environmental Impact Statement |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FEMAT | Forest Ecosystem Management Assessment Team |
| FWS | U.S. Fish and Wildlife Service |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NWFP | Northwest Forest Plan |
| O&C Act | Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937 |
| RMPs | Resource Management Plans |
| ROD | Record of Decision |

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

INTRODUCTION

In August 2016, the U.S. Bureau of Land Management ("BLM") issued revised Resource Management Plans ("RMPs") for the six forested BLM districts in southwestern Oregon. These 2.6 million acres of federal public land have been the focus of intense debate for decades. Governed in part under the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937 ("O&C Act"), a statute that focuses on sustainable forest production, protection of watersheds and stream flows, and local economic stability, these lands have been managed under the interagency science-based ecosystem management plan known as the Northwest Forest Plan ("NWFP") since 1994. The revised RMPs remove BLM lands from the NWFP; of particular concern are reductions in the size of riparian reserves and elimination of the NWFP's Aquatic Conservation Strategy ("ACS"), both of which are essential to the conservation and recovery of listed species and to protecting watersheds and stream flows.

The major flaw that runs through BLM's decision and the biological opinions on that decision is that the agencies treat the revised RMPs as if they are written on a blank slate. They are not. For years, the NWFP has set the management standards, guidelines, and objectives for U.S. Forest Service and BLM lands in the Pacific Northwest. While BLM has the ability to adopt new management rules for its districts, the National Environmental Policy Act ("NEPA") requires BLM to analyze the direct, indirect, and cumulative impacts of a decision to secede from the NWFP on the federal lands that remain under the NWFP. BLM failed to do so here.

Nor can the expert biological agencies, the National Marine Fisheries Service ("NMFS") and U.S. Fish and Wildlife Service ("FWS"), review the revised RMPs without acknowledging their own previous factual findings that the ACS remains the best available science and their conclusions that compliance with the ACS is necessary to avoid jeopardy and adverse modification of critical habitat under the Endangered Species Act ("ESA"). The challenged

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - 1-

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

biological opinions do not explain the reversal of expert agency opinion that the mandatory ACS objectives are necessary to fulfill the ESA's requirements.

Finally, the revised RMPs violate the O&C Act. The NWFP, with its complete ACS, complied with the O&C Act and met its requirements that the O&C Act lands be managed for sustained forest production <u>and</u> protecting watersheds <u>and</u> regulating stream flows <u>and</u> contributing to local economic stability. 43 U.S.C. § 1181a. The revised RMPs, however, eliminate provisions of the NWFP that have successfully protected watersheds and stream flows on O&C Act lands for decades in order to dramatically increase timber harvest, which BLM has acknowledged will increase community economic instability in contravention of the O&C Act.

Plaintiffs respectfully ask the Court to invalidate the agencies' decisions and reinstate the NWFP as the management plan for these federal forest lands.

## JURISDICTION

Plaintiffs challenge final agency actions as defined by the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(13). Plaintiffs' members regularly use and enjoy BLM lands covered by the challenged decisions. Each of these conservation and fishing organizations has a long and committed history of involvement with western Oregon public forestry issues, and many of these organizations were plaintiffs in prior litigation challenging land management decisions for this area. *See PRC v. Shepard*, 2011 WL 7562961, Report & Recommendation (D. Or. 2011), *adopted in part,* 2012 WL 950032 (D. Or. 2012), No. 12-35570, slip opinion (9th Cir. Mar. 1, 2013); *PRC v. Shepard*, No. 09-0058-ST (D. Or.) (stipulated dismissal without prejudice Aug. 3, 2009); *Oregon Wild v. Shepard*, No. 09-0060-PK (D. Or.) (stipulated dismissal without prejudice July 31, 2009). Plaintiffs and their members are harmed by the adoption and implementation of the revised RMPs and by the approval of the revised RMPs in the NMFS and FWS biological opinions. The injury to plaintiffs caused by BLM's violations of law can be remedied by the

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - 2-

relief sought in this action.  *See* Declarations of H. Michael Anderson, Francis Eatherington, Ronna Friend, Doug Heiken, Jonathan Kurtz, Joseph Patrick Quinn, George Sexton, Glen H. Spain, and Chuck Willer, filed concurrently.

## BACKGROUND

I.    THE NORTHWEST FOREST PLAN, ITS DEVELOPMENT, AND REQUIREMENTS.

In 1991, upon uncovering "a remarkable series of violations of the environmental laws," and "a deliberate and systematic refusal … to comply with the laws protecting wildlife," a federal district court issued an injunction halting timber sales in old-growth forests on Forest Service land in western Oregon and Washington.  *Seattle Audubon Soc'y v. Evans*, 771 F. Supp. 1081, 1089-90 (W.D. Wash. 1991), *aff'd*, 952 F.2d 297 (9th Cir.1991).  A similar injunction on BLM logging followed.  *Portland Audubon Soc'y v. Lujan*, 795 F. Supp. 1489 (D. Or. 1992), *aff'd sub nom. Portland Audubon Soc'y v. Babbitt*, 998 F.2d 705 (9th Cir. 1993) ("*Portland Audubon Soc'y II*").

These rulings, coming after years of controversy over management of old-growth forest habitat in the Pacific Northwest, required the Forest Service and BLM to develop interagency regional forest management standards and guidelines.  In April 1994, the Secretaries of Agriculture and Interior signed a record of decision adopting the Northwest Forest Plan ("NWFP") as the management plan for their lands in this region.  NWFP Record of Decision ("ROD") (Apr. 13, 1994), Administrative Record ("AR") IND 0326622-0326869.[1]

---

[1] Federal Defendants filed the searchable administrative record for this case on June 15, 2017.  It is divided into various parts, each with a separate index.  Plaintiffs provide the Bates-stamped number identification given each document by Federal Defendants for the initial citation to the document, and use the document's internal pagination thereafter.  Due to the AR's size and complexity, plaintiffs intend to file, as a courtesy, an excerpt of the cited documents with their summary judgment reply brief.

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - 3-

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

The NWFP contains standards and guidelines for managing both Forest Service and BLM lands (including lands now managed under the revised RMPs), creates old-growth and Riparian Reserves, institutes the ACS, and provides for continued timber harvest.  In upholding the NWFP's application to both the Forest Service and BLM, the district court held that "[g]iven the current condition of the forests, there is no way the agencies could comply with the environmental laws <u>without</u> planning on an ecosystem basis."  *Seattle Audubon Soc'y v. Lyons,* 871 F. Supp. 1291, 1311 (W.D. Wash. 1994), *aff'd sub nom. Seattle Audubon Soc'y v. Moseley,* 80 F.3d 1401 (9th Cir. 1996) (emphasis in original).  Of critical importance to this case, in upholding the NWFP, the district court cautioned that "[i]f the plan as implemented is to remain lawful, the monitoring, watershed analysis, and mitigating steps called for by the ROD will have to be faithfully carried out, and adjustments made if necessary."  *Id.* at 1322.

The court specifically addressed management of these BLM lands under the NWFP, holding that "in regard to the [O&C Act]" the NWFP "was a lawful exercise of the Secretary's discretion."  *Id.* at 1314.  As the record of decision for the NWFP explained, managing lands in a manner that results in ecosystem deterioration could result in listing of additional species under the ESA, a result that would "limit[] the O&C Lands Act's goal of achieving and maintaining permanent forest production."  NWFP ROD at 49-50.  The NWFP also found that protecting additional species "would contribute to the economic instability of local communities and industries, in contravention of a primary objective of Congress in enacting the O&C Lands Act." *Id.* at 50.  "Protection of watersheds and regulating streamflow are explicit purposes of forest production under the O&C Lands Act."  *Id*.

Indeed, the effectiveness and legality of the NWFP depends on its application to both Forest Service and BLM lands, making the NWFP a true "interagency plan."  *Portland Audubon*

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

*Soc'y II*, 795 F. Supp. at 1494-95.  The original biological opinion for the NWFP also required

"coordinated management direction for the lands administered by the Forest Service and BLM

within the range of the spotted owl [that will also] protect and enhance late successional and old-

growth forest ecosystems."  NWFP Biological Opinion at 2 (Feb. 10, 1994), AR FWS 049503-

049549.  The NWFP Biological Opinion made two key assumptions: (1) future actions on BLM

and Forest Service Lands would be consistent with the NWFP, and (2) "[r]iparian and Late-

Successional Reserves (LSRs) will retain reserve status and will not be available for timber

production other than as provided in [the Plan.]"  *Id.* at 4.

