SUSAN JANE M. BROWN (OSB #054607)       THE HONORABLE JOLIE A. RUSSO
brown@westernlaw.org
Western Environmental Law Center
4107 NE Couch St.
Portland, OR.  97232
(503) 914-1323 | Phone
(541) 485-2457 | Fax

KRISTEN L. BOYLES (WSB #23806)
*(Admitted Pro Hac Vice)*
kboyles@earthjustice.org
JAIMINI PAREKH (CSB #309983)
*(Admited Pro Hac Vice)*
jparekh@earthjustice.org
TODD D. TRUE (WSB #12864)
*(Admitted Pro Hac Vice)*
ttrue@earthjustice.org
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA.  98104
(206) 343-7340 | Phone
(206) 343-1526 | Fax

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| PACIFIC RIVERS, CASCADIA WILDLANDS, COAST RANGE ASSOCIATION, KLAMATH-SISKIYOU WILDLANDS CENTER, OREGON WILD, THE WILDERNESS SOCIETY, PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, INSTITUTE FOR FISHERIES RESOURCES, and UMPQUA WATERSHEDS, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. BUREAU OF LAND MANAGEMENT; NATIONAL MARINE FISHERIES SERVICE; U.S. FISH AND WILDLIFE SERVICE; U.S. DEPARTMENT OF INTERIOR; U.S. DEPARTMENT OF COMMERCE, | No. 6:16-cv-01598-JR <br><br> PACIFIC RIVERS' *ET AL.* REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION

Defendants,

and

ZUBER & SONS LOGGING, LLC;
TURNER LOGGING, INC.; ROSEBURG AREA
CHAMBER OF COMMERCE,

Defendant-Intervenors.

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

ARGUMENT .......................................................................................................3

I.    NMFS AND FWS VIOLATED THE ESA BY FAILING TO USE THE BEST
      AVAILABLE SCIENCE AS EMBODIED IN THE ACS. ...............................................3

      A.    The Northwest Forest Plan's ACS Remains the Best Available Science. ..............3

      B.    NMFS and FWS Failed To Explain Their Abandonment of the Northwest
            Forest Plan and the ACS. ....................................................................7

II.   THE RMPS WEAKEN RIPARIAN PROTECTIONS FOR FISH AND
      ELIMINATE CRITICAL COMPONENTS OF THE ACS ...........................................11

      A.    NMFS Did Not Adequately Support Adoption of Shrunken Riparian
            Reserves. ...................................................................................18

      B.    NMFS Failed To Constrain New Road Construction. ...........................................19

III.  THE FEIS FAILED TO ANALYZE THE DIRECT, INDIRECT, AND
      CUMULATIVE EFFECTS OF SECEDING FROM THE NORTHWEST
      FOREST PLAN IN VIOLATION OF NEPA. .................................................21

      A.    NEPA Requires BLM To Address the Impacts of Its Policy Change on
            Reliant Federal and Nonfederal Landowners. ......................................22

      B.    BLM Has Conducted the Requisite NEPA Analysis in the Past. .........................24

      C.    Analysis of Impacts of Seceding from the Northwest Forest Plan Is Not
            Unduly Speculative. ..........................................................................25

      D.    BLM's NEPA Handbook Supports Review of Reasonably Foreseeable
            Impacts of BLM's Decision To Secede from the Northwest Forest Plan..............28

IV.   THE REVISED RMPS VIOLATE THE O&C ACT BECAUSE THEY
      ADMITTEDLY INCREASE ECONOMIC INSTABILITY FOR LOCAL
      ECONOMIES. ..................................................................................29

CONCLUSION..................................................................................................35

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AquAlliance v. U.S. Bureau of Reclamation,*
   287 F. Supp. 3d 969 (E.D. Cal. 2018)................................................................8, 9

*BARK v. Northrop,*
   2018 WL 1598662 (D. Or. March 31, 2018) ...........................................................8

*Barnes v. U.S. Dep't of Transp.,*
   655 F.3d 1124 (9th Cir. 2011) ...............................................................................25

*City of Davis v. Coleman,*
   521 F.2d 661 (9th Cir.1975) ..................................................................................25

*Conner v. Burford,*
   848 F.2d 1441 (9th Cir. 1988) .................................................................................6

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.,*
   937 F. Supp. 2d 1140 (N.D. Cal. 2013) .................................................................24

*Ctr. for Biological Diversity v. U.S. BLM,*
   698 F.3d 1101 (9th Cir. 2012) .................................................................................9

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,*
   807 F.3d 1031 (9th Cir. 2015) .................................................................................7

*Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation,*
   655 F.3d 1000 (9th Cir. 2011) ...............................................................................24

*Defenders of Wildlife v. Babbitt,*
   958 F.Supp. 670 (D. D.C. 1997) ..............................................................................6

*Defenders of Wildlife v. Zinke,*
   856 F.3d 1248 (9th Cir. 2017) ...............................................................................10

*E.E.O.C. v. Ratliff,*
   906 F.2d 1314 (9th Cir. 1990) ...............................................................................24

*Encino Motorcars, LLC v. Navarro,*
   136 S. Ct. 2117 (2016)......................................................................................22, 23

*F.C.C. v. Fox Television Stations,*
   556 U.S. 502 (2009)........................................................................9, 22, 23, 28

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

*Grand Canyon Trust v. U.S. Bureau of Reclamation*,
    623 F. Supp. 2d 1015 (D. Ariz. 2009) ...................................................................10

*Headwaters v. BLM*,
    914 F.2d 1174 (9th Cir. 1990) ...........................................................31, 32, 33, 35

*Humane Soc'y of U.S. v. Locke*,
    626 F.3d 1040 (9th Cir. 2010) ..................................................................7, 9, 10

*Idaho Sporting Cong. v. Rittenhouse*,
    305 F.3d 957 (9th Cir. 2002) ..................................................................26

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*,
    99 F. Supp. 3d 1033 (N.D. Cal. 2015) ......................................................25

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976) ..................................................................................26

*Mack v. S. Bay Beer Distribs.*,
    798 F.2d 1279 (9th Cir. 1986) ..................................................................24

*Motor Vehicle Mfr. Ass'n v. State Farm Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................7, 9, 10, 26

*Mullis v. U.S. Bank. Ct.*,
    828 F.2d 1385 (9th Cir. 1987) ..................................................................24

*N. Alaska Envtl. Ctr. v. Kempthorne*,
    457 F.3d 969 (9th Cir. 2006) ....................................................................3

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir.2011) ..................................................................25

*N. Spotted Owl v. Hodel*,
    716 F. Supp. 479 (W.D. Wa. 1988) ..........................................................15

*N.L.R.B. v. Bell Aerospace Co. Div. of Textron*,
    416 U.S. 267 (1974) ..................................................................................23

*National Cable & Telecomm. Ass'n. v. Brand X Internet*,
    545 U.S. 967 (2005) ..................................................................................22

*Native Vill. of Point Hope v. Jewell*,
    740 F.3d 489 (9th Cir. 2014) ..............................................................26, 28

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
    477 F.3d 668 (9th Cir. 2007) ....................................................................9

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

*Nw. Envtl. Def. Ctr. v. Nat'l Marine Fisheries Serv.*,
  647 F. Supp. 2d 1221 (D. Or. 2009) ...............................................................8

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2005) .......................................................................25

*Or. Nat. Desert Ass'n v. Jewell*,
  840 F.3d 562 (9th Cir. 2016) .......................................................................27

*Or. Natural Res. Council v. Allen*,
  476 F.3d 1031 (9th Cir. 2007) .......................................................................9

*Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS*,
  No. C04-1299-RSM, Report and Recommendation (W.D. Wash. March 28,
  2006) ..............................................................................................................11

*Pac. Coast Fed'n of Fishermen's Ass'ns (PCFFA IV) v. NMFS*,
  482 F.Supp.2d 1248 (W.D. Wash. 2007).......................................................11

*Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS*,
  265 F.3d 1028 (9th Cir. 2001) ............................................................. *passim*

*Papai v. Harbor Tug and Barge Co.*,
  67 F.3d 203 (9th Cir. 1995), ........................................................................24

*Rock Creek Alliance v. U.S. Fish and Wildlife Serv.*,
  390 F. Supp. 2d 993 (D. Mont. 2005).............................................................10

*San Luis & Delta-Mendota Water Auth. v. Locke*,
  776 F.3d 971 (9th Cir. 2014) .........................................................................3

*Seattle Audubon Soc'y v. Babbitt*,
  998 F.2d 705 (9th Cir. 1993) .......................................................................31

*Seattle Audubon Soc'y v. Lyons*,
  871 F. Supp. 1291 (W.D. Wash. 1994).....................................................1, 31

*Seattle Audubon Soc'y v. Moseley*,
  80 F.3d 1401 (9th Cir. 1996) .....................................................................1, 31

*Singh v. Ashcroft*,
  393 F.3d 903 (9th Cir. 2004) .......................................................................24

*Smiley v. Citibank (South Dakota), N.A.*,
  517 U.S. 735 (1996)...............................................................................22, 23

*Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*,
  143 F.3d 515 (9th Cir. 1998) .........................................................................8

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

*United States v. Penn. Indus. Chem. Corp.*,
    411 U.S. 655 (1973)................................................................................................23

*Vista Hill Foundation, Inc. v. Heckler*,
    767 F.2d 556 (9th Cir. 1985) ................................................................................7

*WildEarth Guardians v. Montana Snowmobile Ass'n*,
    790 F.3d 920 (9th Cir. 2015) ................................................................................27

**Statutes**

Administrative Procedure Act
    5 U.S.C. § 706(2)(A)........................................................................... *passim*

