CLIFFORD E. STEVENS, JR.
SHAUN M. PETTIGREW
U.S. Department of Justice
Environment & Natural Resources Division
601 D Street, NW
Washington, D.C. 20004
Phone: (202) 353-7548 (Stevens)
(202) 305-3895 (Pettigrew)
Fax: (202) 305-0506
clifford.stevens@usdoj.gov
shaun.pettigrew@usdoj.gov

*Counsel for Federal Defendants*

THE HONORABLE JOLIE A. RUSSO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PACIFIC RIVERS, et al.,

      Plaintiffs,

      v.

UNITED STATES BUREAU OF LAND
MANAGEMENT, et al.,

      Federal Defendants,

  and

ZUBER & SONS LOGGING, LLC, et al.,

      Defendant-Intervenors.

_____

Case No.: 6:16-cv-01598-JR

FEDERAL DEFENDANTS' REPLY
MEMORANDUM IN SUPPORT OF CROSS
MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 2

I.  The ESA BiOps Are Supported by the Record and Should Be Upheld ............................. 2

    A.  The Whole Record Shows That The Services Considered the NWFP
    ACS .................................................................................................... 2

    B.  Plaintiffs' Reliance on NMFS' DEIS Comments is Misplaced Because
    BLM Made Changes to the Proposed Action to Address Those
    Comments ............................................................................................ 6

    C.  Plaintiffs Identify No "Abandonment" of Agency Policy or Directly
    Inconsistent Factual Findings Requiring More Explanation ......................... 9

        1.  The "Failure to Explain" Cases Cited By Plaintiffs Do Not Apply
        Here .......................................................................................... 9

        2.  NMFS Did Not Find That The NWFP Or Its Riparian Reserve System
        Is the Only Way to Avoid Jeopardy ............................................... 11

        3.  Contrary to Plaintiffs' New Argument on Reply, BLM Included a Landscape
        Level Strategy in Response to NMFS' Comments ............................. 15

        4.  There is No "Unexplained" Inconsistency Between NMFS' BiOp and the
        1997 Biological Opinion for the NWFP ......................................... 17

    D.  The RMPs Provide Comparable or Better Protections for New
    Roads ................................................................................................. 19

II.  The FEIS Took a Hard Look at the Direct, Indirect, and Cumulative
  Effects of Management under the 2016 RMPs ............................................. 21

    A.  The FEIS Reasonably Considered Current Management Practices on Non-BLM
    Land When Examining the Cumulative Impacts of the 2016 RMPs. .............. 21

    B.  Motor Vehicle Manufacturers Ass'n and Its Progeny are Irrelevant to Plaintiffs'
    NEPA Claims. ..................................................................................... 27

III.  The 2016 RMPs Comply with the O&C Act ............................................. 29

CONCLUSION.................................................................................................................. 35

## TABLE OF AUTHORITIES

**CASES**      **PAGE**

*Alaska Ctr. for Env't v. U.S. Forest Serv.*,
    189 F.3d 851 (9th Cir. 1999) ................................................................... 15

*Alcoa, Inc. v. Bonneville Power Admin.*,
    698 F.3d 774 (9th Cir. 2012) ................................................................... 28

*Baker v. Barnhart*,
    457 F.3d 882 (8th Cir. 2006) ................................................................... 26

*Barnhart v. Walton*,
    535 U.S. 212 (2002) ................................................................................. 34

*Butte Envtl. Council v. U.S. Army Corps of Eng'rs*,
    620 F.3d 936 (9th Cir. 2010) ................................................................... 12

*City of Davis v. Coleman*,
    521 F.2d 661 (9th Cir. 1975) ................................................................... 24

*Coleman v. Estes Express Lines*,
    631 F.3d 1010 (9th Cir. 2011) ................................................................. 29

*Conner v. Burford*,
    848 F.2d 1441 (9th Cir. 1988) ................................................................... 3

*Consol. Salmonid Cases*,
    713 F. Supp. 2d 1116 (E.D. Cal. 2010) ................................................... 15

*Ctr. for Biological Diversity v. Lubchenco*,
    758 F. Supp. 2d 945) (N.D. Cal. 2010) ..................................................... 6

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
    807 F.3d 1031 (9th Cir. 2015) ......................................................... 3, 6, 19

*Defenders of Wildlife v. Zinke*,
    856 F.3d 1248 (9th Cir. 2017) ................................................................. 12

*Defs. of Wildlife v. Hall*,
    565 F. Supp. 2d 1160 (D. Mont. 2008) ................................................... 10

*Douglas Timber Operators v. Salazar*,
    774 F. Supp. 2d 245 (D.D.C. 2011) ........................................................ 33

*El Rescate Legal Servs. v. Exec. Office of Immigration Review*,
    959 F.2d 742 (9th Cir. 1991) ............................................................... 27

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) ...................................................................... 27

*Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*,
    451 F.3d 1005 (9th Cir. 2006) ............................................................ 22

*FCC v. Fox Television Stations*,
    556 U.S. 502 (2009) ................................................................... 10, 27

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
    378 F.3d 1059 (9th Cir. 2004) ............................................................ 21

*Grand Canyon Trust v. U.S. Bureau of Reclamation*,
    623 F. Supp. 2d 1015 (D. Ariz. 2009) ................................................. 10

*Headwaters, Inc. v. BLM*,
    914 F.2d 1174 (9th Cir. 1990) ............................................................ 34

*Humane Society v. Locke*,
    626 F.3d 1040 (9th Cir. 2010) ............................................................ 10

*Kern Cty. Farm Bureau v. Allen*,
    450 F.3d 1072 (9th Cir. 2006) .............................................................. 3

*Klamath-Siskiyou Willdlands Ctr. v. NOAA*,
    99 F. Supp. 3d 1033 (N.D. Cal. 2015) ................................................. 24

*Lands Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2005) ............................................................ 26

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins.*,
    463 U.S. 29 (1983) ....................................................... 9, 18, 20, 27

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007) ...................................................................... 34

*Nat'l Mining Ass'n v. Zinke*,
    877 F.3d 845 (9th Cir. 2017) ................................................... 30, 31, 32

*N. Plains Res. Council v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir. 2011) ............................................. 21, 22, 23, 24

*Northwest Environmental Defense Center v. Bonneville Power Administration*,
    477 F.3d 668 (9th Cir. 2007) ................................................................................ 9

*Nw. Ecosystem All. v. FWS*,
    475 F.3d 1136 (9th Cir. 2007) ............................................................................... 7

*Organized Vill. of Kake v. U.S. Dep't of Agriculture*,
    795 F.3d 956 (9th Cir. 2015) ............................................................................... 27

*Pacific Coast Federation of Fishermen's Ass'ns ("PCFFA") v. NMFS*,
    482 F. Supp. 2d 1248 (W.D. Wash. 2007) ........................................................... 11

*Pac. Rivers v. Shepard*, 3:11-CV-442-HU,
    2012 WL 950032 (D. Or. Mar. 20, 2012) ............................................................ 33

*Portland Audubon Soc'y v. Babbitt*,
    998 F.2d 705 (9th Cir. 1993) ............................................................................... 34

*Rock Creek All. v. FWS*,
    390 F. Supp. 2d 993 (D. Mont. 2005) .................................................................. 10

*Rybachek v. EPA*,
    904 F.2d 1276 (9th Cir. 1990) ............................................................................. 26

*Salmon River Concerned Citizens v. Robertson*,
    32 F.3d 1346 (9th Cir. 1994) ............................................................................... 21

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) ................................................................................. 6

*San Luis & Delta-Mendota Water Auth. v. Salazar*,
    666 F. Supp. 2d 1137 (E.D. Cal. 2009) ................................................................. 6

*Seattle Audubon Soc'y v. Lyons*,
    871 F. Supp. 1291 (W.D. Wash. 1994) ................................................................ 34

*Selkirk Conservation All. v. Forsgren*,
    336 F.3d 944 (9th Cir. 2003) ............................................................................... 23

*Wasco Prods. v. Southwall Techs.*,
    435 F.3d 989 (9th Cir. 2006) ........................................................................ 28, 29

*Watt v. Alaska*,
    451 U.S. 259 (1981) ............................................................................................. 34

**STATUTES**

5 U.S.C. § 706 ................................................................................................ 6

16 U.S.C. § 1536(a)(2) .................................................................................. 3

43 U.S.C. § 1701 ........................................................................................... 30

43 U.S.C. § 1702(c) ...................................................................................... 30

43 U.S.C. § 2601 ........................................................................................... 29

**FEDERAL REGULATIONS**

36 C.F.R. § 294.11 ........................................................................................ 20

43 C.F.R. § 1601.0-6 .................................................................................... 28

50 C.F.R. § 402.02 ........................................................................................ 21

50 C.F.R. § 402.03 ........................................................................................ 35

81 Fed. Reg. 7214 (Feb. 11, 2016) ............................................................. 19

## TABLE OF ACRONYMS

| | |
|---|---|
| ACS | Aquatic Conservation Strategy |
| APA | Administrative Procedure Act |
| BiOp | Biological Opinion |
| BMP | Best Management Practice |
| BLM | U.S. Bureau of Land Management |
| DEIS | Draft Environmental Impact Statement |
| DOI | U.S. Department of the Interior |
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| FWS | U.S. Fish and Wildlife Service |
| NCO | Northwestern and Coastal Oregon |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NSO | Northern Spotted Owl |
| NWFP | Northwest Forest Plan |
| O&C Act | Oregon and California and Coos Bay Wagon Road Grant Lands Act of 1937 |
| RIEC | Regional Interagency Executive Committee |
| RMP | Resource Management Plan |
| ROD | Record of Decision |

