IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PACIFIC RIVERS, CASCADIA WILDLANDS,
COAST RANGE ASSOCIATION, KLAMATH-
SISKIYOU WILDLANDS CENTER, OREGON
WILD, THE WILDERNESS SOCIETY,
PACIFIC COAST FEDERATION OF
FISHERMEN'S ASSOCIATIONS, INSTITUTE
FOR FISHERIES RESOURCES, and UMPQUA
WATERSHEDS,

   Plaintiffs,

 v.

UNITED STATES BUREAU OF LAND
MANAGEMENT, NATIONAL MARINE
FISHERIES SERVICE, U.S. FISH AND
WILDLIFE SERVICE, U.S. DEPARTMENT
OF INTERIOR, and U.S. DEPARTMENT OF
COMMERCE,

   Defendants,

 v.

ZUBER & SONS LOGGING, LLC, TURNER
LOGGING, INC., and ROSEBURG AREA
CHAMBER OF COMMERCE,

   Defendant-intervenors.
_____

Case No. 6:16-cv-01598-JR

FINDINGS AND
RECOMMENDATION

RUSSO, Magistrate Judge:

Plaintiffs Pacific Rivers, Cascadia Wildlands, Coast Range Association, Klamath-Siskiyou Wildlands Center, Oregon Wild, the Wilderness Society, Pacific Coast Federation of Fishermen's Associations, Institute for Fisheries Resources, and Umpqua Watersheds – i.e., organizations representing the interests of environmental causes and/or commercial fishermen – initiated this action against defendants the U.S. Bureau of Land Management ("BLM"), National Marine Fisheries Service ("NMFS"), U.S. Fish and Wildlife Service ("FWS"), U.S. Department of Interior, and U.S. Department of Commerce.

Plaintiffs' claims, asserted under the National Environmental Policy Act ("NEPA"), Endangered Species Act ("ESA"), and Oregon and California Lands Act ("O&C Act"), are premised on 2016 revisions to the Resource Management Plans ("RMPs") for six forested BLM districts in southwestern Oregon. Zuber and Sons Logging, LLC ("Zuber"), Turner Logging, Inc. ("Turner"), and Roseburg Area Chamber of Commerce ("RCC") intervened on behalf of BLM and also assert a NEPA counterclaim against defendants.

The parties each move for summary judgment pursuant to Fed. R. Civ. P. 56.[1] Oral argument was held on September 13, 2018. For the reasons set forth below, defendant-intervenors' motion as to their counterclaim should be denied and defendants' motion should be granted, and plaintiffs' motion as to their claims should be denied and defendant-intervenors' and defendants' motions should be granted.

---

[1] Defendant-intervenors' arguments in favor of summary judgment as to plaintiffs' claims are largely analogous to those asserted by defendants. Except where otherwise indicated, the Court addresses defendant-intervenors' and defendants' motions together.

# BACKGROUND

This case involves a challenge to BLM's decision to amend the 1995 RMPs. The area in question encompasses 2.5 million acres of federal land in the BLM districts of Salem, Eugene, Roseburg, Coos Bay, and Medford, and the Klamath Falls Resource Area of the Lakeview District. Joint Appendix[2] ("JA") 3717-18. These lands have historically been managed in accordance with the presiding resource management plan, the Northwest Forest Plan ("NWFP"). JA 3736-40. The U.S. Forest Service ("Forest Service") and BLM adopted the NWFP in 1994, which was designed to provide a comprehensive management program for 24.5 million acres of federal forest lands throughout the range of the northern spotted owl ("NSO"). Seattle Audubon Soc'y v. Lyons, 871 F.Supp. 1291, 1304-06 (W.D. Wash. 1994), aff'd, 80 F.3d 1401 (9th Cir. 1996). RMPs adopted in 1995 incorporated the NWFP's standards and guidelines. JA 3736, 12088.

The NWFP allocated lands into seven categories, including late-successional reserves, riparian reserves, and matrix lands. JA 12083-84. Late-successional reserves were intended to serve predominantly as habitat and riparian reserves were intended to protect the water systems and their attendant species; as a result, only limited thinning proscriptions were generally allowed within these areas. JA 12083-87, 12476-77. Matrix lands were those outside of the reserves designated for timber harvest. JA 12084. The 1995 RMPs allocated 19% of lands to late-successional reserves, 38% to riparian reserves, and 28% to matrix lands. JA 3751.

---

[2] The administrative record in this case is "exceedingly large and difficult to navigate" due to the fact that several parties introduced separate excerpts of record. PMSJ Reply 4 n.2 (doc. 82). The Court cites to the "Joint Appendix of Documents from Administrative Records" – submitted by the parties following oral argument and comprised of evidence relied on in their respective briefs – except in the few limited circumstances where other relevant evidence beyond that appendix exists.

Concerning the latter, the annual allowable sale quantity ("ASQ")[3] of timber was 203 million board feet. JA 4057.

One of the key components of the NWFP is the Aquatic Conservation Strategy ("ACS"), a comprehensive plan designed to maintain and restore the ecological health of the waterways in federal forests. JA 3739. There are four components to the ACS: key watersheds, riparian reserves, watershed analysis, and watershed restoration. JA 3739, 12086-87, 12185-207. The ACS also has binding standards and guidelines that restrict certain activities within riparian reserves or key watersheds, and nine objectives designed to maintain or restore properly functioning aquatic habitats. JA 3739, 12182-207, 12214, 12237-45.

Another key component of the NWFP is the establishment of the Regional Interagency Executive Committee ("RIEC"), a group of heads of various federal agencies; the States of Washington, Oregon, and California; and three tribal organizations. JA 12538. The NWFP provided that amendments to RMPs that would "modify [its] standards and guidelines or land use allocations" be coordinated through the RIEC. JA 12137.

In 2012, BLM evaluated the 1995 RMPs in accordance with its planning regulations. JA 3717, 3721. This assessment revealed new information and changed conditions regarding both the timber program and NSO. JA 3721, 9514-16. BLM initiated the process to revise the 1995 RMPs – including coordination with the RIEC and formal ESA Section 7 consultation with FWS and NMFS – which culminated, in 2016, with the adoption of two revised RMPs. JA 272-76, 591-95, 3058, 3714-15, 3736-37, 4790-91.

---

[3] "The ASQ is the annual timber volume that a forest can produce continuously under [a specific] intensity of management." JA 4053. ASQ is synonymous with "annual productive capacity," "annual sustained yield capacity," and "sustained yield capacity." JA 3720.

Specifically, on August 5, 2016, BLM issued two separate Records of Decision ("RODs"): the Northwest Coastal ROD and the Southwestern Coastal ROD. JA 228-879. The Northwest and Southwestern Coastal RODs were supported by a single 2000-plus page Final Environmental Impact Statement ("FEIS"). JA 3679-5792. Similar to the NWFP, the 2016 RMPs allocate land into six categories, including 38% to late-successional reserves, 26% to riparian reserves, and 19% to harvest land base.[4] JA 3758, 7797-98. The ASQ of the harvest land base is 205 million board feet; an additional 73 million board feet of non-ASQ timber harvest is anticipated over the next decade. JA 4023.

On August 8, 2016, plaintiffs commenced this action for declaratory and injunctive relief, alleging defendants violated NEPA, the ESA, and the O&C Act. As relief, plaintiffs request that the FEIS and 2016 RMPs be vacated, and the NWFP and ACS be restored. Between November 2017 and May 2018, the parties filed their respective motions for summary judgment; briefing for those motions was completed in August 2018.

## STANDARD

A federal agency's compliance with NEPA, the ESA, and the O&C Act is reviewed under the Administrative Procedure Act ("APA"). 5 U.S.C. § 706. In an APA case, summary judgment is awarded in favor of the plaintiff if, after reviewing the administrative record, the court determines the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Natural Res. Def. Council v. Nat'l Marine Fisheries Serv., 421 F.3d 872, 877 (9th Cir. 2005) (citation and internal quotations omitted). A decision is not arbitrary or capricious if the agency articulated a rational connection between the facts found and the choice made. Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs, 384 F.3d 1163, 1170

---

[4] Similar to matrix lands, harvest land base is managed to "achieve continual timber production that can be sustained through a balance of growth and harvest." JA 3758.

(9th Cir. 2004); see also Lands Council v. McNair, 537 F.3d 981, 987 (9th Cir. 2008) (en banc), overruled on other grounds by Am. Trucking Ass'ns Inc. v. City of L.A., 559 F.3d 1046 (9th Cir. 2009) (court "will reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise").

Review under this standard is narrow and the court may not substitute its judgment for that of the agency. Lands Council, 537 F.3d at 987. While this standard is deferential, the court must "engage in a substantial inquiry, . . . a thorough, probing, in-depth review." Native Ecosys. Council v. U.S. Forest Serv., 418 F.3d 953, 960 (9th Cir. 2005) (citation and internal quotations omitted).

