Michael E. Haglund, OSB No. 772030
e-mail: mhaglund@hk-law.com
Julie A. Weis, OSB No. 974320
e-mail: weis@hk-law.com
Haglund Kelley LLP
200 SW Market St., Suite 1777
Portland, Oregon 97201
Phone: (503) 225-0777
Facsimile: (503) 225-1257

Attorneys for Defendant-Intervenors

## UNITED STATES DISTRICT COURT
### DISTRICT OF OREGON
### EUGENE DIVISION

| | |
|---|---|
| PACIFIC RIVERS, CASCADIA WILDLANDS, COAST RANGE ASSOCIATION, KLAMATH-SISKIYOU WILDLANDS CENTER, OREGON WILD, THE WILDERNESS SOCIETY, PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, INSTITUTE FOR FISHERIES RESOURCES, and UMPQUA WATERSHEDS, | Case No. 6:16-cv-01598-JR <br><br> **DEFENDANT-INTERVENORS' OBJECTIONS TO THE MAGISTRATE'S FINDINGS AND RECOMMENDATION ON THEIR CROSSCLAIM** |
| Plaintiffs, | |
| v. | |
| UNITED STATES BUREAU OF LAND MANAGEMENT; NATIONAL MARINE FISHERIES SERVICE; U.S. FISH AND WILDLIFE SERVICE; U.S. DEPARTMENT OF INTERIOR; and U.S. DEPARTMENT OF COMMERCE, | |
| Defendants, | |
| and | |
| ZUBER & SONS LOGGING, LLC, TURNER LOGGING, INC. AND ROSEBURG AREA CHAMBER OF COMMERCE, | |
| Defendant-Intervenors. | |

**DEFENDANT-INTERVENORS' OBJECTIONS TO THE MAGISTRATE'S FINDINGS AND RECOMMENDATION**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

LEGAL STANDARDS .............................................................................................................. 3

    I.    Standard of Review ........................................................................................... 3

    II.   Elements of Standing ........................................................................................ 3

            A.   Zone of Interests Standing .................................................................... 4

            B.   Constitutional Standing ........................................................................ 5

ARGUMENT ............................................................................................................................. 6

    I.    Intervenors Have Interrelated Environmental, Economic and Social Interests
        in BLM's Management of Public Lands Under the BLM RODs .............................. 6

    II.   Intervenors Have Prudential Standing .............................................................. 8

    III.  Intervenors Have Article III Standing ............................................................... 12

            A.   Intervenors Established Injury in Fact ................................................. 13

            B.   Intervenors Established Traceability and Redressability ....................... 19

CONCLUSION ......................................................................................................................... 22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arlington Heights v. Metro. Housing Dev. Corp.*,
    429 U.S. 252 (1977)..................................................................................4, 12

*Cantrell v. City of Long Beach*,
    241 F.3d 674 (9th Cir. 2001) ..................................................................6, 19

*Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*,
    731 F. Supp. 2d 15 (D.D.C. 2010)................................................................10

*Carpenters Industrial Council v. Zinke*,
    854 F.3d 1 (D.C. Cir. 2017).........................................................................21

*Cent. Delta Water Agency v. United States*,
    306 F.3d 938 (9th Cir. 2002) .......................................................................14

*Churchill County v. Babbitt*,
    150 F.3d 1072, *amended by* 158 F.3d 491 (9th Cir. 1998)...........................6

*Clarke v. Secs. Indus. Ass'n*,
    479 U.S. 388 (1987)..................................................................................4, 11

*Czyzewski v. Jevic Holding Corp.*,
    137 S. Ct. 973 (2017)....................................................................................13

*Hanly v. Mitchell*,
    460 F.2d 640 (2d Cir. 1972) ........................................................................10

*Hunt v. Wash. State Apple Advertising Comm'n*,
    432 U.S. 333 (1977)........................................................................................9

*Kern v. U.S. Bureau of Land Mgmt.*,
    284 F.3d 1062 (9th Cir. 2002) .....................................................................19

*Laub v. U.S. Dep't of Interior*,
    342 F.3d 1080 (9th Cir. 2003) ...............................................................*passim*

*Lexmark Intl. v. Static Control Components*,
    572 U.S. 118 (2014).................................................................................9, 13

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..................................................................................6, 11

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990)....................................................................................11

*Massachusetts v. E.P.A.,*
    549 U.S. 497 (2007)....................................................................................19

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010)........................................................................4, 9, 11, 12

*Mountain States Legal Found. v. Glickman,*
    92 F.3d 1228 (D.C. Cir. 1996)....................................................................11

*Port of Astoria, Or. v. Hodel,*
    595 F.2d 467 (9th Cir. 1979) .........................................................................4

*Public Citizen v. Dep't of Transp.,*
    316 F.3d 1002 (9th Cir. 2003), *rev'd on other grounds,* 541 U.S. 752 (2004).........................6

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. United States Dep't of Agric.,*
    415 F.3d 1078 (9th Cir. 2007)....................................................................4, 8

*San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.,* ...................................12
    819 F. Supp. 2d 1077, 1099 (E.D. Cal. 2011)

*Steel Co. v. Citizens for a Better Envt.,*
    523 U.S. 83 (1998)......................................................................................13

*Sugar Cane Growers Co-op. of Fla. v. Veneman,*
    289 F.3d 89 (D.C. Cir. 2002)..................................................................19, 20

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009)......................................................................................5