    While the NWFP was initially and primarily a conservation plan for the northern spotted

owl, the NWFP included the ACS to address the habitat needs of salmonids, clean water, and

other aquatic species on federal lands within the range of the owl.  The ACS aims to maintain

and restore the ecological health of watersheds and aquatic ecosystems on public lands through

four basic components: (1) a system of key watersheds or refugia comprising watersheds with

the best aquatic habitat or the greatest potential for recovering at-risk fish stocks; (2) riparian

reserves along streams where certain activities are constrained by enforceable standards &

guidelines; (3) watershed analysis to be used to tailor activities to specific watershed needs; and

(4) a comprehensive, long-term watershed restoration program.  NWFP ROD at B-12.

    The ACS establishes substantive protections for forests that benefit water quality in two

ways.  First, binding standards and guidelines restrict certain ground disturbing activities within

riparian reserves and key watersheds.  *See* NWFP ROD at, C-7, C-30 to C-38.  Second, to

constrain degrading cumulative impacts of activities throughout the watershed, the ACS includes

nine "maintain and restore" objectives requiring that all aquatic habitat be maintained and

restored to properly functioning conditions.  NWFP ROD at, B-9 to B-34.  The NWFP gave the

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - 5-

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

ACS objectives binding force and explicitly required that federal lands shall be managed to attain the ACS objectives. NWFP ROD at App. A, I, & B-1, B-9 to B-10; *see also id.* at B-11. "Management actions that do not maintain the existing condition or lead to improved conditions in the long term would not 'meet' the intent of the Aquatic Conservation Strategy and thus, should not be implemented." NFWP ROD at B-9 and B-10.

## II.   THE CHALLENGED 2016 REVISED RMPS

In 2008 and pursuant to a legal settlement agreement with the timber industry, BLM first promulgated a revision of its RMPs for the O&C Act lands. Those RMPs were vacated because BLM failed to consult with NMFS and FWS as required under the ESA. *PRC v. Shepard*, 2011 WL 7562961, Report & Recommendation (D. Or. 2011), *adopted in part,* 2012 WL 950032 (D. Or. 2012), No. 12-35570, slip opinion (9th Cir. Mar. 1, 2013). After another planning effort supported by an EIS, on August 5, 2016, BLM issued two separate Records of Decision ("RODs"), the Northwest and Coastal Oregon ROD and the Southwestern Oregon ROD, which are challenged in this action. *See* N.W. & Coastal Or. ROD & Res. Mgmt. Plan, (Aug. 2016), AR IND 0512693-0513012; S.W. Or. ROD & Res. Mgmt. Plan, (Aug. 2016), AR IND 0513013-0513344. These final actions collectively govern management decisions for the BLM Districts of Salem, Eugene, Roseburg, Coos Bay, and Medford, and the Klamath Falls Resource Area of the Lakeview District; BLM also issued the associated Final Environmental Impact Statement ("FEIS"). RMP FEIS 2016, AR IND 0514323-0513345.

The revised RMPs make many changes to the interagency NWFP, two of which are especially relevant to this action. First, the RMPs eliminate the nine Aquatic Conservation Strategy Objectives and the corresponding management requirements and limitations, which NMFS, FWS, and BLM (and the Forest Service) have consistently stated are the best available science and have a twenty-year track record of working to protect, restore, and recover listed

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - 6-

aquatic species, their habitat, and watersheds and stream flows.  Second, the revised RMPs

reduce the size of riparian reserves by more than half, RMP FEIS 2016 at 109, and permit

ground disturbing activities such as roadbuilding and logging in these areas, which was

prohibited or dramatically limited by the NWFP.  RMP FEIS 2016 at 93.

NMFS and FWS issued biological opinions for the revised RMPs on July 15, 2016, and

July 24, 2016, respectively, each concluding that implementation of the RMPs would not cause

jeopardy to any ESA-listed species or cause destruction or adverse modification of any

designated critical habitat for such a species.  AR FWS 082903-083297 (NMFS 2016 BiOp); AR

FWS 000001-001086 (FWS 2016 BiOp).

## STANDARD OF REVIEW

Under the APA, this Court must vacate the agency decisions if it finds the decision

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A).  Importantly, "an agency changing its course by rescinding a rule is obligated to

supply a reasoned analysis for the change beyond that which may be required when an agency

does not act in the first instance."  *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 42 (1983) (quotation omitted).  Moreover, federal action that silently departs from

prior policy is arbitrary and capricious.  *Federal Communications Comm. v. Fox Television

Stations,* 556 U.S. 502, 515 (2009).

## ARGUMENT

I.    THE FEIS FAILED TO ANALYZE THE DIRECT, INDIRECT, AND CUMULATIVE
      EFFECTS OF SECEDING FROM THE NORTHWEST FOREST PLAN, IN
      VIOLATION OF NEPA.

Under NEPA, BLM must consider the direct, indirect, and cumulative effects of its

planning decisions on federal and nonfederal actors and resources.  *Oregon Nat. Res. Council

Fund v. Brong*, 492 F.3d 1120, 1133–35 (9th Cir. 2007).  Over 25 years ago, this Court expressly

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

held that BLM's failure to assess the direct, indirect, and cumulative effects of its actions (or failure to act) on wide-ranging species such as the northern spotted owl violated NEPA. *Portland Audubon Soc'y II,* 795 F. Supp. at 1495.  To comply with NEPA, the O&C Act, and the ESA, BLM was initially required to manage its lands in coordination with the Forest Service. For the 2016 revised RMPs, BLM prepared a lengthy FEIS, yet BLM failed to assess the consequences of seceding from the NWFP.  Especially given its history, BLM cannot now eschew the NWFP without analyzing the impact on the lands managed by its former federal partner and non-federal land owners.  BLM has once again failed to comply with the law.

There are literally decades of court decisions and prior policies requiring BLM to plan together with the Forest Service for the management of these lands.  While the concept of planning across federal jurisdictions for an entire forested ecosystem was somewhat novel at the time in the Pacific Northwest, it was then—and remains today—the only scientifically based way in which complex, interrelated terrestrial and aquatic ecosystem can be conserved and managed at very large scales.  *Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. at 1310-11.  Indeed, "the courts have repeatedly encouraged the Forest Service, the BLM, and FWS to turn from disparate strategies for managing [old growth] forests to a cooperative approach."  *Id.*

Since the 1970s, scientists, BLM, and (later) the courts have consistently recognized BLM's unique obligation to consider the direct, indirect, and cumulative effects of its actions (or its failures to act, *Portland Audubon Soc'y II*, 795 F. Supp. at 1495) on the late-successional and old growth forest ecosystem that spans the range of the northern spotted owl, due primarily to the location of the O&C Act lands in southwest Oregon and the fragmented checkerboard ownership pattern of these lands.  *Portland Audubon Soc'y*, 712 F. Supp. 1456, 1479-80 (D. Or.), *aff'd in part, rev'd in part*, 884 F.2d 1233 (9th Cir. 1989) ("*Portland Audubon Soc'y I*") ("Because of

BLM's checkerboard land ownership pattern, it was recognized by BLM biologists in the late

1970's that to have some degree of a functioning ecosystem management strategy (that included

old-growth forest habitat) on the O & C forest lands in western Oregon would require some type

of corridor or linking of blocks of older forest habitat....  At this time BLM recognized that self-

sustaining populations of northern spotted owls could not be maintained exclusively on BLM

lands, however, that these lands had a vital role in the maintenance of spotted owls in western

Oregon, especially in the Coast Range Mountains.").  According to a 1987 BLM analysis on the

demography of the owl:

> The scattered nature and amount of BLM old-growth forest lands indicate actions
> BLM takes to maintain the spotted owl should be done in consort with other
> landowners.  Other agency land management actions may have a greater impact
> on maintenance of spotted owl populations, than will Bureau actions. Bureau
> lands may provide links between owl populations in the Coast and Cascade
> ranges, in northern California, and between Bureau lands and other ownerships....