Endangered Species Act
    16 U.S.C. § 1536(a)(2)........................................................................ *passim*

National Environmental Policy Act
    42 U.S.C. § 4321 et seq....................................................................... *passim*

Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act
    43 U.S.C. § 2601................................................................................. *passim*

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION         -v-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

## __GLOSSARY__

| | |
|---|---|
| ACS | Aquatic Conservation Strategy |
| AR | Administrative Record |
| BiOp | Biological Opinion |
| BLM | U.S. Bureau of Land Management |
| DEIS | Draft Environmental Impact Statement |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FEMAT | Forest Ecosystem Management Assessment Team |
| FWS | U.S. Fish and Wildlife Service |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NWFP | Northwest Forest Plan |
| O&C Act | Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937 |
| RMPs | Resource Management Plans |
| RODs | Records of Decision |
| SPTH | Site Potential Tree Height |

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION          -vi-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

## INTRODUCTION

The Northwest Forest Plan is a unique land-management plan in a number of respects. Born out of the controversy of the rampant over-logging of federal forests in Oregon, Washington, and northern California, the Northwest Forest Plan was the first bioregional plan in the nation, covering 19 national forests managed by the U.S. Forest Service and six Bureau of Land Management ("BLM") districts. The Plan provided for imperiled species, like the northern spotted owl and marbled murrelet, that had already been listed as threatened under the Endangered Species Act ("ESA") due to habitat loss caused by logging. The Plan also contained a comprehensive Aquatic Conservation Strategy ("ACS"), aimed at protecting and restoring populations of native salmon, steelhead, and trout from habitat loss and degradation before they declined to such an extent as to warrant ESA consideration. As a federal district court noted at the time, "[g]iven the current condition of the forests, there is no way the agencies could comply with the environmental laws <u>without</u> planning on an ecosystem basis." *Seattle Audubon Soc'y v. Lyons,* 871 F. Supp. 1291, 1311 (W.D. Wash. 1994), *aff'd sub nom. Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401 (9th Cir. 1996) (emphasis in original).

Twenty years later, BLM and U.S. Forest Service analysis showed that the Northwest Forest Plan and its Aquatic Conservation Strategy had done its job, maintaining (if not yet fully restoring) habitat for fish and wildlife to survive on our federal forestlands. The ACS was also consistently identified as the "best available science" by the federal biological agencies— National Marine Fisheries Service ("NMFS") and U.S. Fish and Wildlife Service ("FWS"). Yet in August 2016, BLM seceded from the Northwest Forest Plan by issuing revised Resource Management Plans ("RMPs") for those six forested districts. The revised RMPs reduced the size of riparian reserves and eliminated the Northwest Forest Plan's ACS objectives; the

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION            -1-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

environmental review of the revised RMPs, while lengthy, was notably silent on the deviation from the Northwest Forest Plan and the ACS. Plaintiffs Pacific Rivers *et al.* challenge the RMPs and the biological opinions on those RMPs as violating the ESA, National Environmental Policy Act ("NEPA"), and the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937 ("O&C Act").

On the ESA claims, Federal Defendants' response tries to deflect attention away from 25 years of acknowledgment that the Northwest Forest Plan's ACS is the best available science with respect to aquatic habitat protection on forested lands. The agencies here were not writing on a blank slate; indeed, as recently as December 2015, the National Marine Fisheries Service ("NMFS") reaffirmed the standing of the ACS as the best available science for this very action. Federal Defendants accuse Pacific Rivers of arguing that BLM can never deviate from the ACS, Fed. Defs. Br. at 22, but Pacific Rivers made no such argument, instead explicitly noting that BLM has the ability to adopt new management rules for its districts if it explains departure from past plans and follows the best available science. Yet in reviewing BLM's proposed action, neither NMFS nor FWS can bless any new planning scheme without acknowledging (1) their own previous factual findings that the ACS remains the best available science, and (2) their prior conclusions that compliance with all portions of the ACS at all scales is necessary to avoid jeopardy and adverse modification of critical habitat under the ESA. Neither NMFS nor FWS did that here, instead saying next to nothing about the Northwest Forest Plan and the ACS in their biological opinions.

Similarly, under NEPA, BLM must analyze the direct, indirect, and cumulative impacts of BLM's decision to secede from the Northwest Forest Plan on the other federal lands that remain under the Plan and on nonfederal landowners who made management decisions based on

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION                    -2-

BLM's participation in the Plan.  Particularly given the prominence of the Northwest Forest Plan over the last 25 years, it is vital that BLM investigate the full impacts of its decision to secede from the Plan.  And as the federal government has conducted the requisite analysis in the past, such analysis now would not be unduly speculative.  The multi-volume Final Environmental Impact Statement ("FEIS"), IND_0514323-0514918, IND_0513345-0513906, IND_0513907-0514322, IND_0514919-0515458, does not contain this required analysis.

Finally, the O&C Act itself compels BLM to manage O&C lands for watersheds, water flow, and the economic stability of local communities and industries, as well as sustainable timber production.  Although it may seem counter-intuitive, BLM acknowledged that additional timber harvest from these lands will increase local economic instability, contrary to one of the explicit goals of the O&C Act.  As with the ESA and NEPA violations, the Court should not allow BLM to disregard its duties under the O&C Act.

Pacific Rivers respectfully asks the Court to vacate the NMFS and FWS biological opinions, vacate the BLM Records of Decision on the revised 2016 RMPs, and reinstate the Northwest Forest Plan as the management plan for these federal BLM forest lands.

## ARGUMENT

I.    NMFS AND FWS VIOLATED THE ESA BY FAILING TO USE THE BEST AVAILABLE SCIENCE AS EMBODIED IN THE ACS.

A.    The Northwest Forest Plan's ACS Remains the Best Available Science.

The ESA requires NMFS to "to ensure that an action of a federal agency is not likely to jeopardize the continued existence of any threatened or endangered species."  *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 980 (9th Cir. 2006) (internal citations and quotation marks omitted).  In making such a determination, NMFS is required "to use 'the best scientific and commercial data available.'"  *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971,

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

995 (9th Cir. 2014) (quoting 16 U.S.C. § 1536(a)(2)).  According to NMFS, the Northwest

Forest Plan and its Aquatic Conservation Strategy are the best available science on managing

forests to protect aquatic habitat for threatened and endangered fish.  Excluding consideration of

the Northwest Forest Plan and ACS in its biological opinion ("BiOp"), FWS_082903-083297,

violated the ESA's mandate to consider best available science in making a jeopardy

determination under ESA § 7.[1]

In both its August 21, 2015 comment letter on these RMP revisions, and again in its

December 18, 2015 self-styled "clarification" letter, NMFS itself reiterated that the science-

based management approach of the Northwest Forest Plan was the best available science on

managing forests to protect threatened and endangered fish.  In those letters, NMFS described

the Northwest Forest Plan as the "reflect[ing] the general scientific consensus at the time as to

the level of protection needed for recovery of salmon over a 100-year time frame[,]" and further

noted that "[s]ince that time, scientific consensus has not changed, and available evidence

suggests that implementation of the NWFP has in fact resulted in slowly improving habitat

conditions for salmonids."  NMFS1_0003100 (emphasis added).[2]  Critiquing the proposed

RMPs, NMFS stated:

---

[1] Pacific Rivers' arguments with respect to NMFS' failure to use the best available science and failure to explain deviations from the Northwest Forest Plan and ACS apply equally to FWS and the portions of its biological opinion that analyze impacts to protected fish species such as bull trout.  *See* Pacific Rivers Br. at 31-32.

[2] The administrative record submitted by Federal Defendants is exceedingly large and difficult to navigate.  Where possible, Pacific Rivers cites to documents using their record title and number (IND, NMFS1, FWS) but in some instances have been unable to provide record citations for documents that may be in the record. Several cited documents are submitted to the Court with the Declaration of Jaimini Parekh as summary judgment exhibits.  Pacific Rivers will also submit a thumb drive containing all documents cited in their opening and reply briefs for the convenience of the Court.

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION          -4-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

> Several scientific reviews … have broadly concluded that while a great deal of new information has been published, the fundamentals and rationale of FEMAT[3] and the ACS remain consistent with available scientific information. Nonetheless, the proposed DEIS substantially reduces the environmental protections in the NWFP while bringing little in the way of new science to the table to substantiate its assertions.

NMFS1_0003102.  NMFS further raised concern that while the Northwest Forest Plan's ACS prohibited future management activities from retarding recovery of protected salmon, the RMPs fail to include this "potent" requirement.  NMFS1_0003101.

NMFS's December 18, 2015 clarifying comment letter did not change that opinion, although NMFS tried to soften the blow.  Regarding the Northwest Forest Plan riparian reserve approach, the agency stated that "the NWFP, and its ACS … reflect best available science." NMFS1_0003947.  While noting that science might exist to support smaller riparian reserves, NMFS pointed out that such science had not been integrated into the RMPs.  NMFS1_0003947; IND_0095732 ("NOAA thought (and still thinks) the DEIS didn't adequately reference the scientific basis for the 1 [site potential tree height] option.").

Monitoring and data collection confirmed the role of the Northwest Forest Plan and ACS as the best available science.  The 20-year monitoring study of the Northwest Forest Plan demonstrated the Plan's continued success.  IND_0514645 ("[T]wo-thirds of the watersheds in the Northwest Forest Plan area have improved in condition in the past two decades.").  This report found that management activities under the Northwest Forest Plan did not result in increased water temperatures, especially in comparison to nonfederal forest land, an indication

---

[3] The Forest Ecosystem Management Assessment Team ("FEMAT") report was authored by hundreds of expert scientists from BLM, Forest Service, National Park Service, Environmental Protection Agency, FWS, NMFS, and several universities; it provided the scientific underpinning for the Northwest Forest Plan.  Of particular relevance, FEMAT found that riparian reserves alone were not enough to protect aquatic ecosystems; additional watershed analysis and objectives to protect and restore habitat were needed.