SPTH            Site Potential Tree Height

SWO             Southwestern Oregon

**KEY TO CITED RECORD DOCUMENTS**

With Bates Pages in BLM, NMFS or FWS Record

| | |
|---|---|
| 5/5/15 ESA Meeting | ESA Riparian/Aquatic Technical Team Meeting Summary (May 5, 2015), IND_ 0154545 (email); IND_0776715 (attachment) |
| 8/21/15 Letter | NMFS Comments on Draft Environmental Impact Statement (August 21, 2015), NMFS1_0003092-0003151 |
| 10/7/15 ESA Meeting | ESA Consultation Meeting, NWFP ACS "Crosswalk" with Proposed RMP Strategy (October 7, 2015), NMFS1_0003460-0003485 |
| 10/15/15 Draft | Email Attachment re Draft ESA Biological Assessment (October 15, 2015), IND_0116353 (email); IND_0786811 (attachment) |
| 12/9/15 ESA Meeting | Biological Assessment Briefing Meeting Notes (December 12, 2015), IND_0089366 (email); IND_0793755 (attachment) |
| 12/10/15 Email | Email re Riparian Reserve Changes, IND_0097301-0097302 |
| 12/18/15 Letter | Clarification of NMFS Comments on Draft Environmental Impact Statement (December 18, 2015), NMFS1_0003946-0003948 |
| 1941 DOI Opinion | Opinion of the Assistant Secretary of the Department of the Interior, Applicability of Mining Laws to Revested Oregon and California and Reconveyed Coos Bay Grant Lands, August 25, 1941, IND_0526907-0526913 |
| 1955 DOI Opinion | Memorandum from Regional Solicitor, Department of the Interior, Authority of the Secretary of Interior to Make Withdrawals of O&C Lands for Recreational Purposes, May 17, 1955, IND_0526893-0526902 |
| 1981 DOI Opinion | Memorandum from Solicitor, Department of the Interior, Review of BLM Policy Statement for Multiple Use Management of the Oregon and California Railroad and Coos Bay Wagon Road Revested Lands (O&C Lands), September 8, 1981, IND_0519661-0519671 |
| 1986 DOI Opinion | Memorandum from Associate Solicitor, Department of the Interior, Statutes Governing Management of the Northern Spotted Owl, October 20, 1986, IND_0526723-0526733 |

| | |
|---|---|
| 1997 BiOp | NMFS ESA Section (7)(a)(2) Biological Opinion and Conference Opinion (March 18, 1997), IND_0050808-0050887 |
| 2014 RMP Update | BLM Update for Kim Kratz of NMFS on Proposed RMP (November 17, 2014), NMFS1_0000869-877 |
| BLM NEPA Handbook | BLM NEPA Handbook (January 2008), IND_0379897-0380080 |
| Consultation Agreement | ESA Consultation Agreement Between BLM, FWS, and NMFS (June 2013), NMFS1_0000202-211 |
| Consultation Timeline | ESA Consultation Integrated Timeline (March 19, 2013), NMFS1_0000199-201 |
| DEIS | Draft Environmental Impact Statement, IND_0172601-0173084 (vol. 1), IND_0516602-0517085 (vol. 2), IND_0515462-0515765 (vol. 3) |
| FEIS | Final Environmental Impact Statement, IND_0514323-0514918 (vol. 1), IND_0513345-0513906 (vol. 2), IND_0513907-0514322 (vol. 3), IND_0514919-0515458 (vol. 4) |
| FWS BiOp | FWS ESA Section 7(a)(2) Biological Opinion (July 20, 2016), FWS_000001-001086 |
| Medford ROD | Record of Decision for the Medford District Resource Management Plan, IND_0246196-0246468 |
| NCO ROD | 2016 Northwestern and Coastal Oregon Record of Decision and Resource Management Plan, IND_0512693-0513012 |
| NMFS BiOp | NMFS ESA Section 7(a)(2) Biological Opinion (July 16, 2016), FWS_082903-083297 |
| NMFS BiOp Briefing | Memorandum on ESA Consultation with BLM for Western Oregon Plan Revision (June 2, 2016), NMFS1_0004439-00004442 |
| NMFS Presentation | NMFS Presentation on Resource Management Plans (June 2016), NMFS1_0005008-0005026 |
| NWFP EIS | Final Supplemental Environmental Impact Statement on Management of Habitat for Late-Successional and Old-Growth Forest-Related Species Within the Range of the Northern Spotted Owl, Vol. 1, IND_0865313-0865868 |

| | |
|---|---|
| NWFP S&G | Northwest Forest Plan Standards and Guidelines, IND_0503374-0503526 |
| NWFP ROD | Northwest Forest Plan Record of Decision, IND_0381473-0381550 |
| O&C Act Hearings | Transcript of Hearings before the Committee on the Public Lands, House of Representatives, on H.R. 5858, A Bill Relating to the Revested Oregon and California Railroad and Reconveyed Coos Bay Wagon Road Grant Lands Situated in the State of Oregon (May and June 1937), IND_0526963-0527219 |
| O&C Act House Report | Report of the House Committee on the Public Lands, Revested Oregon & California Railroad and Reconveyed Coos Bay Wagon Road Grant Lands Situated in Oregon (June 23, 1937), IND_0527222-0527227 |
| SWO ROD | 2016 BLM Southwestern Oregon Record of Decision and Resource Management Plan, IND_0513013-0513344 |
| WOPR EIS | Final Environmental Impact Statement for the Revision of the Resource Management Plans of the Western Oregon Bureau of Land Management, Vol. 1, October 2008, IND_0520542-0521080 |

## INTRODUCTION

Plaintiffs' arguments on reply challenging the Endangered Species Act ("ESA") biological opinions ("BiOps") of the National Marine Fisheries Service ("NMFS") and the U.S. Fish & Wildlife Service ("FWS") (collectively, "Services") are contradicted by the administrative record and unsupported by case law.  Plaintiffs assert the Court may not look to any record evidence other than the BiOps themselves to determine whether the Services considered the Northwest Forest Plan Aquatic Conservation Strategy ("NWFP ACS") in finding that the 2016 western Oregon resource management plans ("RMPs") of the U.S. Bureau of Land Management ("BLM") would not jeopardize ESA-listed species or adversely modify their critical habitat.  To the contrary, the Court must examine the whole administrative record. And the record here shows the Services extensively considered the NWFP ACS – even though they were not required to compare the proposed RMPs to that prior action.  Plaintiffs also continue to take grossly out of context NMFS' comments on BLM's draft environmental impact statement ("DEIS").  The record shows that after NMFS made its comments, BLM responded by making many changes to the proposed RMPs that were key to the Services' no-jeopardy findings. Plaintiffs also place undue weight on a line of cases developed to address situations where agencies completely failed to explain stark reversals in their own policies.  Here, the Services did not make any radical departure from the NWFP ACS.  They evaluated another agency's action that incorporated and updated the NWFP ACS.  Finally, Plaintiffs paint a false picture regarding new roads: the record shows that the RMPs are as or more protective as the NWFP.

Moreover, none of Plaintiffs' arguments supports a violation of the National Environmental Policy Act ("NEPA").  Rather, Plaintiffs continue to insist that BLM engage in wholesale speculation to determine whether other land managers in the region will respond to the

2016 RMPs by changing their own management, guess as to how they will respond, and assess the potential environmental consequences of any such speculative changes. NEPA, however, does not mandate such an analysis. Instead, the final environmental impact statement ("FEIS") satisfied NEPA by assessing the reasonably foreseeable impacts of the 2016 RMPs based on current management practices on other lands. NEPA requires nothing more, and Plaintiffs' attempt to cobble together such a requirement using non-NEPA case law should be rejected.

Finally, Plaintiffs continue to misunderstand the Oregon and California and Coos Bay Wagon Road Grant Lands Act of 1937 ("O&C Act"). The plain language, legislative history, longstanding agency interpretation, and governing Ninth Circuit precedent establish that the O&C Act is a dominant-use statute that provides for the cutting, removing, and selling of timber based on sustained-yield principles to achieve a variety of purposes, including promoting the stability of local communities and industries. Because Plaintiffs do not argue that the 2016 RMPs fail to provide for the production of timber based on sustained-yield principles, their claim under the O&C Act fails. And even if the O&C Act required BLM to contribute to the stability of local communities and industries separate from providing for timber production on a sustained yield basis, Plaintiffs' claim would still fail because the 2016 RMPs do just that.

## ARGUMENT

### I. The ESA BiOps Are Supported by the Record and Should Be Upheld

#### A. The Whole Record Shows That The Services Considered the NWFP ACS

Plaintiffs' primary theory is that the Services disregarded the claimed "best available science," the decades-old NWFP ACS, in reaching their no-jeopardy conclusions. Pls. Reply (ECF No. 82) at 3-4, 6-8. As an initial matter, Plaintiffs inaccurately refer to the NWFP ACS itself as "science." *Id*. at 3, 10. The NWFP ACS, as adopted in the 1995 RMPs that the 2016 RMPs replace, is not itself "scientific and commercial data" within the meaning of ESA Section

7.  16 U.S.C. § 1536(a)(2).  Rather, the NWFP ACS represents a *past agency action*: an agency-adopted set of land use allocations and rules and policies to govern future activities.  Indeed, Plaintiffs at times admit as much.  Pls. Reply 8 (describing NWFP and its ACS as "policy" rather than science).

But even if the NWFP ACS itself constituted "science," the record as a whole shows that the Services – and in particular NMFS[1] – extensively considered the NWFP ACS prior to finding that the new RMPs would not cause jeopardy or adverse modification.  The Ninth Circuit has held that the ESA's "best available data" standard "merely prohibits [the Services] from *disregarding* available scientific evidence that is in some way better than the evidence [the Services] relie[d] on."  *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080-81 (9th Cir. 2006) (emphasis added) (rejecting best available science claim where plaintiff "point[s] to no data that was omitted from consideration") (citations omitted).  "Essentially, [the Services] cannot *ignore* available biological information."  *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1048 (9th Cir. 2015) (emphasis added) (quoting *Kern Cty Farm Bureau*, 450 F.3d at 1080-81, and *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988)).  Here, the Court cannot possibly find that the Services disregarded or ignored the NWFP ACS in the ESA consultation for the new RMPs.

NMFS' August 21, 2015 comment letter on the alternatives in BLM's DEIS – heavily relied upon by Plaintiffs – itself disproves any suggestion that NMFS did not consider and use the guidance of the NWFP ACS in evaluating BLM's proposed new RMPs as part of the ESA

---

[1] Virtually all of the aquatic species at issue here are within NMFS' jurisdiction.  Fed. Defs. Br. (ECF No. 75-1) at 26-27.

consultation.[2]  The letter refers extensively to the NWFP and/or its ACS, identifies the need in the RMPs for management direction focused on aquatic conservation comparable to the "standards and guidelines" of the NWFP ACS, and discusses the four key components of the NWFP ACS (riparian reserves, key watersheds, watershed analysis, and watershed restoration). *See*, *e.g.,* 8/21/15 Letter at 6-8, 42.  Similarly, NMFS' December 18, 2015 clarification letter shows that NMFS relied in large part on the NWFP ACS in advising BLM of the changes to its evolving proposed action that were needed to avoid ESA concerns.  12/18/15 Letter 1-3.