## DISCUSSION

Plaintiffs argue defendants acted arbitrarily and capriciously in promulgating the 2016 RMPs by failing to: (1) "analyze the direct, indirect, and cumulative effects of seceding from the [NWFP], in violation of NEPA"; (2) "use the best available science" – i.e., the NWFP and ACS, and the underlying 1993 Forest Ecosystem Management Assessment Team ("FEMAT") report – in violation of the ESA; and (3) protect watersheds and the stability of local communities, and regulate stream flows, in violation of the O&C Act. Pls.' Memo. in Supp. of Mot. Summ. J. ("PMSJ") 7-35 (doc. 62-1). Defendant-intervenors likewise contend BLM acted arbitrarily and capriciously "by failing to adequately consider the detrimental impacts on timber harvest" of various actions authorized by the 2016 RMPs. Def.-Intervenors' Mot. Summ. J. ("IMSJ") 13-34 (doc. 66).

Conversely, defendants assert the 2016 RMPs – designed over many years in consultation with the public, its own experts, the RIEC, the Forest Service, FWS, and NWFS, and resulting in a 2000-plus page FEIS – satisfied both NEPA and the ESA. Defs.' Memo. in Supp. of Cross-Mot. Summ. J. on Pls.' Claims ("DXMSJ") 11-32 (doc. 75-1). Regarding the O&C Act, defendants argue it is a predominant use statute centered on timber production that only identifies watershed protection, stream-flow regulation, and community stability as ancillary benefits of sustained-yield principles. Id. at 32-35.

I.    **Defendant-Intervenors' NEPA Counterclaim**

Defendants raise two preliminary issues regarding defendant-intervenors' counterclaim. Specifically, defendants argue defendant-intervenors failed to exhaust their administrative remedies and lack standing. Defs.' Memo. in Supp. of Cross-Mot. Summ. J. on Def.-Intervenors' Claim 7-30 (doc. 76-1). The Court must initially determine whether subject-matter jurisdiction exists before reaching the substantive merits of defendant-intervenors' NEPA claim.

A.    **Failure to Exhaust**

The APA "requires that plaintiffs exhaust available administrative remedies before bringing their grievances to federal court." Idaho Sporting Cong., Inc. v. Rittenhouse, 305 F.3d 957, 965 (9th Cir. 2002). The purpose of the exhaustion doctrine is to allow administrative agencies to utilize their expertise, correct any mistakes, and avoid unnecessary judicial intervention. Buckingham v. Sec'y of the U.S. Dep't of Agric., 603 F.3d 1073, 1080 (9th Cir. 2010). "Persons challenging an agency's compliance with NEPA must structure their participation so that it . . . alerts the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration." Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 764 (2004).

The record reflects BLM provided multiple opportunities for the public to meaningfully participate in preparing the 2016 RMPs. Beginning in March 2012, BLM engaged in "38 public involvement efforts, including formal scoping, regional workshops on recreation management, community listening sessions, and public meetings about the Planning Criteria and preliminary alternatives." JA 271-76, 591-92. In April 2015, BLM provided a 120-day period for the public to comment on the draft RMPs/EIS (during which BLM received approximately 4,500 comments) and a 30-day protest period. JA 271-76, 591-92, 3714-15. No defendant-intervenor participated in these efforts by submitting comments or filing its own protest. IMSJ Reply 2-5 (doc. 81).

Although defendant-intervenors certainly could have done more to structure their participation in a more robust and transparent manner, the Court nonetheless finds that they did not waive their counterclaim. The record demonstrates that other parties raised, as part of the administrative process, the issues implicated by defendant-intervenors' NEPA claim, which BLM addressed. JA 30-31, 40-41, 67-69, 72-76, 108-11, 134, 173-81, 3468-98. This is sufficient for exhaustion purposes. Kern v. Bureau of Land Mgmt., 38 F.Supp.2d 1174, 1180 (D. Or. 1999), rev'd on other grounds, 284 F.3d 1062 (9th Cir. 2002).

The dispositive inquiry does not concern *who* raised a particular objection but rather *whether* that objection was raised, so as to provide the agency with an opportunity to respond. See id. ("[s]o long as the agency properly had the opportunity to consider the objection, it has no reason to challenge the bringing of such objection before a court by another party"); Conservation Cong. v. U.S. Forest Serv., 555 F.Supp.2d 1093, 1106 (E.D. Cal. 2008), aff'd, 489 Fed.Appx. 151 (9th Cir. 2012) ("[t]here is no need for a litigant to have personally raised the issue, so long as the issue was raised by another party and the agency had the opportunity to

consider the objection") (citations omitted); see also Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt., 606 F.3d 1058, 1065 (9th Cir. 2010) ("the exhaustion requirement should be interpreted broadly"). Thus, the exhaustion requirement was satisfied by virtue of other organizations who voiced the objections underlying defendant-intervenors' counterclaim.

### B.    Standing

The standing jurisprudence of federal courts "contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, [and] prudential standing, which embodies judicially self-imposed limits on the exercise of federal jurisdiction." Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11 (2004) (citations and internal quotations omitted). Both must be satisfied in order for subject-matter jurisdiction to exist. Or. Advocacy Ctr. v. Mink, 322 F.3d 1101, 1108 (9th Cir. 2003).

The "irreducible constitutional minimum of standing" requires the party invoking the court's jurisdiction demonstrate that: (1) he or she suffered an "injury in fact"; (2) the injury is "fairly traceable to the challenged action of the defendant"; and (3) "it must be likely . . . that the injury will be redressed by a favorable decision." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992) (citations and internal quotations omitted). In order to be redressable, the injury in fact must be both "actual and imminent, not conjectural or hypothetical." Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009) (citation omitted). In addition, where private companies are involved, as opposed to organizations representing the interests of their members, "the Article III standing requirements [must be met] on their own behalf." Pac. Rivers Council v. Shepard, 2011 WL 7562961, *7 (D. Or. Sept. 29, 2011), adopted as modified, 2012 WL 950032 (D. Or. Mar. 20, 2012).

Prudential limitations come into play where a "complaint [does not] fall within the zone of interests protected by the law invoked." Allen v. Wright, 468 U.S. 737, 751 (1984). In assessing the "zone of interests," a court must determine whether the plaintiff's interests are among those "arguably . . . to be protected" by the statute at issue. Nat'l Credit Union v. First Nat'l Bank & Trust Co., 522 U.S. 479, 489 (1998). Although the "zone of interests" test "is not meant to be especially demanding," the standard forecloses suit when the plaintiff's interests are "marginally related to or inconsistent with the purposes implicit in the statute." Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 225 (2012) (citation and internal quotations omitted).

Defendant-intervenors assert their interests are at risk of injury due to increased likelihood of wildfire caused by the "loss of active management on BLM lands." Zuber Decl. ¶¶ 6-11 (doc. 12); Turner Decl. ¶¶ 6-11 (doc. 13); Fromdahl Decl. ¶¶ 3-10 (doc. 42); Hearing (Sept. 13, 2018). Stated differently, defendant-intervenors' principal contention is that the 2016 RMPs should have authorized more timber harvest to ameliorate the risk of forest fire. Id.; see also IMSJ 30 (doc. 66) ("[d]espite BLM's acknowledgment that land management activities like timber harvest can moderate fire behavior and fire effects, the BLM RODs placed the vast majority of BLM-administered public lands outside of the Harvest Land Base").

The Court finds defendant-intervenors' declarations are speculative with respect to the claimed threat to their interests, and conclusory or silent with respect to causation and redressability. Notably, defendant-intervenors neglect to cite to any evidence in the 50,000-plus page administrative record suggesting that the 2016 RMPs will produce an increased risk of wildfire. See generally id.; IMSJ Reply 23-26 (doc. 81). In fact, one purpose of the challenged action is to engage active forest management to improve forest resiliency and restore fire-

adapted ecosystems. JA 3726. While defendant-intervenors advocate for increased logging as a method to reduce the risk of wildfire, they ignore the fact that the 2016 RMPs authorize a *greater amount of timber harvest* over both the 1995 RMPs and historical levels. See JA 4023, 4053, 4057 (ASQ of 203 million board feet in the 1995 RMPs vs. ASQ of 205 million board feet in the 2016 RMPs); see also JA 4066-67 (average of 167 million board feet of ASQ and non-ASQ timber was sold between 1995 and 2012, compared to the 278 million board feet of ASQ and non-ASQ harvest anticipated under the 2016 RMPs during the first decade of implementation).