**Statutes**

28 U.S.C. § 636(b)(1) ......................................................................................3

42 U.S.C. § 4321 et. seq. .................................................................................1

**Other Authorities**

40 C.F.R § 1508.8..........................................................................................5

40 C.F.R. § 1508.14........................................................................................5

77 Fed. Reg. 71,876 (Dec. 4, 2012)..............................................................17, 21

FRCP 72(b)..............................................................................................1, 3

Local Rule 73-3 ........................................................................................................................ 1

http://roseburgareachamber.org ............................................................................................... 7

# INTRODUCTION

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure (FCRP), Local Rule 73-3, and the Magistrate Judge's order dated October 17, 2018 (ECF No. 95), defendant-intervenors Zuber & Sons Logging, LLC, Turner Logging, Inc. and the Roseburg Area Chamber of Commerce (collectively Intervenors) hereby object to Magistrate Judge Russo's Findings and Recommendation (F&R, ECF No. 92) on the issue of Intervenors' standing to pursue their NEPA crossclaim. *See* F&R at 9-14.[1]

On October 12, 2018, the Magistrate Judge issued the F&R that urged the reviewing Court to grant summary judgment in favor of federal defendants the U.S. Bureau of Land Management et al. (collectively BLM) and Intervenors on all of plaintiffs' claims involving BLM's issuance of the 2016 Records of Decision for the Resource Management Plans for Western Oregon (the BLM RODs). The Magistrate Judge's F&R rightly concluded that plaintiffs (collectively Pacific Rivers) failed to demonstrate that the BLM RODs (and their accompanying biological opinions) were arbitrary and capricious under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et. seq., the Endangered Species Act, or the O&C Sustained Yield Act. The Court should adopt the F&R with respect to all of Pacific Rivers' claims.

But in addition to joining BLM in defending the BLM RODs against Pacific Rivers' claims, Intervenors also brought a NEPA crossclaim against BLM on separate grounds. On that issue, the Magistrate Judge's F&R wrongly concluded that Intervenors lacked standing, both

---

[1] References to page numbers are to those of the original document, not the ECF pagination displayed at the top of each page, which may differ from that of the original document.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
PI.20

constitutional (Article III) and prudential (zone of interest, or statutory), to bring their NEPA crossclaim against BLM. F&R at 9-14. Respectfully, the Court should reject the Magistrate Judge's F&R regarding Intervenors' standing to pursue their NEPA crossclaim, and recommit to the Magistrate Judge with instructions to adjudicate Intervenors' NEPA crossclaim on the merits.

Intervenors' NEPA crossclaim alleges that BLM failed to consider and disclose the true environmental impacts of the BLM RODs on public lands managed by BLM, thereby misleading the decisionmaker and the public with respect to forthcoming timber harvest levels on BLM lands, and the associated health of natural resources resulting from insufficient active land management. More specifically, Intervenors' NEPA crossclaim alleged that BLM inadequately considered and disclosed the following environmental impacts of the BLM RODs: (1) the detrimental impacts on timber harvest from locating a large proportion of Harvest Land Base acres -- about 35% – within protective designated critical habitat for the northern spotted owl; (2) the detrimental impacts of wildfire on natural resources flowing from placing the vast majority of public lands covered by the BLM RODs outside of the Harvest Land Base, coupled with arbitrary restrictions on post-fire timber salvage; and (3) the detrimental impacts on timber harvest associated with BLM's arbitrary reliance on timely implementation of a hypothetical barred owl management program, instead of disclosing the foreseeable effects of further spotted owl population declines.

The Magistrate Judge first erred in concluding that Intervenors lack prudential standing to pursue their NEPA claim. Intervenors' prudential standing is not a close call – the applicable "zone of interests" test is not especially demanding, and Intervenors demonstrated that their interests fall with the zone of interests protected by NEPA by having a sufficiently close tie to

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
PL20

relevant environmental impacts of the BLM RODs. Intervenors' constitutional (Article III) standing may be a closer call due to the programmatic (rather than project-specific) nature of the BLM RODs. *See* F&R at 11 n.5. But on the facts of this case, the Magistrate Judge also erred in concluding that Intervenors fell short of establishing Article III standing while finding that Pacific Rivers, for its claims, met the same standard.

As discussed below, the Court should reverse the F&R regarding Intervenors' standing to pursue their NEPA crossclaim. The Court also should recommit Intervenors' crossclaim to the Magistrate Judge with instructions to reach the merits of Intervenors' NEPA crossclaim against the BLM RODs.

## LEGAL STANDARDS

### I.    Standard of Review.

When a party objects to any part of a magistrate judge's findings and recommendation, the district court's charge is to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). The district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* The district court also may "recommit the matter to the magistrate judge with instructions." *Id. See also* FRCP 72(b)(3) (setting forth the de novo standard of review and the district court's suite of potential actions on timely objections).

### II.    Elements of Standing.

A litigant challenging final agency action under NEPA typically must establish both prudential (zone of interest) standing and constitutional (Article III) standing. Where at least

Page-3 **DEFENDANT-INTERVENORS' OBJECTIONS TO THE MAGISTRATE'S FINDINGS AND RECOMMENDATION ON CROSSCLAIM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
Pl.20

one claimant has standing on a legal claim, a court need not consider the standing of the other parties bringing the same claim. *See, e.g., Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977).