*Id.* at 1474-76.

Despite BLM's acknowledgement that its lands play an indispensable role for terrestrial

and aquatic species and habitat conservation, in the 1980s and early 1990s the agency steadfastly

refused to work in concert with the Forest Service to develop a scientifically sound and legally

responsible conservation plan for the owl and the old growth forest ecosystems upon which it

depends prior to the implementation of the NWFP.  While the Forest Service—the land manager

responsible for management of most federal forestlands—began to prepare management

strategies to conserve the owl pursuant to court orders, that agency recognized that its own

efforts would be incomplete and ultimately ineffective and unlawful if BLM was not a co-

implementer of whatever strategy was adopted.  *Portland Audubon Soc'y II*, 795 F. Supp. at

1494 ("In May of 1990, the Interagency Scientific Committee issued its Final Report, in which it

concluded that the lack of consistent planning strategy has resulted in a high risk of extinction for

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - 9-

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

the northern spotted owl subspecies"); *id*. at 1510 (citing failed Forest Service-only conservation plan invalidated by *Seattle Audubon Soc'y v. Evans*).  The Interagency Scientific Committee report—one of the first plans to attempt to conserve the owl—expressly concluded that BLM's lack of coordination with the Forest Service undermined that agency's attempts to comply with the National Forest Management Act.  *Seattle Audubon Soc'y v. Evans*, 771 F. Supp. at 1092-93.

The failure of BLM to create a legally and scientifically adequate conservation plan in the 1980s put the Forest Service in an untenable position, given the scientific consensus that uncoordinated efforts to conserve the owl would be inadequate to prevent the extinction of the species.  *Seattle Audubon Soc'y v. Moseley*, 798 F. Supp. 1494, 1479-80 (W.D. Wash. 1992); *Portland Audubon Soc'y I,* 712 F. Supp. at 1470-71.  As experts at the time explained, while the Forest Service had a larger management role due to its larger acreage, BLM "will also have a particularly vital role to play.  Indeed, the completion of the habitat network critical to sustaining a proper distribution of the owls is heavily dependent on BLM lands in Oregon."  *Id.* at 1469.

Beyond the legal and ecological need for BLM to act in concert with the Forest Service to conserve listed species and their habitat, the courts have clearly explained that any deviation from an interagency conservation effort would necessarily cast substantial doubt on the agencies'—particularly the Forest Service's—ability to meet legal requirements for the conservation of wildlife.  For example, Judge Dwyer observed that due to BLM's decision to implement 13 timber sales in suitable northern spotted owl habitat, "the Forest Service's viability analysis [for the owl on national forests] will have to be reevaluated."  *Seattle Audubon Soc'y v. Moseley*, 798 F. Supp. at 1479-80.  Rather than conduct this stand-alone viability analysis, the Forest Service and BLM instead jointly promulgated the NWFP, which Judge Dwyer held met the requirements to conserve biodiversity incumbent upon both federal land management

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

agencies, but only by the slimmest of margins.  Judge Dwyer explained that "as written [the NWFP] is legally sufficient.  It remains, of course, to be carried out....  <u>If it is not funded, or not done for any reason, the plan will have to be reconsidered</u>."  *Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. at 1324 (emphasis added).  Consequently, BLM's actions concretely affected the legal obligations of its sister land management agency because both agencies manage a common resource (old growth forest ecosystems) that cross jurisdictional and political boundaries irrelevant to wide-ranging listed species such as the northern spotted owl and salmon.

It was this shared stewardship that rendered the NWFP legally and scientifically defensible.  The Washington district court explained that although adoption of the NWFP "mark[s] the first time that the Forest Service and BLM have worked together to preserve ecosystems common to their jurisdictions," "any more logging sales than the plan contemplates would probably violate the laws.  Whether the plan and its implementation will remain legal will depend on future events and conditions."  *Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. at 1300.

While the courts have concluded that the scientifically sound and legally responsible interagency NWFP met all legal requirements, plaintiffs recognize that it may not be the only plan that can achieve these objectives.  Federal agencies can change their positions or approaches to solving problems within their jurisdiction under certain circumstances.  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-27 (2016); *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966-70 (9th Cir. 2015).  It is doubtful BLM can move alone, however, as the courts have time and again expressed extreme skepticism that a conservation plan for the owl without both BLM and Forest Service participation would pass legal muster.  Moreover, BLM's solitary decision to secede from the NWFP affects many other landowners.  For example, the Washington Department of Natural Resources expressly relied upon the aquatic and terrestrial

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - 11-

protections of the interagency NWFP to authorize extensive logging on state-managed lands. *See* Washington Department of Natural Resources, *Forest Practices Habitat Conservation Plan Final Environmental Impact Statement* 5-12 – 5-15 (Nov. 15, 2017), https://www.dnr.wa.gov-/programs-and-services/forest-practices-/forest-practices-habitat-conservation-plan#FEIS (last visited Nov. 16, 2017).  Similarly, private industrial timberland owners in California have relied upon full implementation of the NWFP to conduct extensive logging and road building on their lands.  *See* NMFS and FWS, *Final Environmental Impact Statement for Authorization for Incidental Take and Implementation of Fruit Growers Supply Company's Multi-Species Habitat Conservation Plan* 5-15 – 5-18 (Nov. 15, 2017), https://www.fws.gov/yreka/Info/FGS_Final_-EIS_Vol_1.pdf (last visited Nov. 16, 2017).[2]  The courts have been clear that NEPA requires BLM to assess the environmental consequences of a departure from past practice, including on its federal partners and nonfederal actors, in part because those partners and actors have relied on BLM's contribution to conservation and recovery of imperiled species and their habitat through BLM's participation in the NWFP.

In *Moseley*, the courts rejected an EIS that failed to assess the direct, indirect, and cumulative environmental effects on national forestlands from BLM's failure to participate in a joint conservation effort to protect the spotted owl.  *Seattle Audubon Soc'y v. Moseley*, 798 F.

---

[2] "Implementation of the ACS on federal forests has become a foundational baseline component for attainment of salmonid recovery under the Endangered Species Act and of water quality standards under the Clean Water Act.  For example, federal ESA salmon recovery plans in Oregon and California rely heavily on Plan implementation.  Furthermore, because of the extent to which ACS implementation is widely assumed to represent the federal contribution to aquatic ecosystem conservation, the proposed changes in the DEIS have regulatory implications for nonfederal lands. … A fundamental alteration of the ACS potentially re-opens all such agreements across the region to cascading re-analysis and renegotiation, and the DEIS should acknowledge and fully address possible consequences for these affected parties, and inform the public and other agencies of this exigency."  NMFS DEIS Comment Ltr. at 8.

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - 12-

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

Supp. at 1478.  In contrast, the courts upheld the EIS supporting the NWFP because the "cumulative effects, including those in federal forests, those on nonfederal land, and those arising from nonfederal actions, are discussed in a six-page section of the FSEIS (at 3 & 4–4–10) and elsewhere in the document."  *Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. at 1323 (noting that "any action taken by Federal land managers has a large impact on [] spotted owl habitat" and concluding that management of owls by one federal partner that differs from other federal partners will affect the species range wide).

Here, the analysis underlying the revised RMPs explicitly does not contain such a cumulative effects discussion, explaining that "there is not a discrete and separate section labeled as cumulative effects" in the FEIS, and instead BLM focused its analysis on the effects of adopting the revised RMPs on its lands only.  RMP FEIS 2016 at 118-20.  Indeed, there is no analysis anywhere in the voluminous administrative record of how BLM's secession from the NWFP will affect lands managed by the Forest Service or private landowners who for decades have relied upon implementation of the interagency NWFP to meet their own legal obligations. AR IND 0156398 (BLM email correspondence with Forest Service stating that a comparison analysis of how the revised RMPs will affect national forestlands is "out of scope").  The lack of a cumulative effects analysis that examines how BLM's new approach to conserving species that depend on an entire ecosystem that spans multiple federal and nonfederal jurisdictions affects those other actors violates NEPA. *Portland Audubon Soc'y I*, 712 F. Supp. at 1479 (citing BLM conclusions offered during evidentiary hearing that "spotted owl viability cannot be met on BLM lands alone" to invalidate NEPA analysis of a prior go-it-alone approach).