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION          -5-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

that the ACS and Northwest Forest Plan successfully maintained watershed health.
FWS_006985.  The checkerboard pattern of alternating public and private land ownership in
southwest Oregon makes strong forest protections on BLM land even more vital to the protection
of listed fish, as nonfederal forest lands have significantly weaker protections for imperiled
species.  Although riparian conditions improved in most areas governed by the Northwest Forest
Plan, lands managed by BLM merely maintained physical habitat condition.  FWS_006894.
This indicated that the Northwest Forest Plan, particularly on BLM lands, contained the bare
minimum protections necessary to protect listed fish.  *See* NMFS1_0003100.

Despite the Northwest Forest Plan's success and NMFS's acknowledgment that the Plan
was the best available science for managing forest to protect fish and aquatic habitat, by the time
NMFS issued the final BiOp, all thoughts of the ACS had vanished.  Discussion or analysis of
the Northwest Forest Plan and ACS are wholly absent from the final BiOp.  Internal emails show
that NMFS intentionally chose to ignore this highly successful scientific management approach
that governed BLM forests for more than two decades.  NMFS1_0003949 ("We are not
comparing the proposed action to the NW Forest Plan.").  "Although the Court must defer to an
agency's expertise, it must do so only to the extent that the agency utilizes, rather than ignores,
the analysis of its experts."  *Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 685 (D. D.C.
1997).  In ignoring its own findings and policy, NMFS failed to comply with the statutory
mandate to consider the best available science in making its jeopardy determination, and on this
basis alone this Court should invalidate the NMFS BiOp.  *See Conner v. Burford*, 848 F.2d 1441,
1454 (9th Cir. 1988); *Pac. Coast Fed'n of Fishermen's Ass'ns. ("PCFFA") v. NMFS,* 265 F.3d
1028, 1034 (9th Cir. 2001) ("A biological opinion may also be invalid if it fails to use the best
available scientific information[.]"); Pacific Rivers Br. at 15.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

Counsel for Federal Defendants now claims that the agency did consider the best available science in developing its BiOp, but this argument is merely a post-hoc rationalization to be disregarded by the Court. *Motor Vehicle Mfr. Ass'n v. State Farm Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). The Ninth Circuit has long held that "[a]n agency's decision can be upheld only on a ground upon which it relied in reaching that decision." *Vista Hill Foundation, Inc. v. Heckler,* 767 F.2d 556, 559 (9th Cir. 1985) (citations omitted). The best available science analyzing the potential effects of the action on listed species must be considered in the biological opinion itself. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1048 (9th Cir. 2015). Tellingly, Federal Defendants do not cite to the biological opinion to support their argument that the agency considered best available science. Fed. Defs. Br. at 21 n.10. Rather, Federal Defendants cite to the December 18, 2015 comment letter, and a few scientific studies. As previously noted, the December 18, 2015 comment letter stated that science might exist to support smaller riparian reserves, but that the DEIS did not review or contain that science. The letter did not establish that this science was considered and integrated into NMFS's BiOp. Nor can citations to scientific studies in a court brief save the day, as they likewise fail to demonstrate that NMFS considered this science in crafting its biological opinion. This Court "cannot gloss over the absence of a cogent explanation by the agency by relying on the post hoc rationalizations offered by defendants in their … briefs." *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1049 (9th Cir. 2010).

B.  <u>NMFS and FWS Failed To Explain Their Abandonment of the Northwest Forest Plan and the ACS.</u>

Even if the ACS science was integrated into the BiOp (which it was not), it does not excuse NMFS's failure to consider, analyze, and compare that science with the Northwest Forest Plan and ACS, which have been the scientific benchmarks for the last 25 years. Federal

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION          -7-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

defendants argue that NMFS can consult on the RMPs in a vacuum, and ignore the Northwest Forest Plan as well as its ACS. Federal Defendants are wrong. An argument that NMFS need not consider the Northwest Forest Plan or ACS ignores bedrock principles of administrative law, and adoption of this position by the Court would create a wholly new standard of review for biological opinions.

In support of their proposition, Federal Defendants point to a two-sentence holding in a district court opinion that cites no case law as authority for its reasoning. *See AquAlliance v. U.S. Bureau of Reclamation*, 287 F. Supp. 3d 969, 1068 (E.D. Cal. 2018). *AquAlliance* is not binding precedent for this Court, nor are the facts similar to those presented here. In *AquAlliance*, plaintiffs challenged a biological opinion for a threatened species of snake, contending that FWS failed to include protective measures that it had required in prior biological opinions. 287 F. Supp. 3d at 1067. The district court rejected the challenge, holding that "conservation measures incorporated into the BiOp are not FWS policy." *Id.* (emphasis removed). Here, in contrast, the Northwest Forest Plan and ACS have been Federal Defendants' policy for almost 25 years, and the agencies have worked together for decades with the ACS as the planning background. To abandon the ACS now, without explanation, is quintessential arbitrary and capricious action.[4]

---

[4] In *BARK v. Northrop,* 2018 WL 1598662 (D. Or. March 31, 2018), the district court specifically held that NMFS's duty was to use the best scientific and commercial data available. *Id.* at *10. Based on the facts of that particular site-specific challenge, the court found that NMFS had used the best science, despite not relying on ACS consistency, as the agency used other competent data. Intervenors cite to a case holding that the consulting agency can change its position without explanation from a draft consultation document to the final, but the Northwest Forest Plan and ACS were not drafts; they were BLM and NMFS policy for decades. *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 523 (9th Cir. 1998). NMFS's citation to *Nw. Envtl. Def. Ctr. v. Nat'l Marine Fisheries Serv.*, 647 F. Supp. 2d 1221, 1238 (D. Or. 2009) is also unavailing, because that case does not consider this issue.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

Moreover, the *AquAlliance* court holding was incorrect.[5]  A biological opinion constitutes a final agency action subject to judicial review because it marks the consummation of the Section 7 consultation process.  *See PCFFA v. NMFS*, 265 F.3d at 1034.  Courts review such final agency actions under the arbitrary, capricious, and contrary to law standard of the Administrative Procedure Act ("APA").  *Or. Natural Res. Council v. Allen*, 476 F.3d 1031, 1036 (9th Cir. 2007).  Under this standard, an agency "changing its course … is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance."  *Motor Vehicle*, 463 U.S. at 42.  The Supreme Court affirmed this principle in *F.C.C. v. Fox Television Studios*, holding that an agency cannot silently depart from a prior policy.  556 U.S. 502, 515 (2009).

Federal Defendants attempt to distinguish *Motor Vehicle* and *Fox* by arguing that a biological opinion is not a policy, ignoring relevant Ninth Circuit cases that have previously applied the *Motor Vehicle* standard to individual final agency actions and biological opinions. *See Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 690 (9th Cir. 2007) (invalidating the agency's final action as unlawful when it "departed from its two-decade-old precedent without supplying a reasoned analysis for its change of course."); *Humane Society of U.S.*, 626 F.3d at 1048 (invalidating a biological opinion with contradictory factual findings that departed from prior findings in another biological opinion).  In *Humane Society*, the appellate court specifically held that prior factual findings constitute "relevant data" to consider in the face

---

[5] In fact, *AquAlliance* ultimately found that FWS failed to use the best science for the conservation measures in the challenged biological opinion.  "So far as the Court can determine, the BiOp does not explain how, in light of these findings, the conservation measures avoid jeopardy.  A BiOp is arbitrary and capricious if it fails to 'consider the relevant factors and articulate a rational connection between the facts found and the choice made.'"  *Id.* at 1073 (citing *Ctr. for Biological Diversity v. U.S. BLM*, 698 F.3d 1101, 1121 (9th Cir. 2012)).

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION          -9-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

of new, contrary findings, even where an agency does not change from its prior precedent.  626 F.3d at 1050-51.

Most recently, the Ninth Circuit applied the *Motor Vehicle* standard to a biological opinion.  While the Court held that the agency did not violate the *Motor Vehicle* test, the court nevertheless reasoned that under certain circumstances, "an agency's prior factual findings or conclusions may be 'relevant data'" requiring the agency to "articulate a satisfactory explanation" when changing direction.  *Defenders of Wildlife v. Zinke*, 856 F.3d 1248, 1262-63 (9th Cir. 2017).  Similarly, district courts have invalidated biological opinions that fail to consider contradictory factual findings or that rescind protective measures from a prior biological opinion without explanation.  *Rock Creek Alliance v. U.S. Fish and Wildlife Serv.*, 390 F. Supp. 2d 993, 1010 (D. Mont. 2005) (invalidating a biological opinion that dismissed as insignificant adverse impacts to a bull trout sub-population when prior biological opinions emphasized the need for genetic diversity); *Grand Canyon Trust v. U.S. Bureau of Reclamation*, 623 F. Supp. 2d 1015, 1033–34 (D. Ariz. 2009) (invalidating biological opinion that departed from longstanding prior opinion without directly addressing why prior protections were no longer needed).