One key document – which Plaintiffs mischaracterize as only a table "buried in the response to comments section of the FEIS," Pls. Reply 12 – is the "crosswalk" of the NWFP ACS with the new aquatic conservation strategy of the RMPs.  This document appears at multiple points in the record and was a focus point for discussions between the Services and BLM during the consultation process.  For example, for an October 7, 2015 ESA consultation meeting, BLM prepared a document explaining "how the BLM will bring forward the concepts of the [NWFP ACS]" into the RMPs.  10/7/15 ESA Meeting 1.  The document states that the RMPs "will have the four major components of the [NWFP] ACS in a modified, evolved form," including "NWFP riparian reserves," "NWFP Key Watersheds," "NWFP Watershed Analysis," and "NWFP Watershed Restoration."  *Id*. at 1-2.  The document includes the "crosswalk" table showing how the RMPs' management objectives and direction – including for programs such as "fisheries" and "hydrology" that apply outside of the riparian reserves – correspond to the ACS

---

[2] In June 2013, the agencies entered into an agreement providing for a multi-year, structured informal consultation process in which the Services would provide input on BLM's proposed action *prior to* the initiation of formal consultation, including as part of the NEPA process. Consultation Agreement 1-3; Consultation Timeline 1-3; *see also* Fed. Defs. Br. 7.

objectives of the NWFP.  *Id*. at 3-9.  Other documents confirm that the Services considered the NWFP ACS.  *See*, *e.g.*, 10/15/15 Draft 1; 12/9/15 ESA Meeting 1-2.

Despite this record evidence, Plaintiffs insist that by the time of the BiOps, "all thoughts of the [NWFP] ACS had vanished."  Pls. Reply 6.  This argument ignores that ESA consultation is a process and that here the extensive process leading to the BiOps plainly involved consideration of the NWFP ACS.  Plaintiffs also know this claim is not true from their own interactions with NMFS.  On June 30, 2016, two weeks before NMFS issued its BiOp, NMFS met with Plaintiffs and gave a presentation comparing the NWFP and proposed RMPs, explaining that the inner zone of the RMPs' riparian reserves "provides more certainty than the Northwest Forest Plan," and walking through the newer science and data showing that the two-site-potential-tree-height ("SPTH") riparian reserve width of the NWFP[3] "does not contribute significantly to functions needed for clean water and fish."  NMFS Presentation 4-5, 7-8, 10, 14. Consistent with this presentation, a memorandum prepared for NMFS headquarters just before issuance of the BiOp states that, while superficially the optics suggested that BLM's updated strategy reduced protections, in actuality "[t]he information and analysis available to date suggest that the new strategy will provide consistent protection of the riparian zone and aquatic habitats supporting NMFS ESA-listed species."  NMFS BiOp Briefing 1.  All of this record evidence undermines any claim that NMFS did not consider the NWFP ACS.

Plaintiffs' suggestion that the Court must put on blinders and look only at the BiOps is contrary to law.  Pls. Reply 7.  Under the Administrative Procedure Act ("APA"), the Court must review the Services' ESA Section 7 findings based on the "whole record," and a decision is unlawful for failure to consider matters only where an agency "*entirely failed* to consider an

_____

[3] The NWFP allowed the two SPTH riparian reserve width to be reduced later.  Fed. Defs. Br. 20.

important aspect of the problem." 5 U.S.C. § 706; *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 996 (9th Cir. 2014) ("*After reviewing the record as a whole*, we are satisfied that, when developing each component of the BiOp, NMFS relied on the factors that Congress intended it to consider [and] considered all important aspects of the problem . . .") (emphasis added).  *See also San Luis & Delta-Mendota Water Auth. v. Salazar*, 666 F. Supp. 2d 1137, 1154-59 (E.D. Cal. 2009) (rejecting claim that a BiOp alone must show all of FWS' consideration of data, and finding after a review of the case law that "the issue . . . must be decided on the basis of the entire record"); *Ctr. for Biological Diversity v. Lubchenco*, 758 F. Supp. 2d 945, 957-58) (N.D. Cal. 2010) (finding agency consideration adequate based on a series of record documents, including scientific studies and personal communications by NMFS staff).[4]

   Furthermore, while Plaintiffs wrap their argument in the language of "best available science," they do not point to any superior, current scientific data on any specific issue that the Services should have but failed to consider.  Given the abundant record evidence that the Services (and NMFS in particular) considered the NWFP ACS, Plaintiffs fail to present any viable "best available science" claim under Ninth Circuit law in this case.

### B.  Plaintiffs' Reliance on NMFS' DEIS Comments is Misplaced Because BLM Made Changes to the Proposed Action to Address Those Comments

   On reply, Plaintiffs go so far as to suggest that BLM made no significant changes to the proposed RMPs to address NMFS' August 21, 2015 comment letter on the DEIS.[5]  To the contrary, the record shows that BLM made the necessary changes to address NMFS' concerns.

---

[4] Plaintiffs cite *Center for Biological Diversity*, 807 F.3d at 1048, Pls. Reply 7, but that case did not find a BiOp unlawful for failing to show consideration of scientific data in the BiOp itself as opposed to elsewhere in the record.

[5] *See*, *e.g.*, Pls. Reply 5 (NMFS' requested changes "had not been integrated into the RMPs"); *id.* at 15 ("the riparian reserve objectives did not change between the [DEIS] and the final RMPs").

FED. DEF. REPLY ON CROSS MOTION FOR SUMMARY JUDGMENT          6

First, while Plaintiffs rely heavily on NMFS' August 21, 2015 DEIS comments, that letter was not the agency's final word.  In its December 18, 2015 letter and subsequent communications, NMFS clarified its views regarding what changes to the proposed action were recommended to protect aquatic listed species.  Agencies are entitled to completely change their minds, and here NMFS only further clarified its position.  *See*, *e.g.*, *Nw. Ecosystem All. v. FWS*, 475 F.3d 1136, 1145 (9th Cir. 2007) ("the [agency] may change its mind after internal deliberation. . . .").  NMFS clarified that, while it did not view any of the four action alternatives in the DEIS (A through D) to be individually sufficient, "elements" of two alternatives could be combined and further developed to yield a sufficient aquatic conservation strategy.  12/18/15 Letter 1.  NMFS stated that it "expects that BLM will draw on the experience of implementation of the NWFP, new technologies, and adapting science to develop revised ACS components with objectives similar to those in the NWFP ACS."  *Id.*

None of the four DEIS alternatives that NMFS had found lacking included all four key NWFP ACS components.  For example, one of the "key elements" NMFS identified as missing in the DEIS alternatives was "[i]dentification and differential management of a network of aquatic-emphasis watersheds."  8/21/15 Letter 42.  To address this issue, BLM moved to a riparian reserve system that NMFS helped BLM to design.  *See*, *e.g.*, 5/5/15 ESA Meeting 2-4; 12/9/15 ESA Meeting 1-3.  The final riparian reserve strategy was not present in any of the DEIS alternatives; rather it combined "elements of each of the alternatives" and "carrie[d] forward the concept of key watersheds from the No Action alternative [(the 1995 NWFP-based plans)], in that it varies riparian management based on the importance of the subwatershed to the conservation and recovery of ESA-listed fish."  FEIS 86; Fed. Defs. Br. 15-16 (explaining riparian reserve class system of the RMPs).  Two other key components of the NWFP ACS that

NMFS' August 21 letter had identified as missing were: "[u]se of watershed-scale assessment and planning to guide land management actions" and "restoration of habitat with high intrinsic geomorphic potential." 8/21/15 Letter 42. These too were subsequently included as part of the proposed action submitted for formal consultation and reviewed in the BiOps.[6]

Multiple other record documents confirm that BLM made numerous, significant changes after the DEIS. The ACS "crosswalk" document discussed above serves as compelling evidence of how the dialogue between the Services and BLM led to changes from the DEIS alternatives to the final RMPs analyzed in the BiOps. *Compare* 2014 RMP Update 2 (November 2014 "crosswalk" noting absence of key watershed element and watershed analysis) *with* 10/7/15 ESA Meeting (October 2015 "crosswalk" showing addition of riparian reserve class system and watershed analysis and restoration); NMFS BiOp 27-45 (discussing same as reflected in final RMPs); FWS BiOp 12-14, Appendix C at 12, 16-17 (riparian reserve class system). *Also compare* 12/10/15 Email *with* FEIS 1842, NCO ROD 68-70, and SWO ROD 75-77 (changes in management objectives and direction and riparian reserve distance made in response to NMFS).

In short, Plaintiffs' reliance on NMFS' August 21, 2015 comment letter, which addressed very early proposals by BLM for a proposed action and was later significantly clarified by NMFS, is fundamentally misplaced. That letter only led to extensive further dialog between the agencies and major revisions to the proposed action reviewed in the BiOps.

---

[6] The final proposed action included as one of its key aquatic conservation measures the use of "Watershed-Scale Information for Implementation Actions," *see* NMFS BiOp 45, directly filling the gap identified by NMFS in the DEIS comment letter. One of the other aquatic conservation measures in the final proposed action was an elaborate watershed restoration program, again addressing the gap identified by NMFS in the DEIS comment letter, and it is focused on habitat with the greatest potential just as NMFS had specified. *See* NMFS BiOp 42-43.

C.     **Plaintiffs Identify No "Abandonment" of Agency Policy or Directly
Inconsistent Factual Findings Requiring More Explanation**

Beyond ignoring the record of the consultation, Plaintiffs continue to place undue weight

on "failure to explain" case law that has little if any application in this case.  Plaintiffs also

identify no factual inconsistencies on any specific issue that required more explanation.