Any potential benefits that defendant-intervenors propose as a result of increased logging beyond the scope of the proposed action are speculative. See Turner Decl. ¶ 11 (doc. 13) ("extend[ing] the time frame for timber harvesting [and allowing] an opportunity to enter older forest stands for timber harvest . . . would diversify the forest to the benefit of wildlife like elk and deer"). Likewise, the fact that defendant-intervenors and their surrounding communities would benefit economically from increased logging is neither sufficiently specific nor causally connected to the proposed action. Id. at ¶¶ 7-8, 11-12; Zuber Decl. ¶¶ 7-9 (doc. 12); Fromdahl Decl. ¶¶ 3-10 (doc. 42).

As a result, defendant-intervenors' reliance on Laub v. U.S. Dep't of Interior, 342 F.3d 1080 (9th Cir. 2003), is misplaced.[5] In Laub, three farmers – Laub, Jacobsen, and Sneely – alleged that implementation of the challenged action would "directly result in . . . the loss of affordable irrigation water for their agricultural lands" and, in fact, had already caused "westside users [to look] beyond the existing sources . . . to the eastside of San Joaquin Valley, like Laub's and Jacobsen's." Id. at 1085-86.

---

[5] At the hearing, defendant-intervenors recognized that it is "more difficult" to establish Article III standing for programmatic actions "because there is no[thing] site-specific." Hearing (Sept. 13, 2018). They also acknowledged that their counterclaim was at the "boundaries of injury in fact" but nonetheless argued that subject-matter jurisdiction existed under Laub. Id.

Here, in contrast, defendant-intervenors do not assert any definitive and impending injury associated with the 2016 RMPs. Rather, defendant-intervenors merely surmise that their economic interests could be impaired and the risk of wildfires increase if BLM lands are not *more* actively managed – i.e., if harvest levels are not expanded beyond those already authorized in the 2016 RMPs. Zuber Decl. ¶¶ 6-11 (doc. 12); Turner Decl. ¶¶ 6-11 (doc. 13); Fromdahl Decl. ¶¶ 3-10 (doc. 42). As such, unlike the plaintiffs in Laub, defendant-intervenors fail to present facts sufficient to establish their alleged injury is actual and imminent. See W. Expl., LLC v. U.S. Dep't of Interior, 250 F.Supp.3d 718, 734 (D. Nev. 2017) ("alleged potential harm in the future [of increased wildfire] is not actual or imminent") (citation and internal quotations omitted); see also Swanson Grp. Mfg. LLC v. Jewell, 790 F.3d 235, 242 (D.C. Cir. 2015) (logging company's attestations that it "may not be able to continue to operate its facility and keep its current work force employed" if the challenged action was implemented constituted "the kind of uncertain and unspecific prediction of future harm that is inadequate to establish Article III standing") (collecting cases).

Defendant-intervenors also do not fall within NEPA's "zone of interests." NEPA "was enacted to in order to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." Nev. Land Action Ass'n v. U.S. Forest Serv., 8 F.3d 713, 716 (9th Cir. 1993) (citation and internal quotations omitted). The purpose of NEPA therefore "is to protect the environment, not the economic interest of those adversely affected by agency decisions." Id. (citation omitted).

Accordingly, there is nothing in NEPA that even arguably was intended to encompass the interests of private for-profit companies or commerce-centered organizations that seek economic benefit from timber harvest on federally-managed land. Acknowledging as much, defendant-

intervenors contend for the first time in their reply brief[6] that their "interests are environmental in nature – all Intervenors share a commitment to healthy public forestlands." IMSJ Reply 8 (doc. 81) (citing Zuber Decl. ¶ 11 (doc. 12); Turner Decl. ¶ 6 (doc. 13); Fromdahl Decl. ¶¶ 3, 10 (doc. 42)); see also Hearing (Sept. 13, 2018) (defendant-intervenors arguing that appropriate land management will lead to healthier forests which, in turn, will inhere to the benefit of local businesses). Defendant-intervenors assert RCC has an added interest in "the recreation industry, like fishing and hunting." IMSJ Reply 9 (doc. 81) (citing Fromdahl Decl. ¶ 4 (doc. 42)).

The problem with defendant-intervenors' argument is that the declaration excerpts they rely on, when read in context, make clear that their de facto interest in the proposed action is limited to whether it could potentially reduce timber yields and, by extension, have a negative economic impact on their companies or members. See, e.g., Zuber Decl. ¶¶ 6-11 (doc. 12); Turner Decl. ¶¶ 6-11 (doc. 13); Fromdahl Decl. ¶¶ 3-10 (doc. 42); see also Def.-Intervenors' Am. Answer & Counterclaim p. 21 (doc. 54) (alleging defendants violated NEPA by failing to "adequately consider and disclose the timber harvest impacts" of various proposed activities, and by placing "[a]rbitrary restrictions on post-fire timber salvage"). The requisite nexus between defendant-intervenors' stated concerns and the environment is simply absent.

Significantly, defendant-intervenors have not cited to, and the Court is not aware of, any authority in which parties with analogous interests were held to fall within NEPA's "zone of interests."[7] To the contrary, courts have routinely required at least some interest that goes beyond

---

[6] While defendant-intervenors conclude broadly in their opening memorandum that prudential standing exists, they neither provided any meaningful analysis nor cited to a single paragraph in their declarations. IMSJ 8-10 (doc. 66); see also Jones v. Wood, 207 F.3d 557, 562 n.2 (9th Cir. 2000) (issues not "specifically and distinctly raised in [the] opening brief" are deemed waived).

[7] Defendant-intervenors' citations to San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv., 819 F.Supp.2d 1077, 1099 (E.D. Cal. 2011), and Monsato Co. v. Geerston Seed Farms,

economic impact to the plaintiff, especially where, as here, actions perpetuated by that plaintiff have contributed to the need for greater environmental protections. See Am. Indep. Mines & Minerals v. U.S. Dep't of Agric., 494 Fed.Appx. 724, 726-27 (9th Cir. 2012) (mining company's "commitment to environmental studies and mitigation activities" did not meet NEPA's zone of interest requirement because "these activities . . . are undertaken only as part of the pursuit of [its] economic interest in mining"); see also Nev. Land Action Ass'n, 8 F.3d at 715-16 (ranchers lacked prudential standing to challenge an amended RMP that reduced grazing levels based on a general interest in protecting the "human environment" to prevent a "lifestyle loss" and "an economic interest in maintaining the forest resources and therefore in protecting the environment"; the court reasoned NEPA cannot be invoked to prevent a "lifestyle loss when the lifestyle in question is damaging to the environment").

Because defendant-intervenors' counterclaim is "more likely to frustrate than to further [NEPA's] statutory objectives," their declarations fail to establish that any one of them[8] possesses prudential standing. Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 397 n.12 (1987). This Court lacks subject-matter jurisdiction, such that defendants' motion should be granted and defendant-intervenors' motion should be denied as defendant-intervenors' NEPA counterclaim.

---

561 U.S. 139, 153-56 (2010) – cases in which the plaintiff possessed both economic and environmental interests, the latter of which the courts described as "direct" (i.e., protecting particular salmon runs) and "significant" (i.e., protecting against the risk of gene infection to the plaintiffs' crops), respectively – are inapposite.

[8] RCC is "a proactive business organization dedicated to supporting the successes of our members, who comprise hundreds of businesses and professional firms sharing a common goal of a strong local and regional economy." Fromdahl Decl. ¶ 3 (doc. 42). As the only defendant-intervenor that is not a for-profit timber company, RCC comes closest to showing prudential standing. Nevertheless, RCC's declaration reflects that any putative interest in promoting the environment or reducing wildfire exists only to foster tourism and/or timber harvest, which, in turn, furthers the economic interests of its members. See, e.g., id. at ¶¶ 7, 9-10.

II.    **Plaintiffs' NEPA Claim**

NEPA is "a procedural statute that does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." Sierra Club v. Bosworth, 510 F.3d 1016, 1018 (9th Cir. 2007) (citation and internal quotations omitted). Because NEPA "simply guarantees a particular procedure," the rights and obligations it creates are "fundamentally unlike" those of substantive land management statutes like the Federal Land and Policy Management Act ("FLPMA"). Kern, 284 F.3d at 1070-71 (citation and internal quotations omitted).

To accomplish the "hard look" mandate, NEPA requires the agency to provide "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." WildEarth Guardians v. Mont. Snowmobile Ass'n, 790 F.3d 920, 924 (9th Cir. 2015) (citation and internal quotations omitted). By extension, the agency must address past, present, and "reasonably foreseeable" future cumulative or indirect impacts for any major federal action. 42 U.S.C. § 4332(c); 40 C.F.R. §§ 1508.7, 1508.8(b). "Reasonably foreseeable future actions are those for which there are existing decisions, funding, formal proposals, or which are highly probable, based on known opportunities or trends." JA 10416. The consideration of such impacts must contain enough quantified or detailed information to allow for a "useful analysis." Kern, 284 F.3d at 1075 (citation omitted).