### A. Zone of Interests Standing.

The test for prudential standing "is not meant to be especially demanding . . . ." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399 (1987). A party satisfies the test unless its interests "are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.*

In the NEPA context, a litigant "must allege injury to the environment; economic injury [standing alone] will not suffice." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. United States Dep't of Agric.*, 415 F.3d 1078, 1103 (9th Cir. 2007). Importantly, the NEPA zone of interest test does *not* treat economic and environmental interests as mutually exclusive – nor does it preclude a party with some economic interest from bringing a NEPA claim. Rather, a litigant may "have standing under NEPA even if his or her interest is primarily economic, so long as he or she also alleges an environmental interest or economic injuries that are 'causally related to an act within NEPA's embrace.'" *Id.* at 1103 (quoting *Port of Astoria, Or. v. Hodel*, 595 F.2d 467, 476 (9th Cir. 1979)). Thus, "[t]he mere fact that [a party] also seek[s] to avoid certain economic harms that are tied to the risk of [the action] does not strip them of prudential standing." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 155-56 (2010). This "tie to the environment" requirement is consistent with direction in NEPA's implementing regulations regarding the statute's application to interrelated environmental and economic or social effects resulting from a federal action. "Human Environment" under NEPA

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
PL20

"shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14; *see also id.* ("[E]conomic or social effects are not intended by themselves to require preparation of an environmental impact statement. When . . . economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment."); 40 C.F.R § 1508.8 (defining "effects" to include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative").

## B. **Constitutional Standing**.

The constitutional standing requirement aims to ensure that a litigant bringing a claim in federal court has a sufficiently personal stake in the outcome for the court to exercise jurisdiction over the case or controversy. *Summers v. Earth Island Inst.*, 555 U.S. 488, 492-93 (2009). To establish Article III standing, a party must show a threatened injury, traceability and redressability as follows:

> he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

*Id.* at 493.

In the context of NEPA, a wholly procedural statute, a litigant's burden of showing the traceability (or causation) and redressability elements is lessened:

> Once a plaintiff has established an injury in fact . . . the causation and redressability requirements are relaxed. The Supreme Court has recognized that the assertion of procedural rights is "special": "The person who has been accorded

Page-5 **DEFENDANT-INTERVENORS' OBJECTIONS TO THE MAGISTRATE'S FINDINGS AND RECOMMENDATION ON CROSSCLAIM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
PL20

a procedural right to protect his concrete interests can assert that right without
meeting all the normal standards for redressability and immediacy."

*Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir. 2001) (quoting *Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 572 n.7 (1992)).   Thus to establish traceability, a NEPA litigant need

only show a reasonable probability that the challenged action threatens its concrete interests.

*See, e.g.*, *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1087 (9th Cir. 2003) (citing to *Churchill*

*County v. Babbitt*, 150 F.3d 1072, *amended by* 158 F.3d 491 (9th Cir. 1998)).   *Accord Public*

*Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1016-18 (9th Cir. 2003) (finding a reasonable

probability of causation for purposes of standing under NEPA where challenged regulations were

alleged to increase the likelihood that Mexico-based trucks would operate in the U.S. with a

resultant increase in air pollution, assuming that the U.S. President lifted a moratorium on such

traffic), *rev'd on other grounds*, 541 U.S. 752 (2004).   To establish redressability, a litigant need

only show a possibility "that the decision could be influenced by the environmental

considerations that NEPA requires an agency to study."   *Laub*, 342 F.3d at 1087.

## ARGUMENT

I.   **Intervenors Have Interrelated Environmental, Economic and Social Interests in
BLM's Management of Public Lands Under the BLM RODs.**

The Court's standing inquiry, particularly the prudential standing inquiry, requires an

examination of Intervenors' interrelated environmental, economic and social interests in BLM's

management of public lands governed by the BLM RODs.   On this fundamental point, the

Magistrate Judge erroneously stated that Intervenors "contend for the first time in their reply

brief" that they have an environmental interest in the BLM RODs.   F&R at 13.   That is

incorrect.   The Court is referred to Intervenors' opening brief on their crossclaim (Intervenors'

Page-6 **DEFENDANT-INTERVENORS' OBJECTIONS
TO THE MAGISTRATE'S FINDINGS AND
RECOMMENDATION ON CROSSCLAIM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
PL20

Op. Br., ECF No. 66), where Intervenors discussed their environmental interests in the BLM

RODs, along with Intervenors' intertwined economic and social interests in BLM's management

of public lands governed by the BLM RODs. *See, e.g.*, Intervenors' Op. Br. at 3-4, 7, 8-10.

Intervenors also discussed their ties to the environment in their crossclaim reply brief

(Intervenors' Reply Br., ECF No. 81, at 8-10), and in their opening brief on Pacific Rivers' claims

(ECF No. 80, at 3-4), but those discussions were preceded by that in Intervenors' opening brief

on their crossclaim. And Intervenors discussed their environmental interests in their two

separate motions to intervene. *See* ECF Nos. 11, 41.