BLM's secession from the interagency NWFP will have real effects on lands managed by parties other than BLM.  Among other consequences, the revised RMPs eliminate Adaptive

Management Areas designed to test critical assumptions of forest management; release BLM from interagency monitoring requirements the courts have held are required to meet a number of legal obligations, *Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. at 1306; absolve BLM from participation in the interagency Regional Interagency Executive Committee, which served the important policy objective of making "the federal government work together" in the public interest, NWFP ROD at 3; excuse BLM from seeking approval of the interagency Regional Ecosystem Office  for destructive post-fire logging in late-successional reserves; eliminate the Survey and Manage mitigation measures designed to protect rare species from ground disturbing activities; eliminate the ACS, which conserves listed and at-risk aquatic species; and eliminate key watersheds that protected unroaded values, among others.  And, because the interagency NWFP has been "the federal contribution to recovery" for more than 20 years, nonfederal actors have relied upon it to carry the bulk of species conservation efforts; now, that balance must be re-struck, and perhaps place greater obligations on nonfederal lands.  BLM never analyzed any of these effects the environment or on other federal and nonfederal land ownders, and this failure violated NEPA.

II.     NMFS AND FWS VIOLATED THE ESA BY FAILING TO USE THE BEST
        AVAILABLE SCIENCE AND FAILING TO EXPLAIN THE DISREGARD OF THAT
        SCIENCE IN THEIR CONSULTATIONS.

        Like BLM, when NMFS and FWS issued biological opinions on the revised RMPs, they were not writing on blank slates. Years of prior agency scientific factual findings, as well as Court opinions upholding that science, found that the NWFP ACS was not only the best available science, but also that compliance with it could be used as a surrogate for assessing jeopardy.  Yet the NMFS and FWS biological opinions read as if none of that history ever happened.  Indeed, as recently as one year prior to releasing its 2016 biological opinion, NMFS criticized BLM for moving away from the ACS and not adequately protecting fish and aquatic

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - 14-

habitat.  NMFS later approved these reduced protections without addressing its own prior findings and decisions; the agency's silence on issues of sufficient riparian widths, reducing or prohibiting management activities within riparian zones, and retaining the nine ACS objectives was deafening.

The U.S. Supreme Court has called the ESA "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).  The ESA reflects "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies."  *Id.* at 185.  For federal actions, the heart of the ESA is section 7(a)(2), which requires that every federal agency insure that its actions are not likely to "jeopardize" a listed species or "adversely modify" its critical habitat.  16 U.S.C. § 1536(a)(2).  The obligation to "insure" against a likelihood of jeopardy or adverse modification requires the agencies to give the benefit of the doubt to endangered species and to place the burden of risk and uncertainty on the proposed action.  *See Sierra Club v. Marsh*, 816 F.2d 1376, 1386 (9th Cir. 1987); *Washington Toxics Coalition v. Envtl. Prot. Agency*, 413 F.3d 1024, 1035 (9th Cir. 2005).  The formal consultation ends when NMFS or FWS issues a "biological opinion" that determines if the action is likely to jeopardize the species.  50 C.F.R. § 402.14(a).  In carrying out these duties, NMFS and FWS are required to use the best scientific information available.  16 U.S.C. § 1536(a)(2).

A.     <u>NMFS and FWS Previously Made No-Jeopardy Findings Based on Full Compliance with ACS Standards, Guidelines, and Objectives.</u>

While no aquatic species within the area of the NWFP were protected under the ESA at the time of its adoption, Umpqua cutthroat trout were listed as endangered in 1996.  On March 18, 1997, NMFS issued a biological opinion concluding that continued implementation of the forest plans as amended by the ACS components of the NWFP would not jeopardize survival

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

and recovery of Umpqua cutthroat trout. *See* 1997 NMFS Programmatic BiOp, AR IND 0050808-0050887. That biological opinion covered other salmon populations that were subsequently listed.

The 1997 Programmatic BiOp did not assess the impact of the NWFP on particular fish populations. Instead, it considered generally whether implementation of the Plan would maintain or restore properly functioning aquatic habitat so as to provide for salmonids' biological requirements. The 1997 Programmatic BiOp established three criteria that must be satisfied to meet this goal and avoid jeopardy:

> (1) essential components of [Land and Resource Management Plans] and [Resource Management Plans], including [Aquatic Conservation Strategy] objectives, watershed analysis, restoration, land allocations, and standards and guidelines, will be fully applied at the four spatial scales of implementation (region, province, watershed, and site or projects); (2) management actions will comply with all applicable land allocations and standards and guidelines; and (3) management actions will promote attainment of ACS objectives.

1997 NMFS Programmatic BiOp at 38.

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

According to NMFS, it was not enough that the proposed action be in compliance with the ACS standards and guidelines, the objectives had to be incorporated as well. *Id*. at 26 ("[A]pplication of the standards and guidelines alone may not always guarantee that all management decisions had to be fully consistent with the ACS objectives."). Moreover, future site-specific actions "must be consistent with the ACS objectives. Compliance with these ACS objectives is not left to chance or to the discretion of individual land managers." 1997 NMFS Programmatic BiOp at 24. Only "[i]mplementation of actions consistent with the ACS objectives and components" would provide "high levels of aquatic ecosystem understanding, protection, and restoration for aquatic-dependent species." *Id*. at 44-45.

A Washington district court decision confirmed that NMFS could validly make compliance with ACS objectives as the ESA standard for future site-specific projects. The district court accepted the agencies' representations that "before a project can proceed, USFS and BLM must find that the actions either meet, or do not prevent attainment of, the ACS objectives. The finding must be supported by an analysis of how the proposed management action will maintain the existing condition or restore it." *PCFFA v. NMFS*, No. C97-775R, May 29, 1998 Amended Order at 29 (W.D. Wash.) ("*PCFFA I*").

FWS followed NMFS's lead several years later. In May 2000, FWS issued a programmatic biological opinion concluding that continued implementation of the forest plans as amended by the ACS would not jeopardize survival and recovery of listed bull trout populations. 2000 FWS Programmatic BiOp, FWS AR 083963-084076. Like the NMFS 1997 Programmatic BiOp, FWS based its 2000 opinion on the assumption that "[a]ll action in watersheds containing bull trout should be consistent with the appropriate ACS objectives of the NFP." 2000 FWS Programmatic BiOp at 48; *see also id*. at 49 ("The USFS and BLM management activities are

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

directed to be consistent with the nine ACS objectives.  Consequently, the USFS and BLM must manage the riparian-dependent resources to maintain the existing condition or implement actions to restore conditions."); *id*. at 50 ("[O]nly those actions which do not retard or prevent attainment of ACS objectives should be implemented (ROD, page B-10)").

Along with their 1997 and 2000 biological opinions, NMFS and FWS issued incidental take statements, which authorized the "take" of listed fish species during forest plan implementation, subject to reasonable and prudent measures and mandatory terms and conditions.  A reasonable and prudent measure deemed "necessary and appropriate" to minimize take required that the Forest Service and BLM "shall apply the review criteria described on pages B-9 and B-10 of the NFP ROD to ensure that proposed actions are fully consistent with applicable standards and guidelines and ACS objectives."  1997 NMFS Programmatic BiOp at 63; 2000 FWS Programmatic BiOp at 84 (same).

One of the mandatory terms and conditions requires that "[t]o ensure that proposed actions designed in accordance with relevant standards and guidelines are in fact consistent with the [ACS] objectives, USFS and BLM decision makers will apply the results of watershed analysis and other relevant information to reach findings that actions either 'meet' or 'do not prevent attainment' of the ACS objectives." 1997 NMFS Programmatic BiOp at 66; 2000 FWS Programmatic BiOp at 86.  The term and condition further recognized that "[m]anagement actions that do not maintain the existing condition or lead to improved conditions in the long term would not 'meet' the intent of the Aquatic Conservation Strategy and thus should not be implemented." NWFP ROD at B-10.