Finally, NMFS' argument that it need not explain its departure from years of reliance on the ACS as the best science in federal land forestry consultations is belied by court rebuttal of this very same tactic 11 years ago.  As discussed in Pacific Rivers opening brief (at 21-22), a decade ago, as now, BLM and the Forest Service tried to amend the ACS to eliminate the requirement that each action proceeding under the Northwest Forest Plan would meet, attain, not retard, or not prevent attainment of the ACS objectives.  The Plan amendment and BiOps were challenged by conservation groups precisely because they reversed the prior positions taken by NMFS and FWS without an adequate explanation; they deviated from the best available

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION              -10-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

scientific information in FEMAT and the ACS; and they relied on future site-specific NEPA analyses and ESA § 7 consultations to address harmful impacts.

The district court set aside the prior, nearly identical ACS Amendment. *See PCFFA v. NMFS,* No. C04-1299-RSM, Report and Recommendation (W.D. Wash. March 28, 2006), *adopted in part,* 482 F. Supp. 2d 1248 (W.D. Wash. 2007) ("*PCFFA IV*"). First, the court found that reliance on future site-specific ESA consultations could not validly replace the need to fully assess cumulative impacts during broader, programmatic consultation. *PCFFA IV*, slip op. at 18-22. Second, the court held that the Services departed from the best available science embodied in FEMAT and past biological opinions without a sound basis or rational explanation. Slip op. at 26-27. The court noted that an agency was free to take a different approach during consultation, but it could not do so without reasoned explanation, which, as here, NMFS and FWS failed to supply. *Id.* This Court should join the *PCFFA IV* court in rejecting the 2016 biological opinions as arbitrary, capricious, and contrary to the best available science.

II.    THE RMPS WEAKEN RIPARIAN PROTECTIONS FOR FISH AND ELIMINATE CRITICAL COMPONENTS OF THE ACS.

The Northwest Forest Plan and its Aquatic Conservation Strategy governed forest management on BLM lands for decades. The 1997 NMFS BiOp mandated that to prevent jeopardy to protected salmon, the objectives of the ACS must be considered at all scales including the project level; the 1997 BiOp also instituted particular restrictions on forest management activities including riparian buffers with a two site potential tree height ("SPTH") and "no net new roads" policy. The NMFS BiOp here was a substantial departure from these prior requirements, and yet NMFS wholly failed to address the changes from the Northwest Forest Plan and the ACS. This exclusion was plainly arbitrary and capricious.

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION            -11-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

Citing to a table prepared by BLM, Federal Defendants claim that the BiOp did not need to discuss the Northwest Forest Plan's ACS because BLM integrated the same resource management principles into the RMPs.  Fed. Defs. Br. at 15, 49-51 (Exhibit 1); *id.* at 7 (stating the final RMPs includes an "updated" version of the ACS).  To the contrary, the table (buried in the response to comments section of the FEIS at page 1843) does not document adoption of a management plan similar to the ACS, but rather a dramatic departure from its standards, guidelines, and objectives.

Unlike the ACS, management objectives for maintaining and restoring aquatic habitat in the RMPs apply only to actions located within the shrunken riparian reserves, and do not apply to all ground-disturbing management actions.  The Northwest Forest Plan ACS created substantive protections for water quality and aquatic habitat restoration by mandating both (1) binding standards and guidelines to restrict activities in key watersheds and riparian reserves, and (2) all management activities attain nine objectives to "maintain and restore" aquatic habitat.  Pacific Rivers Br. at 5-6.  Compliance with the ACS objectives was mandatory, and the NWFP forbid management activities that did not maintain the existing condition or lead to improved conditions in the long term for aquatic habitat.  *Id.*  In assessing the impact of the action on listed salmon, the 1997 BiOp issued by NMFS made a finding of no jeopardy on the basis that "management actions will promote attainment of ACS objectives" and that future site specific actions "must be consistent with the ACS objectives."  *Id.* at 16-17.  In this way, the ACS objectives applied not only to management actions in riparian reserves, but to any final agency action on federal lands governed by the NWFP.  Pacific Rivers Br. at 15-21; *PCFFA v. NMFS,* 265 F.3d at 1036-38 (invalidating biological opinions for 20 timber sales for failure to ensure compliance with ACS objectives at the project level).

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

In its August 21, 2015 letter, NMFS acknowledged that applying the nine ACS objectives to all management actions was a "potent" requirement central to the success of the Northwest Forest Plan, one that prevented individual projects from retarding recovery of threatened and endangered salmon.  NMFS1_0003101.  The objectives required managers to ascertain the "net effects" of any proposed action on recovery at the site-specific scale, as well as larger scales. Practically speaking, the Northwest Forest Plan included overarching objectives to protect water quality and fish habitat that applied across land use allocations – including outside of riparian reserves – for all ground-disturbing activities.  *Id.*  The FEMAT science team recommended adoption of the ACS objectives, and applying the objectives to all federal actions, because they observed that past degradation resulted from numerous incremental harms that cumulatively degraded aquatic habitats and recovery of salmon species.  *Id.*  As a result, the ACS restricted these death-by-a-thousand-cuts activities that adversely affect aquatic ecosystems, and managers could only pursue activities that were "restorative or protective in nature."  NMFS1_0003102.

Other state and federal agencies shared NMFS's concerns.  *See* EPA DEIS comment letter (July 29, 2015), IND_0780890-0780899 (finding BLM Draft RMP/EIS to have "environmental concerns-insufficient information").  "Specifically, we find that the riparian strategy … presents potential risks to aquatic resources that are incongruent with the BLM's purpose and need. … We also recommend that the overarching aquatic strategy be expanded to capture key concepts [in other alternatives] including Key Watersheds and Watershed Analysis." *Id.* at IND_0780890-0780891.  *See also* FWS DEIS comment letter (Aug. 20, 2015), IND_07808991 (outlining concerns with riparian strategy in preferred alternative); Oregon DEIS comment letter (Aug. 21, 2015), IND_0781004 (critiquing "significant deviation" from ACS and promoting Key Watersheds).

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

Unlike the ACS, however, the RMPs dramatically reduced the width of riparian reserves, curtailed the scope of ecological objectives that apply within riparian reserves, and failed to apply objectives outside riparian reserves for ground-disturbing actions outside riparian reserves to prevent adverse impacts to aquatic habitat.  The RMPs created different types of land use allocations across the landscape.  IND_0512757-0512769.  For each land use allocation, the RMPs created management objectives and identified particular management directions that would achieve the objectives.  *See id*.  Management objectives applied only within that land use allocation.  IND_0512749.  While the riparian reserve land use allocation included management objectives to maintain and restore aquatic habitat, none of the other land use allocations included similar objectives.  Fed. Def. Br. at 49-51 (Exhibit 1); IND_0512757-0512776 (Nw. Or. RMP); IND_0513075-0513109 (Sw. Or. RMP).

Moreover, only the riparian reserve land allocation included a management objective that required contributing to recovery of ESA listed fish.  *Id.*  Rather than applying to all federal forestlands like the Northwest Forest Plan, the RMPs focused on restoring and maintaining aquatic functions and protecting listed salmon only in waterways – about 26% of all BLM lands – and not in the connected uplands.  *See* IND_0514442 (describing the percentage of area designated as riparian reserves).

According to NMFS itself, this departure from the Northwest Forest Plan may have a significant adverse impact on the survival of protected fish.  NMFS raised the alarm in its August 21, 2015 letter that the Draft EIS omitted "this central guiding tenet" of requiring attainment with the ACS objectives for all management actions on federal forestlands, dramatically shifting the burden of proof required for agency actions, and potentially substantially impacting the environment.  NMFS1_0003102.  NMFS recommended that, unlike the Draft EIS:

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

> [The RMPs should] include mandatory standards and guidelines to set sidebars
> for individual actions.  Management activities should be constrained under the
> standards and guidelines depending on whether they would contribute to or delay
> attainment of the aquatic habitat objectives similar to those identified in the nine
> objectives of the aquatic conservation strategy of the Northwest Forest Plan.

NMFS1_0003097.  In an internal inter-agency meeting on October 7, 2015, NMFS staff

emphasized that "the NWFP Aquatic Conservation Strategy (ACS) objectives are as important

now as they were 20 years ago . . . [and] they want to see that the BLM is considering the status,

risks, and restoration opportunities when contemplating management actions within a

watershed."  IND_0701650.  In its December 18, 2015 comment letter, the agency again

reiterated its concern, noting: "NMFS expects BLM's ACS will contain components with

objectives aligned with the four components of the ACS of the Northwest Forest Plan."

NMFS1_0003946.

　　　　These concerns raised by NMFS staff during the consultation process remain relevant;

the riparian reserve objectives did not change between the draft EIS and the final RMPs.

*Compare* IND_0512770 (riparian reserve management objectives for the RMPs) *with*

NMFS1_0003097 (NMFS Comment Letter describing riparian reserve objectives common to all

alternatives in the Draft EIS).  However, despite NMFS's vociferous prior objections to the

dilution of substantive protections for imperiled fish, the final BiOp itself is silent regarding the

need to apply aquatic conservation objectives to all final actions across all BLM lands.

Reviewing courts should "reject conclusory assertions of agency 'expertise' where the agency

spurns unrebutted expert opinions…."  *N. Spotted Owl v. Hodel*, 716 F. Supp. 479, 483 (W.D.

Wa. 1988).  Here, NMFS failed to follow through with its concerns about abandoning the ACS,

and NMFS's about-face on these issues is not entitled to deference.

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION　　　　　-15-

The Ninth Circuit has held that disregarding impacts from individual projects that degrade aquatic habitat, even within a "relatively small area of impact" is a "major flaw." *PCFFA v. NMFS,* 265 F.3d at 1036.  The Ninth Circuit held:

> Without aggregation, the large spatial scale appears to be calculated to ignore the effects of individual sites and projects.  Unless the effects of individual projects are aggregated to ensure that their cumulative effects are perceived and measured in future ESA consultations, it is difficult to have any confidence in a wide regional no-jeopardy opinion.