1.    **The "Failure to Explain" Cases Cited By Plaintiffs Do Not Apply Here**

The "*Motor Vehicle* standard" line of cases on which Plaintiffs rely (Reply at 8-9)

involved a very different context: where agencies had provided no explanation at all for a new

policy.  Fed. Defs. Br. 12-13.  In *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins.*, 463

U.S. 29, 47-49 (1983), the agency previously had found that passive restraints (automatic

seatbelts or airbags) were necessary for auto safety, and then rescinded a passive restraint

requirement based solely on the deficiencies of automatic seatbelts without providing any

explanation why airbags were not a viable alternative.  While acknowledging that the agency

could reverse course, the Court found fatal that "[t]here are no findings and no analysis here to

justify the choice made, no indication of the basis on which the [agency] exercised its expert

discretion."  *Id.*[7]  By contrast, the BiOps provide voluminous analysis on the only issue that the

Services are required to consider under ESA Section 7: whether the new RMPs avoid jeopardy

and adverse modification.

Setting aside that the NWFP ACS was not the Services' policy, but rather BLM's, *see*

Fed. Defs. Br. 13, the Services did not in any sense completely "abandon" the NWFP ACS, as

passive safety restraints had been abandoned in *Motor Vehicles*.  As set out above, the record

shows that NMFS extensively considered the NWFP ACS and advised BLM to include all four

---

[7] Likewise, in *Northwest Environmental Defense Center v. Bonneville Power Administration*, 477
F.3d 668, 688 (9th Cir. 2007), the Ninth Circuit expressed frustration that the record essentially
contained "no explanation for why [the agency] would abandon the [program]."

components of it in the RMPs, updated to reflect new science and data and BLM's experience. *See also* Fed. Defs. Br. 15-17.  Nor is this a case where the record evinces that the Services had no "awareness" of BLM's update of the NWFP ACS, or where the Services "disregard[ed] facts and circumstances that underlay or were engendered by the prior policy."  *FCC v. Fox Television Stations*, 556 U.S. 502, 515-16 (2009) (upholding change in FCC policy where "[t]here is no doubt that the [agency] knew it was making a change.").

In the ESA Section 7 context, the line of cases relied upon by Plaintiffs would at most apply to directly inconsistent findings on a specific factual or scientific issue.  In *Humane Society v. Locke*, 626 F.3d 1040, 1045 (9th Cir. 2010), relied upon by Plaintiffs, the agencies had found that take of 5.5 to 17% of listed salmonids would have minimal adverse impacts, while NMFS found in another context that *lesser* mortality to those same salmonids *was having* a significant adverse impact.  Even on these facts, the Ninth Circuit rejected the claim that NMFS had made an "unexplained 'swerve' from 'prior precedent'" because the past findings were made in a different context.  *Id*. at 1050, n.4.  Finding no direct inconsistency in that situation, the Court distinguished a case where FWS had made a "factual determination that genetic exchange was unnecessary for the health of the wolf population [that] *directly contradicted* its earlier determination that such exchange was required."  *Id.* (emphasis in original) (citing *Defs. of Wildlife v. Hall*, 565 F. Supp. 2d 1160, 1170 (D. Mont. 2008)).  The Court emphasized that past agency findings that "are at most potentially inconsistent, not directly contradictory" were not enough.  *Id*.  Other district court cases cited by Plaintiffs similarly involved directly inconsistent factual findings on a specific issue.[8]  As explained in the next sections, Plaintiffs do not identify

---

[8] Pls. Reply 10 (citing *Grand Canyon Trust v. U.S. Bureau of Reclamation*, 623 F. Supp. 2d 1015, 1032–34 (D. Ariz. 2009) (inconsistent findings regarding the same flow regime for a dam);

any directly contradictory findings on any specific factual issue that could have required additional explanation by the Services.

Plaintiffs also mistakenly rely on *Pacific Coast Federation of Fishermen's Ass'ns ("PCFFA") v. NMFS*, 482 F. Supp. 2d 1248 (W.D. Wash. 2007). Pls. Reply 10-11. In that case, the Court found the Services were free to adopt a different method to evaluate proposed actions other than consistency with the NWFP ACS, but found that the Services had unlawfully adopted a "discretionary" draft analytical plan that constituted "wholesale deferral of analysis to the project level," and did so without a without a "reasoned" explanation. *PCFFA*, 482 F. Supp. 2d at 1267, 1269-70. Plaintiffs make a much narrower claim here, that NMFS unlawfully deferred its analysis for one future activity (new roads) to future site-specific consultations. Pls. Br. (ECF No. 62-1) at 27-29. As discussed below, Plaintiffs' argument is wrong: the RMPs include mandatory, non-discretionary sideboards for new roads comparable or better than the NWFP ACS, and NMFS fully analyzed those sideboards in the BiOp. NMFS also analyzed the RMPs' sideboards for multiple other activities across the BLM lands in question. NMFS BiOp 172-240 (analysis of effects of each category of future activities) and 241-320, 323-33 (analysis of impacts of those activities on listed species). Unlike in *PCFFA*, NMFS did not "wholesale" defer its analysis to later project-specific consultations, approve a "discretionary" replacement for the NWFP ACS, or fail to provide a "reasoned" explanation for its findings.

## 2.  NMFS Did Not Find That The NWFP Or Its Riparian Reserve System Is the Only Way to Avoid Jeopardy

For the most part, Plaintiffs do not even try to identify directly contradictory findings on a specific factual or scientific issue and instead resort to a much vaguer claim that NMFS found

---

*Rock Creek All. v. FWS*, 390 F. Supp. 2d 993, 1010 (D. Mont. 2005) (inconsistent findings regarding the importance of a particular subpopulation of bull trout)).

that the NWFP ACS is the "best available science" in some overarching sense, as the only or best

way to avoid jeopardy.  Pls. Reply 2, 4-5, 10.  But Plaintiffs do not cite any past finding that the

NWFP ACS is, as they claim NMFS found, "the best available science on managing forests to

protect threatened and endangered fish," or is "the best science in federal land forestry

consultations,"  Pls. Reply 4, 10.  It is implausible that the Services would find a more-than-two-

decades-old strategy to be unqualifiedly the best science today on every conceivable question or

technical issue.  Science does not stand still and new data have become available that bears on

the necessary measures to protect listed species.  Fed. Defs. Br. 21-22.

Plaintiffs also face a high bar to show any direct inconsistency between the BiOps and

past findings.  In *Defenders of Wildlife v. Zinke*, 856 F.3d 1248, 1262-63 (9th Cir. 2017), cited by

Plaintiffs as applying *Motor Vehicles*, the Ninth Circuit found that a BiOp did not need to

expressly address prior comments of an FWS field office regarding the protections needed for a

listed species, because changes had been made to the proposed action following those comments.

Thus, "even if the FWS's comments on the [NEPA document at issue] were construed to have

made factual or scientific findings, they would not be inconsistent with the FWS's conclusions . .

. in the BiOp because the [NEPA document] and the BiOp *evaluated substantially different*

*plans*." *Id*.;  *see also Butte Envtl. Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 936, 945 (9th

Cir. 2010) (finding that an agency's decision was not a "reversal" of prior critical comments by

the agency where there had been many changes made in response to those comments).

Running afoul of this case law, Plaintiffs rely almost entirely on statements in NMFS'

DEIS comment letters that evaluated different, earlier BLM proposals.  Plaintiffs argue that

NMFS' August 21 DEIS comment letter found "benefits of larger riparian reserves for

controlling stream temperatures," citing the NWFP's riparian reserve width of two SPTH (which

could actually be reduced on a case-by-case basis).  Pls. Reply 19; Fed. Defs. Br. 20.  But NMFS' clarification letter expressly stated that there are other ways to achieve the same benefits: "best available science supports both (a) two SPTH and (b) one SPTH, coupled with an aquatic conservation strategy that incorporates those identified elements on page 42 of the [August 21] letter."  12/8/15 Letter 2.  Based on the changes that BLM made to the riparian reserve system, the universe of other changes made by BLM after the DEIS, and the U.S. Environmental Protection Agency ("EPA") modelling and other scientific literature cited in the BiOp, NMFS thus reasonably found that a riparian reserve width of one SPTH with its 120-foot protected inner zone for fish-bearing and perennial streams was sufficient to maintain water temperature and other stream conditions.  NMFS BiOp 175-178; Fed. Defs. Br. 18-19.  BLM also produced a comparative analysis, not available at the time of the DEIS, showing that the proposed RMPs would protect stream conditions as well as or better than the NWFP-based plans.  *See*, *e.g.*, FEIS 293-97 (wood delivery), 297-301, 401-08 (sediment), 369-384 (temperature).

The parts of the August 21 letter quoted by Plaintiffs also do not support their claim that NMFS found the NWFP ACS is the best available science in some broad and overarching sense. The key quote relied on by Plaintiffs in fact relates solely to riparian reserves, and so cannot be interpreted to apply to the NWFP ACS as a whole.  The sentence states that the "*Riparian Reserves* created by the [NWFP] were developed by a broad group of scientists and reflected the general scientific consensus at the time as to the level of protection for recovery of salmon. . . ." 8/21/15 Letter 6 (emphasis added).  And even as to riparian reserves, the August 21 letter acknowledged that the NWFP ACS needed to be updated and did not reflect current scientific understanding, stating that because "streams are far more sensitive to shade removal that previously appreciated . . . . even past thinning in Riparian Reserves under the [NWFP ACS] . . .

has likely caused water temperature increases." 8/21/15 Letter 16.  The August 21 letter noted that a 120-foot no-thinning buffer – as implemented in the final RMPs but absent from the NWFP – "would minimize temperature effects" to listed fish.  *Id*. at 14.  In the end, the August 21 letter did not foreclose a different approach to riparian reserve width, stating only that BLM "needs to more clearly explain" its changes from the NWFP.  *Id*. at 7.

Plaintiffs' effort to minimize and distort NMFS' December 18, 2015 clarification letter also fails.  Plaintiffs selectively quote one statement in the letter that "the NWFP, and its ACS … reflect best available science," while omitting the text in the letter stating that the "statements . . . indicating that the NWFP, and its ACS (and riparian reserves designed around two [site potential tree height]) reflect best available science should not be taken out of context to mean that [riparian reserves] based on two [site potential tree height] is the only option that meets that test."  12/8/15 Letter 2.  In the clarification letter, NMFS further pointed to six elements on page 42 of the August 21, 2015 letter, all of which BLM intentionally incorporated into the final RMPs, that would make for "a more robust" strategy that adequately protected ESA-listed aquatic species.[9]  In the letter, NMFS disavowed any suggestion that the NWFP ACS was the only way to do so, stating that "[p]roductive discussions, since issuance of the [August 21] letter, validate our confidence that our joint effort to strengthen concepts of Alternative A and D could result in a proposed action that includes an appropriate aquatic conservation strategy for listed salmonids that is supported by the best available science."  12/18/15 Letter 2.  In sum, Plaintiffs'

---

[9] BLM addressed the first four elements by including all four components of the NWFP ACS, the fifth element by including binding management directions for riparian reserves and BLM programs applicable across all land use allocations, and the sixth through measures directed at climate change.  *See* NCO ROD 23; SWO ROD 23; FEIS 165, 199-202.