Plaintiffs contend BLM violated NEPA in two respects. First, they argue the 2016 RMPs represent an impermissible unilateral succession from the NWFP. PMSJ 11 (doc. 62-1). Second, plaintiffs assert BLM erred because the FEIS does not contain a stand-alone "cumulative effects

discussion [and instead] focused its analysis on the effects of adopting the revised RMPs on [BLM's] lands only." Id. at 13-14.[9]

Concerning plaintiffs' first contention, it is undisputed that, under FLPMA, BLM possesses the authority to amend or revise any RMP, including the NWFP. JA 3721, 3736, 12137; 43 U.S.C. § 1712(a), (c); 43 C.F.R. §§ 1601.0-1-8, 1610.5-6. Plaintiffs do not raise any FLMPA claim or otherwise assert BLM departed from FLMPA's procedures in amending the 1995 RMPs.[10] Further, the record is replete with evidence demonstrating BLM did not "move alone" in promulgating the 2016 RMPs. Critically, the Forest Service, FWS, NMFS, the U.S. Environmental Protection Agency ("EPA"), the State of Oregon, six tribes, and sixteen counties all participated in the RMP revision process as formal cooperators. JA 272-74, 592-93, 3714-15,

---

[9] Plaintiffs rely, in part, on extra-record evidence to support their NEPA claim. PMSJ 11-12 (doc. 62-1). Defendants object, arguing that such evidence does not fall within any of the recognized exceptions to the record review rule under the APA. DXMSJ 32 n.15 (doc. 75-1). The Court is "capable of independently resolving conflicts in the record and questions of admissibility," and therefore declines to strike the evidence at issue, especially because it does not alter the outcome of this case. Cascadia Wildlands v. Bureau of Land Mgmt., 2012 WL 6738275, *3 n.6 (D. Or. Dec. 21, 2012).

[10] For the first time in their reply brief, plaintiffs argue NEPA required BLM to provide a "reasoned explanation" for its substantive decision to "reverse course (seceding from the [NWFP]) and choose a new policy direction (adopting the revised RMPs)." PMSJ Reply 22- 23 (doc. 82). Aside from the fact that the court need not consider arguments first raised in a reply brief, NEPA is a procedural statute that simply mandates the agency take a hard look at the environmental consequences of its actions. Lentini v. Cal. Ctr. for the Arts, Escondido, 370 F.3d 837, 843 n.6 (9th Cir. 2004). Even assuming the 2016 RMPs could be categorized as a change in agency policy, the parties do not take a clear position regarding the analytical framework that applies in this context. See, e.g., PMSJ Reply 22- 23 (doc. 82); DXMSJ Reply 27-28 (doc. 86); Def.-Intervenors' Reply to Cross-Mot. Summ. J. on Pls.' Claims 11 n.6 (doc. 87). Irrespective of which standard governs, the proposed action passes muster as the administrative record clearly evinces defendants satisfied the four-part test articulated in Fed. Comm'n Comm. v. Fox Television Stations, Inc., 556 U.S. 502, 515-16 (2009). See, e.g., DXMSJ Reply 28 (doc. 86); Def.-Intervenors' Cross-Mot. Summ. J. on Pls.' Claims 9-12 (doc. 80). Namely, the FEIS explicitly identified updating the NWFP's ACS due to new scientific information regarding the NSO and timber harvest as part of its purpose and need. JA 3721-26. The FEIS went on to discuss the NWFP and ACS at various points, and cogently described why BLM believed the new aquatic conservation strategy to be beneficial. See, e.g., JA 3703, 3738-40, 5618-29.

4783-99. This involved structured participation by these entities at all stages of RMP development, and consultation with a working group, as well as coordination through the RIEC. JA 3736, 4789-91. As discussed in greater detail below, BLM also formally and informally consulted with FWS and NMFS under the ESA.

Regarding plaintiffs' second contention, the Court finds that BLM provided the requisite discussion of indirect and cumulative impacts. Although plaintiffs are correct that a stand-alone section entitled "cumulative impacts" is absent, the reasonably foreseeable effects of the proposed action were fully analyzed within the FEIS. In addressing indirect and cumulative impacts, the FEIS specified:

> Due to the nature of the analysis in this large-scale and long-term planning effort, all environmental effects described [herein] would have incremental impacts that would have a cumulative effect together with past actions, other present actions, and reasonably foreseeable actions. Therefore, there is not a discrete and separate section labeled as cumulative effects. The discussion of effects on each resource incorporates the effects of past actions, and describes other present action and reasonably foreseeable actions to provide context in which the incremental effects are examined, thus revealing the cumulative effects of the alternatives and the Proposed RMP . . .

> BLM integrated the effects of present actions on other ownerships into the broader analysis of current condition and assumptions about continued management consistent with existing plans or current trends. For BLM-administered lands, reasonably foreseeable future actions are those actions that would occur as described under the various alternatives and the Proposed RMP. For other ownerships within the planning area, reasonably foreseeable actions are those actions that would occur with the continuation of present management, also from a broad-scale perspective. It would be speculative for the BLM to presume knowledge of site-specific actions that would occur in the future on lands managed by others over the time period analyzed in the Proposed RMP/Final EIS. The BLM based these assumptions about future management on other ownerships on existing plans or current trends, and these assumptions are broad and general in nature. However, the broad assumptions are sufficient to provide context for evaluating the incremental effect of the alternatives.

JA 3835-36.

As such, BLM resolved that anticipating how all other landowners over a vast geographical range would respond to the 2016 RMPs on a site-specific level would be unduly conjectural. Indeed, the western Oregon planning area encompasses approximately 22 million acres, only 11% (or 2.5 million acres) are managed by BLM. JA 3831. The remaining lands within the planning area are managed by private landowners (54%), the Forest Service (30%), state or local governments (4%), and other federal agencies (1%). JA 3832.

Accordingly, the spatial scope of the FEIS' analysis was reasonably determined on a concrete, resource-by-resource basis instead of on the basis of land type. Contrary to plaintiffs' assertion, the FEIS' analysis was not limited solely to the 2.5 million acres of BLM land or the 22 million acres of the planning area. JA 3831-32, 3835-36, 3839. In other words, BLM considered potential direct, indirect, and cumulative impacts of the various management alternatives on twenty-five resources throughout the FEIS, and addressed site-specific future actions where those actions could be reasonably forecasted. See, e.g., JA 3836-38, 4671-73, 4689-90, 4692, 4698-4715, 5512-69.

Plaintiffs have not provided any argument or evidence to refute or otherwise undermine BLM's approach to assessing direct, indirect, and cumulative impacts, nor do they challenge any of the specific analyses in the FEIS. PMSJ 8-14 (doc. 62-1); PMSJ Reply 21-28 (doc. 82); see also Selrick Conservation All. v. Forsgren, 336 F.3d 944, 962 (9th Cir. 2003) ("[t]he selection of the scope of an EIS is a delicate choice and one that should be entrusted to the expertise of the deciding agency"); League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv., 549 F.3d 1211, 1218 (9th Cir. 2008) ("[i]t is not for this court to tell the [agency] what specific evidence to include, nor how specifically to present it") (emphasis removed).

Furthermore, again contrary to plaintiffs' assertion, NEPA does not require BLM to discuss any potential change to management within the entire 22 million acre planning area.[11] Such an analysis would necessitate that BLM hypothesize what changes, if any, all other non-BLM landowners throughout the region would make in response to each proposed alternative and then guess as to the possible environmental effects.[12] Yet it is well-established within the Ninth Circuit that "[p]urely hypothetical cumulative impacts needs not be evaluated." Seattle

---

[11] Plaintiffs contend for the first time in their reply that such an analysis is required because "[d]efendants have conducted [it] in the past." PMSJ Reply 24-25 (doc. 82). Yet, for non-federal lands, the NWFP EIS did not conduct the type of assessment that plaintiffs now claim NEPA requires. JA 13596-14737. Cumulative impacts to Forest Service lands were discussed within the NWFP EIS, but only because the NWFP EIS pinpointed reasonably foreseeable changes to the management of these lands. See, e.g., JA 13620. In contrast, plaintiffs here have not identified, and the Court is not aware of, any reasonably foreseeable changes to the Forest Service's management plans or those of any other land manager arising out of the proposed action. See Sierra Club v. U.S. Dep't of Transp., 310 F.Supp.2d 1168, 1186 (D. Nev. 2004) ("[m]ere disagreement with the [agency's] substantive conclusions regarding the proposed project's impacts . . . is not a basis for overturning an agency decision under NEPA"). In fact, plaintiffs' briefs underscore the uncertainty surrounding non-BLM landowners' responses to the revised RMPs. See PMSJ Reply 28 (doc. 82) ("[i]t is highly probable that other land managers will respond *in some fashion* with their own land management now that BLM has seceded from the [NWFP]") (emphasis added). As a result, the precedent that plaintiffs rely on in support of their NEPA claim is distinguishable; in each of those cases, the agency ignored existing or otherwise available information in its analysis of cumulative impacts.