The Roseburg Area Chamber of Commerce (Chamber) is an Oregon mutual benefit

nonprofit corporation dedicated to supporting the successes of its many and diverse members in

and around southern Oregon. Declaration of Debra Fromdahl (Fromdahl Decl., ECF No. 42) ¶

3. The southern Oregon area is a natural resource-based community where people are tied

naturally to the land in work and recreation. *Id.* Thus not surprisingly, the Chamber's large and

diverse membership includes natural resource-based members in the timber industry (including

wood products manufacturing and logging related businesses), in the recreation field (including

fishing and hunting guides), and in tourism (along with all who serve the myriad needs of

tourists), among other types of members having close ties to the land. *See generally*

http://roseburgareachamber.org. The Chamber is dedicated to supporting the successes of its

members, who are adversely affected by the lack of active management on BLM lands with its

attendant detrimental effects on the health of the forest, the community (both the social fabric

and economy), and even the physical health of community members. *See generally* Fromdahl

Decl. ¶¶ 4, 6-10.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
PL20

Zuber and Sons Logging, LLC (Zuber) and Turner Logging, Inc. (Turner) are family-owned independent logging businesses based in Oregon. Declaration of Bruce Zuber (Zuber Decl., ECF No. 12) ¶¶ 2-4; Declaration of Mark Turner (Turner Decl., ECF No. 13) ¶¶ 2, 4. Zuber is based in Gold Beach in southern Oregon, Zuber Decl. ¶ 4, whereas Turner is based in Banks in the northern portion of the state. Turner Decl. ¶ 4. Zuber provides logging services to landowners and mills to facilitate the harvest of timber and subsequent delivery of logs to mills. Zuber Decl. ¶ 5. Turner similarly works to facilitate the harvest of timber and subsequent delivery of logs to mills, particularly from commercial thinning operations designed to improve forest health and increase the resiliency of timberlands when exposed to wildfire. Turner Decl. ¶ 6. Zuber and Turner work in western Oregon where a large proportion of the land is managed by public agencies, including BLM. Thus BLM timber sales provide Zuber and Turner with concrete opportunities to obtain logging contracts that sustain the companies and keep employees working in the woods while simultaneously improving forest health and reducing forest susceptibility to wildfire. *See* Zuber Decl. ¶ 11 (discussing forest health and wildfire concerns associated with insufficient active management of BLM lands); Turner Decl. ¶ 10 (same).

Intervenors' concrete and interrelated environmental, economic and social interests in the public lands governed by the BLM RODs support their standing.

## II.  <u>Intervenors Have Prudential Standing</u>.

The fundamental flaw in the Magistrate Judge's prudential (zone of interests, or statutory) standing analysis is the conclusory assumption that economic and environmental interests are mutually exclusive.[2] They are not. *Ranchers Cattlemen*, 415 F.3d at 1103 (stating that a

---

[2]  The Supreme Court in recent years has clarified that prudential standing is more appropriately

Page-8 **DEFENDANT-INTERVENORS' OBJECTIONS TO THE MAGISTRATE'S FINDINGS AND RECOMMENDATION ON CROSSCLAIM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
PL20

litigant may "have standing under NEPA *even if his or her interest is primarily economic*, so long as he or she also alleges an environmental interest or economic injuries that are 'causally related to an act within NEPA's embrace'") (emphasis added, citation omitted); *Monsanto*, 561 U.S. at 155 (holding the mere fact a claimant sought to avoid economic harms "does not strip them of prudential standing").

But the Magistrate Judge assumed that the presence of economic interests jettisoned Intervenors from NEPA's zone of interests. F&R at 12 ("[T]here is nothing in NEPA that even arguably was intended to encompass the interests of private for-profit companies or commerce-centered organizations that seek economic benefit from timber harvest on federally-managed land."). The Magistrate Judge even viewed the Chamber[3] as being impermissibly tainted by economic interests, describing its "putative interest in promoting the environment or reducing wildfire [as existing] only to foster tourism and/or timber harvest, which, in turn, furthers the economic interests of its members." F&R at 14 n.8.

Regarding the Chamber's interests, which the Magistrate Judge described as coming "closest to showing prudential standing," *id.*, the Court should readily conclude that the

---

called statutory standing. *Lexmark Intl. v. Static Control Components*, 572 U.S. 118, 127 (2014).

[3] The Chamber has standing to bring a NEPA crossclaim on its own behalf, including because of the Chamber's interest in local tourism and outdoor recreation due to its responsibility to run the local Visitor Center. Fromdahl Decl. ¶ 10. In addition, the Chamber has standing to bring a NEPA crossclaim on behalf of its members because: (1) one or more of its members would have standing to do so in their own right; (2) the Chamber's interests in bringing the NEPA crossclaim are relevant to its organizational purpose; and (3) the participation of individual Chamber members is not required for pursuit of the NEPA crossclaim. *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). No party disputed this, and the Magistrate Judge correctly did not conclude otherwise.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
PL20

Chamber's intertwined environmental and economic interests are causally related to an act within NEPA's embrace, namely promulgation of the BLM RODs. The BLM RODs govern land management on public lands, including those in and around southern Oregon where the Chamber and its members reside. Fromdahl Decl. ¶ 3 (explaining that southern Oregon is "a natural resource-based community where people are tied to the land in work and recreation"). The Chamber and its members "desire to see an increase in active management on our federal forests for the purpose of creating healthier and more resilient public lands." *Id.* Through its role with the local Visitor Center, the Chamber itself has an interest in local recreation and tourism on public lands, *id.* ¶¶ 4, 10, the enjoyment of which is fostered by healthy forests. Similar interests have long been held within NEPA's zone of interests. *See Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 731 F. Supp. 2d 15, 21 (D.D.C. 2010) (holding sufficient "assertion[s] of future recreational harms" and "assertions of harms they suffered in relation to repair of area beaches and harms to the quality of life of residents related to the physical environment"); *Hanly v. Mitchell*, 460 F.2d 640, 647 (2d Cir. 1972) (holding that "[n]oise, traffic, overburdened mass transportation systems, crime, congestion and even availability of drugs all affect the urban 'environment'").