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - 18-

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

B.   <u>Court Decisions Affirmed that Projects Must Be Consistent with the ACS
Objectives To Protect Salmonids from Jeopardy.</u>

When NMFS began addressing specific timber sales, however, the shell game began.

NMFS issued a series of site-specific biological opinions on timber sales and other actions that

were tiered to the 1997 NMFS Programmatic BiOp, but failed to ensure compliance with the

ACS objectives.  Analyses prepared by the Forest Service and BLM for those timber sales

revealed that much of the existing habitat was either not properly functioning or at risk, and that

proposed sales, which included extensive clearcutting, would further degrade some aquatic

habitat or merely maintain habitat that was not properly functioning or at risk.  The biological

opinions, however, uniformly reached the conclusion that the projects were not likely to

jeopardize the survival of endangered Umpqua cutthroat trout.

In subsequent legal challenges, the Washington district court held that NMFS acted

arbitrarily, capriciously, and contrary to the best available science by requiring compliance with

the ACS only at the watershed scale, and only over the long-term.  *PCFFA v. NMFS,* 71 F.

Supp.2d 1063 (W.D. Wash. 1999) ("*PCFFA II*").  The court granted an injunction invalidating

20 NMFS biological opinions because NMFS "(1) failed to measure impacts at the site specific

scale, instead of reviewing for compliance with ACS guidelines on a watershed level; [and] (2)

ignored short term effects that would not be measurable ten or more years after the action."

*PCFFA v. NMFS*, C00-1757R, Order at 7 (W.D. Wash. Dec. 7, 2000) ("*PCFFA III*").

Based on the report issued by the Forest Ecosystem Management Assessment Team

("FEMAT")[3] and the 1997 Programmatic BiOp, both of which stressed that the ACS must be

---

[3] The FEMAT report was authored by hundreds of expert scientists from BLM, Forest Service,
National Park Service, Environmental Protection Agency, FWS, NMFS, and several universities;
it provided the scientific underpinning for the NWFP.  FEMAT assessed ecological, economic,
and social conditions of federal forests within the range of the owl, and evaluated 48 options to
conserve the species and its habitat, closely analyzing 10 of these options.  FEMAT found that

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - 19-

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

implemented at four spatial scales ranging from the project to the region, the court held that each

project must also be consistent with the ACS objectives.  71 F. Supp.2d at 1069.

The Ninth Circuit affirmed, holding that viewing compliance with the ACS mandate to

maintain and restore aquatic ecosystems only at the watershed scale "does not prevent site

degradation and does nothing to restore habitat over broad landscapes if it ignores the cumulative

effects of individual projects on small tributaries within watersheds."  *PCFFA v. NMFS,* 265

F.3d 1028, 1036 (9th Cir. 2001).  NMFS was not "free to ignore site degradations because they

are too small to affect the accomplishment of that goal at the watershed scale."  *Id*. at 1035.

The Ninth Circuit also held that NMFS cannot limit its assessment to "only degradations

that persist more than a decade … This generous time frame ignores the life cycle and migration

cycle of anadromous fish.  In ten years, a badly degraded habitat will likely result in the total

extinction of the subspecies that formerly returned to a particular creek for spawning."  *Id*. at

1037.  The Ninth Circuit further stated that "NMFS does not and cannot explain adequately its

disregard of short-term effects … Given the importance of the near-term period on listed species

survival it is difficult to justify NMFS's choice not to assess degradation over a time frame that

takes into account the actual behavior of the species in danger."  *Id*. at 1038.

In 2002, this Court issued a similar decision holding that FWS biological opinions for

particular timber sales in bull trout habitat on the Willamette National Forest failed to ensure that

the sales were consistent with the ACS objectives as required by the terms and conditions of the

incidental take statement, particularly in light of acknowledged sedimentation of bull trout

---

riparian reserves were not enough to protect aquatic ecosystems and needed additional watershed
analysis and objectives to protect and restore habitat to meet scientific muster.

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - 20-

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

habitat from road construction and road densities. *Cascadia Wildlands Project v. FWS*, No. CV-02-747-RE (D. Or. Aug. 7, 2002).

     C.     <u>A Prior Agency Attempt to Weaken the ACS Was Held Unlawful.</u>

     After the original series of *PCFFA* cases, the Forest Service and BLM moved to amend the ACS to eliminate the requirement that each action proceeding under the NWFP will meet, attain, not retard, or not prevent attainment of the ACS objectives. NMFS and FWS both issued no-jeopardy biological opinions on the ACS Amendment. Both were challenged by conservation groups because they reversed the positions taken by NMFS and FWS in their previous biological opinions without an adequate explanation; they deviated from the best available scientific information in FEMAT and the ACS; and they punted to subsequent site-specific NEPA analyses and ESA § 7 consultation, which are inadequate substitutes for ensuring at the plan level that plan implementation will avoid jeopardizing listed salmonids and bull trout or adversely modifying their critical habitat.

     The district court agreed and set aside the ACS Amendment. *See PCFFA v. NMFS,* No. C04-1299-RSM, Report and Recommendation (W.D. Wash. March 28, 2006), *adopted in part,* 482 F. Supp. 2d 1248 (W.D. Wash. 2007) ("*PCFFA IV*"). First, the court found that reliance on future site-specific ESA consultations could not validly replace the need to fully assess cumulative impacts during broader, programmatic consultation. *PCFFA IV*, slip op. at 18-22. Second, the court held that the Services departed from the best available science embodied in FEMAT and past biological opinions without a sound basis or rational explanation. Slip op. at 26-27. The court noted that an agency was free to take a different approach during consultation, but it could not do so without reasoned explanation, which NMFS and FWS failed to supply. *Id.* Here, not only have NMFS and FWS approved revisions that reject the ACS objectives and punt review of harmful impacts to later site-specific consultations, as with the invalid ACS

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

Amendments, but the revised RMPs cut in half the size of protected riparian reserves and allow

logging within those curtailed areas.  As in *PCFFA IV,* this Court should reject the 2016

biological opinions as arbitrary, capricious, and contrary to the best available science.

      D.      <u>NMFS and FWS 2016 Biological Opinions</u>

The NMFS and FWS 2016 Biological Opinions read as if none of the preceding years of

biological opinions and case law emphasizing the critical role of the ACS to protection of native

fish and aquatic habitat ever existed.  Despite stating for years that FEMAT and the ACS

constitute the best available science for protecting fish from habitat degrading logging, federal

Defendants discarded the interagency NWFP and the ACS without explanation.  Despite the

length of the new biological opinions, they both fail to grapple with the dramatic change in

agency policy away from the NWFP, nor do they explain how FEMAT and the ACS, as the best

available science, is adequately replaced by BLM's new approach.

Government action that departs from prior findings *sub silentio* is arbitrary and

capricious.  *Fox Television,* 556 U.S. at 515.  "Unexplained inconsistency between agency

actions is a reason for holding an interpretation to be an arbitrary and capricious change."

*Village of Kake,* 795 F.3d at 966 (quotation omitted).  An agency violates the APA if it "ignores

or countermands its earlier factual findings without reasoned explanation for doing so."  *Fox*

*Television,* 556 U.S. at 537 (Kennedy, J. concurring); *Village of Kake,* 795 F.3d at 966.

      1.      *NMFS failed to explain why the agency departed from the protections of*
                    *the interagency Northwest Forest Plan.*

Beginning with its 1997 Programmatic BiOp, NMFS reached a no-jeopardy conclusion

only because the Forest Service and BLM both expressly promised that each project proceeding

under the NWFP would be fully consistent with the ACS objectives:  NMFS expressly wrote this

requirement into the binding conditions of its 1997 programmatic incidental take statement.  The

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

NMFS biological opinion on the revised RMPs ("NMFS 2016 BiOp") reverses this prior requirement and eliminates the ACS objectives from both mandatory aquatic conservation measures and from the incidental take statement.  *See* NMFS 2016 BiOp at 42-45, 334-343, AR FWS 082952-082955, 083244-083253.  "[I]mplement[ing] Recovery Plans for listed species within the Action Area" is relegated to a mere "conservation recommendation," a discretionary measure to avoid impacts to federally-listed species or critical habitat.  NMFS 2016 BiOp at 343-344.  Furthermore, the revised RMPs halve the size of riparian reserves established as a standard under the ACS and allow logging within the smaller riparian reserves.