*Id.* at 1036.  Yet the NMFS BiOp also made factual findings that directly contradicted the findings of the 1997 BiOp.  For example, the 1997 BiOp NMFS found that <u>any</u> degradation in aquatic conditions would jeopardize the continued existence of protected salmon.  Pacific Rivers Br. at 30.  In the challenged BiOp, however, NMFS inexplicably concluded that adverse effects to salmon populations from the adoption of the RMPs would not cause jeopardy, despite finding that "the proposed action would continue to worsen the baseline for suspended sediment and stormwater contaminants."  BiOp at 327.

The no jeopardy determination is particularly troubling in light of the high extinction risk for protected salmon.  Describing the baseline condition, NMFS described the salmon extinction risk as "high to very high" further stating that "[t]he existing environmental baseline is degraded for all listed species and the quality of habitat … [in the action area] has been substantially reduced."  BiOp at 324-25.  And further noted that "[t]he effect of this baseline condition of critical habitat (not fully functioning) is a general and systemic reduction in carrying capacity for each of the anadromous species considered in this opinion."  BiOp at 325.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

In fact, considering the whole impact of the action, NMFS found that the revised RMPs would cause population mortality and aquatic habitat degradation for every listed fish species.[6] *See, e.g.,* BiOp at 327-28 ("[t]he proposed action has conservation measures designed to address limiting factors for stream complexity and temperature; however, the proposed action would continue to worsen the baseline for suspended sediment and stormwater contaminants.") (emphasis added).  As a result, "[t]he proposed action is likely to cause a decrease in the rate of egg and fry survival, and injury in juveniles as a result of increased suspended sediment."  BiOp at 328; *see also id.* at 329 (Upper Willamette River salmon), 330-31 (coho), 333.  Overall, "the effects of the proposed action are negative for sedimentation and contaminants from stormwater across the range of ESA-listed anadromous species in Oregon, and aggregate over time."  Biop at 333.  Nevertheless, NMFS discounted these losses as minor impacts, given the scale it chose for its review.  *See* BiOp at 323-333.

Again, the Ninth Circuit has already rejected such an approach, holding that NMFS cannot "assume away significant habitat degradation."  *PCFFA v. NMFS,* 265 F.3d at 1037.  The court invalidated biological opinions that "acknowledge[] . . . degradations but then deems that degradation inconsequential."  *Id.*  Managing BLM lands in accordance with the Northwest Forest Plan maintained physical aquatic habitat scores, even if it did not restore them.  FWS_006894.  However, the revised RMPs will reverse that trend, and degrade aquatic habitat.  Issuing a "no jeopardy" determination, in light of anticipated aquatic habitat degradation and

---

[6] Federal Defendants take issue with one sentence in Pacific Rivers' opening brief describing the "cumulative impacts" section of the NMFS BiOp as including impacts from the RMPs.  Fed. Defs. Br. at 24-25.  This characterization was incorrect; Pacific Rivers agrees that the "cumulative impacts" section of the BiOp discusses only nonfederal activities.  The findings discussed here were made in the "Integration and Synthesis" section of the BiOp, which analyzed the effect of the RMPs on the environment, designated critical habitat, cumulative impacts, and the corresponding response of each species.  BiOp at 324.

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION                    -17-

increased threatened and endangered species mortality, is a significant departure from NMFS's prior finding that "any" further degradation will have a "significant impact" on protected salmon. Pacific Rivers Br. at 30.

    A.    <u>NMFS Did Not Adequately Support Adoption of Shrunken Riparian Reserves.</u>

    Federal Defendants claim that NMFS used the best available science when evaluating whether shrunken riparian reserves adequately protected listed salmon, citing to a few scientific studies in the record, and the December 18, 2015 NMFS DEIS comment letter. As discussed above, these citations fail to prove NMFS considered such science in the biological opinion. Moreover, by flatly ignoring the two site potential tree height ("STPH") option described in the Northwest Forest Plan, NMFS failed to consider what the agency itself deemed the best available science. *See* NMFS1_0003947.

    While the December 18, 2015 letter stated that a narrower riparian reserve width of one SPTH could protect listed salmon,[7] NMFS qualified this statement by observing that such an option should draw on the experience of implementing the Northwest Forest Plan, including using the ACS objectives to manage forests at the watershed scale, and should integrate recommendations from NMFS's August 21, 2015 letter. NMFS1_0003946-0003948. "[N]one of the DEIS alternatives contain such a landscape strategy." NMFS1_0003946. The August 21, 2015 comment letter recommended adopting binding aquatic conservation objectives that applied outside of riparian reserves, as discussed above, and prohibiting a net increase in road density in any watershed. NMFS1_0003128. Neither of these recommendations were adopted, yet only a

---

[7] Federal Defendants claim that Pacific Rivers inaccurately described the BLM RMPs as halving the size of riparian reserves, but NMFS itself stated "all four Action Alternatives, propose[] at minimum, to reduce by half the width of all Riparian Reserves along fish-bearing streams, from two site potential tree heights (SPTH) to 1 SPTH, with no explanation as to why the rationale in the NWFP for creating 2 STPH Riparian Reserves was no longer relevant." NMFS1_0003118.

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION     -18-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

few months later, NMFS issued a no-jeopardy biological opinion on the revised RMPs.  Such a

failure to follow the best available science is arbitrary and capricious.

Additionally, the NMFS August 21, 2015 letter identified benefits of larger riparian

reserves for controlling stream temperatures that were—once again—wholly omitted from the

BiOp.  In August 2015, NMFS cautioned that a riparian reserve width of two-SPTH was

important for creating redundancy in shade protection, increasing shade density, reducing actual

solar energy that reaches the water surface, and lowering the temperature of groundwater that

contributed to summer base flows.  NMFS1_0003110.  The final biological opinion is silent

about these ecosystem benefits from larger riparian reserves.  *See* NMFS BiOp at 175-78, 241-

42.  Rather than building in redundancy to fortify forests in light of expected adverse climate

change impacts, NMFS BiOp at 105, NMFS gave the green light to a plan that removed

redundancy and permitted incremental loss of stream shade.  *Id.*; *see also* NMFS1_0003110-

0003111 (Recent studies show a no-cut buffer width of 150 feet is needed to fully protect stream

shade, because streams are "far more sensitive to shade removal than previously appreciated.").

B.    NMFS Failed To Constrain New Road Construction.

Roads are the greatest source of fine sediment in aquatic habitat, and all life stages of

salmon can die from high concentrations of suspended sediments, or suffer sub-lethal chronic

impacts from lower concentrations.  Pacific Rivers Br. at 28.  Roads can deliver up to 90 percent

of the total sediment production from timber extraction activities, and they are the primary

conduit for stormwater contamination.  NMFS BiOp at 159-60.  "The magnitude of existing road

impacts on watersheds and streams … may equal or exceed the effect of all other activities

combined."  NMFS DEIS Comment Ltr. at 33.  While the BiOp set sideboards for existing roads

in its incidental take statement, NMFS BiOp at 334-43, no such sideboards exist for construction

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

of new roads.  This is a significant departure from the Northwest Forest Plan, which restricted

new road construction to maintain and restore water quality in key watersheds.

The NMFS BiOp found that increased suspended sediments from implementation of the

RMPs would cause adverse physical and behavioral responses in salmon that rear in streams

within the action area.  NMFS BiOp at 246.  NMFS found that timber extraction, which includes

new road construction, would adversely affect protected salmon through temperature increases,

sediment delivery into streams, stormwater contaminants, reduction in woody debris, and

changes in stream flow.  NMFS BiOp at 266.

Despite these conclusions, the NMFS BiOp authorized RMPs that impose no meaningful

restriction on new road construction.  Under the ACS, objectives set limitations on new road

construction near streams by discouraging road construction in riparian reserves and prohibiting

a net increase in roads in key watersheds.  NMFS DEIS Comment Ltr. at 33. NMSF1-003127.

NWFP ROD at B-11, B-19.) IND_0326736-0326744.  In contrast, BLM proposed one

management direction, only applicable inside riparian reserves, prohibiting road construction and

stream crossings unless "there is no operationally feasible and economically viable alternative."

NMFS BiOp 179.  While NMFS stated that road building in riparian reserves was "extremely

unlikely," the agency imposed no restrictions on such construction.  *Id.*  Moreover, this statement

contradicts the agency's findings that at least 66 miles of new roads would be constructed within

200 feet of streams.  NMFS BiOp at 57.

Federal Defendants claim that NMFS need not set restrictions on overall new road

construction because individual roads will be subject to future ESA consultation at the project

level.  Fed. Defs. Br. at 22-24.  Yet without the programmatic control of the Northwest Forest

Plan ACS, there is no way to ensure that future site-specific consultations will consider

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

landscape level impacts.  "[I]t does not follow that NMFS is free to ignore site degradations because they are too small to [protect forest and water resources] . . . at the watershed scale." *PCFFA v. NMFS,* 265 F.3d at 1035.  By delaying consultation for new road constructions to future, project specific consultations, NMFS diluted the serious impacts of roads and failed to address the combined impacts of old and new roads across the landscape.

III.    THE FEIS FAILED TO ANALYZE THE DIRECT, INDIRECT, AND CUMULATIVE EFFECTS OF SECEDING FROM THE NORTHWEST FOREST PLAN IN VIOLATION OF NEPA.