FED. DEF. REPLY ON CROSS MOTION FOR SUMMARY JUDGMENT                14

claim that NMFS previously made broad findings that the NWFP ACS is the only "best available" science or "bare minimum" is meritless.[10]

### 3. Contrary to Plaintiffs' New Argument on Reply, BLM Included a Landscape Level Strategy in Response to NMFS' Comments

Plaintiffs' other attempts to manufacture inconsistent findings similarly fail. In a new argument not in their opening brief, Plaintiffs now claim that the NWFP ACS applied to all lands governed by the 1995 BLM plans, not just the riparian reserves, while the management objectives and directions of the RMPs allegedly do not. Pls. Reply 11-14. Plaintiffs claim that NMFS' August 21, 2015 letter "acknowledged that applying the nine ACS objectives to all management actions was a 'potent' requirement . . . that prevented individual projects from retarding recovery of threatened and endangered salmon." Pls. Reply 13. Plaintiffs suggest NMFS abandoned this purported "finding" without explanation by reaching no-jeopardy conclusions for RMPs that allegedly lack protections for aquatic species outside riparian reserves. *Id.* at 2, 13, 14. First of all, Plaintiffs waived this argument by not raising it in their opening brief. *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 858 n.4 (9th Cir. 1999); *Consol. Salmonid Cases*, 713 F. Supp. 2d 1116, 1163 (E.D. Cal. 2010).

In any event, Plaintiffs mischaracterize NMFS' August 21 letter and are flatly wrong. The letter does not find that application of the NWFP ACS objectives at all scales is required. The letter ultimately states only that "managers must ascertain the net effects of any proposed action on natural recovery processes at site-specific and larger spatial scales." 8/21/15 Letter at

---

[10] NMFS' August 21 letter had stated that the NWFP riparian reserve system "was considered by the federal courts to be the 'bare minimum' necessary for the recovery of salmon," but no case ever made such a holding and NMFS' clarification letter stated that the August 21 letter "should not have included interpretations of judicial decisions on the NWFP, and all such comments are withdrawn." 12/18/15 Letter 2.

FED. DEF. REPLY ON CROSS MOTION FOR SUMMARY JUDGMENT          15

7.  Here, the RMPs ensure that protection by including multiple safeguards for aquatic species that apply not only within, but also outside of, the RMPs' riparian reserves.  The RMPs include management objectives and directions for programs such as hydrology and fisheries – that are in addition to the management objectives and directions for riparian reserves – and these apply to all future activities across all lands governed by the RMPs.  NCO ROD 76-102, SWO ROD 89-122.  *See also* 10/7/15 Meeting 3-7 (separately noting riparian reserve and program management objectives and directions, and noting that "[t]he intent of the 9 ACS objectives can essentially be found in several [land use allocation] or *Resource Program* Management Objectives (MO) throughout the [proposed RMP]") (emphasis added); *see also* NMFS BiOp 59, 81, 183, 196, 199, 215, 225, 247, 250, 314-15 (management direction for hydrology, roads, and minerals).[11]

Similar to the 2016 RMPs, BLM's prior 1995 plans also had standards and guidelines that applied only in the riparian reserves.  Medford ROD 25, 27-31.  Plaintiffs do not cite any language of the 1995 RMPs showing that they applied more broadly; rather, they cite only a court decision involving specific timber projects that likely had impacts within riparian reserves.  Pls. Reply 12 (citing *Pac. Coast Fed'n of Fishermen's Ass'ns*).  The reality of the landscape here is that one does not need to go far from an "upland" area to reach a stream.  Plaintiffs' new attempt to manufacture differences between the NWFP and the RMPs across land use allocations

---

[11] Indeed, BLM strengthened many of the program management directions applying outside of the riparian reserves in response to NMFS' comments.  As one example, in the management directions for the hydrology program, several provisions that had appeared as a discretionary best management practice ("BMP") in the DEIS alternatives became mandatory management direction in the final RMPs, *e.g.*, "[s]uspend commercial road use where the road surface is deteriorating due to vehicular rutting or standing water, or where turbid runoff is likely to reach stream channels."  SWO ROD 93; NCO ROD 80.  In the final RMPs, landscape-scale direction also was added to "[i]mplement road improvements, storm proofing, maintenance, or decommissioning to reduce or eliminate chronic sediment inputs to stream channels and water bodies."  SWO ROD 93; NCO ROD 80; NMFS BiOp 196 (discussing importance of same).

ignores the fact that BLM's management of all future projects under the RMPs, and any future

site-specific ESA consultations, will consider the entirety of a project's effects, which will often

extend to riparian reserves even if the project is located outside of those reserves.

Plaintiffs fail to recognize that the RMPs' new riparian reserves are far better designed

and more protective of the critical inner zone than the more generic NWFP-based ones that they

replace, and include all of the permanent and intermittent streams and habitat most critical to the

survival and recovery of ESA-listed fish.  *See* Fed. Defs. Br. 15-16, 21.  NMFS had expressly

requested in its August 21, 2015 DEIS comment letter that BLM modify the DEIS alternatives to

include "differential management of a network of aquatic-emphasis watersheds" and provide for

"more conservative management in aquatic-emphasis watersheds." 8/21/15 Letter 42.  After the

DEIS, BLM worked together with the Services to do exactly what NMFS asked.  It created a

class system for the riparian reserves and more protective management objectives and directions

that applied within those reserves, similar to the NWFP standards and guidelines for riparian

reserves but including more specificity and detail.  *See* Fed. Defs. Br. 15.

### 4.  There is No "Unexplained" Inconsistency Between NMFS' BiOp and the 1997 Biological Opinion for the NWFP

In their opening brief, Plaintiffs pointed to a statement in NMFS' 1997 BiOp for NWFP-

based plans that "[a]ny further degradation of [] conditions is expected to have a significant

impact due to the level of risk that listed, and [other species] presently face under the

environmental baseline."  Pls. Br. 30.[12]  Plaintiffs argued this finding was inconsistent with

NMFS' findings in its 2016 BiOp regarding the effects of the new RMPs, but they had cited to

the cumulative effects section of the BiOp analyzing the effects of *non-federal activities*.  *See*

---

[12] Stretching the statement, Plaintiffs wrongly claim on reply that NMFS found that any
degradation "would jeopardize the continued existence of protected salmon."  Pls. Reply 16.

Fed. Defs. Br. 24-25.  Plaintiffs now concede their error, but shift to another new argument not presented in their opening brief.  Now they point to statements in another section of the BiOp where NMFS discusses how activities under the RMPs would cause some limited adverse effects to a few individual fish at a given time from sediment and storm water contaminants, and they argue that any such finding of adverse effects is irreconcilable with NMFS' no-jeopardy conclusions in light of the above statement from the 1997 BiOp.  Pls. Reply 16-18, n. 6.

This new version of the argument is wrong because in its BiOp for the new RMPs – just as it did in the 1997 BiOp for the NWFP-based plans – NMFS found for good reasons that, although there would be some adverse effects from the plans, they would not cause jeopardy or adverse modification.  In the 1997 BiOp, NMFS found that the NWFP-based plans would have "adverse effects to salmonid habitat," including "increased habitat sedimentation," but those effects were "expected to be generally minor in magnitude and short-lived in duration," 1997 BiOp 28; *see also id*. at 45 (noting that the plans would "avoid or *minimize* adverse effects") (emphasis added).[13]  NMFS similarly found the same for the RMPs, *i.e.*, that despite some adverse effects, these would be limited in impact due to their spatial and temporal spread.  *See* Fed. Defs. Br. 18-20, 26.

Indeed, contrary to Plaintiffs' claim that NMFS "inexplicably" found no jeopardy, NMFS cogently explained its conclusion in the portion of the BiOp selectively quoted:

> The habitat changes from sediment and stormwater contaminants are only expected to affect a few individuals and thus will not affect the population level. The proposed action is likely to cause a decrease in the rate of egg and fry survival, and injury in juveniles and adults as result of increased suspended sediment.  However, the effects are not expected to cause a biologically meaningful effect at the species scale.  This is because the effects will be spatially and temporally separated and will likely only affect a small number of fish at any

---

[13] If no adverse effects had been expected to occur under the NWFP-based plans, then there would have been no biological opinion prepared for them in the first place.  Fed. Defs. Br.  28.

> one time because of the limited amount of BLM land and subsequent proposed
> action activity occurring within the watersheds inhabited by these ESUs. In
> addition, only small numbers of these fish are in the action area compared to the
> range of the species, and so the number of fish impacted will, by definition, be
> small. Sediment is not a limiting factor for these species.

NMFS BiOp 327-28. Nowhere does NMFS find "population mortality," as Plaintiffs claim. Pls.

Reply 17. In fact, NMFS finds the opposite – that adverse effects will be spatially and

temporally separated and only small numbers of individual fish will be exposed such that no

effects will occur at the population level. NMFS BiOp 327-28. Plaintiffs erroneously suggest

that any adverse effect equals jeopardy and that making jeopardy conclusions at the population

scale was a convenient choice by NMFS. In fact, the Services precisely followed the ESA in

considering how the scope and scale of the adverse effects would impact the listed species as a

whole. *Ctr. for Biological Diversity*, 807 F.3d at 1052 (citing ESA Consultation Handbook

stating that, "[t]he determination of jeopardy or adverse modification is based on the effects of

the action on the continued existence of the entire population of the listed species[.]"); *see also*

81 Fed. Reg. 7214, 7222 (Feb. 11, 2016).

### D.    The RMPs Provide Comparable or Better Protections for New Roads

In continuing to argue that NMFS unlawfully deferred ESA consultation on new roads to

later project-specific consultations, Pls. Reply 19-21, Plaintiffs again ignore and fail to challenge

the Services' regulations for "mixed programmatic" actions like the RMPs, as well as NMFS'

analyses in the BiOps that are entirely consistent with those regulations. *See* Fed. Defs. Br. 22-

24. Plaintiffs instead resort to distorting the facts.

First, Plaintiffs' argument that the RMPs "impose no meaningful restrictions on new road

construction" compared to the NWFP is simply not true. Pls. Reply 20. Under the RMPs, new

roads in riparian reserves are limited to where there is no operationally feasible and economically

viable alternative, and there is management direction that applies to new roads that minimize any

sedimentation reaching streams, including program-level direction that applies to new roads outside of riparian reserves, as discussed above. *See* NMFS BiOp 179, 192, 196, 199-200. NMFS reasonably relied on these sideboards for new roads, as well as the expected low intensity of new road construction in riparian reserves, in finding no jeopardy. *See id*.