[12] For the first time in their reply brief, plaintiffs cite to Smiley v. Citibank (S. Dakota), N.A., 517 U.S. 735 (1996), in support of the proposition that non-BLM landowners possess "serious reliance interests . . . that must be considered and addressed prior to an agency shifting its position." PMSJ Reply 22-23 (doc. 82). Plaintiffs again cited to Smiley at the hearing as proof that defendants were required to expressly evaluate possible land management changes throughout the planning area due to the substantial reliance interests at stake. Hearing (Sept. 13, 2018). Smiley, however, merely noted that policy "change that does not take account of legitimate reliance on prior interpretation may be arbitrary, capricious or an abuse of discretion," before holding that nothing "which can accurately be described as a change of official agency position has occurred here." Smiley, 517 U.S. at 742. Cases interpreting this rule have generally limited its application to policy changes involving criminal or civil liability. See, e.g., United States v. Pa. Indus. Chem. Corp., 411 U.S. 655, 670-75 (1973); Nat'l Labor Relations Bd. v. Bell Aerospace Co., 416 U.S. 267, 295 (1974); Perez v. Mortg. Bankers Ass'n, 135 S.Ct. 1199, 1209 (2015). In the case at bar, plaintiffs have not shown that undefined adverse consequences ensuing from non-BLM landowners' reliance interests are so substantial that defendants should be precluded under APA from implementing the 2016 RMPs.

Audubon Soc'y, 871 F.Supp. at 1323 (citation omitted); see also N. Plains Res. Council v. Surface Transp. Bd., 668 F.3d 1067, 1078 (9th Cir. 2011) (agency is "not required to engage in speculative analysis"); Envtl. Prot. Info. Ctr. v. U.S. Forest Serv., 451 F.3d 1005, 1014 (9th Cir. 2006) (NEPA does not "requires the government to do the impractical, if not enough information is available to permit meaningful consideration") (citation and internal quotations omitted).

In sum, the FEIS furnished a great deal of data and analysis concerning the direct, indirect, and cumulative impacts of the 2016 RMPs, and concluded that anticipating how each non-BLM landowner's management activities would change in light thereof was not reasonably foreseeable. This conclusion was based on agency expertise and other site-specific knowledge. See Hells Canyon All. v. U.S. Forest Serv., 227 F.3d 1170, 1184 (9th Cir. 2000) ("[t]he agency is entitled to rely on its own expertise"). The Court finds the foregoing sufficient to satisfy NEPA's "hard look" mandate. Defendants' and defendant-intervenors' motions should be granted, and plaintiffs' motion should be denied, as to plaintiffs' NEPA claim.

## III.    Plaintiffs' ESA Claim

Section 7 of the ESA requires each federal agency to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of a listed species' designated critical habitat. 16 U.S.C. § 1536(a)(2). Section 7 and its implementing regulations delineate the consultation process for determining the biological impacts of a proposed action. 16 U.S.C. § 1536(a)-(c); 50 C.F.R. § 402. In brief, if a proposed federal action "may effect" a listed species or its critical habitat, the "acting agency" must consult with the "consulting agency." 50 C.F.R. §§ 402.13, 402.14.

The consulting agency prepares a biological opinion ("BiOp") setting forth its conclusions about whether the proposed action will affect a listed species or its designated critical habitat. 16 U.S.C. § 1536(b)(3)(A). The BiOp must be based on the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). An agency action is likely to "jeopardize" a protected species if that action reasonably would be expected to cause an appreciable reduction in the likelihood of the survival and recovery of a protected species. 50 C.F.R. § 402.02.

If the BiOp concludes that jeopardy is not likely and that there will not be adverse modification of critical habitat, the consulting agency can issue an incidental take statement. Id.; 16 U.S.C. § 1536(b)(4). If followed, the incidental take statement exempts the acting agency from the prohibition on takings found in section 9 of the ESA. Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin., 175 F.3d 1156, 1159 (9th Cir. 1999).

Here, BLM consulted with FWS and NMFS in amending the 1995 RMPs. Between August 2013 and January 2016, BLM, FWS, and NMFS held numerous meetings and exchanged written correspondences regarding the 2016 RMPs and a new aquatic conservation strategy.[13] JA 3057-58, 4788-89. On February 1, 2016, BLM initiated formal ESA Section 7 consultation for the final proposed action, pursuant to which BLM transmitted a biological assessment ("BA") reflecting the prior work done by the agencies to arrive at a new aquatic conservation strategy. JA 3058, 6541-7285. On July 15, 2016, NMFS authored a final BiOp, in which it issued "no jeopardy" and "no adverse-modification" findings in relation to fifteen ESA-listed salmonid species and the southern resident killer whale. JA 3049-443. On July 20, 2016, FWS authored a

---

[13] In 2013, BLM, FWS, and NMFS "entered into an agreement providing for a multi-year, structured informal consultation process" pursuant to which FWS and NMFS were to provide input on BLM's proposed action prior to the initiation of formal ESA consultation or the issuance of a FEIS. JA 9384-92. The "goals of [this agreement] were to foster early coordination and integrate the ESA consultation with the NEPA process, and provide a process for ESA section 7 consultation for the [revised] RMP." JA 3057.

final BiOp, in which it issued "no jeopardy" and "no adverse-modification" findings concerning the three listed fish species within its jurisdiction (bull trout, the lost river sucker, and the shortnose sucker), as well as for a number of non-fish species including the NSO. JA 880-1965.

Plaintiffs argue these BiOps violated the ESA in three ways: (1) NMFS and FWS "failed to explain why the agency departed from the protections of the [NWFP by eliminating] ACS objectives from both mandatory aquatic conservation measures and from the incidental take statement"; (2) "NMFS improperly delayed consideration of impacts from construction of new roads to future project-specific consultations" and, as a result, "failed to impose reasonable and prudent measures to restrict construction of roads in riparian reserves"; and (3) "NMFS determined that the revised RMPs will cause populations of listed fish and habitat to slowly decline, reversing the upward trend created by the [NWFP], yet failed to explain how this trend will not harm salmon recovery." PMSJ 14-32 (doc. 62-1).

## A.    Departure from the NWFP

The main theme underlying plaintiffs' ESA claim is that defendants were not, as a matter of law, allowed to diverge from the NWFP's ACS absent an express analysis of that science within the BiOp itself. Id. at 11-22; Hearing (Sept. 13, 2018). Yet nothing in the ESA or its implementing regulations require the consulting agency to compare the acting agency's prior plan to the currently proposed action. Courts within the Ninth Circuit have repeatedly rejected ACS consistency as a general standard and instead interpret section 7 as necessitating that the consulting agency explain, based on the best available science, whether the acting agency's decision is likely to jeopardize listed species or adversely modify their critical habitat. See Pac. Coast Fed'n of Fishermen's Ass'n ("PCFFA") v. Nat'l Marine Fisheries Serv., 265 F.3d 1028, 1034-35 (9th Cir. 2001) ("other methods of reaching a jeopardy determination are available to

NMFS [outside of] ACS consistency . . . NMFS' primary objective is to determine [an action's]

effect on listed fish species"); Bark v. Northrup, 2018 WL 1598662, *10 (D. Or. Mar. 31, 2018)

(NMFS is generally "not required to independently determine [NWFP] ACS consistency").