There is nothing speculative or economically-tainted about the Chamber's asserted environmental interest in fostering healthy forests through active land management – the region "has experienced devastating wildfires on public lands in recent years," *id.* ¶ 9, and hence knows all too well the environmental destruction of wildland fire. In a similar vein, Turner provides forest thinning services that improve forest health and increase the resiliency of forests to wildfire, Turner Decl. ¶ 6, and Zuber has an asserted interest in BLM protecting the forests

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
PL20

entrusted to its management, including by "proactively taking steps to reduce the risk of catastrophic wildfire . . . ."  Zuber Decl. ¶ 11.  As Justice Stevens noted more than a quarter of a century ago, "we have no license to demean" an individual's interest in the environment, whether that interest is "motivated by esthetic enjoyment, an interest in professional research, or an economic interest . . . ."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 582 (1992) (Stevens, J., concurring).

Again, the zone of interests inquiry is not an "especially demanding" one.  *Clarke*, 479 U.S. at 399.  And the Supreme Court has recognized that outdoor recreational interests like those of the Chamber and its members, *see* Fromdahl Decl. ¶¶ 4, 9-10, are certainly within NEPA's zone of interests.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886 (1990) (expressing "no doubt" that recreational interests "are among the *sorts* of interests" within NEPA's zone of interests) (emphasis in original); *see also Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1236 (D.C. Cir. 1996) (holding that a concern about "increase in wildfire risk . . . is surely 'environmental'").

Further, although the Magistrate Judge characterized as "inapposite" the *San Joaquin River* and *Monsanto* cases discussed by Intervenors in support of their prudential standing, F&R at 13-14 n.7, those cases actually are highly instructive.  In *Monsanto*, a case involving the government's decision to deregulate genetically-modified Roundup Ready Alfalfa, for-profit alfalfa farmers satisfied the NEPA zone of interest test even though they complained of commercial injury flowing from the risk of genetic contamination to their crops.  561 U.S. 139, 153-56 (2010).  *Cf.* F&R at 12 (erroneously concluding that "nothing in NEPA . . . even arguably was intended to encompass the interests of private for-profit companies or commerce-

Page-11 **DEFENDANT-INTERVENORS' OBJECTIONS TO THE MAGISTRATE'S FINDINGS AND RECOMMENDATION ON CROSSCLAIM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
PL20

centered organizations that seek economic benefit").   As the Supreme Court held, "[t]he mere fact that [the farmers] also seek to avoid certain economic harms that are tied to the risk of gene flow does not strip them of prudential standing."   *Monsanto*, 561 U.S. at 155-56.   Likewise, in *San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.*, the court properly held that the interests of the River Authority fell within NEPA's zone of interests because of the Authority's interest in a fishery despite the Authority's interest being primarily economic.   819 F. Supp. 2d 1077, 1099 (E.D. Cal. 2011) (emphasis in original) ("That Plaintiff and its members hold this interest for largely economic reasons, rather than purely aesthetic or environmental ones, does not transform that interest from a permissible environmental interest into an impermissible economic one.").

In sum, the interests of Intervenors, certainly at least one Intervenor, fall within NEPA's zone of interests, thereby bringing the prudential standing inquiry to an end.   *Arlington Heights*, 429 U.S. at 264 & n.9 (ending the prudential standing inquiry after concluding that "at least one individual plaintiff . . . demonstrated standing").   Intervenors' interest in the preservation and health of public forestlands managed by BLM under the BLM RODs is a goal compatible with NEPA, even though that interest has an admitted economic component.   As illustrated by the foregoing, and as supported by Intervenors' declarations, Intervenors have attested to interrelated economic, social and environmental impacts resulting from the BLM RODs.   Intervenors thus fall within NEPA's zone of interests.   The F&R erred in concluding otherwise.

## III.   Intervenors Have Article III Standing.

The Magistrate Judge's constitutional standing analysis was in error for two reasons,

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
PL20

namely: (1) the failure to consider, in the context of the injury element for standing,[4] all three ways in which Intervenors alleged the BLM RODs ran afoul of NEPA; and (2) the failure to acknowledge the relaxation of the causation and redressability requirements for standing in the context of a purely procedural NEPA claim.

### A.  **Intervenors Established Injury in Fact.**

Regarding the injury in fact element for standing, the Magistrate Judge's analysis focused solely on Intervenors' allegations regarding insufficient timber harvest levels in the BLM RODs and the increased risk of wildfire flowing from such insufficient active land management.  F&R at 10.  While Intervenors maintain that such allegations do satisfy the injury element for standing, those allegations were only one part of Intervenors' NEPA claim.  Intervenors also asserted that BLM inadequately considered and disclosed the detrimental impacts on timber harvest levels, and resulting environmental harms, from locating 35% of the Harvest Land Base acres within designated critical habitat for the northern spotted owl, and from failing to disclose the foreseeable effects of further spotted owl population declines on timber harvest levels, and resulting environmental harms.  *See generally* First Amended Answer (ECF No. 54) at 15-21 (Crossclaim).