Riparian reserves are a vital part of the ACS's aquatic habitat conservation scheme. Beyond protecting fish-bearing streams, "[r]iparian reserves are used to maintain and restore riparian structures and functions of intermittent streams, confer benefits to riparian-dependent and associated species other than fish, enhance habitat conservation for organisms that are dependent on the transition zone between upslope and riparian areas, improve travel and dispersal corridors for many terrestrial animals and plants, and provide for greater connectivity of the watershed.  The Riparian Reserves will also serve as connectivity corridors among the Late-Successional Reserves."  NWFP ROD, B-13.

As areas where logging and land-disturbing activities are generally not allowed, riparian reserves protect fish habitat, water quality, stream flows, sediment filtering, and wood recruitment.  NMFS DEIS Comment Ltr. at 3.  NMFS expressed great concern over BLM's proposal, now adopted, to shrink riparian reserves and allow timber harvest within them.  "Very few of the many completed watershed analyses offered a scientific rationale for reducing default Riparian Reserve areas in any location; a larger number identified site-specific reasons to expand Riparian Reserves beyond the specified default widths (Pacific Rivers Council 2008).  The DEIS

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

should explain the basis for concluding that smaller Riparian Reserves are adequate when

FEMAT and the subsequent accumulation of scientific evidence suggests otherwise." *Id.* at 9.

Despite this criticism, in the final 2016 biological opinion, NMFS fails to explain why the

agency is diverging from its prior finding that the ACS standards, guidelines, and objectives

embody the best available science and a necessary reasonable and prudent measure to guard

against jeopardy to listed salmonids. *See* NMFS 2016 BiOp at 1-348. Neither the ACS nor its

objectives or standards and guidelines are even mentioned in the NMFS 2016 BiOp. The NMFS

BiOp mentions the NWFP on three pages in passing, but does not describe why NMFS is

reversing its prior findings. NMFS 2016 BiOp at 54, 168, 174. Indeed, NMFS expressly states

that "[w]e are not comparing the proposed action to the NW Forest Plan." AR NMFS1 0003949

(internal email correspondence). And, in the section regarding riparian reserves and proposed

aquatic conservation measures, NMFS does not analyze anticipated impacts from reduction in

stream protections. *See* NMFS 2016 BiOp at 25-42. And there is absolutely no analysis of how

eschewing the ACS on O&C Act lands will affect salmonids and their habitat on Forest Service

lands or nonfederal lands.

This silence and lack of explanation is arbitrary and capricious. NMFS has not displayed

awareness that it is changing position nor has it provided "good reasons for the new policy,

which … must include a reasoned explanation … for disregarding facts and circumstances that

underlay or were engendered by the prior policy." *Village of Kake,* 795 F.3d at 966 (quotations

omitted). Where a "new policy rests upon factual findings that contradict those which underlay

its prior policy," an agency must provide "more detailed justification than what would suffice for

a new policy created on a blank slate." *Fox Television,* 556 U.S. at 515.

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - 24-

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

NMFS's silence regarding its departure from the NWFP and ACS is also a stunning reversal from the comment letter NMFS submitted on the Draft Environmental Impact Statement ("DEIS") for the proposed RMPs barely a year earlier.[4]  NMFS DEIS Comment Ltr., AR NMFS1 0003092-0003151.  In the letter, NMFS raised concerns that the DEIS lacked a scientific basis to conclude that the "proposed, substantially smaller Riparian reserves and the proposed increased timber harvest activities within the smaller Reserves are sufficient for the needs of salmon and other riparian-dependent species." *Id.* at 6.  NMFS elaborated:

> Although the DEIS proposes substantial reductions in Riparian Reserves and other protections [], the DEIS paradoxically concludes that for many parameters related to riparian and aquatic ecosystem conservation [the proposed action] . . . will have no effect[.] . . . The basis for this rather counterintuitive conclusion is unclear, and at variance with numerous published scientific findings, including the vast body of scientific literature that was used in the original development of the Riparian Reserve and Key Watershed systems[.]

*Id.* at 5 (citing FEMAT 1993). NMFS raised alarm that:

> Unexplained in the DEIS is the scientific basis for concluding that the proposed, substantially smaller Riparian Reserves and the proposed increased timber harvest activities within the smaller Reserves are sufficient for the needs of salmon and other riparian-dependent species. … The DEIS is (implicitly) making an extraordinary claim: that the FEMAT science team (and the Federal courts) were in error, and that up to 81% of the existing Riparian Reserve network can be opened for substantially increased levels of timber harvest. … It is an axiom in science that extraordinary claims require extraordinary proof, yet the DEIS provides little data or even logical cohesion in support of this <u>extraordinary shift</u> in fundamental scientific assumptions.

*Id.* at 6 (emphasis added).

---

[4] Until the 2016 BiOp, NMFS consistently backed the necessity of the ACS objectives.  In its comments on the draft EIS for the 2008 RMP revisions, NMFS found that the plan's riparian management strategy "would not adequately maintain and restore the riparian and aquatic habitat conditions and processes that are critical to the conservation of anadromous fish," and NMFS criticized BLM's models, assumptions, and chosen scale of analysis. NMFS DEIS Comment Ltr., AR NMFS1 0003093.

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - 25-

The NMFS comment letter opined that the larger riparian reserves required by the interagency NWFP "were developed by a broad group of scientists and reflected the general scientific consensus at the time as to the level of protection needed for the recovery of salmon over a 100-year time frame." *Id.* Measures less protective than the NWFP, but more protective than the riparian reserves proposed in the RPMs, "were rejected as inadequate." *Id.* "Since that time, the scientific consensus has not changed, and available evidence suggests that implementation of the NWF Plan has in fact resulted in slowly improving habitat conditions for salmonids." *Id.*

NMFS recommended adopting mandatory aquatic habitat goals, similar to the NWFP:

> The selected alternative in the FEIS <u>should include mandatory standards and guidelines to set sidebars for individual actions</u>. Management activities should be constrained under the standards and guidelines depending on whether they would contribute to or delay attainment of the aquatic habitat objectives <u>similar to those identified in the nine objectives of the aquatic conservation strategy of the Northwest Forest Plan.</u>

NMFS DEIS Comment Ltr. at 3 (emphasis added). Four months later, in a "letter of clarification," NMFS explained that it "clearly endorsed" the riparian reserve standard from the NWFP, but a smaller riparian reserve might also protect salmonids if coupled with measures to protect ecological function. AR NMFS1 0003946-0003948. In this letter, NMFS expressed that it "expects that BLM's [new aquatic conservation strategy] will contain components with objectives aligned with the four components of the ACS of the Northwest Forest Plan[.] . . . NMFS expects that BLM will draw on the experience of the NWF Plan, new technologies, and adapting science <u>to develop revised ACS components with objectives similar to those in the [NWF Plan] ACS</u>." AR NMFS1 0003946 (emphasis added). While NMFS's expectations remained unmet, by the time the agency issued its 2016 biological opinion, it had dropped the requirement for "ACS components with objectives." This change, without explanation, is

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - 26-

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

arbitrary and capricious.

Factual findings in earlier environmental analyses are "relevant data," and it is "incumbent on the agency to offer a satisfactory explanation for its decision in light of the earlier findings." *Humane Soc'y of the U.S. v. Locke,* 626 F.3d 1040, 1051 (9th Cir. 2010) (quotation omitted). The record here has no "satisfactory explanation." Despite making the above statements in official letters, the NMFS 2016 BiOp jettisons the nine ACS objectives. *See* NMFS 2016 BiOp at 42-45 (no mention of ACS objectives in "aquatic conservation measures"). As the Ninth Circuit held in *Village of Kake*, it is arbitrary and capricious to fail to explain "why an action that it found posed a prohibitive risk" in a previously issued decision, "now merely poses a minor one." 795 F.3d at 969.