Given the legal history of the development and implementation of the Northwest Forest Plan, BLM has an obligation to explain how unilaterally seceding from the interagency Northwest Forest Plan will affect nonfederal and other federal landowners and resources shared across ownership boundaries.[8]  To be sure, the Northwest Forest Plan is not the only way in which BLM may meet its legal and ecological obligations, *see* Pacific Rivers Br. at 11, but if

---

[8] Cross-ownership issues have been present since the enactment of the O&C Act: the Forest Service, the agency that manages intermingled federal land, expressed concern in 1937 about the need for federal and private landowners to work together to manage the O&C estate:

...Outside of the national forests but immediately contiguous to them is a much greater acreage of land of the same type which forms an integrated part of the national units of forest operation which ultimately will cover the major portion of forest lands.  The problem is to combine the forest management of the entire territory under one management, having one standard of operation and have in those units an intermingling logically of private land and national forest land and reverting or recovered lands, so that whatever is done in the management of the recovered land or the revested land will have a very definite influence upon what is done on management of the national forest timber.  It seems logical and economical and sound that this timber should be handled more or less as an entity, for the support of the industry and the community welfare.

*Hearing on H.R. 5858, A Bill Relating to the Revested Oregon and California Railroad and Reconveyed Coos Bay Wagon Road Grant Lands Situated in the State of Oregon Before the Committee on the Public Lands, 75th Congress*, 31 (April 13, 1937) (Statement of L.F. Kniepp, Assistant Chief, Forest Service), IND_0526960.

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION          -21-

*Earthjustice*
705 Second Ave., Suite 203
Seattle, WA  98104-1711
(206) 343-7340

BLM decides to change a longstanding policy position, as it did here, BLM must consider that

impact of that policy change on other interests that have relied on the prior policy:

> In explaining its changed position, an agency must also be cognizant that longstanding policies may have "engendered serious reliance interests that must be taken into account."  [*FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515, (2009)]; *see also Smiley v. Citibank (South Dakota), N.A.,* 517 U.S. 735, 742, (1996).  "In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox Television Stations, supra,* at 515–516, 129 S.Ct. 1800.

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016).  It is these "serious

reliance interests" that BLM has completely neglected to take into account when developing the

revised RMPs.  Consequently, the agency's NEPA analysis is also devoid of "a reasoned

explanation ... for disregarding facts and circumstances that underlay or were engendered by the

prior policy," rendering the analysis arbitrary, capricious, and not in accordance with NEPA.  5

U.S.C. § 706(2)(A).  *National Cable & Telecomm. Ass'n v. Brand X Internet Serv.,* 545 U.S.

967, 981 (2005) (an "[u]nexplained inconsistency" in agency policy is "a reason for holding an

interpretation to be an arbitrary and capricious change from agency practice").

> A.    <u>NEPA Requires BLM To Address the Impacts of Its Policy Change on Reliant Federal and Nonfederal Landowners.</u>

In its opening brief, Pacific Rivers explained (at 7-13) the long land management

planning and legal history leading up to the eventual adoption of the Northwest Forest Plan, as

well as subsequent judicial review of the Plan.  These planning and legal decisions were clear

that the Forest Service and BLM must embrace a co-management approach to land management:

at the time, the Northwest Forest Plan was the best – and the only – strategy federal land

managers could conceive to address necessary ecological and legal requirements.  Pacific Rivers

recognizes that today, the Northwest Forest Plan may no longer be the only way to address these

ecological and legal requirements, although those requirements have not changed since 1994.

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION              -22-

However, the law is plain that when an agency reverses course (seceding from the Northwest Forest Plan) and choses a new policy direction (adopting the revised RMPs), it must address how the new policy affects other parties who have relied upon the old policy to meet their legal obligations. *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) ("change that does not take account of legitimate reliance on prior interpretation" is arbitrary and capricious); *United States v. Penn. Indus. Chem. Corp.*, 411 U.S. 655, 674 (1973) (prior agency positions engender justifiable reliance by third parties; a change in position requires rational explanation); *N.L.R.B. v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 294–95 (1974) (same).

In this case, that reliance interest goes to how nonfederal and other federal parties manage natural resources shared across the landscape to meet various legal and ecological obligations. Federal Defendants are clear that they do not believe that they have an obligation to assess how other landowners – including adjacent and intermingled federal landowners – may be affected by BLM's unilateral decision to secede from the interagency Northwest Forest Plan. Fed. Defs. Br. at 30-32. To the contrary, it is exactly this type of third party reliance interest that must be considered and addressed prior to an agency shifting its position affecting the reliance interest. *Navarro*, 136 S. Ct. at 2125-26 (2016). Because BLM did not conduct the requisite analysis, its decision is arbitrary and capricious. *Id.*

Importantly, in neither the FEIS and Records of Decision ("RODs") supporting the RMPs nor in its briefing before this Court does BLM even attempt to conduct the type of analysis the Supreme Court has required when an agency dramatically shifts position. While Intervenors address the *Fox* factors, Int. Br. at 8-12, they focus only on the environmental consequences <u>on BLM lands</u> of the revised RMPs: Intervenors do not show that BLM considered how its unilateral secession would affect other federal (*e.g.* U.S. Forest Service) and nonfederal (*e.g.*

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

state and private landowners) actors or resources shared across the checkerboard landscape in southwest Oregon.  These nonfederal and federal parties have made land management decisions based on the integrity of the interagency Northwest Forest Plan that must now be reassessed based on the dramatically different trajectory BLM has selected for its lands.[9]

B.    BLM Has Conducted the Requisite NEPA Analysis in the Past.

In the past, reliance on the Northwest Forest Plan by nonfederal and other federal parties has been expressly encouraged by BLM (and its federal partners), so eschewing the old policy for a new one predictably will have effects on those other parties.  BLM responds that this type of analysis would be speculative and therefore impossible to conduct, and that NEPA does not require this kind of analysis.  Fed. Defs. Br. at 30-31.  BLM is wrong.

Analyzing how changing a federal land management policy affects nonfederal and other federal land managers is not speculative, and in fact, BLM has conducted just this type of analysis before: specifically, when BLM (and the Forest Service and other federal partners) adopted the Northwest Forest Plan in the first place.[10]  IND_0865458-0865462 (*Final*

---

[9] BLM argues that Pacific Rivers impermissibly cited to extra-record documents in its opening brief to demonstrate the reliance placed on the Northwest Forest Plan by federal and nonfederal managers.  Fed. Defs. Br. at 32 n.15.  However, the Ninth Circuit has explained that "judicial notice is properly taken of orders and decisions made by…administrative agencies."  *Papai v. Harbor Tug and Barge Co.*, 67 F.3d 203, 207 n. 5 (9th Cir. 1995), *rev'd on other grounds*, 520 U.S. 548 (1997).  The existence of agency-prepared documents and their conclusions also are "capable of accurate and ready determination" and are readily accessible on official web sites of various state and federal agencies.  *See E.E.O.C. v. Ratliff*, 906 F.2d 1314, 1318 n. 6 (9th Cir. 1990); *Singh v. Ashcroft*, 393 F.3d 903, 905 (9th Cir. 2004).  Similarly, a court may take judicial notice of matters of public record, including agency records and planning documents.  *See Mack v. S. Bay Beer Distribs.*, 798 F.2d 1279, 1282 (9th Cir. 1986); *Mullis v. U.S. Bank. Ct.*, 828 F.2d 1385, 1388 (9th Cir. 1987).  The cited documents may in fact be somewhere in the administrative record yet undiscoverable; regardless, they are available on federal and state websites and this Court may take judicial notice of their contents.

[10] Federal agencies, including BLM, regularly conduct analyses of the environmental effects of third parties responding to federal decisions.  *See generally Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 937 F. Supp. 2d 1140, 1155 (N.D. Cal. 2013) (requiring NEPA analysis

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION                    -24-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

*Supplemental Environmental Impact Statement on Management of Habitat for Late-Successional and Old-Growth Forest Related Species Within the Range of the Northern Spotted Owl* (1994)) ("When an action takes place on federal forests, it may cause direct, indirect, or cumulative effects on nonfederal lands. … [T]here are both environmental and economic interactions with adjacent nonfederal forests.").

C.    Analysis of Impacts of Seceding from the Northwest Forest Plan Is Not Unduly Speculative.

Equally as important, "NEPA requires that an EIS engage in reasonable forecasting. Because speculation is ... implicit in NEPA, we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as crystal ball inquiry." *N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1079 (9th Cir.2011) (internal quotation marks and citation omitted); *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 99 F. Supp. 3d 1033, 1063 (N.D. Cal. 2015) (same); *City of Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir.1975) ("While 'foreseeing the unforeseeable' is not required, an agency must use its best efforts to find out all that it reasonably can"). Because Federal Defendants have conducted an analysis in the past of how adopting the Northwest Forest Plan would affect nonfederal and other federal parties and the resources they manage, BLM

―――――――――――

of effects of opening a new area to oil and gas development if developers actually seek to permission for new leases in the area). These effects "include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." *Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1011 (9th Cir. 2011); *Ocean Advocates v. U.S. Army Corps of Eng'rs,* 402 F.3d 846, 867-70 (9th Cir. 2005) (Corps violated NEPA by failing to account for the environmental effects of the additional tanker traffic that would be caused by a proposed dock expansion); *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1132-39 (9th Cir. 2011) (DOT violated NEPA by failing to analyze environmental effects caused by third parties responding to airport expansion). BLM is not exempt from the requirement to reasonably assess the environmental consequences of third parties responding to BLM's decision to secede from the Northwest Forest Plan.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

cannot now rationally argue that the reverse analysis – how seceding from the Plan will affect those same landowners and resources – is somehow impossible.