Plaintiffs imply that the NWFP had a universal "'no net new roads' policy." Pls. Reply 11. But the NWFP limited new roads only in a limited acreage of certain *key watersheds*, *i.e.*, not all of the riparian reserves, as Plaintiffs elsewhere admit. *Id*. at 20; Pls. Br. 28. In fact, new roads were only prohibited in U.S. Forest Service inventoried "roadless" areas in key watersheds, of which there are none on the BLM lands at issue here.[14] Plaintiffs nevertheless claim the NWFP was somehow better because new roads were vaguely "discouraged" in the NWFP riparian reserves, which does not mean that none were allowed. Pls. Reply 20. The prior 1995 BLM plans contemplated that new roads would be built in the riparian reserves, and that sedimentation caused by roads would be "minimized" but not eliminated. *See, e.g.*, Medford ROD 27 ("For each existing and planned road," meet ACS objectives by "minimizing road and landing locations in riparian reserves"; "[m]inimize sediment delivery to streams from roads").

Nothing in the administrative record suggests that the RMPs' sideboards for new roads are weaker than those in BLM's 1995 plans based on the NWFP. Plaintiffs point to NMFS' observation that under the RMPs, a projected 66 miles of new roads would be built over 10 years within the 200-foot sediment delivery distance of streams. Pls. Reply 20. But that is in the context of 5,096 miles of such roads that already exist on these lands, or a 1.3% increase. FEIS 405. Further, BLM projected that a *greater* amount of such new roads (154 miles) would be

---

[14] NWFP S&G at C-7 ("Inside Roadless Areas - No new roads will be built in remaining unroaded portions of inventoried (RARE II) roadless areas); 36 C.F.R. § 294.11.

built under the "No Action" alternative, *i.e.*, retention of the 1995 NWFP-based plans. *Id*. at 407.

As noted above, Plaintiffs also are wrong in suggesting that NMFS has unlawfully deferred its analysis of new roads. The Ninth Circuit has "approved programmatic environmental analysis supplemented by later project-specific environmental analysis." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1068 (9th Cir. 2004), *amended on other grounds*, 387 F.3d 968 (9th Cir. 2004) (citing *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994)). This concept was endorsed in the 2015 revisions to the regulations applied here. *See* 50 C.F.R. § 402.02 ("Framework programmatic action means . . . a Federal action that approves a *framework* for the development of future action(s) that are authorized, funded or carried out at a later time.") (emphasis added). And here, consistent with the regulations, NMFS' BiOp fully analyzes the 2016 RMPs' sideboards for new roads. NMFS BiOp 179, 192, 196, 199-200. NMFS did not rely solely on future site-specific consultations. NMFS analyzed landscape-level impacts of new roads based on the sideboards of the RMPs, which will be supplemented later in site-specific ESA consultations for particular new roads before they are built, and that is fully consistent with the law.

## II. The FEIS Took a Hard Look at the Direct, Indirect, and Cumulative Effects of Management under the 2016 RMPs

### A. The FEIS Reasonably Considered Current Management Practices on Non-BLM Land When Examining the Cumulative Impacts of the 2016 RMPs

Federal Defendants' opening brief explained that the FEIS exhaustively analyzed the potential direct, indirect, and cumulative impacts of various management alternatives. Fed. Defs. Br. 29. Consistent with NEPA, this included analyses that involved "reasonable forecasting." *See N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1079 (9th Cir. 2011) ("NEPA requires that an EIS engage in reasonable forecasting." (citation omitted)). For example, the

FEIS examined current northern spotted owl ("NSO") habitat in western Oregon and then

forecast how that habitat would potentially change under certain alternatives by 2043 and 2063.

FEIS 937-40.  Similarly, the FEIS forecast the change in NSO population throughout the United

States' portion of the NSO's range from 2023 to 2113 under various alternatives.  *See* FEIS 956-

73.

Plaintiffs do not challenge any of the specific analyses in the FEIS, including those that

involved reasonable forecasting.  Instead, Plaintiffs argue that NEPA required BLM to

(1) determine what, if any, changes all other land managers (*i.e.,* other federal, non-federal, and

private) throughout the region would make to the management of their lands in response to each

of the alternatives, (2) guess as to exactly which changes those land managers would make in

response to each of the alternatives, and (3) analyze the potential environmental effects of all

other land managers' potential responses to each of the alternatives.  *See* Pls. Reply 26 (arguing

NEPA required BLM to assess the "synergistic effects of other landowners *responding to* BLM's

new RMPs and changing their own management of owls and owl habitat").  But Plaintiffs

identify no future changes to the management of other lands that are reasonably likely to be

made in response to the alternatives considered by the FEIS, much less the potential

environmental effects of such changes under each of those alternatives.  *See id*. at 28 (noting

only that "[i]t is highly probable that other land managers will respond *in some fashion* with their

own land management" (emphasis added)).  Absent such information, Plaintiffs effectively argue

that NEPA requires BLM to engage in wholesale speculation.  It does not.  *See N. Plains Res.*

*Council*, 668 F.3d at 1078 (agency "not required to engage in speculative analysis."); *Envtl. Prot.*

*Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1014 (9th Cir. 2006) (NEPA does not "require the

government to do the impractical, if not enough information is available to permit meaningful consideration.").

Rather than engage in the wholesale speculation that Plaintiffs desire, BLM determined that for lands under other public or private management, "reasonably foreseeable actions are those actions that would occur with the continuation of present management." FEIS 120. This approach is consistent with BLM's NEPA handbook, which defines "reasonably foreseeable future actions" as "those for which there are existing decisions, funding, formal proposals, or which are highly probable, based on known opportunities or trends." [15] BLM NEPA Handbook 59. And BLM's reasonable determination as to the scope of the FEIS is entitled to deference. *See Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 962 (9th Cir. 2003) (noting scope of EIS is a "delicate choice" entrusted to agency so long as agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made" (citation omitted)). In short, BLM's decision not to speculate as to whether other land managers throughout the region would change their management practices under each of the alternatives, how they would do so, or the potential environmental effects of those speculative changes was not arbitrary or capricious and did not violate NEPA.

None of the cases cited by Plaintiffs supports a different conclusion. For example, in *Northern Plains Resources Council*, the principal case relied on by Plaintiffs, the agency ignored detailed *existing* information in its analysis of cumulative impacts. 668 F.3d at 1079 (noting agency "has not sufficiently explained why it cannot or should not incorporate this *available*

---

[15] Plaintiffs argue that changes to other federal, non-federal, and private land management and the potential environmental effects of those changes are "highly probable based on known opportunities or trends." Pls. Reply 28. But, again, Plaintiffs identify no such changes, much less any that are highly probable.

*data concerning likely future development* into its environmental impact analysis." (emphasis added)).  That is a far cry from the present situation where Plaintiffs identify no specific information that BLM ignored but instead improperly insist that BLM "peer into a crystal ball" to divine how all other land managers in the region would respond to the FEIS' alternatives.  *See id.* (agency not required "to peer into a crystal ball." (citation omitted)).  The other cases cited by Plaintiffs are similarly distinguishable.  *See, e.g.*, *Klamath-Siskiyou Willdlands Ctr. v. NOAA*, 99 F. Supp. 3d 1033, 1064 (N.D. Cal. 2015) (faulting agency for not considering cumulative effects of future actions for which sites had been identified and detailed maps provided); *City of Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir. 1975) (finding agency erred in not conducting NEPA analysis and noting purpose of an EIS "is to evaluate the possibilities in light of *current and contemplated plans . . . ."* (emphasis added)).

Plaintiffs also argue that the EIS for the NWFP supports their argument that BLM should speculate as to how other land managers may change their management in response to the 2016 RMPs.  Pls. Reply 24.  It does not.  Because the NWFP proposed to amend the Forest Service's land and resource management plans throughout the range of the NSO, the NWFP EIS considered the potential environmental effects of any such changed management.  NWFP EIS S-3 (noting EIS examined environmental effects of ten alternatives proposing "alternate Forest Service and [BLM] management direction within the range of the northern spotted owl").  But that is because such changes had been proposed and were reasonably foreseeable.  Plaintiffs have identified no proposed changes to the Forest Service's management plans (or those of any other land manager) that would have been reasonably foreseeable when the 2016 RMPs were adopted.

Moreover, for non-federal lands, the NWFP EIS did not conduct the type of analysis that Plaintiffs now claim NEPA requires.  The NWFP EIS relied on a supply-and-demand analysis,

determining that a reduction in timber harvest on federal lands was projected to briefly increase the demand for timber on non-federal lands.  NWFP EIS 3&4-6.  But this is not the type of analysis Plaintiffs argue for here.  If it were, Plaintiffs' claims would fail because the FEIS contains the same type of supply-and-demand analysis as the NWFP EIS.  In particular, the FEIS noted that if timber harvested from BLM lands increases, "there would be reductions in private harvests as timberland owners adjust their harvest downwards as prices fall."  FEIS 640.  The FEIS then examined the potential effect of the alternatives on the supply and demand.  FEIS 640-42, 679 ("As the BLM timber harvest would change, market forces would prompt private timberland owners to adjust their harvest volumes.").