Thus, actions under ESA review are not held to a comparative standard. See Nat'l

Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 524 F.3d 917, 926-30 (9th Cir. 2008) (faulting

NMFS' use of a "comparative approach," explaining that "[a]gency action can only 'jeopardize'

a species' existence if that agency action causes some deterioration in the species' pre-action

condition"); see also AquAlliance v. U.S. Bureau of Reclamation, 287 F.Supp.3d 969, 1667-68

(E.D. Cal. 2018) (rejecting the plaintiffs' substantively identical argument). Moreover, the cases

cited by plaintiffs regarding an agency's "change in course" are inapt, as each involved changes

to the acting agency's own policies. Via their BiOps, neither FWS nor NMFS are proposing

agency action or endorsing any change to their policies; they are instead reviewing another

agency's action – i.e., the BLM's adoption of the 2016 RMPs – for compliance with section 7 of

the ESA.[14]

Regardless, the 2016 RMPs correspond to all four key elements of the NWFP's ACS –

i.e., riparian reserves, key watersheds, watershed analysis, and watershed restoration. JA 3738-

40, 5618-23. Notably, the 2016 RMPs encompass a system of riparian reserves focused on

---

[14] To the extent plaintiffs maintain NMFS' comments endorsing the NWFP's ACS prior to the issuance of its 2016 BiOp constitute an earlier factual finding, their argument is unavailing. PMSJ 24-27 (doc. 62-1). "Agencies are entitled to change their minds." Butte Envtl. Council v. U.S. Army Corps of Eng'rs, 620 F.3d 936, 946 (9th Cir. 2010). "[T]he fact that a preliminary determination by a local agency representative is later overruled at a higher level within the agency does not render the decisionmaking process arbitrary and capricious." Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 659 (2007). Even assuming NMFS' comments during the planning process, or the NWFP itself, represented prior factual findings and, by extension, "relevant data" for which NMFS must "articulate a satisfactory explanation" when it changes course, such an explanation exists on the record before the Court, as discussed herein. Defs. of Wildlife v. Zinde, 856 F.3d 1248, 1262-63 (9th Cir. 2017).

important watersheds for listed aquatic species. JA 3802. The 2016 RMPs, however, employ specific calculations to categorize the "intrinsic potential" of each stream, whereas the NWFP's ACS relied on more general information from a "very large and diverse assessment area." JR 3083-84, 3807, 5618-19, 13042, 14529-33. Similar to the NWFP's ACS, the 2016 RMPs also provide for site-specific, activity-based compilation of "watershed-scale information on aquatic and riparian resources, including identifying resource conditions, watershed processes, risks to resources, and restoration opportunities," as well as "watershed restoration," such as road decommissioning, modifying road drainage systems, and reconstructing stream crossings. JA 3098-99, 3101, 3738-40, 5782-83, 12087, 12134-36, 12152. In other words, while not identical to the NWFP's ACS, the 2016 RMPs nonetheless identify quality aquatic habitat and hydrologically important areas, document existing and desired watershed conditions, include a program to restore aquatic ecosystems and watershed health, and designate buffer zones along streams, lakes, wetlands, etc.

Additionally, the 2016 RMPs incorporate "management objectives" that align with each of the nine ACS objectives. JA 5620-23, 3081-83, 7168-81, 7155-57. The 2016 RMPs also include detailed "management direction" for particular activities to help achieve these objectives, which the NWFP lacked. JA 5620-23, 3081-83, 7168-81, 7155-57. To ensure that these objectives and key components are being implemented, the 2016 RMPs call for monitoring. JA 3099-3101. If this monitoring (or other data) shows that the revised RMPs are not being properly executed or otherwise may affect listed species in a manner or to an extent not considered by FWS or NMFS, the BiOps require re-initiation of the ESA consultation process. JA 1708, 3281, 3380.

Thus, the BiOps fully analyzed the effects of the 2016 RMPs' revised aquatic conservation strategy. FWS' BiOp is over one thousand pages and addresses, at great length, the impacts of the 2016 RMPs on the aquatic environment and species within FWS' jurisdiction. JA 951-1017, 1066-1121, 1842-45, 1864-71. Likewise, NMFS' BiOp spans nearly 350 pages and thoroughly discusses activities governed by the 2016 RMPs, including forest management, fire and fuels management, grazing, minerals, visitation, and recreation. JA 3049-443. Both FWS and NMFS made numerous specific conclusions relating to the new aquatic strategy that support their no-jeopardy findings. See, e.g., JA 3246-47, 3256, 3298-99, 3301, 3334, 3336-40, 3342, 3345-47.

The one significant manner in which the 2016 RMPs diverge from the NWFP's ACS is based on the best available science and is fully supported by the record. The 2016 RMPs call for a riparian reserve of one site-potential tree height for fish-bearing and perennial streams, whereas the ACS mandated a riparian reserve of two site-potential tree heights for fish-bearing streams. Compare JA 12087, 14262, with JA 3086. Plaintiffs rely predominantly on an August 2015 comment letter from NMFS to intimate that NMFS strongly supported larger riparian reserves and, generally, verbatim adoption of the NWFP's ACS until undertaking a "stunning reversal" in position via its BiOp. PMSJ 25-26 (doc. 62-1); see also PMSJ Reply 6 (doc. 82) ("by the time NMFS issued the final BiOp, all thoughts of the ACS had vanished").

The record, however, demonstrates that NMFS' August 2015 comments were in relation to BLM's draft EIS. JA 7545-89; see also Zinde, 856 F.3d at 1262-63 (even if consulting agency's comments during the NEPA process "were construed [as] factual or scientific findings, they would not be inconsistent with" the agency's ultimate conclusions "in the BiOp because [each pertained to] substantially different plans"). After NMFS provided these comments, BLM,

NMFS, and FWS engaged in further discussions, and BLM continued to make changes to address NMFS' concerns, ultimately resulting in the revised aquatic conservation strategy set forth in the 2016 RMPs. See, e.g., JA 7286-87, 7354-413; see also JA 305-07, 632-34, 928-31, 1824, 1828-29, 3083-3101 (evidence reflecting BLM changes made in response to NMFS). For instance, BLM, FWS, and NWFS consulted following NMFS' August 2015 comments and, in October 2015, BLM authored a document outlining "how the BLM will bring forward the concepts of the Northwest Forest Plan Aquatic Conservation Strategy (ACS) into the Proposed Resource Management Plan/Final EIS." JA 7389. BLM then went on to detail how elements of the revised RMPs would correlate to each of the ACS' four key components and nine objectives. JA 7389-400.

The federal agencies thereafter conferred several times regarding BLM's progress in updating the NWFP's ACS for the purposes of revising the 1995 RMPs. JA 7361-84. In December 2015, based on these communications, NMFS authored a letter clarifying that:

> NMFS' view is that best available science is consistent both with the notion that two [site-potential tree heights], applied at the landscape scale, would ensure protection and recovery of ecological function and endangered and threatened aquatic species, but it is also consistent with the notion that one [site-potential tree height], coupled with elements such as we described on page 42 of our comment letter, can achieve those goals. Indeed, the NWFP itself provided a process by which the two [site-potential tree height buffer] could be modified in a step-down analysis taking into account site-specific factors.

JA 7355. NMFS concluded: "we believe best available science can support the concept of an aquatic conservation strategy our agencies have discussed over the last several years" and that the "building blocks of such a strategy" are present in the draft EIS. JA 7356. The federal agencies continued to discuss revisions to the 1995 RMPs over the following month and, in February 2016, BLM formally initiated section 7 ESA consultation with NMFS and FWS. JA 7286-87.

Page 26 – FINDINGS AND RECOMMENDATION

As the administrative record clearly demonstrates, ESA consultation was an extensive process that included explicit consideration of the NWFP's ACS. See Friends of the Earth v. Hintz, 800 F.2d 822, 834 (9th Cir. 1986) (agency's approval of a permit despite earlier criticism "was not a reversal but simply the culmination of over a year and a half of investigations, meetings, and reports"). NMFS' BiOp, in turn, addressed more recent scientific findings, including EPA modeling, to conclude that one site-potential tree height, coupled with other protective measures included in the 2016 RMPs, was sufficient to maintain and restore stream conditions important to listed aquatic species. JA 3228-3377, 3379-90; see also NMFS1 5014-16 (NMFS indicating there is "[n]o second site-potential tree height [because it] does not contribute significantly to functions needed for clean water and fish"). In fact, the 1993 FEMAT report, on which plaintiffs heavily rely, does not contain any data supporting a reserve width greater than one site-potential tree height.[15] JA 13055-58. BLM also produced a comparative analysis, not available at the time of the draft EIS, showing that the 2016 RMPs would protect stream conditions as well as or better than the NWFP-based alternatives. See, e.g., JA 4009-17, 4085-100, 4117-24, 7389-413.

Critically, plaintiffs do not cite to any evidence indicating FWS or NMFS ignored available science in issuing their BiOps, or otherwise disregarded facts and circumstances underlying or engendered by the NWFP. See Kern Cnty. Farm Bureau v. Allen, 450 F.3d 1072, 1080-81 (9th Cir. 2006) ("[t]he best available data requirement merely prohibits an agency from disregarding available scientific evidence that is in some way better than the evidence it relies

---

[15] As noted above, plaintiffs also rely on the ACS as evidence of the "best available science." PMSJ Reply 3-4 (doc. 82); Hearing (Sept. 13, 2018). Yet the ACS itself is not "scientific or commercial data" within the meaning of ESA section 7. JA 5624-25; 16 U.S.C. § 1536(a)(2). Rather, it is but one component of the NWFP, which represents a past agency action – i.e., a government-adopted set of standards and land use allocations used to govern future activities.

on" and concluding the plaintiff's claim failed because it "points to no data that was omitted from consideration") (citations and internal quotations and brackets omitted); see also Audubon Soc'y of Portland v. Nat'l Marine Fisheries Serv., 849 F.Supp.2d 1017, 1044-47(D. Or. 2011) (plaintiffs were unlikely to prevail on their "best available science" claim where they "failed to cite a single scientific study NMFS failed to consider, or to provide a single expert opinion of their own concluding the proposed . . . action would jeopardize the [listed species] or their critical habitat").