---

[4]  The questions regarding statutory standing and Article III standing are distinct.  *See Steel Co. v. Citizens for a Better Envt.*, 523 U.S. 83, 96-97 (1998).  Because statutory standing questions relate to the particular statute at issue, the test for statutory standing is often narrow.  *See Lexmark*, 572 U.S. at 132 (holding that a "consumer who is hoodwinked into purchasing a disappointing product may well have an injury-in-fact cognizable under Article III, but he cannot invoke the protection of the Lanham Act").  Intervenors' economic harms standing alone would be sufficient to establish Article III standing, as "[f]or standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"  *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017).  The discussion herein shows these harms have been sufficiently established, and the F&R acknowledged "defendant-intervenors and their surrounding communities would benefit economically from increased logging."  F&R at 11.

Page-13 **DEFENDANT-INTERVENORS' OBJECTIONS TO THE MAGISTRATE'S FINDINGS AND RECOMMENDATION ON CROSSCLAIM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
PL20

Because the BLM RODs are programmatic actions, *Laub*, 342 F.3d 1080, is instructive on the element of injury in fact. In *Laub*, three California farmers were held to have standing to challenge a programmatic water management plan involving proposed water acquisitions intended to benefit the California Bay-Delta. The farmers' injury allegations, which the court held were sufficiently concrete and imminent, were that the water management plan would impair the "'environmental and economic health'" of lands farmed by the farmers and also cause water shortages that eventually would lead to "'the potential loss of [the farmers'] farming operations, jobs and related services.'" *Id.* at 1085 (quoting the complaint). *See also id.* at 1085-86 (similarly stating that another farmer's livelihood was at risk due to the potential loss of "'an adequate, reliable, affordable water supply of good quality'"). The court found the alleged injury to be sufficiently concrete, particularized and imminent for purposes of standing because the farmers complained of a threatened "loss of affordable irrigation water for their irrigation lands." *Id.* at 1086; *accord Cent. Delta Water Agency v. United States*, 306 F.3d 938, 950 (9th Cir. 2002) (holding "a credible threat of harm is sufficient to constitute actual injury for standing purposes, whether or not a statutory violation has occurred").

Although the Magistrate Judge found Intervenors' allegations of injury more speculative than those alleged in *Laub*, F&R at 11, that is not so. The types of NEPA procedural violations alleged by the farmers in *Laub* are akin to the allegations in Intervenors' crossclaim. *Compare id.* at 1084 (alleging a failure to consider the direct, indirect and cumulative impacts "of projects that will cause significant effects on agricultural resources") *with* First Amended Answer at 18-21 (Crossclaim ¶¶ 11-27) (alleging a failure to consider all relevant environmental effects of managing public lands under the BLM RODs, which will cause significant unacknowledged

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
PL20

effects on natural resources managed by BLM, particularly timber resources). The farmers in *Laub* alleged that future water acquisitions under the challenged water management plan surely would make it more difficult for them to acquire the water they needed for their farms. 342 F.3d at 1085-86. Two of the farmers, who drew from water resources on the east side of the San Joaquin Valley, alleged that new competition for the east side water "would ultimately result in the potential loss of [their] farming operations, jobs, and related services." *Id.* at 1085. The third farmer similarly alleged that the water supplier on which he relied surely would find it more difficult to meet the farmer's needs, causing "the potential loss of [the farmer's] farming operations, jobs, and related services." *Id.* at 1085-86. The Ninth Circuit construed these allegations as the threatened "loss of affordable irrigation water for [the farmers'] agricultural lands" and found them sufficiently concrete and imminent to establish injury in fact for purposes of Article III standing.

Analogously, Intervenors assert a shared interest in healthy public forestlands that is threatened by the insufficient level of authorized active land management under the BLM RODs. Healthy forests are facilitated by timber harvest that both supports Intervenors' economic and community interests and fosters a resilient forest ecosystem, but the BLM RODs do not provide for such levels of active management (to the detriment of Intervenors) nor adequately disclose the environmental effects of that shortcoming. *See, e.g.*, Zuber Decl. ¶¶ 9, 10, 11 (discussing insufficient levels of timber harvest that fail to reduce the risk of destructive catastrophic wildfire); Turner Decl. ¶¶ 8, 10 (discussing same, and explaining that while wildfire is inevitable, catastrophic wildfire that destroys natural resources could be avoided with increased timber harvest); Fromdahl Decl. ¶¶ 3, 4, 5, 6, 11 (discussing the desire of the Chamber and its

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
PL20

members for increased active management on BLM lands to ameliorate threats to their concrete interests); *id.* ¶¶ 9, 10 (further explaining that the lack of sufficient timber harvest under the BLM RODs threatens the physical health of Chamber members and impairs the tourism and recreation interests of the Chamber and its members).

The Magistrate Judge compared timber harvest levels from actual implementation under the prior land management plans with timber harvest projections under the BLM RODs. F&R at 11. The F&R concluded that Intervenors could not be injured because timber harvest levels could theoretically increase under the new plans. *Id.* Comparing apples (actual historical harvest levels) to oranges (aspirational harvest projections) is fundamentally inappropriate, particularly given Intervenors' NEPA crossclaim allegations that BLM failed to disclose significant impediments to implementing timber harvest under the BLM RODs.