NMFS's no-jeopardy conclusion and elimination of the prior mandatory conditions are arbitrary, capricious, contrary to the evidence in the record, and an unexplained and unjustifiable departure from NMFS's prior determinations. NMFS fails to explain how, in light of anticipated substantial increases in logging next to streams and rivers, this dramatic departure from the interagency NWFP's successful ecosystem management approach will nevertheless protect salmonid species and water quality on O&C Act lands, national forestlands managed by the Forest Service, and nonfederal lands reliant on the interagency NWFP.

> 2. *NMFS improperly delayed consideration of impacts from construction of new roads to future project-specific consultations, failing to consider all of the impacts of the revised RMPs.*

The NMFS 2016 BiOp acknowledges that the revised RMPs will adversely affect listed aquatic species in a number of ways. NMFS 2016 BiOp at 241, 242, 266, 270, 276 (temperature increases); 243-244, 266, 276 (woody debris reductions); 244 (peak flow increases). Chinook salmon, coho salmon, and steelhead at all life stages will likely be adversely impacted as a result. *Id.* at 245, 266. All species will be exposed to increased sediment as a result of activities undert

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - 27-

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

the revised RMPs, including new road construction.  *Id.* at 246, 266.  "Sediments derived from roads is the greatest source of fine sediments."  *Id.* at 247.

"Roads are ecologically problematic in any environment because they affect biota, water quality, and a suite of biophysical processes through many physical, chemical, and biological pathways."  NMFS DEIS Comment Ltr. at 33.  Density of spawning coho is negatively associated with road density.  *Id.*  High levels of suspended sediment are lethal to salmonids, and lower levels can cause chronic sub-lethal effects.  NMFS 2016 BiOp at 249.  "The magnitude of existing road impacts on watersheds and streams on federal lands in the [Pacific Northwest] may equal or exceed the effect of all other activities combined."  NMFS DEIS Comment Ltr. at 33.

The ACS objectives, which required BLM to "maintain and restore" the physical and biological features of aquatic ecosystems, discouraged locating roads in riparian reserves, required that roadless areas be maintained, and prohibited a net increase in roads in Key Watersheds.  NMFS DEIS Comment Ltr. at 33; NWFP ROD at B-11, B-19.  The ACS restricted timber harvest within riparian areas, minimizing sediment generating activities near streams.

NMFS failed to impose reasonable and prudent measures to restrict construction of roads in riparian reserves, despite finding that salmonids will be adversely affected by temperature increases, sediment delivery into streams, storm contaminants, reduction in woody debris, and changes in stream flow caused by new road construction.  Yet, at the same time, NMFS found the impact of roads on listed fish to be so significant that it chose miles of road (paved and unpaved) as a proxy for take.  NMFS 2016 BiOp at 338.  However, in measuring take, NMFS focuses solely on existing roads, and does not require reporting of construction of new roads.  *Id.* at 340 ("[T]he incidental take exempted in this Opinion relates to use of existing roads[.]") (emphasis added).  NMFS delayed issuing a take statement for new roads to future project

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - 28-

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

specific consultation processes.  *Id.* at 340-41 ("New roads and sites are addressed at a

framework programmatic level in this Opinion: specific actions will be subject to future ESA

consultation obligations[.]").  Yet without the sideboards of the ACS objectives, there is no way

to ensure that future site-specific consultations will be adequate.  While NMFS previously

commanded that "[c]ompliance with these ACS objectives" cannot be "left to chance or to the

discretion of individual land managers," 1997 Programmatic BiOp at 24, the NMFS 2016 BiOp

allowed just that.

    Based on the administrative record, it is clear that incidental take of listed species from

construction of new roads was wholly excluded from the incidental take analysis, and that NMFS

did not impose any reasonable and prudent measures or mandatory conditions on the revised

RMPs to restrict construction of new roads in riparian reserves.  *See* NMFS 2016 BiOp at 341-

43.  By delaying consultation for new road constructions to future, project specific consultations,

NMFS arbitrarily dilutes the serious impacts of roads to insignificance and necessarily fails to

address the combined impacts of old and new roads across the landscape.

> 3.    *NMFS determined that the revised RMPs will cause populations of listed fish and habitat to slowly decline, reversing the upward trend created by the interagency NWFP, yet failed to explain how this trend will not harm salmon recovery.*

    NMFS determined that the cumulative effects of the revised RMPs "will have a minor

negative effect on population abundance trends" and that "the quality and function of critical

habitat [physical or biological features]" will generally express a minor negative trend over time.

NMFS 2016 BiOp at 322.  Yet the extinction risk for most salmonid species in the planning area

is high to very high, indicating that continued persistence of these species is precarious at best.

NMFS 2016 BiOp at 324.  NMFS found that a gradual positive trend was possible depending on

the balance between habitat restoration and protection and economic activities; however, it

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - 29-

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

imposed no sideboards to avoid an appreciable reduction in the likelihood of the species'

recovery, or to ensure that habitat restoration actually occurs.  NMFS 2016 BiOp at 322, 341-43.

Despite finding that listed fish populations and their habitat will decline over the 50-year period

of RMP implementation, NMFS nevertheless issued a no jeopardy finding.  NMFS 2016 BiOp at

334; *see id.* at 54 (estimating impacts from 2013-63).  This is a significant, unexplained reversal

from the statement by NMFS in its 1997 programmatic biological that "[a]ny further degradation

of [] conditions is expected to have a <u>significant impact</u> due to the level of risk that listed,

proposed, and candidate salmonids presently face under the environmental baseline."  1997

NMFS Programmatic BiOp at 15 (citation omitted) (emphasis added).  This is precisely the same

situation that was presented in the *PCFFA* cases, *see supra,* where NMFS first determined that

habitat conditions were deteriorating, but found no jeopardy.  The district court rejected those

biological opinions, as should the Court here.

Moreover, NMFS never explains why the anticipated gradual decline in population and

aquatic habitat conditions under the revised RMPs does not cause jeopardy given the perilous

condition of these species.  The Biological Assessment prepared by BLM for its RMPs

acknowledged that over the last 20 years, implementation of the NWFP resulted in "statistically

significant improving trends in watershed yearly seven-day average water

temperatures…suggesting that Forest Management activities on Federal lands, …have not

resulted in water temperature increases in this timeframe."  AR FWS 006985.  The interagency

NWFP maintained stream condition and physical habitat, a success in light of the "diversity of

federal entities, public and private landowners as well as the multiple use mandates of land

management agencies."  AR FWS 006897.  Furthermore, "increases in macroinvertebrate

diversity and decreases in water temperatures" suggest an improvement and restoration of

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

aquatic habitats.  AR FWS 006897.  Given the highly precarious status of the species, the concern in 1997 that further degradation of salmon habitat would be unacceptable, and the evidence that the NWFP has avoided this gradual erosion of habitat conditions, NFMS' failure to explain why returning to a declining trend doesn't jeopardize listed species is arbitrary and capricious.

>    4.    *FWS failed to explain why the agency departed from the protections of the interagency Northwest Forest Plan.*

As with the NMFS 2016 BiOp regarding anadromous species, the FWS 2016 BiOp acknowledges that bull trout are listed as "endangered" in part because of habitat degradation including road construction and timber extraction.  FWS 2016 BiOp at 56, AR FWS 000093. FWS also determined that logging authorized by the revised RMPs would harm the ecological functioning of critical habitat across a range of indicators, but dismissed the impacts as short-term and insignificant.  FWS 2016 BiOp at 75-80, 86-88, 99, App. C at 128.

FWS cannot dismiss these impacts based on the notion of short-term pain for long-term good.[5]  As the Ninth Circuit held when reviewing the NMFS site-specific biological opinions discussed earlier, "[g]iven the importance of the near-term period on listed species survival it is difficult to justify NMFS's choice not to assess degradation over a time frame that takes into account the actual behavior of the species in danger."  *PCFFA v. NMFS,* 265 F.3d at 1038. Similarly, in a challenge to another biological opinion for impacts on coho salmon in the Klamath River, the appellate court again focused on the temporal aspect of the analysis in the

---

[5] "The guiding language in the nine narrative ACS objectives directs managers to "maintain and restore" specifically identified ecological conditions and functions.  Hence management activities that will affect aquatic ecosystems may be pursued only under a reasonable assurance that they are restorative or protective in nature.  It is not sufficient that management activities produce acceptably small adverse impacts, or cause harms that might potentially be mitigated by other measures."  NMFS DEIS Comment Ltr. at 8.