BLM contends that it conducted an adequate NEPA analysis because it assessed the direct, indirect, and cumulative impacts of adopting the revised RMPs on a "resource-by-resource basis," and provided an example of such an analysis for northern spotted owls. Fed. Defs. Br. at 30. Importantly, however, this analysis only addressed the influence of BLM's new RMPs on spotted owls and owl habitat, not the synergistic effects of other landowners *responding to* BLM's new RMPs and changing their own management of owls and owl habitat. 2016 RMPs FEIS at 948 ("the BLM examined <u>potential BLM contributions</u> to northern spotted owl habitat in the planning area") (emphasis added). To the extent that BLM assumed that other land managers would change nothing about their management in response to BLM's actions, Int. Br. at 28-29 (*citing* FEIS at 119-20), this assumption was unreasonable. *Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 502-05 (9th Cir. 2014) (invalidating NEPA analysis that assumed no development would occur in an area that had not yet been developed for oil and gas leasing). There is nothing in the voluminous administrative record for this case that evaluates and confirms BLM's assumption that no other landowner within the range of the northern spotted owl would change its management in any way in response to BLM's decision to eschew the interagency Northwest Forest Plan. As an unsupported assumption at best, this conclusion is due no deference by this Court. *Id.*

As the Ninth Circuit has held, "ordinarily, an agency has the discretion to determine the physical scope used for measuring environmental impacts. However, the choice of analysis scale must represent a reasoned decision and cannot be arbitrary." *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 973-74 (9th Cir. 2002) (*citing Kleppe v. Sierra Club*, 427 U.S. 390,

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

414, (1976); *PCFFA v. NMFS*, 265 F.3d at 1037-38; *Motor Vehicle.* 463 U.S. at 43 (agency

action is arbitrary and capricious if it "entirely failed to consider an important aspect of the

problem").  In this case, it was unreasonable for BLM to conclude that it need not assess the

effects of its secession from the Northwest Forest Plan on other landowners and the resources

they manage.  Those natural resources are inextricably bound together across ownerships, as the

courts and BLM recognized when it developed the Northwest Forest Plan in the first instance.

Indeed, BLM gives no rational explanation in the FEIS, RODs, or its briefing before this Court

for eschewing the requisite analysis, other than that BLM desired to go another direction with its

land management planning.  This oversight was not harmless, because it pervaded the entirety of

BLM's NEPA analysis.  *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 569-70 (9th Cir. 2016)

(invalidating NEPA analysis because "the inaccurate information and unsupported assumption

materially impeded informed decisionmaking and public participation); *WildEarth Guardians v.

Montana Snowmobile Ass'n*, 790 F.3d 920, 925-26 (9th Cir. 2015) (same).

    That other landowners may respond to BLM's new RMPs by altering their management

and affecting natural resources shared in common is reasonably foreseeable, contrary to BLM's

protestations to the contrary.  Fed. Defs. Br. at 31.  This issue was raised before BLM in the

administrative process.  IND_0779928 ("If BLM continues to pursue a path that departs from the

NWFP (ACS, survey and manage) it needs to discuss how its decreased protection

responsibilities will affect the functionality of the NWFP, other landowners, including the Forest

Service's responsibilities to pick up the slack, and how BLM's reductions in protections affect

the assumptions upon which Habitat Conservation Plans on nonfederal lands are based");

IND_0136153 ("The DEIS Plan simply fails to mention or consider the very real concerns of the

neighboring nonfederal property owners.  Through past Forest Plan public involvement these

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

issues have been voiced and written to forest planners—yet, the current proposed DEIS neglects to address the severe potential and ongoing impacts about how "border" BLM forest management effects their neighbors."); IND_0136155 ("The lesson here is that the BLM forests do not exist in a vacuum.  Whatever practices are implemented within the national forests will generate consequences for neighboring properties and their owners.  Those landowners deserve a formal seat at the table"); IND_0659762-0659769; IND_0039461-0039467, but BLM failed to address it, instead stating that consideration of the synergistic effects of BLM's secession from the Plan was outside the scope of its analysis.  IND_0507880.  NEPA case law belies this conclusion.  *Native Vill. of Point Hope*, 740 F.3d at 502-05.

      D.      <u>BLM's NEPA Handbook Supports Review of Reasonably Foreseeable Impacts of BLM's Decision To Secede from the Northwest Forest Plan.</u>

      Federal Defendants cite to BLM's own NEPA Handbook for the premise that BLM need not assess the effects of other landowners responding to BLM's actions, but the Handbook actually supports Pacific River's position.  The Handbook states that "reasonably foreseeable future actions are those for which there are existing decisions, funding, formal proposals, <u>or which are highly probable, based on known opportunities or trends</u>."  Bureau of Land Management, *National Environmental Policy Act Handbook* (June 24, 2018) at 59, IND_0379897-0380080 (emphasis added).  It is highly probable that other land managers will respond in some fashion with their own land management now that BLM has seceded from the interagency Northwest Forest Plan, particularly based on "known...trends" in how federal and nonfederal lands were managed in the past under the Plan and the ecological and legal implications of that management.[11]  In reality, BLM's actions reopen the carefully crafted

_____

[11] Indeed, Federal Defendants fail to respond at all to Pacific Rivers' arguments in its opening brief outlining the ecological conditions that led to the Northwest Forest Plan, or rebut the ecological and legal conclusions that a coordinated approach across at least federal lands was

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION     -28-

*Earthjustice*
705 Second Ave., Suite 203
Seattle, WA  98104-1711
(206) 343-7340

*détente* embodied in the Northwest Forest Plan that provided reasonable certainty for nonfederal and other federal land managers, and there will be repercussions from this unilateral decision.

The Northwest Forest Plan is not an ordinary agency action that dictates activities on only a single unit of federal public land. Instead, the Northwest Forest Plan is a comprehensive, interagency land management plan with signatories from several federal land management agencies that committed those agencies to a cooperative agreement affecting millions of acres of federal land across several jurisdictions. Over the last 25 years, nonfederal and other federal landowners made assumptions in reliance on that joint federal framework. Now that BLM has unilaterally seceded from that framework, those nonfederal and federal entities will be forced to reevaluate their assumptions and are likely to alter their management accordingly. Because BLM has steadfastly refused to analyze these effects, the decision to secede from the Northwest Forest Plan is arbitrary, capricious, and not in accordance with NEPA.

## IV.  THE REVISED RMPS VIOLATE THE O&C ACT BECAUSE THEY ADMITTEDLY INCREASE ECONOMIC INSTABILITY FOR LOCAL ECONOMIES.

It is undisputed that the O&C Act requires "permanent forest production...for the purpose of contributing to the economic stability of local communities and industries...." 43 U.S.C. § 2601. Relatedly, and according to BLM, one of the primary purposes for the revision of BLM's Southwest Oregon RMPs was to address the "substantial, long-term departure from the timber management outcomes predicted under the 1995 RMPs." FEIS at xxiii. Essentially, harvest levels had been below those predicted in the 1995 RMPs, and BLM sought to increase the harvest level over the status quo by 37%. FEIS at 112, 351-353, 355, 679; IND_0023552

---

required for all federal land managers to meet their legal obligations. BLM cannot simply ignore this history and focus narrowly on the impacts on its own landholdings; indeed, the courts have repeatedly held that this approach unlawful. *Fox Television*, 556 U.S. at 515.

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION         -29-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

(internal p. 33).  Unfortunately for the local communities affected by the RMP revision, BLM concluded that "the Proposed RMP with harvest volumes that exceed current levels are likely to introduce greater instability into local economies."  FEIS at 702 (emphasis added).  Despite this negative conclusion, BLM adopted the RMP revisions.

BLM and Intervenors first allege that (1) Plaintiffs are attacking BLM's sustained yield calculations, and (2) taken to its logical extreme, Plaintiffs' argument would compel a zero harvest outcome.  Fed. Defs. Br. at 34-35; Int. Br. at 23.  The Court should not fall for this misdirection.  Plaintiffs have cited BLM's own economic analysis supporting its revised RMPs that concluded additional harvest over the current level of approximately 203 MMbf/year will create economic instability in affected communities.  Plaintiffs have not mounted a challenge to the way in which the sustained yield calculations or other economic determinations were made.  The O&C Act is clear that a purpose of the statute is to "contribute to the economic stability of local communities and industries," not destabilize them.  Federal Defendants cannot hide from their own analysis and conclusions.

Second, BLM argues that the proposed RMPs reduce the amount of timber harvest on O&C lands over the Northwest Forest Plan, presumably in an attempt to undermine its own conclusion in the FEIS that additional timber harvest will destabilize local communities.  Fed. Defs. Br. at 34.  Plaintiffs agree with BLM that the Northwest Forest Plan as written predicted timber harvest levels of approximately 400 MMbf/year on O&C lands.  Id.  However, the Northwest Forest Plan as written has not been implemented on O&C lands, as BLM acknowledges.  FEIS at xxiv ("The No Action alternative is implementation of the 1995 RMPs as written (in contrast to BLM's current implementation practices under the 1995 RMPs)").  Instead, approximately 203 MMbf of timber has been harvested annually from O&C lands under

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION          -30-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

the Northwest Forest Plan.  Because the RMPs increase the predicted annual harvest level to 278 MMbf, local economic instability will result.  FEIS at 353 (harvest increase), 702 (instability will result).  This economic instability, as a result of BLM's action to approve the RMPs, violates the O&C Act.