Finally, although ostensibly acknowledging that the NWFP "may no longer be the only way to address" management of federal lands in the range of the NSO, Plaintiffs continue to suggest that BLM developed the 2016 RMPs in a vacuum without coordinating with other land managers.  Pls. Reply 22.  That is not the case.  The 2016 RMPs were developed through an extensive and robust process involving active participation from other federal, non-federal, and private entities.  *See* FEIS 1041-58 (summarizing public involvement and collaboration).  As noted in Federal Defendants' opening brief, the Forest Service, FWS, NMFS, EPA, the State of Oregon, six tribes, and 16 counties participated in the RMP revision process as formal cooperators.  Fed. Defs. Br. 32 (citing FEIS 1045-48).  This involved formal and structured participation by these entities through all stages of development of the RMPs.  It also included a working group that "reviewed and provided input on the methodology for analyzing the impacts of the alternatives on terrestrial resources and met to discuss and provide feedback on the components of the alternatives related to timber harvest, northern spotted owl conservation, marbled murrelet conservation, and fire and fuels management."  FEIS 1047.  BLM further

formally consulted with FWS and NMFS under the ESA, and a consistency review by the

Governor of Oregon "did not identify any State or local plans . . . with which she found the

Proposed RMP inconsistent and did not recommend any specific changes to the Proposed RMP .

. . ."  SWO ROD 36; *see also* NCO ROD 36.

　　And perhaps most telling, Plaintiffs conspicuously ignore the fact that BLM revised the

RMPs in the exact manner contemplated by the NWFP.  The NWFP established the Regional

Interagency Executive Committee ("RIEC"), comprising "regional directors from the various

land management, regulatory, research, and other relevant agencies in the Federal government

located in northern California, western Oregon, and western Washington."  FEIS 1048-49; *see*

*also* NWFP S&G E-16.  The NWFP also anticipated that forest plans and RMPs would be

modified and provided a process for such modifications to be coordinated through the RIEC.

NWFP ROD 58.  BLM coordinated with the RIEC throughout the RMP revision process.  FEIS

1048-49.  In short, any suggestion by Plaintiffs that BLM acted in a vacuum or in any way not

contemplated by the NWFP in revising the RMPs is contradicted by the record.[16]

---

[16] Plaintiffs' opening brief cited to certain extra-record documents. Pls. Br. 12.  Federal
Defendants noted that Plaintiffs had not even tried to satisfy their burden of establishing the
narrow circumstances in which extra-record evidence can be considered in cases involving
review of an administrative record. Fed. Defs.' Br. 32 n.15.  Plaintiffs' response does not
address that failing.  Pls. Reply 24 n.9.  Instead, Plaintiffs argue the Court should take judicial
notice of the cited documents.  In doing so, Plaintiffs seek an end-run around the "general rule
that courts reviewing an agency decision are limited to the administrative record." *Lands
Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir. 2005).  Such an approach should not be
countenanced.  *See Rybachek v. EPA*, 904 F.2d 1276, 1296 n.25 (9th Cir. 1990) (rejecting motion
to take judicial notice because "[j]udicial review of agency actions should generally be confined
to the original record upon which the actions were based." (citation omitted)); *Baker v. Barnhart*,
457 F.3d 882, 891 (8th Cir. 2006) (finding district court abused its discretion by taking judicial
notice of an article not contained in the administrative record).

B.      *Motor Vehicle Manufacturers Ass'n* **and Its Progeny are Irrelevant to Plaintiffs' NEPA Claims**

Plaintiffs argue for the first time in their reply brief that "the agency's NEPA analysis is also devoid of 'a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy,' rendering the analysis arbitrary, capricious, and *not in accordance with NEPA*."  Pls. Reply 22 (emphasis added); *see id.* at 22-24.  In other words, Plaintiffs argue NEPA required BLM to provide a reasoned explanation for why it decided to depart from the NWFP and adopt the 2016 RMPs.  NEPA, however, contains no such requirement.  Instead, as previously discussed, NEPA required BLM to take a hard look at the potential environmental consequences of alternative management approaches.  The FEIS did this.  But Plaintiffs now suggest that NEPA contains an overlay that requires BLM to explain its *substantive* decision to depart from the NWFP.  It does not.  NEPA is a procedural statute and the cases cited by Plaintiffs are inapposite to Plaintiffs' NEPA claims.

The APA requires an agency to "give adequate reasons for its decisions" by examining the relevant data and articulating "a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).  An agency's policy change "complies with the APA if the agency (1) displays 'awareness that it is changing position,' (2) shows that 'the new policy is permissible under the statute,' (3) 'believes' the new policy is better, and (4) provides 'good reasons' for the new policy."  *Organized Vill. of Kake v. U.S. Dep't of Agriculture*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (quoting *Fox Television*, 556 U.S. at 515-16).  But the APA provides no stand-alone cause of action because "[t]here is no right to sue for a violation of the APA in the absence of a relevant statute whose violation forms the legal basis for the complaint."  *El Rescate Legal Servs. v. Exec. Office of Immigration*

*Review*, 959 F.2d 742, 753 (9th Cir. 1991) (citation omitted).  Therefore, the "new policy" for

which the APA requires a "satisfactory explanation" must be tethered to the statute being

challenged.

Here, Plaintiffs have identified no policy change *under NEPA* that would trigger

application of *Motor Vehicle Manufacturers Ass'n* and its progeny.  BLM regulations require

preparation of an EIS for RMP revisions, 43 C.F.R. § 1601.0-6, and if BLM were to change that

policy, it may have to provide a reasoned explanation for that change under NEPA.  *Cf. Alcoa,*

*Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 794 n.13 (9th Cir. 2012) (rejecting argument that

agency did not adequately explain "its change of opinion regarding the necessity of an EIS").

But that is not the situation presented here where BLM maintained its policy of preparing an EIS

when revising the RMPs for western Oregon.

Plaintiffs' attempt to shoehorn a requirement into NEPA that BLM was required to

explain its substantive decision to adopt the 2016 RMPs should be rejected.  *Cf. Wasco Prods. v.*

*Southwall Techs.*, 435 F.3d 989, 992 (9th Cir. 2006) ("[S]ummary judgment is not a procedural

second chance to flesh out inadequate pleadings.").  But even if Plaintiffs had alleged a separate

non-NEPA claim that required BLM to explain its substantive decision to depart from the NWFP

by adopting the 2016 RMPs, the record would belie any such claim.  As explained in

Intervenors' opening brief, the record shows BLM was aware that the 2016 RMPs would replace

the 1995 RMPs (which incorporated the NWFP), that the 2016 RMPs were permissible, that

BLM believed the 2016 RMPs were better than the 1995 RMPs, and that there were good

reasons for adopting the 2016 RMPs based on updated scientific information.  *See* Defendant-

Intervenors' Mot. & Mem. in Supp. of Cross-Mot. for Summ. J. 9-12, ECF No. 80; *see also, e.g.*,

FEIS 1-25 (explaining decision to be made and purpose and need for RMP revision).

FED. DEF. REPLY ON CROSS MOTION FOR SUMMARY JUDGMENT          28

III.    **The 2016 RMPs Comply with the O&C Act**

Plaintiffs argued in their opening brief that the 2016 RMPs violated the O&C Act by not protecting "watersheds, water quality, stream flows, and the health [of] aquatic species" and because they will "increase economic instability in communities in Southwest Oregon." Pls. Br. 35. Federal Defendants explained that these arguments misunderstood the O&C Act and ignored the analyses in the record. Fed. Defs. Br. 32-35. Plaintiffs failed to respond to Federal Defendants' arguments regarding watersheds, water quality, and stream flow. Instead, Plaintiffs now argue only that the 2016 RMPs violate the O&C Act by "increas[ing] economic instability for local economies." Pls. Reply 29. This argument continues to misunderstand the O&C Act and ignore the analyses in the record.

The O&C Act provides that O&C lands "shall be managed . . . for permanent forest production . . . and providing recreational facilities." 43 U.S.C. § 2601. Permanent forest production involves harvesting timber "in conformity with the princip[le] of sustained yield *for the purpose of* providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries . . . ." *Id.* (emphasis added). In other words, as explained in the FEIS, "'contributing to the economic stability of local communities and industries' [is] one of the purposes for which the O&C Act authorizes and directs the selling, cutting, and removing of timber in conformity with the principle of sustained yield." FEIS 1835. Therefore, the plain language of the O&C Act indicates that managing the O&C lands under the principle of sustained yield *by definition* contributes to the economic stability of local communities and industries. *See Coleman v. Estes Express Lines*, 631 F.3d 1010, 1015 (9th Cir. 2011) ("We begin with the words of the statute. When the words of a statute are unambiguous this first canon is also the last: judicial inquiry is complete." (citations and quotations omitted)). Plaintiffs do not argue that the 2016 RMPs fail to

manage the O&C lands under principles of sustained yield and their claim under the O&C Act

fails.

Plaintiffs misread the plain text of the O&C Act to suggest that contributing to the

stability of local communities and industries provides management direction separate from the

requirement that BLM manage O&C lands for sustained yield timber production.  In support of

this interpretation, Plaintiffs mistakenly claim that the O&C Act is a multiple-use statute akin to

the Federal Land Policy and Management Act ("FLPMA") rather than a dominant-use statute.[17]

The O&C Act, however, provides for the dominant use of timber production and Plaintiffs'

characterization to the contrary, in addition to contravening the plain text of the O&C Act, is also

inconsistent with the Act's legislative history, the agency's longstanding interpretation of the

Act, and governing Ninth Circuit precedent.[18]

The statement submitted to Congress by the Department of the Interior during

deliberations over the O&C Act explains the purpose of the Act by reviewing the history of

management of O&C lands, identifying the shortcomings in earlier attempts to manage those

lands, discussing the intent of the O&C Act to manage those lands on a sustained-yield basis, and

exploring the attendant benefits of such management.  *See* O&C Act Hearings 20-31.  As

---

[17] FLPMA defines "multiple use" as "the management of the public lands and their various
resource values so that they are utilized in the combination that will best meet the present and
future needs of the American people."  43 U.S.C. § 1702(c).  Under multiple-use management,
an agency need not "promote one use above others," but instead must weigh competing interests
and, where necessary, make judgments about incompatible uses."  *Nat'l Mining Ass'n v. Zinke*,
877 F.3d 845, 872 (9th Cir. 2017).