Indeed, the record unambiguously reflects NMFS considered the NWFP, the ACS, and the 1993 FEMAT Report during the planning process.[16] See, e.g., JA 7354-56, 7545-89; see also Portland Audubon Soc'y v. Endangered Species Comm., 984 F.2d 1534, 1548 (9th Cir. 1993) (review under the APA must be based on the "whole record," which "includes everything that was before the agency pertaining to the merits of its decision") (citation and internal quotations omitted); San Luis & Delta-Mendota Water Auth. v. Salazar, 666 F.Supp.2d 1137, 1154-59 (E.D. Cal. 2009) (rejecting the plaintiffs' claim that "the face of the BiOp" must show all of the consulting agency's data considerations). Likewise, plaintiffs do not identify any directly contradictory findings that could have required additional explanation by FWS or NMFS.[17]

---

[16] At the hearing, defendants noted that "part of why there is no explicit discussion in the BiOps of the NWFP and ACS" is precisely because BLM conferred with NWFS and FWS for years leading up to the 2016 RMPs pursuant to the federal agencies' 2013 agreement. Hearing (Sept. 13, 2018). The ESA expressly contemplates such informal consultation between the acting and consulting agencies, the by-product of which may include "suggest[ed] modifications [by NMFS or FWS] to the action that the Federal agency . . . could implement to avoid the likelihood of adverse effects to listed species or critical habitat." 50 C.F.R. § 402.13.

[17] For the first time in their reply brief, plaintiffs assert the BiOps were inconsistent with the 1995 RMP and the NMFS' August 2015 letter because they did not explain the lack of protection for aquatic species outside of riparian reserves. PMSJ Reply 2, 11-14, 16-18 (doc. 82). Plaintiffs waived this argument by failing to raise it in their opening brief. In any event, NMFS' August 2015 letter does not conclude that application of ACS objectives is required across all scales. Rather, it states "managers must ascertain the net effects of any proposed action on natural

In sum, FWS and NMFS neither ignored the NWFP, the ACS, or prior scientific findings in issuing the BiOps, nor did they wholly abandon the management objectives set forth therein. Instead, the record establishes FWS and NMFS considered the relevant facts, available data, and scientific information, and supplied a reasoned analysis in determining the 2016 RMPs would avoid jeopardy and adverse modification. Under these circumstances, the Court must defer to the FWS' and NMFS' decisions. See Conservation Cong. v. Finley, 774 F.3d 611, 620 (9th Cir. 2014) ("[t]he determination of what constitutes the best scientific data available belongs to the agency's special expertise, and thus when examining such a determination, a reviewing court must generally be at its most deferential") (citation and internal quotations omitted). Defendant and defendant-intervenors' motions should be granted, and plaintiffs' motion should be denied, in this regard.

### B.   Construction of New Roads

The 2016 RMPs qualified as "mixed programmatic actions." JA 3160. For a mixed programmatic action, the regulations specify that an incidental take statement is required "only for those program actions that are reasonably certain to cause take and are not subject to further section 7 consultation." 50 C.F.R. § 402.14(i)(6); see also 50 C.F.R. § 402.02 (defining "mixed programmatic action").

Because the 2016 RMPs authorize some activities that are expected to result in take and will not undergo formal future ESA consultation (such as the use of the existing road network), BLM formally consulted on these activities, resulting in the issuance of an incidental take statement. JA 3159-60, 3390-99. For other activities – including future new road construction

recovery processes at site-specific and larger spatial scales." JA 7554. The 2016 RMPs do just that and plaintiffs do not identify any provisions of the 1995 RMPs that apply more broadly. JA 313-39, 646-79; PMSJ Reply 12 (doc. 82).

over the course of plan implementation – the 2016 RMPs provide guiding programmatic framework. JA 3159-60. In particular, NMFS' BiOp analyzes management direction that limits road construction in riparian reserves to where there is no operationally feasible and economically viable alternative, considering the expected low intensity of new road construction and protective effects of no-cut buffers. JA 3235, 3248, 3252-53, 3255-56. Based on this analysis, NMFS concluded the 2016 RMPs sufficiently protected key water features – e.g., water temperature, large wood recruitment, fish habitat components, etc. – to avoid jeopardy. JA 3235, 3248, 3252-53, 3255-56.

This is all that is required for mixed programmatic actions. Plaintiffs acknowledge that the "BiOp set[s] sideboards for existing roads in its incidental take statement" and do not address, or otherwise dispute, the mixed programmatic nature of the 2016 RMPs. PMSJ Reply 19-21 (doc. 82). While plaintiffs maintain the NWFP provided greater protections against the construction of new roads in light of the ACS, they nonetheless admit that the BiOp found "road building in riparian reserves was extremely unlikely." Id. at 20 (citation and internal quotations omitted).

Furthermore, the record contravenes plaintiffs' contentions regarding the existence of more strenuous restrictions in the NWFP. In fact, under the NWFP, new roads were limited only in Forest Service inventoried "roadless" areas for key watersheds, none of which overlap with the BLM lands at issue in this case. JA 12184, 12192, 12452; 36 C.F.R. § 294.11. Similarly, the 1995 RMPs based on the NWFP contemplated that new roads would be built in riparian reserves and sedimentation caused by such roads would be minimized but not eliminated. See, e.g., JA 11105-06.

Finally, the fact that 66 miles of new roads would be built over 10 years within the 200-foot sediment delivery distance of streams under the selected alternative does not invalidate NMFS "no jeopardy" finding. JA 4123. In the context of the 5,096 miles of such roads that already exist in the planning area, this represents a 1.3% increase. JA 4121-22. BLM projected that a larger amount of new roads – 154 miles – would be built under the "No Action" alternative. JA 4123. As such, retention of the 1995 RMPs would result in greater net impacts due to new road construction.

Therefore, NMFS was not required to issue an incidental take statement or reasonable and prudent measures associated with future new road construction. See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv., 807 F.3d 1031, 1053 (9th Cir. 2015) (affirming the deferral of incidental take statements to later "second level analysis" for programmatic ESA consultation); see also Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv., 378 F.3d 1059, 1068 (9th Cir. 2004) (as amended), superseded on other grounds by Definition of Destruction or Adverse Modification of Critical Habitat, 81 Fed. Reg. 7214 ("[w]e have previously approved programmatic environmental analysis supplemented by later project-specific environmental analysis") (citation omitted). Nevertheless, the 2016 RPMs contain enforceable sideboards, which, in any event, will be supplemented later in site-specific ESA consultations. Defendants' and defendant-intervenors' motions should be granted, and plaintiffs' motion should be denied, as to this issue.

C.    **Salmon Recovery**

Plaintiffs retreat from their argument regarding salmon recovery as set forth in their opening brief. PMSJ Reply 16-17 (doc. 82). Plaintiffs initially argued that, "[d]espite finding that listed fish populations and their habitat will decline over the 50-year period of project

implementation, NMFS nevertheless issued a no jeopardy finding." PMSJ 29-30 (doc. 62-1).

Defendants responded by pointing out that plaintiffs were relying on the "Cumulative Effects"

portion of the BiOp, wherein "those effects of future state or private activities, not involving

Federal activities," were discussed. DXMSJ 25 (doc. 75-1); JA 3377-80. NMFS discusses, in

other portions of its BiOp, the effects of the revised RMPs and finds the designated riparian

reserves, and related objectives and direction, will protect important watersheds and stream

characteristics. See, e.g., JA 3228-3301.

    In other words, in the portion of the BiOp relied on by plaintiffs, NMFS was discussing

the effects of non-federal activities, not the effects of the 2016 RMPs.[18] As a result, the fact

NMFS found that some specific, future non-federal activities would have adverse effects on

listed species and, "in most instances" have "a minor, negative effect on population abundance

trends" and the "quality and function of critical habitat," does not violate the ESA. JA 3378; see

also Ctr. for Biological Diversity, 807 F.3d at 1052 (cumulative effects "outside the federal

agency's control" do not preclude a no-jeopardy finding).