BLM acknowledged that in comparison with the prior land management plans, the BLM RODs more aggressively restrict active land management in the form of timber harvest. When responding to Pacific Rivers' motion for summary judgment, the agency pointed out that the annual anticipated timber harvest under the BLM RODs is substantially less than that under the prior land management plans. *See* Federal Defendants' Summ. J. Mem. in Opp'n to Pls.' Mot. (ECF No. 75-1) at 45 (stating that whereas the prior land management plans allowed for the harvest of 400 million board feet of timber from matrix lands and reserves, the BLM RODs allow for the harvest of only 278 million board feet from such lands). Also unlike the prior land management plans, the BLM RODs restrict salvage harvest in reserves. Joint Appendix (JA, ECF No. 91) 5680 (IND_0515346 (EIS 1902)) (stating that "salvage harvesting would be permissible to recover economic value or minimize economic loss only in the Harvest Land

Page-16 **DEFENDANT-INTERVENORS' OBJECTIONS TO THE MAGISTRATE'S FINDINGS AND RECOMMENDATION ON CROSSCLAIM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
PL20

Base.  The [BLM RODs] would prohibit salvage harvesting in Riparian Reserve and Late-Successional Reserve" land allocations).  And the BLM RODs allocate a full 75% of BLM lands to non-timber, reserve purposes compared with only 19% to the Harvest Land Base.  JA 3797 (IND_0514441 (EIS 81) (Figure 2-10)).  *See* JA 4866 (IND_0513936 (EIS 1106)) (explaining that the Harvest Land Base is comprised of those forestlands expected to be the source of "continual timber production" under the BLM RODs).

Compared with the prior land management plans (as represented by the no action alternative), which allocated about 692,000 acres to the Harvest Land Base, JA 3707 (IND_0514351 (EIS xxvii)), the Harvest Land Base under the BLM RODs is substantially reduced to only about 498,000 acres.  *See* JA 280 (IND_0512745 (Northwestern & Coastal Oregon ROD at 43)) (Northwestern & Coastal Oregon ROD has a 247,045 acre Harvest Land Base); JA 600 (IND_0513065 (Southwestern Oregon ROD at 43)) (Southwestern Oregon ROD has a 251,552 acre Harvest Land Base).  The BLM RODs thus pose an imminent threat to Intervenors' shared interest in healthy and resilient forest resulting from active land management.

In addition, regarding the owl critical habitat overlay on the Harvest Land Base, U.S. Fish and Wildlife Service direction to BLM regarding land management activities in owl critical habitat is consistent with Intervenors' assertions regarding undisclosed restrictions on timber harvest.  For example, the critical habitat rule for the northern spotted owl, *see* 77 Fed. Reg. 71,876 (Dec. 4, 2012), emphasizes activities that are not conducive to sustained yield timber harvest like that supposedly allowed on Harvest Land Base acres.  Among other things, the critical habitat rule cautions land managers not to employ active land management treatment in moist forest habitat, 77 Fed. Reg. at 71,909, which will particularly constrain timber harvest on

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
PL20

the three sustained yield units (out of six) comprised almost entirely of moist forested acres.   JA

4941 (IND_0514011 (EIS 1181, Table C-10)) (showing that moist forest comprises 99.2%,

99.7% and 98.2% of the Coos Bay, Eugene and Salem sustained yield units, respectively).   *See*

*also id.* (showing that moist forest comprises more than half of the total forested acres in the six

sustained yield units combined).   The owl critical habitat rule also advises against commercial

thinning in moist forest habitat, which bodes ill for timber harvest (and Turner's interest in

commercial thinning projects) given that commercial thinning historically has accounted for the

highest number of proposed timber harvest acres and timber volume per decade.   JA 4075-76

(IND_0514719-20 (EIS 359-60)).

Finally, Intervenors alleged injury flowing from BLM's failure to assess or disclose the

foreseeable impacts on timber harvest – and resulting environmental harms – from further

spotted owl population declines due to barred owl competition.   Instead, BLM devoted

considerable resources to assessing and disclosing the effects of a speculative U.S. Fish and

Wildlife Service program to reduce the numbers of barred owls on a certain time frame, even

though that agency had "not made a proposal or a decision on future barred owl control," let

alone doing so on any particular time trajectory.   JA 4695 (IND_0513765 (EIS 953)).   What is

missing from BLM's analysis is consideration of the impacts on timber harvest from further

foreseeable declines of the owl.   BLM omitted this analysis despite admitting that "[f]urther

population declines of the northern spotted owl could result in additional restrictions on timber

harvest, disrupting and limiting the BLM's ability to provide a sustained yield of timber."   JA

5614 (IND_0515280 (EIS 1836)).   BLM does not tackle this fundamental omission, which is at

the heart of Intervenors' crossclaim.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
PL20

All of the above supports Intervenors' assertions of injury in fact flowing from the BLM RODs.

**B. Intervenors Established Traceability and Redressability.**

Regarding the traceability and redressability elements for Article III standing, Intervenors pointed out above that in the context of NEPA, a wholly procedural statute, a litigant's burden of showing causation and redressability is relaxed. *Cantrell*, 241 F.3d at 682. To establish traceability, Intervenors need only show a reasonable probability that the BLM RODs threaten their concrete interests. *Laub*, 342 F.3d at 1087. And to establish redressability, Intervenors need only show a possibility that the BLM RODs "could be influenced by the environmental considerations that NEPA requires an agency to study." *Id.* The F&R did not acknowledge this aspect of a procedural NEPA claim, instead simply stating that Intervenors' declarations were "conclusory or silent with respect to causation and redressability." F&R at 10.

The Magistrate Judge's finding is contrary to the fundamental tenet of administrative law that a party claiming a procedural violation does not have to prove the additional procedure would have led to a particular result. All the party has to show is "the procedural step was connected to the substantive result." *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002). Thus, "any NEPA violation (and any procedural injury) inherent in the promulgation of an inadequate EIS for the [BLM RODs] *have already occurred*." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1071 (9th Cir. 2002) (emphasis added). "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007). Here, the requested

Page-19 **DEFENDANT-INTERVENORS' OBJECTIONS TO THE MAGISTRATE'S FINDINGS AND RECOMMENDATION ON CROSSCLAIM**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
PI.20

relief will undoubtedly lead BLM to reconsider the harmful RODs. Intervenors made a sufficient showing on causation by demonstrating a reasonable probability that the BLM RODs were the source of the threat to their asserted interests. Intervenors also made a sufficient showing on redressability because the missing NEPA analysis, if ordered by the Court, *could* generate improved BLM RODs that ameliorated the harms to Intervenors. *Laub*, 342 F.3d at 1087 (explaining that the redressability requirement does not require Intervenors to "show that further analysis by the government would result in a different conclusion," but rather only that the BLM RODs *could* have been "influenced by the [missing] environmental considerations that NEPA requires an agency to study"); *Sugar Cane Growers*, 289 F.3d at 94 ("A plaintiff who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered.").

For example, Turner alleged that as promulgated – with insufficient consideration of forthcoming timber harvest levels and the associated health of natural resources on BLM lands – the BLM RODs "do not treat enough of the landscape," Turner Decl. ¶ 9, and allocate a shamefully "small percentage of BLM timber . . . for timber production. I know BLM could do better . . . . I believe there is ample opportunity for BLM to do more, yet the agency seems to tie its own hands with overly restrictive management plans like the [BLM RODs." *Id.* ¶ 8. Zuber similarly criticized the BLM RODs on the grounds that the agency "should be doing more in terms of timber harvest from our public lands . . . . Management of BLM lands in Oregon . . . should be focused on proper management of the resource in compliance with the law . . . ." Zuber Decl. ¶ 9 (concluding that the BLM RODs were not properly promulgated, which will result in insufficient timber offerings). *See also id.* ¶ 10 (alleging the BLM RODs "provide for

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
Pl.20

insufficient timber harvest"); *id.* ¶ 11 (stating that BLM should have "more proactively tak[en] steps to reduce the risk of catastrophic wildfire"). Likewise, the Chamber asserted that as promulgated, the BLM RODs "provide for insufficient active management . . . ." Fromdahl Decl. ¶ 6. *See also id.* ¶ 9 (alleging the BLM RODs insufficiently address the "likelihood that the inevitable fire start will grow into a destructive wildfire"); *id.* at 10 (BLM RODs insufficiently balance the allocation of public lands "between reserves and the harvest land base").

   *Carpenters Industrial Council v. Zinke*, 854 F.3d 1 (D.C. Cir. 2017), further supports a finding of traceability and redressability, particularly as to Intervenors' assertion that BLM violated NEPA by inadequately considering the detrimental impacts from locating 35% of the Harvest Land Base acres within designated critical habitat for the northern spotted owl. In *Carpenters*, the D.C. Circuit Court of Appeals concluded that an association had standing to challenge the critical habitat rule for the northern spotted owl, *see* 77 Fed. Reg. 71,876, because "the critical habitat designation will decrease the availability of the [member] companies' source of timber supply, which in turn will cause them to suffer economic injury." *Carpenters*, 854 F.3d at 5. *See also id.* at 6-7 (further stating that "common sense" teaches that the critical habitat rule, which "imposes restrictions on the Government's ability to offer timber from designated forest lands for harvest[,] is substantially probable to cause a decline in the timber supply from those lands"). Note that *Carpenters* also supports Intervenors' alleged economic interests establishing the injury in fact element for standing.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
PL20

In short, Intervenors' evidence and common sense demonstrate satisfaction of the

traceability and redressability elements for standing, particularly given the relaxed standard for

meeting those elements in the context of Intervenors' NEPA crossclaim.

## CONCLUSION

Based on these objections, Intervenors respectfully ask that the Court reverse the

Magistrate Judge's F&R on the issue of Intervenors' standing to purse their NEPA crossclaim

against the BLM RODs.   The Court should conclude that Intervenors have standing to pursue

their NEPA crossclaim and recommit the issue of Intervenors' NEPA crossclaim to the

Magistrate Judge for adjudication on the merits.   The Court should otherwise adopt and uphold

the Magistrate Judge's F&R and enter summary judgment in favor of BLM and Intervenors on all

of Pacific Rivers' claims.

DATED this 16th day of November, 2018.

**HAGLUND KELLEY LLP**

By:＿＿＿/s/ Julie A. Weis＿＿＿＿＿＿＿＿
  Michael E. Haglund, OSB No. 772030
  Julie A. Weis, OSB No. 974320
  Attorneys for Defendant-Intervenor

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
PL20

**CERTIFICATE OF SERVICE**

I hereby certify that on the 16th day of November, 2018, I served the foregoing

**DEFENDANT-INTERVENORS' OBJECTIONS TO THE MAGISTRATE'S FINDINGS**

**AND RECOMMENDATION ON THEIR CROSSCLAIM** with the Clerk of the Court using

the CM/ECF system, which will send notification of this filing to the attorneys of record and all

registered participants.


/s/ Julie A. Weis
Julie A. Weis