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - 31-

BiOp.  "An agency does not avoid the likelihood of jeopardy to a listed species when it disregards the life cycle of the species in crafting the measures designed to protect it.  Nor can the agency provide only partial protection for a species for several generations without any analysis of how doing so will affect the species.  *PCFFA v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1094 (9th Cir. 2005).

When describing the proposed action, the FWS 2016 BiOp neither acknowledges nor analyzes the impacts to listed species as a consequence of the revised RMPs' elimination of the ACS objectives or the reduction of the riparian reserve buffer distances proscribed by the NWFP. FWS 2016 Biop at 2-30.  The BiOp recognizes that the ACS "should be considered successful" because riparian conditions in bull trout habitat have incrementally improved over the last twenty years, including increases in macroinvertebrate diversity and decreases in water temperatures. *Id.* at 74.  The BiOp also states that the ACS was developed to halt aquatic degradation, and "over the span of several decades (20-100 years), restore ecological processes." *Id.*  But despite acknowledging the successes of the Aquatic Conservation Strategy and the NWFP, the FWS 2016 BiOp fails to disclose and analyze the biological consequences on listed aquatic species of BLM's departure from the NWFP or how eliminating these protections will affect federally listed aquatic species.  *Id.* at 35-101.

III.    THE REVISED RMPS VIOLATE THE O&C ACT.

The Oregon and California Lands Act of 1937, 43 U.S.C. § 1181a, marks Congress' first multiple-use mandate for federal public forestland management.  The O&C Act lands are the only forested public lands in the United States that are managed by BLM rather than the Forest Service for the purposes of

> permanent forest production, and the timber thereon shall be sold, cut, and removed in conformity with the principal [sic] of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds,

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - 32-

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facilities.

*Id.* § 1181a.  Contrary to the view of some, the O&C Act is not a "timber first and always" statute, but rather a multiple use law that requires BLM to meet a number of conservation objectives.  *Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. at 1314 ("Decisions more recent than *Headwaters [v. BLM, Medford District*, 914 F.2d 1174 (9th Cir.1990)] confirm that in managing the O&CLA lands the BLM must fulfill conservation duties imposed by other statutes" such as the ESA and NEPA).

The riparian reserves adopted in 1994 by the interagency NWFP were required to meet a wide variety of ecological objectives, including those set by the O&C Act, that must still be met by the revised RMPs.  Among other actions, the revised RMPs reduce the size of streamside buffers, eliminate the requirement to meet ACS objectives, and abolish Key Watersheds for salmon recovery and municipal drinking water.  These actions, individually and together, will cause increased degradation of watersheds and stream flows, as well as impair the health of numerous species of fish and wildlife including a number of species either listed or proposed for listing under the ESA.  As discussed above, the revised RMPs greatly reduce stream buffers and eliminate the ACS objectives, leaving an important purpose of the O&C Act – the protection of watersheds and stream flows – inadequately addressed.  The failure to meet these purposes is not rationally explained in the FEIS or ROD.

BLM stated that revisions to its RMPs were necessary because "[t]here has been a substantial, long-term departure from the timber outcomes predicted under the 1995 RMPs" and "new scientific information and policies related to the northern spotted owl, including a revised Recovery Plan and a new designation of critical habitat."  June 2013 Purpose and Need Statement, AR IND 0289092-0289100, 0289095.  BLM made no mention of watersheds and

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - 33-

stream flows.  Instead, the revised RMPs will increase the amount of timber available to be

logged on these BLM lands by almost one-third—from 205 million board feet to 278 million

board feet.  RMP FEIS 2016 at 112, 351, 352, 355, 697.

The revised RMPs deviate from the carefully-crafted and judicially-approved NWFP

without adequate explanation.  *Encino Motorcars, LLC v. Navarro,* 136 S. Ct. 2117, 2126

(2016).  The revised RMPs do not offer a rational account for how they will fulfill BLM's legal

obligations to provide for the health, diversity, and productivity of these forest lands or how they

will protect watersheds without all the elements of the ACS.

In addition to the ecological impacts from BLM's secession from the NWFP, BLM has

acknowledged that increasing timber harvest on its lands will destabilize the local economies that

the O&C Act was expressly enacted to protect from such market vacillations.[6]  The FEIS for the

revised RMPs explains that "over the long-term (1969–2007), timber-based industries nationally

exhibited low or negative growth rates with high volatility compared with the United States

economy as a whole, indicating that these industries tend to be inherently volatile," RMPs FEIS

2016 at 698, and that

> Over six United States business cycles, the Forest and Wood Products Industries
> have grown slowly, and have shown a very high level of volatility (or instability).
> These commodity-based industries are subject to the highs and lows of business
> cycles not only in the United States, but also internationally....If industries
> increase that exhibit historic instability, they may inject greater economic
> instability into their host communities.

RMPs FEIS 2016 at 701. Indeed, BLM confirms that

---

[6] Deborah Scott & Susan Jane M. Brown, *The Oregon and California Lands Act: Revisiting the Concept of "Dominant Use"*, 21 J. Envtl. L. & Litig. 259, 272–77 fn. 98 (2006) (collecting legislative history of the O&C Act including testimony that "We want to know not only what happens to the soil, whether it remains productive or not, but also what is going to happen to the numerous communities whose livelihood is drawn mainly from the forest industry, and to the future of the thousands of workers whose job depends upon the forestry industry.")

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

Because the timber industry has a long, national history of high volatility, <u>alternatives and the Proposed RMP with harvest volumes that exceed current levels are likely to introduce greater instability into local economies</u>, based on past business cycles.  The expansion of existing timber-based corporations or the addition of new ones would bring additional jobs and earnings to the planning area, but could make the whole planning area more vulnerable to large fluctuations inherent in domestic and international timber markets.

RMPs FEIS 2016 at 702 (emphasis added).  While other non-consumptive economic drivers such as recreation may soften this volatility, "increases in timber industry activity in the planning area would bring potential for additional exposure to greater economic instability." *Id*. at 698.

Despite acknowledging that increasing timber harvest on its lands is likely to exacerbate already volatile economic conditions, BLM adopted RMPs that will facilitate increased timber harvest on O&C Act lands by as much as 73 million board feet, or 37 percent, as compared to current harvest levels. RMPs FEIS 2016 at 112, 351-353, 355, 679; AR IND 0023552 *33. BLM has failed to offer a rational explanation for why the revised RMPs, which will degrade watersheds, water quality, stream flows, and the health aquatic species, as well as increase economic instability in communities in Southwest Oregon, comply with the O&C Act.

CONCLUSION

For the reasons discussed above, plaintiffs ask the Court to grant their motion for summary judgment, vacate and remand the revised RMP RODs, vacate the NMFS and FWS biological opinions, and reinstate the Northwest Forest Plan, including its Aquatic Conservation Strategy on these BLM lands.

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

Respectfully submitted this 17th day of November, 2017.


/s/Kristen L. Boyles
KRISTEN L. BOYLES (WSB #23806)
kboyles@earthjustice.org
JAIMINI PAREKH (CSB #309983)
jparekh@earthjustice.org
(*Admitted Pro Hac Vice*)
TODD D. TRUE (WSB #12864)
ttrue@earthjustice.org
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
(206) 343-7340 | Phone
(206) 343-1526 | Fax

SUSAN JANE M. BROWN (OSB #054607)
brown@westernlaw.org
Western Environmental Law Center
4107 N.E. Couch Street
Portland, OR  97232
(503) 914-1323 | Phone
(541) 485-2457 | Fax

*Attorneys for Plaintiffs Pacific Rivers, Cascadia Wildlands, Coast Range Association, Klamath-Siskiyou Wildlands Center, Oregon Wild, The Wilderness Society, PCFFA, Institute for Fisheries Resources, and Umpqua Watersheds*

PACIFIC RIVERS MEMORANDUM IN SUPPORT OF
SUMMARY JUDGMENT MOTION - 36-

*Earthjustice*
*705 Second Ave, Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*