Intervenors do not engage Plaintiffs' O&C Act claim directly, instead taking issue with Plaintiffs' characterization of the O&C Act as a multiple use law and relying on a marginalized Ninth Circuit case, *Headwaters v. BLM*, 914 F.2d 1174 (9th Cir. 1990), to make its case.  Int. Br. at 15-25.  Although Intervenors go to great lengths to argue that *Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. 1291 (W.D. Wash. 1994) and *Seattle Audubon Soc'y v. Babbitt*, 998 F.2d 705 (9th Cir. 1993) did not conclude that the O&C Act was a multiple use law, a quick reading of those cases makes it plain that they held that BLM had the discretion to manage the O&C lands for multiple uses in addition to a permanent supply of timber.  *See Lyons*, 871 F. Supp. at 1314 ("Decisions more recent than *Headwaters* confirm that in managing the O&CLA lands BLM must fulfill conservation duties imposed by other statutes" such as the ESA and NEPA).

Moreover, *Headwaters* was almost entirely a NEPA case discussing whether the environmental analysis for a timber sale in northern spotted owl habitat met the requirements of the law; only at the end of the opinion did the Ninth Circuit reach the issue of O&C Act interpretation.  *Headwaters*, 914 F.2d at 1183-84.  In fact, the appellate court's O&C Act holding is arguably dicta, as it was not central to the Court's decision in the case.  The dissent in *Headwaters* was prescient: as Judge Ferguson predicted, the importance of *Headwaters* was short lived due to the impending protection of the northern spotted owl under the ESA.  *Id.* at 1184 (Ferguson, J. dissenting).

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

Finally, while the Ninth Circuit in *Headwaters* stated that the O&C Act was a timber dominant statute, that conclusion was unsupported by the plain language and legislative history of the Act.  The Ninth Circuit simply got it wrong when it held that "there is no indication that Congress intended 'forest' to mean anything beyond an aggregation of timber resources" and that "nowhere does the legislative history suggest that wildlife habitat conservation or conservation of old growth forest is a goal on a par with timber production, or indeed that it is a goal of the O & C Act at all."  914 F.2d at 1183-84.  To the contrary, the Senate Report accompanying the legislative proposal that would eventually become the O&C Act observed that the new law would produce dramatically different results than the status quo, because prior to enactment, "No provision was made for the administration of the land on a conservation basis looking toward the orderly use and preservation of its natural resources."  IND_0527230. Representing the Department of Interior, Rufus G. Poole testified that "This bill has been prepared by the Department with more than the usual care and represents in the Department's belief a very sound program of forest management.  It can be described simply as a management plan for permanent forest protection in accordance with recognized silvicultural practices...." *Hearing on H.R. 5858, A Bill Relating to the Revested Oregon and California Railroad and Reconveyed Coos Bay Wagon Road Grant Lands Situated in the State of Oregon Before the Committee on the Public Lands, 75th Congress*, 6 (April 13, 1937) (Statement of Rufus G. Poole, Office of the Secretary, Department of the Interior) (emphasis added), IND_0526935.  Members of Congress and others who testified in support of the bill that would become the O&C Act recounted disastrous forest liquidation in the Midwest and Pacific Northwest as strong motivation for enacting a new statutory framework that would permanently protect the forested resource for future generations.  *See Hearing on H.R. 5858, A Bill Relating to the Revested*

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION            -32-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

*Oregon and California Railroad and Reconveyed Coos Bay Wagon Road Grant Lands Situated in the State of Oregon Before the Committee on the Public Lands, 75th Congress*, 16 (April 13, 1937) (Statement of W.B. Greeley, Manager, West Coast Lumbermen's Association and former Forest Service Chief), IND_0526945; IND_0526939. The legislative history of the O&C Act forthrightly belies the Ninth Circuit's conclusion that the O&C Act installed a timber-first management scheme.

The Department of Interior and BLM have also long viewed the O&C lands as multiple use lands, similar to the national forestlands managed by the Forest Service in the Department of Agriculture. In 1941, Interior Assistant Secretary Chapman explained that "it is the opinion of this office that Congress intended, by the act of 1937, that the lands and timber involved should be used in the same manner and for the same purposes as those within national forest reservations...." 1941 I.D. LEXIS 23, *10 (August 25, 1941). Later, in a 1979 memorandum from BLM to the Interior Solicitor seeking clarification about management of the O&C lands, the BLM Director stated:

> Over the years, we have managed these O&C lands on the principles of multiple use management. Our basis for multiple use management has been (1) the O&C Act, which lists several uses including timber production without any indication of any one use being dominant, (2) the numerous legislative and Executive Orders direction that has been applied equally to O&C lands and other Federal lands since 1937, and (3) the annual Appropriations Acts which have funded a variety of multiple use activities on these lands, i.e., wildlife and fishery projects, intensive recreation development.

IND_0526880.[12] Similarly, in 1981 the Oregon BLM sought guidance from BLM Director and the Interior Solicitor that Oregon's interpretation of the O&C Act as a multiple-use statute under

---

[12] The Associate Solicitor later acknowledged that "The term 'commercial forestry' cannot be found in the O&C Act nor can support for dominant use for commercial forestry (as opposed to permanent forest production) be supported by its legislative history or by BLM's continued administration and implementation of the Act since 1937... As stated above, permanent forest

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION        -33-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

the umbrella of ensuring permanent forest production was legally accurate. *Memorandum to Director, Bureau of Land Management from State Director, Oregon Regarding Interpretation of the O&C Act (May 4, 1981)*, attached as Exhibit 1 to Parekh Decl.  Oregon BLM explained that

> Applying the Bureau's multiple use management policy to western Oregon forest lands points the decision choice toward an alternative that balances the level of timber production with other non-timber values.  The policy would eliminate those alternatives that are too strongly single use in their orientation (e.g. the alternative of maximizing timber production) or do not give adequate weight to the goal of maintaining community stability (e.g. the alternative of placing predominate emphasis on non-timber uses).

*Id*.  BLM explained that under the Bureau's "multiple use orientation,"

> Heavy public use associated with recreation and scenic values, and sports hunting and fishing sustains major economic values to the local economies.  Anadromous fish production from cradle streams found on O&C lands supports a major commercial fishery that is of local and regional importance.  Therefore, the primary thrust of the management program on the O&C lands is to provide a high-level and undiminishing output of wood under the principle of sustained yield and recognize and provide for these other needs so as to maintain the economic stability of the local communities and industries....

*Id.* at 2-3.  In response to BLM's inquiry, the Solicitor explained that based on a review of the O&C Act, legislative history, and subsequent legislation,

> We have concluded that the O&C Act places <u>forest production</u> in the dominant role within the entire scheme of the Bureau's management of the O&C lands.  Further, the Act clearly does not mandate exclusive use, but instead requires management for other interests as well as timber supply.  Therefore, the Bureau must see that its operations meld the dominant use of forest production with those aspects of multiple use envisioned by the O&C Act in addition to any relevant requirements specified in subsequent legislation.  Thus, to the extent the Bureau's proposed policy, or portions thereof, fulfills this function, then it meets the test for legal sufficiency.

---

production is to be maintained for various purposes which include, inter alia, recreation.  Accordingly, there is no basis to conclude that recreation is always subordinate to the other purposes mentioned in the O&C Act as a matter of law."  IND_0526873.  Inexplicably this persuasive internal legal analysis was not before the Ninth Circuit in *Headwaters*, but it squarely rejects Intervenors' characterization of the O&C Act as a timber-only law.

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION          -34-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

*Memorandum to Director, Bureau of Land Management from Solicitor regarding Review of Policy Statement for Multiple-Use Management of the Oregon and California Railroad and Coos Bay Wagon Road Revested Lands (O&C Lands) (September 8, 1981)* at 1 (emphasis added), attached as Exhibit 2 to Parekh Decl.

In sum, *Headwaters* was wrongly decided and has been largely superseded by later court decisions regarding the requisite multiple use management of the O&C lands. The case has no bearing on whether BLM violated the O&C Act by promulgating RMPs that the agency itself acknowledged would contribute to economic instability in local O&C communities.

## CONCLUSION

For the reasons discussed above and in their opening brief, plaintiffs Pacific Rivers, Cascadia Wildlands, Coast Range Association, Klamath-Siskiyou Wildlands Center, Oregon Wild, The Wilderness Society, PCFFA, Institute for Fisheries Resources, and Umpqua Watersheds ask the Court to grant their motion for summary judgment, vacate and remand the revised RMP RODs, vacate the NMFS and FWS biological opinions, and reinstate the Northwest Forest Plan, including its Aquatic Conservation Strategy, on these BLM lands.

Respectfully submitted this 29th day of June, 2018.

*/s/ Kristen L. Boyles*
KRISTEN L. BOYLES (WSB #23806)
kboyles@earthjustice.org
JAIMINI PAREKH (CSB #309983)
jparekh@earthjustice.org
(*Admitted Pro Hac Vice*)
TODD D. TRUE (WSB #12864)
ttrue@earthjustice.org
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
(206) 343-7340 | Phone
(206) 343-1526 | Fax

SUSAN JANE M. BROWN (OSB #054607)
brown@westernlaw.org
Western Environmental Law Center
4107 N.E. Couch Street
Portland, OR  97232
(503) 914-1323 | Phone
(541) 485-2457 | Fax

*Attorneys for Plaintiffs Pacific Rivers, Cascadia
Wildlands, Coast Range Association, Klamath-
Siskiyou Wildlands Center, Oregon Wild, The
Wilderness Society, PCFFA, Institute for Fisheries
Resources, and Umpqua Watersheds*

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2018, I electronically filed the foregoing *Reply in Support of Motion for Summary Judgment* with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.


/s/ Kristen L. Boyles
Kristen L. Boyles

PACIFIC RIVERS' REPLY IN SUPPORT OF
SUMMARY JUDGMENT MOTION          -37-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*