[18] In addition, FLPMA itself makes clear that the O&C Act is a dominant-use statute.  Rather
than subjecting management of O&C lands to FLPMA's multiple-use mandate, Congress
provided that the O&C Act would control "in the event of conflict with or inconsistency between
[FLPMA] and the [O&C Act] . . . as they relate to management of timber resources. . . ."  43
U.S.C. § 1701 Savings Provision Note (b).

explained in that statement, millions of acres of land were granted to the Oregon and California

Railroad in exchange for the construction of a railroad connecting Portland to the Oregon-

California border.  *Id.* at 20.  But that grant of lands came with conditions that the railroad

breached.  As a result, Congress revested the lands to the federal government in the

Chamberlain-Ferris Act of 1916, which provided for the federal government to dispose "of both

the timber and the lands."  *Id.* at 20-21.  Under that policy:

> [t]imber was to be turned into cash as quickly as the market would permit and the
> lands to be homesteaded . . . .  Clea[r] cutting was contemplated.  No provision was
> made for conservation or reservation of seed trees; or for sustained yield
> management to maintain the supply of timber at a certain level; or for reforestation
> through the reservation from sale of immature or second-growth timber; or for
> protection of stream flow.  Neither was the probable effect of the cutting upon
> community industries . . . or upon the public at large considered.

*Id.* at 21.  In short, the "method of administration and disposal of lands and timber as prescribed

in the [Chamberlain-Ferris Act] permit[ted] no opportunity to administer these lands on a

conservation basis looking toward the orderly use and preservation of the natural resource of

timber contained in the area."  *Id.* at 23.

To address these shortcomings, the O&C Act was intended:

> to provide careful conservation and scientific forest management on a vast Federal
> forest property which [up until that point] receive[d] no planned management
> beyond liquidation of the timber assets and protection from fire.  Sustained yield
> production of timber of commercial quality in the largest possible volume is the
> goal.
>
> This form of management requires that the property be handled in such a manner
> that the amount of timber removed shall be limited to a volume not exceeding the
> volume of new growth, thereby avoiding depletion of forest capital.

*Id.* at 24.

The statement further explained that "[s]ustained yield management of forest means

abandonment of the old procedure which has characterized the cut-out and get-out policy that has

dominated the American lumber industry." *Id.* Abandoning that old approach would replace

"sudden but brief prosperity followed by acute distress" with "a more modest form of initial

development which can be continued on a permanent basis." *Id.* The House Report similarly

noted that the purpose of the O&C Act was

> to provide conservation and scientific management for this vast Federal property
> which now receives no planned management beyond liquidation of timber assets
> and protection from fire. . . . All land classified as timber in character will continue
> in Federal ownership and be managed for permanent forest production on what is
> commonly known as a sustained-yield basis. Under such a plan the amount of
> timber which may be cut is limited to a volume not exceeding new growth, thereby
> avoiding depletion of the forest capital. *This type of management will make for a
> more permanent type of community, contribute to the economic stability of local
> dependent industries, protect watersheds, and aid in regulating streamflow.*

O&C Act House Report 2 (emphasis added). In other words, the purpose of the O&C Act was to

provide for the dominant use of timber production under sustained yield principles that would,

among other things, contribute to the stability of local industries and communities.

This understanding is consistent with longstanding agency interpretation of the O&C Act

to be a dominant-use statute. Soon after passage of the O&C Act, the Assistant Secretary

determined that, unlike the National Forest Act of 1897, the O&C Act did not permit the lands to

be used for mining because it would interfere with the Act's provision for sustained yield timber

production. 1941 DOI Opinion 5 (distinguishing management on national forests from

management on O&C lands because "[t]he act of 1937, however, as to the timber lands, made

the objects and purposes of that act paramount notwithstanding any conflict with any provisions

of the mineral land laws").[19] Similarly, in 1955 the Regional Solicitor opined that withdrawal of

---

[19] Plaintiffs misleadingly quote from this document to suggest that Congress intended the O&C
lands to be managed for multiple uses like national forest lands. Pls. Reply 33 (citing 1941 DOI
Opinion 4). The language quoted by Plaintiffs, however, is not the Assistant Secretary's opinion
but is instead a summary of the conclusions that the Assistant Secretary was asked to review.
1941 DOI Opinion 3-4 (noting "you express the opinion that . . . [i]t is the opinion of this office

O&C lands for use as a state park would be inconsistent with the "intent of Congress to have such lands managed for permanent forest production . . . with the principles of sustained yield." 1955 DOI Opinion 4.

Later pronouncements continued this dominant-use interpretation of the O&C Act. In 1981, the Solicitor "concluded that the O&C Act places forest production in the dominant role within the entire scheme of [BLM's] management of the O&C lands. Further, the Act clearly does not mandate exclusive use, but instead requires management for other interests as well as timber supply." 1981 DOI Opinion 1; *see also id.* at 6 ("Because the O&C Act is a dominant use statute, the broad multiple use management approach provided for in FLPMA may conflict with the more restrictive management approach outlined in the [O&C] Act."). And in 1986, the Associate Solicitor noted "[p]lainly, on lands subject to its provisions, the O&C Act creates a dominant use – the production of timber on a sustained yield basis." 1986 DOI Opinion 6.

After listing of the NSO in 1990, the NWFP and the 1995 RMPs continued to acknowledge that O&C lands were to be managed "on a sustained-yield basis that provides for permanency of timber production over a long-term period." NWFP ROD 49; *see, e.g.*, Medford ROD 17. The EIS supporting 2008 revisions to the 1995 RMPs noted "management of timber (including harvesting) is the dominant use of the O&C lands in western Oregon."[20] WOPR EIS

---

that Congress intended, by the act of 1937, that the lands and timber involved should be used in the same manner and for the same purpose as those within national forest reservations . . . ."). And the Assistant Secretary expressly rejected that conclusion, noting "[t]he policy expressed in the National Forest Act is directly the reverse of that stated in the act of 1937." *Id.* at 5.

[20] These RMPs were never implemented. Instead, they were administratively withdrawn, judicially reinstated, and then judicially vacated. *See Douglas Timber Operators v. Salazar*, 774 F. Supp. 2d 245 (D.D.C. 2011) (reinstating administratively withdrawn RMPs); *Pac. Rivers v. Shepard*, 3:11-CV-442-HU, 2012 WL 950032, at *5 (D. Or. Mar. 20, 2012).

Ch. 1-10.  And finally, the FEIS for the 2016 RMPs acknowledged the dominant use of timber production on O&C lands and noted that "the multiple-use management direction of the FLPMA does not apply to the O&C lands that are suitable for timber production."  FEIS 6.  This longstanding interpretation is consistent with the plain language and legislative history of the O&C Act.  But even if the O&C Act were ambiguous, the agency's interpretation is reasonable and subject to deference.  *See Barnhart v. Walton*, 535 U.S. 212, 221 (2002) (longstanding agency interpretation entitled to deference).

This dominant-use understanding of the O&C Act is also consistent with governing Ninth Circuit precedent.  In *Headwaters, Inc. v. BLM*, 914 F.2d 1174 (9th Cir. 1990), an environmental group challenged a timber sale that included some O&C lands.  The plaintiff argued that those lands (in addition to the public domain lands that were part of the sale) had to be managed "for multiple use, including wildlife conservation, rather than for the dominant use of timber production."  *Id.* at 1183.  Consistent with the plain language, legislative history, and previous agency interpretations, BLM argued that the O&C Act established timber production as the "dominant use" of O&C lands.  *Id.* at 1184.  The court accepted this interpretation, noting that previous cases had determined that the O&C Act "make[s] it clear that the *primary* use of the [O&C] lands is for timber production to be managed in conformity with the provision of sustained yield."[21]  *Id.* at 1183.

─────────────────────

[21] Plaintiffs claim *Headwaters* has been "marginalized."  Pls. Reply 31.  But the cases Plaintiffs cite do not address whether the O&C Act is a dominant-use statute.  Instead, they concern whether the O&C Act can be harmonized with other later-enacted legislation, such as NEPA or the ESA.  *See Portland Audubon Soc'y v. Babbitt*, 998 F.2d 705, 709 (9th Cir. 1993) (NEPA applies because no "clear and unavoidable conflict between statutory directives"); *Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. 1291, 1314 (W.D. Wash. 1994) (finding that in managing O&C lands, "BLM must fulfill conservation duties imposed by other statutes"), *aff'd*, 80 F.3d 1401 (9th Cir. 1996).  Whether the O&C Act can be harmonized with later-enacted statutes was not at issue in *Headwaters* and it is not at issue in this case.  *See Watt v. Alaska*, 451 U.S. 259,

Finally, even if the O&C Act required BLM to contribute to the economic stability of local communities and industries separate from managing the lands for sustained yield timber production, Plaintiffs' argument would fail because the 2016 RMPs do just that. The FEIS noted the inherent volatility of the timber industry. FEIS 702. It then noted that contributing to that industry by offering timber for sale from BLM lands is "likely to introduce greater instability into local economies." *Id.* But this is only one side of the equation examined in the FEIS. The FEIS also looked at recreation-related industries, which "are relatively stable compared with timber-related industries," and determined that the growth in those industries under the 2016 RMPs would promote economic stability. *Id.* Thus, the FEIS determined that under the 2016 RMPs, "lower harvests and high visitation compared with No Action could result in increased stability overall." *Id.* This determination was not arbitrary or capricious and the 2016 RMPs comply with the O&C Act.

## CONCLUSION

The Court should deny Plaintiffs' motion for summary judgment, grant Federal Defendants' cross motion for summary judgment, and dismiss Plaintiffs' claims with prejudice.

Respectfully submitted this 3rd day of August 2018,

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division

s/ *Clifford E. Stevens, Jr.*
CLIFFORD E. STEVENS, JR.

---

267 (1981) (noting general rule that when two statutes apply to a federal undertaking they must be read "to give effect to each if [they] can do so while preserving their sense and purpose."); *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 665 (2007) (upholding regulation interpreting ESA to "apply to all actions in which there is discretionary Federal involvement or control." (quoting 50 C.F.R. § 402.03)).

SHAUN M. PETTIGREW
U.S. Department of Justice
Environment & Natural Resources Division
601 D Street, NW
Washington, D.C. 20004
Phone: (202) 353-7548 (Stevens)
         (202) 305-3895 (Pettigrew)
Fax: (202) 305-0506
clifford.stevens@usdoj.gov
shaun.pettigrew@usdoj.gov

*Counsel for Federal Defendants*