---

[18] Recognizing as much, plaintiffs argue for the first time in their reply brief that the "Integration and Synthesis" portion of NMFS' BiOp reveals significant habitat degradations due to sediment and contaminants, which NMFS wrongfully discounted "as minor impacts" considering the 1997 BiOp's finding that "any degradation in aquatic conditions would jeopardize the continued existence of protected salmon." PMSJ Reply 16-17 (doc. 82). As addressed elsewhere in this Findings and Recommendation, arguments not raised in the opening brief are deemed waived. Regardless, NMFS cogently explained why habitat changes from sediment and storm water contaminants were only expected to have a minor impact – namely, because adverse effects "will be spatially and temporally separated," and only "small numbers of these fish are in the action area compared to the range of the species" given the "limited amount of BLM land." JA 3383-84. Plaintiffs have not cited to, and the Court is not aware of, anything in the record suggesting that an adverse effect equals jeopardy under these circumstances. As a result, plaintiffs' reliance on PCFFA is unconvincing. That case concerned the appropriate scale via which ACS consistency must be determined, as the consulting agency elected to use ACS consistency as the basis of its "no jeopardy" finding. PCFFA, 265 F.3d at 1036. Here, in contrast, there is no indication that defendants used a faulty or impermissible metric in determining the scope or scale of the proposed action. Also, as discussed below, the record reflects no inconsistency between the 1997 and 2016 BiOps.

Plaintiffs' remaining contention – that NMFS' 2016 no-jeopardy finding is inconsistent with the 1997 BiOp for NWFP-based plans because they acknowledge limited adverse effects to individual fish[19] – is unpersuasive. Both the 1997 BiOp and the 2016 BiOps recognized some adverse species effects. See, e.g., JA 3383-84, 10680, 10697. But in 1997, NMFS issued a "no jeopardy" finding for the NWFP-based plans because the NWFP's ACS would improve aquatic habitat and "avoid or minimize" any adverse effects. JA 10694, 10703, 10710-25. Similarly, NMFS found in 2016 that revisions to the 1995 RMPs, including the new aquatic conservation strategy, would ultimately enhance aquatic habitat and therefore not cause jeopardy or adverse modification. JA 3228-3377, 3379-90; see also Ctr. for Biological Diversity, 807 F.3d at 1052 ("[t]he determination of jeopardy or adverse modification is based on the effects of the action on the continued existence of the entire population of the listed species") (citation and internal quotations omitted). Defendants' and defendant-intervenors' motions should be granted, and plaintiffs' motion should be denied, as to plaintiffs' ESA claim.

## IV.    Plaintiffs' O&C Act Claim

Approximately two million of the 2.5 million acres of BLM land within the planning area are governed by provisions of the O&C Act. JA 3720, 3722, 3735. O&C Act lands

> shall be managed . . . for permanent forest production, and the timber thereon shall be sold, cut, and removed in conformity with the principal [sic] of sustained yield for the purpose of providing a permanent source of timber supply, protecting

---

[19] Bull trout are the only aquatic species within either NMFS' or FWS' jurisdiction mentioned as part of plaintiffs' ESA claim. PMSJ 31 (doc. 62-1). Due to upstream dams, there are only "5 – 20 fish" present in the planning area that could even be affected by the 2016 RMPs, out of tens of thousands bull trout elsewhere in the region. JA 985-86, 1015-16; FWS 54907-61. In finding no jeopardy, FWS denoted the few individual bull trout that might be present on BLM lands could not reproduce (given the absence of spawning habitat) or contribute to the genetic diversity of the larger local population (given their isolation). JA 1016-17. Additionally, BLM included mitigation measures in the 2016 RMPs that would be "beneficial . . . to recovery of bull trout over the long term." JA 1015-16. Plaintiffs do not challenge these conclusions or otherwise explain how jeopardy to bull trout as a species could result.

watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facil[i]ties.

43 U.S.C. § 1181a.

Plaintiffs argue the 2016 RMPs violate the O&C Act because "without all the elements of the ACS" they fail to protect "watersheds, water quality, stream flows, and the health [of] aquatic species" and will "increase economic stability in communities in Southwest Oregon." PMSJ 32-35 (doc. 62-1).

Contrary to plaintiffs' assertion, the plain language of the statute, as well as its legislative history, clearly reflect that the O&C Act is not a "multiple use mandate for public federal forestland management." Id. at 32; JA 14738-15417. Rather, courts have repeatedly held the O&C Act is a "primary" or "dominant" use statute for sustained-yield timber production.[20] Headwaters, Inc. v. Bureau of Land Mgmt., 914 F.2d 1174, 1183-84 (9th Cir. 1990); see also Soda Mountain Wilderness Council v. Bureau of Land Mgmt., 2013 WL 12120098, *1 (D. Or. May 29), adopted in part, 2013 WL 4786242 (D. Or. Sept. 6, 2013) (the O&C Act provides "that the primary use of O&C lands is timber production") (citation omitted); Portland Audubon Soc'y v. Lujan, 795 F.Supp. 1489, 1505 (D. Or. 1991) (as modified), aff'd, 998 F.2d 705 (9th Cir. 1993) ("[t]he O&C Act is not legislation designed to protect the environment").

Accordingly, protection of watersheds, stream flow regulation, and contribution to the economic stability of local communities are not ends in themselves. 43 U.S.C. §§ 1181a, 2601; JA 5612-13. Moreover, "wildlife habitat conservation . . . is [not] a goal of the O&C Act at all."

---

[20] Plaintiffs contend Headwaters has been "marginalized" by subsequent cases, the dispositive "holding is arguably dicta," and that the court "got it wrong." PMSJ Reply 31-32, 35 (doc. 82). Headwaters nonetheless remains good law and is directly on point. As such, it is binding on this Court. The cases plaintiffs cite as purportedly undermining Headwaters merely confirm the legal principal that O&C Act lands are subject to duties imposed by other, later-enacted statutes, such as NEPA.

Headwaters, 914 F.2d at 1184. Stated differently, managing O&C lands pursuant to sustained-yield principles by definition protects watersheds, regulates stream flows, and contributes to the economic stability of surrounding communities. Critically, plaintiffs here concede the 2016 RMP's stated ASQ of 205 million board feet from the harvest land base complies with the O&C Act's sustained yield principles. Hearing (Sept. 13, 2018).

In any event, far from degrading watersheds, water quality, and stream flow, the 2016 RMPs contain protections that maintain and/or improve these values. See, e.g., JA 3725, 3758, 4085-131, 4877-89. Plaintiffs do not raise any issues related to these analyses and instead merely suggest that divergence from the NWFP in and of itself is problematic for O&C Act land management. PMSJ 32-35 (doc. 62-1). However, BLM possesses discretion to both amend the NWFP and manage O&C Act lands. Portland Audubon Soc'y, 998 F.2d at 709.

Finally, plaintiffs' argument concerning economic stability is logically flawed. Plaintiffs allege that increased timber harvest[21] would violate the O&C Act and imperil local communities, but this reading is inconsistent with the O&C Act's purpose to promote "timber production as a dominant use." Headwaters, 914 F.2d at 1184.

While plaintiffs are correct the FEIS acknowledges that the timber industry is inherently volatile and thus an expansion of that industry through timber sales from BLM lands is "likely to introduce greater instability into local economies," nothing in the record undermines BLM's conclusion that "important outcomes" stemming from the sustained-yield timber production contemplated by the 2016 RMPs include positive effects on jobs and payments to counties. JA

---

[21] The NWFP, as written, predicted timber harvest levels of approximately 400 million board feet per year on O&C Act lands. JA 4069. Current implementation under the 1995 RMPs yielded an ASQ of 203 million board feet, but with a declared ASQ of 277 million board feet based on updated data and forest conditions. JA 4057, 4069. The 2016 RMPs authorize an increased ASQ, but the level of timber harvest is nonetheless relatively comparable to that occurring pursuant to the 1995 RMPs.

258-59, 579, 4443. For instance, the FEIS also looked at recreation-related industries, which "are relatively stable compared with timber-related industries," and determined that growth affiliated with recreation opportunities under the 2016 RMPs would promote economic stability. JA 4443. In fact, because the 2016 RMPs provided greater recreational opportunities than the "No Action" alternative, and authorized a relatively small increase in the ASQ, BLM concluded the 2016 RMPs "could result in increased [economic] stability overall" as compared to the 1995 RMPs. JA 4442-44.

In light of the record before the Court, BLM's determination that the 2016 RMPs comply with the O&C Act was neither arbitrary nor capricious. Defendants' and defendant-intervenors' motions should be granted, and plaintiffs' motion should be denied, as to plaintiffs' O&C Act claim.

## RECOMMENDATION

Defendants' and Defendant-Intervenors' Cross-Motions for Summary Judgment (docs. 75, 76, 80) should be GRANTED. Plaintiffs' and Defendant-Intervenors' Motions for Summary Judgment (docs. 62, 66) should be DENIED.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's right to de novo consideration of the factual issues and will constitute a

waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

DATED this 12th day of October 2018.


—————————————————
/s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge