SUSAN JANE M. BROWN (OSB #054607)
brown@westernlaw.org
Western Environmental Law Center
4107 NE Couch St.
Portland, OR. 97232
(503) 914-1323 | Phone
(541) 485-2457 | Fax

KRISTEN L. BOYLES (WSB #23806)
*(Admitted Pro Hac Vice)*
kboyles@earthjustice.org
JAIMINI PAREKH (CSB #309983)
*(Admited Pro Hac Vice)*
jparekh@earthjustice.org
TODD D. TRUE (WSB #12864)
*(Admitted Pro Hac Vice)*
ttrue@earthjustice.org
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA. 98104
(206) 343-7340 | Phone
(206) 343-1526 | Fax

THE HONORABLE JOLIE A. RUSSO

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| PACIFIC RIVERS, CASCADIA WILDLANDS, COAST RANGE ASSOCIATION, KLAMATH-SISKIYOU WILDLANDS CENTER, OREGON WILD, THE WILDERNESS SOCIETY, PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, INSTITUTE FOR FISHERIES RESOURCES, and UMPQUA WATERSHEDS, | No. 6:16-cv-01598-JR

PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION

ORAL ARGUMENT REQUESTED |

Plaintiffs,

v.

U.S. BUREAU OF LAND MANAGEMENT;
NATIONAL MARINE FISHERIES SERVICE;
U.S. FISH AND WILDLIFE SERVICE; U.S.
DEPARTMENT OF INTERIOR; U.S.
DEPARTMENT OF COMMERCE,

PLAINTIFFS' OBJECTIONS TO FINDINGS
AND RECOMMENDATION
(No. 6:16-cv-01598-JR)

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

                                        Defendants,

and

ZUBER  &  SONS LOGGING, LLC;
TURNER  LOGGING, INC.; ROSEBURG  AREA
CHAMBER  OF COMMERCE,

                    Defendant-Intervenors.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle,  WA 98104-1711*
*(206) 343-7340*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

STANDARD OF REVIEW ....................................................................................................3

ARGUMENT..........................................................................................................................3

    I.    NMFS VIOLATED THE ESA BY FAILING TO USE THE BEST
        AVAILABLE SCIENCE AS EMBODIED IN THE ACS AND FAILING
        TO EXPLAIN ITS DEPARTURE FROM LONG-STANDING AGENCY
        RELIANCE ON THE ACS. ...........................................................................3

        A.    In Its Biological Opinion On The 2016 BLM Rmps, NMFS
                Ignored The Best Available Science Represented By The ACS. ...............6

                1.    Eliminating The ACS Objectives Weakened Protections
                        For Listed Fish And Provides An Example Of The Harms
                        From NMFS' Abandonment Of The Best Available
                        Science. ........................................................................................8

                2.    Abandonment Of The ACS And Best Available Science
                        Exposes Aquatic Habitat To Harm From New Road
                        Construction. .............................................................................12

        B.    NMFS Invalidly Deviated Without Explanation From Its Prior
                Policy Requiring ACS Consistency As The Best Available
                Science. ..................................................................................................15

                1.    Reduced Riparian Reserves Are An Example Of NMFS's
                        Unexplained Shift In Policy. ......................................................20

        C.    Even If Not Considered A Prior Policy, Findings And Mandatory
                Conditions In The 1997 Biological Opinion Are Relevant Facts
                NMFS Invalidly Ignored. .......................................................................22

    II.    BLM FAILED TO CONSIDER THE CUMULATIVE IMPACT OF
        WITHDRAWING FROM THE NORTHWEST FOREST PLAN.......................23

    III.    THE 2016 RESOURCE MANAGEMENT PLANS VIOLATE THE
        OREGON AND CALIFORNIA LANDS ACT....................................................30

    IV.    PACIFIC RIVERS DID NOT WAIVE ARGUMENTS IN ITS REPLY
        BRIEF. ...........................................................................................................32

CONCLUSION.....................................................................................................................35

PLAINTIFFS' OBJECTIONS TO FINDINGS
AND RECOMMENDATION - Page i
(No. 6:16-cv-01598-JR)

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Wildlife Alliance v. Jensen,*
   108 F.3d 1065 (9th Cir. 1997) ..................................................................34

*American Civil Liberties Union of Nevada v. City of Las Vegas,*
   333 F.3d 1092 (9th Cir. 2003) ..................................................................33

*AquAlliance v. U.S. Bureau of Reclamation,*
   287 F. Supp. 3d 969 (E.D. Cal. 2018)..................................................15, 16

*Barnes v. U.S. Dep't of Transp.,*
   655 F.3d 1124 (9th Cir. 2011) ..................................................................29

*Chevron, U.S.A. v. Nat. Res. Def. Council,*
   467 U.S. 837 (1984)..................................................................................30

*City of Davis v. Coleman,*
   521 F.2d 661 (9th Cir. 1975) ..............................................................26, 29

*Conner v. Burford,*
   848 F.2d 1441 (9th Cir. 1988) .............................................................6, 15

*Conservation Nw. v. Rey,*
   674 F. Supp. 2d 1232 (W.D. Wash. 2009)................................................24

*Estate of Cowart v. Nicklos Drilling Co.,*
   505 U.S. 469 (1992)..................................................................................30

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.,*
   937 F. Supp. 2d 1140 (N.D. Cal. 2013) ...................................................29

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,*
   623 F. Supp. 2d 1044 (N.D. Cal. 2009) ...................................................14

*Ctr. for Biological Diversity v. Zinke,*
   900 F.3d 1053 (9th Cir. 2018) ....................................................................6

*Defenders of Wildlife v. Babbitt,*
   958 F. Supp. 670 (D.D.C. 1997) ..............................................................14

*Encino Motorcars, LLC v. Navarro,*
   136 S. Ct. 2117 (2016)........................................................................24, 33

PLAINTIFFS' OBJECTIONS TO FINDINGS
AND RECOMMENDATION - Page ii
(No. 6:16-cv-01598-JR)

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

*In re FCC 11-161*,
   753 F.3d 1015 (10th Cir. 2014) ......................................................................33

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ......................................................................................16

*Gold v. Wolpert*,
   876 F.2d 1327 (7th Cir. 1989) ......................................................................33

*Grand Canyon Trust v. U.S. Bureau of Reclamation*,
   623 F. Supp. 2d 1015 (D. Ariz. 2009) ....................................................17, 18

*Headwaters v. Bureau of Land Mgmt., Medford District*
   914 F.2d 1174 (9th Cir. 1990) ......................................................................31

*Hernandez v. Cook Cty. Sheriff's Office*,
   634 F.3d 906 (7th Cir. 2011) ........................................................................32

*Humane Soc'y of U.S. v. Locke*,
   626 F.3d 1040 (9th Cir. 2010) ......................................................................22

*Kern v. U.S. Bureau of Land Mgmt.*,
   284 F.3d 1062 (9th Cir. 2002) ......................................................................25

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
   387 F.3d 989 (9th Cir. 2004) ........................................................................25

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*,
   99 F. Supp. 3d 1033 (N.D. Cal. 2015) ..........................................................26

*Lewis v. Rumsfeld*,
   154 F. Supp. 2d 56 (D.D.C. 2001) ................................................................32

*Motor Vehicle Mfr. Ass'n v. State Farm Auto. Ins. Co.*,
   463 U.S. 29 (1983) ..................................................................................16, 19

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
   177 F.3d 800 (9th Cir. 1999) ........................................................................25

*N. Alaska Envtl. Ctr. v. Kempthorne*,
   457 F.3d 969 (9th Cir. 2006) ..........................................................................6

*N. Plains Res. Council v. Surface Transp. Bd.*,
   668 F.3d 1067 (9th Cir. 2011) ......................................................................26

*Nw. Ecosystem Alliance v. Rey*,
   380 F. Supp. 2d 1175 (W.D. Wash. 2005) ....................................................24

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
477 F.3d 668 (9th Cir. 2007) ...................................................................18, 20

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
402 F.3d 846 (9th Cir. 2005) .............................................................................29

*Or. Natural Res. Council v. Allen*,
476 F.3d 1031 (9th Cir. 2007) ...........................................................................16

*Organized Village of Kake v. U.S. Dep't of Agric.*,
795 F.3d 956 (9th Cir. 2015) ...........................................................19, 22, 23, 33

*PCFFA v. NMFS*,
482 F. Supp. 2d 1248 (W.D. Wash. 2007)...........................................10, 19, 24

*PCFFA v. NMFS*,
265 F.3d 1028 (9th Cir. 2001) .......................................................12, 14, 15, 16

*PCFFA v. NMFS*,
71 F. Supp. 2d 1063 (W.D. Wash. 1999)...............................................................7

*PCFFA v. NMFS*,
No. C97-775R, 1998 WL 1988556 (W.D. Wash. May 29, 1998) ...................6, 17

*Portland Audubon Soc'y v. Lujan*,
795 F. Supp. 1489 (D. Or. 1992) .........................................................................4

*Rock Creek Alliance v. U.S. Fish & Wildlife Serv.*,
390 F. Supp. 2d 993 (D. Mont. 2005) .................................................................22

*Seattle Audubon Soc'y v. Lyons*,
871 F. Supp. 1291 (W.D. Wash. 1994)..................................................................4

*Seattle Audubon Soc'y v. Moseley*,
80 F.3d 1401 (9th Cir. 1996) ...............................................................................4

*Sierra Club v. Marsh*,
816 F.2d 1376 (9th Cir. 1987) ........................................................................6, 14

*Smiley v. Citibank*,
517 U.S. 735, 742, (1996) .............................................................................24, 34

*Von Brimer v. Whirlpool Corp.*,
536 F.2d 838 (9th Cir. 1976) .............................................................................34

*Wa. Toxics Coalition v. Envtl. Prot. Agency*,
413 F.3d 1024 (9th Cir. 2005) .............................................................................6

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

**Statutes**

Administrative Procedure Act
    5 U.S.C. § 706(2)(A)................................................................................................*passim*

Endangered Species Act
    16 U.S.C. § 1536(a)(2)..........................................................................................*passim*

National Environmental Policy Act
    42 U.S.C. § 4321 et seq........................................................................................*passim*

Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act
    43 U.S.C. § 2601..................................................................................................*passim*

28 U.S.C. § 636(b)(1)(C) ...............................................................................................3

Fed. R. Civ. P. 72(b)(3)...................................................................................................3

**Regulations**

50 C.F.R. § 402.14(g)(8)................................................................................................6

**Other Authorities**

Regional Ecosystem Office, Northwest Forest Plan Regional Interagency
    Executive Committee, https://www.fs.fed.us/r6/reo/nwfp/riec/ (last visited
    Nov. 3, 2018) ...............................................................................................26

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

INTRODUCTION

The Northwest Forest Plan is a unique land-management plan in a number of respects. Born out of the controversy of the rampant over-logging of federal forests in Oregon, Washington, and northern California, the Northwest Forest Plan was the first bioregional land management plan in the nation, covering nineteen national forests managed by the U.S. Forest Service and six Bureau of Land Management ("BLM") districts.  The Plan provided for imperiled species, like the northern spotted owl and marbled murrelet, that had already been listed as threatened under the Endangered Species Act ("ESA") due to habitat loss caused by logging.  The Plan also contained a comprehensive Aquatic Conservation Strategy ("ACS"), aimed at protecting and restoring populations of native salmon, steelhead, and trout from habitat loss and degradation before they declined to such an extent as to warrant ESA consideration.

Twenty years later, BLM and U.S. Forest Service analysis showed that the Northwest Forest Plan and its ACS had done its job, maintaining (if not yet fully restoring) habitat for fish and wildlife to survive on our federal forestlands.  The ACS was also consistently identified as the "best available science" by the federal biological agencies—National Marine Fisheries Service ("NMFS") and U.S. Fish and Wildlife Service ("FWS").  Yet in August 2016, BLM seceded from the Northwest Forest Plan by issuing revised Resource Management Plans ("RMPs") for those six forested districts.  The revised RMPs reduced the size of riparian reserves and eliminated the Northwest Forest Plan's ACS objectives; the environmental review of the revised RMPs, while lengthy, was notably silent on the environmental consequences of deviation from the Northwest Forest Plan and the ACS. Plaintiffs Pacific Rivers *et al.* challenged the RMPs and the biological opinions on those RMPs as violating the ESA, National Environmental Policy Act ("NEPA"), and the Oregon and California Railroad and Coos Bay Wagon Road Grant

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

Lands Act of 1937 ("O&C Act").  On October 12, 2018, Judge Russo issued Findings and Recommendation ("F&R") denying relief on all grounds.

Pacific Rivers objects to dismissal of its ESA claims challenging the 2016 NMFS Biological Opinion for ignoring the Northwest Forest Plan and its ACS. F&R at 20-33. NMFS's silence on its departure from the ACS violated its mandate under the ESA to use the best available science.  NMFS further failed to explain why the protections of the ACS are no longer necessary to avoid jeopardy, shifting away from its prior policy mandating use of the ACS. To be clear, while NMFS is free to change its policy, and the ACS is not set in stone, the agency must provide a reasonable explanation for its departure from long-standing prior position.  Judge Russo's F&R pointed to letters of dissent objecting to exclusion of aquatic protections as evidence of adequate consideration, but none of that correspondence even attempted to explain why ACS protections were no longer needed.  Rather, the letters reflect concerns from NMFS scientists later ignored by their own agency.  Challenges by Pacific Rivers to new road construction, forest management objectives, and the width of the riparian reserve demonstrate how the failure to consider best available science weakens protections for listed fish.

Pacific Rivers further objects to dismissal of its NEPA claim that BLM failed to consider the foreseeable environmental impact of BLM's large-scale withdrawal from the Northwest Forest Plan on other land managers.  Judge Russo found that this impact was unforeseeable and unduly speculative.  F&R at 15-20. To the contrary, BLM received multiple warnings from the public and other federal agencies, including NMFS and the Environmental Protection Agency ("EPA"), that BLM's withdrawal would trigger a similar departure by other federal forest managers, undermining the Plan as a whole.  It was also clear that lessened protections on federal land would force changes to non-federal land management, as non-federal landowners have

relied on BLM implementation of the Northwest Forest Plan to carry the conservation burden for over two decades. BLM, however, failed to analyze these concerns in its NEPA review.

Pacific Rivers also objects to dismissal of their O&C Act claim. F&R at 33-36. BLM's own findings demonstrate that the RMPs undermine the O&C Act's goal of creating economic stability, a violation of the O&C Act that is independent of any argument about the management emphasis of these lands.

Finally, in several places in the F&R, Judge Russo found that Pacific Rivers had waived arguments allegedly raised for the first time in its reply brief. These findings were incorrect; the arguments referenced did not raise new claims, but rather elaborated on issues already raised in plaintiffs' complaint and opening summary judgment brief and responded to arguments in federal defendants' cross-motion for summary judgment. These arguments were properly before the court and should have been resolved in Plaintiffs' favor.

## STANDARD OF REVIEW

This Court reviews *de novo* the portions of a magistrate judge's findings and recommendation to which objection is made. 28 U.S.C. § 636(b)(1)(C). This Court "may accept, reject, or modify, in whole or part the findings and recommendations made by the magistrate judge," and "may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*; see also Fed. R. Civ. P. 72(b)(3).

## ARGUMENT

I.    NMFS VIOLATED THE ESA BY FAILING TO USE THE BEST AVAILABLE SCIENCE AS EMBODIED IN THE ACS AND FAILING TO EXPLAIN ITS DEPARTURE FROM LONG-STANDING AGENCY RELIANCE ON THE ACS.

The Northwest Forest Plan created old-growth and Riparian Reserves, instituted the ACS, and provided for continued timber harvest. In upholding the Northwest Forest Plan's application to lands managed by both the Forest Service and BLM, the district court held that "[g]iven the

current condition of the forests, there is no way the agencies could comply with the environmental laws <u>without</u> planning on an ecosystem basis." *Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. 1291, 1311 (W.D. Wash. 1994), *aff'd sub nom. Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401 (9th Cir. 1996) (emphasis in original).  Indeed, even before adoption of the Northwest Forest Plan, a federal interagency science committee concluded that lack of consistent planning across agencies had resulted in a high risk of extinction for imperiled northern spotted owls. *Portland Audubon Soc'y v. Lujan*, 795 F. Supp. 1489, 1494-95 (D. Or. 1992).

While the Northwest Forest Plan's development initially focused on protections for the northern spotted owl, the Plan included the ACS to address the habitat needs of salmon and other aquatic species on federal lands.  The ACS aimed to maintain and restore the ecological health of watersheds and aquatic ecosystems on public lands through four basic components: (1) a system of key watersheds that included the best aquatic habitat or had the greatest potential for recovering at-risk fish stocks; (2) riparian reserves along streams where certain activities are constrained by enforceable standards & guidelines; (3) watershed analysis that tailored activities to specific watershed needs; and (4) a comprehensive, long-term watershed restoration program. JA 12185.[1]

The ACS established substantive protections for forests that benefit salmon habitat in two ways.  First, binding standards and guidelines restricted certain ground disturbing activities within riparian reserves and key watersheds.  *See* JA 12214, 12237-12245.  Second, to constrain the adverse cumulative impacts of activities throughout the watershed (not solely in riparian

---

[1] Judge Russo asked the parties to submit a Joint Appendix of Documents from the Administrative Record ("JA") for use in her opinion.  F&R at 3, n.2.  Administrative Record cites in this brief will be to that JA where possible; other record citations will use their Administrative Record ("AR") numbers.

reserves), the ACS included nine "maintain and restore" objectives requiring that all aspects of aquatic habitat be maintained and restored to properly functioning conditions. JA 12182-12207. The Northwest Forest Plan gave the ACS objectives binding force and explicitly required that federal lands shall be managed to attain the ACS objectives. JA 12166, 12174, 12182-83; *see also id.* at 12184. "Management actions that do not maintain the existing condition or lead to improved conditions in the long term would not 'meet' the intent of the Aquatic Conservation Strategy and thus, should not be implemented." JA 12182-83.

At the time of its adoption, there were no aquatic species protected under the ESA within the federal forests governed by the Northwest Forest Plan. In 1996, NMFS listed the Umpqua cutthroat trout as endangered, and on March 18, 1997, issued a biological opinion concluding that continued implementation of the forest plans as amended by the ACS would not cause jeopardy. *See* JA 10646-10725.[2] The 1997 Biological Opinion considered whether implementation of the Plan would maintain or restore properly functioning aquatic habitat for salmon, and found that to avoid jeopardy, forest managers must apply the ACS, including the nine "restore and maintain" objectives, at all scales of implementation, including at the site or project level. JA 10690.

Shortly after the 1997 Biological Opinion was issued, a Washington district court decision confirmed that NMFS could validly make compliance with ACS objectives the ESA standard for evaluating future site-specific projects. The district court accepted the agencies' representations that "before a project can proceed, USFS and BLM must find that the actions either meet, or do not prevent attainment of, the ACS objectives. The finding must be supported by an analysis of how the proposed management action will maintain the existing condition or

---

[2] This biological opinion covered other salmon populations subsequently listed. JA 10656-57.

restore it." *PCFFA v. NMFS*, No. C97-775R, 1998 WL 1988556, at 29 (W.D. Wash. May 29, 1998) ("*PCFFA I*").

A.     <u>In Its Biological Opinion On The 2016 BLM Rmps, NMFS Ignored The Best Available Science Represented By The ACS.</u>

The ESA requires NMFS to "to ensure that an action of a federal agency is not likely to jeopardize the continued existence of any threatened or endangered species." *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 980 (9th Cir. 2006) (internal citations and quotation marks omitted). The obligation to "insure" against a likelihood of jeopardy or adverse modification requires the agencies to give the benefit of the doubt to endangered species and to place the burden of risk and uncertainty on the proposed action. *See Sierra Club v. Marsh*, 816 F.2d 1376, 1386 (9th Cir. 1987); *Wa. Toxics Coalition v. Envtl. Prot. Agency*, 413 F.3d 1024, 1035 (9th Cir. 2005). In carrying out these duties, NMFS and FWS are required to use the best scientific information available. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8). NMFS cannot ignore this science in preparing biological opinions. *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988). This standard requires that NMFS discuss and use the best available science, and prevents the agency from omitting from discussion science that conflicts with its findings. *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1068-69 (9th Cir. 2018).

Contrary to Judge Russo's factual finding, the ACS is the "best available science" for forestland management and protection of aquatic species. *See* F&R at 27 n.15.[3] The ACS is a scientific management approach that directly resulted from and represents the findings of a scientific report, the FEMAT report, authored by an interagency team of the nation's top aquatic

---

[3] Judge Russo cited to the BLM's response to comments in the Final EIS as evidence that the ACS is not scientific data, but rather past agency action. However, NMFS as the consulting agency has the obligation to use best science, and as such, this Court should defer to NMFS's characterizations of what constitutes best science, which for years has been the ACS.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

scientists recommending the best way to manage federal forests.[4]  FEMAT found that riparian buffers alone were not enough to protect aquatic ecosystems, and that additional watershed analysis and objectives were necessary to protect and restore habitat.  NMFS itself characterized the ACS as the best available science during the planning process for BLM's RMPs:

> Several scientific reviews (e.g., Reeves et al. 2006, Everest and Reeves 2006) have broadly concluded that while a great deal of new information has been published, the fundamentals and rationale of FEMAT and the ACS remain consistent with available scientific information.  Nonetheless, the proposed DEIS substantially reduces the environmental protections in the [Northwest Forest Plan] while bringing little in the way of new science to the table to substantiate its assertions.

JA 7555.

NMFS described the Northwest Forest Plan as the "reflect[ing] the general scientific consensus at the time as to the level of protection needed for recovery of salmon over a 100-year time frame[,]" and further noted that "[s]ince that time, scientific consensus has not changed, and available evidence suggests that implementation of the Northwest Forest Plan has in fact resulted in slowly improving habitat conditions for salmonids."  JA 7553.  NMFS did not change its opinion that the ACS reflects best available science in its December 18, 2015 clarifying comment letter.  *See* JA 7355.  Years of prior agency scientific factual findings, as well as Court opinions upholding that science, affirm NMFS's determination that the Northwest Forest Plan's ACS is not only the best available science, but also that compliance with it could be used as a surrogate for assessing jeopardy.  *See PCFFA v. NMFS*, 71 F. Supp. 2d 1063, 1069 - 1073 (W.D.

---

[4] The Forest Ecosystem Management Assessment Team ("FEMAT") report was authored by hundreds of expert scientists from BLM, Forest Service, National Park Service, Environmental Protection Agency, FWS, NMFS, and several universities; it provided the scientific underpinning for the Northwest Forest Plan.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

Wash. 1999), *aff'd in part, vacated in part,* 265 F.3d 1028 (9th Cir. 2001) ("*PCFFA II*"); Pacific

Rivers' Summary Judgment Memo., Dkt. No. 62-1 at 19-20.

Judge Russo pointed to meetings between NMFS and BLM as evidence that NMFS

"considered" the Northwest Forest Plan's ACS. F&R at 27-28, 28 n.16. But the ESA requires

more than private conversations behind closed doors. Eliminating the ACS objectives and the no

net new roads requirement for key watersheds.

> 1.    *Eliminating The ACS Objectives Weakened Protections For Listed Fish And Provides An Example Of The Harms From NMFS' Abandonment Of The Best Available Science.*

BLM's 2016 RMPs eliminated several of the central pillars of the ACS, including the

nine "restore and maintain" aquatic conservation objectives. In the 2016 RMPs, management

objectives for maintaining and restoring aquatic habitat in the RMPs apply only to actions within

much smaller riparian reserves, and do not apply to all ground-disturbing management actions.

As a result, under the RMPs, timber harvest can occur adjacent to, but outside of, riparian

reserves without regard as to whether this activity will degrade water quality. The ACS, on the

other hand, used the aquatic conservation objectives to ensure that even activities outside of

riparian reserves would not degrade aquatic habitat.

The FEMAT science team recommended adoption of the ACS objectives, and applying

the objectives to all federal actions across the landscape because they observed that past

degradation resulted from numerous incremental deleterious actions that cumulatively degraded

aquatic habitats and recovery of salmon species. JA 7554. As a result, the ACS restricted these

death-by-a-thousand-cuts activities that adversely affect aquatic ecosystems, and managers could

only pursue activities that were "restorative or protective in nature." JA 7555.

In its August 21, 2015 letter, NMFS acknowledged that applying the nine ACS objectives to

all management actions was a "potent" requirement central to the success of the Northwest Forest

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

Plan, and one that prevented individual projects from retarding recovery of threatened and endangered salmon. JA 7554. NMFS raised alarm that the Draft EIS omitted "this central guiding tenet" of the ACS, dramatically shifting the burden of proof required for agency actions, and potentially substantially impacting the environment. JA 7554.

In an internal inter-agency meeting on October 7, 2015, NMFS staff again emphasized that "the [Northwest Forest Plan] Aquatic Conservation Strategy (ACS) objectives are as important now as they were 20 years ago . . . [and] they want to see that the BLM is considering the status, risks, and restoration opportunities when contemplating management actions within a watershed." JA 7386. In its December 18, 2015 comment letter, the NMFS again reiterated its concern, noting: "NMFS expects BLM's ACS will contain components with objectives aligned with the four components of the ACS of the Northwest Forest Plan." JA 7354.

These concerns, however, went unheeded. The 2016 RMPs fail to impose aquatic conservation objectives on ground-disturbing actions outside riparian reserves to prevent degradation of aquatic habitat. Instead, the RMPs create different types of land use allocations with particular management objectives and directions that only apply within that zoned area. JA 292-304; JA 284. While Judge Russo found that the 2016 RMPs incorporate "management objectives" that align with each of the nine ACS objectives, F&R at 24-25, those record documents cited as evidence discussed management objectives and directions for the Riparian Reserve land use allocation only, and do not apply to upland areas outside of riparian buffers (which themselves were reduced substantially in width). None of the other land use allocations include such objectives. Fed. Def. Opening Br., Dkt. No. 75-1 at 49-51 (Exhibit 1); JA 292-311 (Nw. Or. RMP); JA 610-644 (Sw. Or. RMP). Rather than applying aquatic conservation objectives to all BLM lands like the Northwest Forest Plan, the RMPs focused on restoring and maintaining aquatic functions and protecting listed salmon only in waterways – about 26% of all

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

BLM lands – and not in the connected uplands.  *See* JA 3798 (describing the percentage of area designated as riparian reserves).[5]

As the ACS recognized, the uplands are inextricably connected to in-stream functions and processes and should not be uncoupled as BLM has done in its RMPs.  ACS objectives created that link, prohibiting management activities even outside riparian reserves if they failed to restore and maintain aquatic conditions.  NMFS disregarded this scientific approach to forest management when it eliminated application of the water quality objectives outside riparian reserves.  *PCFFA v. NMFS*, No. C04-1299-RSM, Report and Recommendation (W.D. Wash. March 28, 2006), *adopted in part*, 482 F. Supp. 2d 1248 (W.D. Wash. 2007) ("*PCFFA IV*") (rejecting ACS amendment because NMFS departed from best available science embodied in ACS and past biological opinions without explanation);

As described in the F&R, the NMFS 1997 Biological Opinion found that implementation of the ACS would improve aquatic conditions contributing to the recovery of endangered salmon.  F&R at 33; JA 10679.  The goal of the ACS was to "reverse the trend" of aquatic ecosystem degradation by contributing to the recovery of aquatic habitat.  JA 10671.  NMFS predicted that by using "landscape-scale strategies emphasizing the protection and restoration of aquatic and riparian habitats, [the ACS] is expected to allow for the survival and recovery of affected Pacific salmonid species."  JA 10679.  NMFS found that restoration of habitat conditions under the ACS would "provide for increased survival of various life stages of these

---

[5] Judge Russo also pointed to a table in the Final EIS that describes objectives and directions for the hydrology and fisheries resource programs as aligning with the ACS objectives.  JA 5620-23. However, these objectives and directions focus primarily on in-stream restoration activities and best management practices for road use and construction, thereby differing from the ACS objectives, which determined whether the proposed management action taken as a whole – e.g. within and outside of riparian areas – will restore and maintain aquatic habitat.  JA 648-650.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

fish and an increased probability of restoring and maintaining viable populations." JA 10679. And that taken as a whole the ACS would restore aquatic habitat conditions, even though some management actions would adversely impact aquatic habitat. F&R at 33; JA 10680.

Twenty years of monitoring data on implementation of the Northwest Forest Plan proved these predictions correct. The Biological Assessment prepared by BLM for its RMPs acknowledged that over the last 20 years, implementation of the Northwest Forest Plan resulted in "statistically significant improving trends in watershed yearly seven-day average water temperatures … suggesting that Forest Management activities on Federal lands, have not resulted in water temperature increases in this timeframe." JA 6148. Furthermore, "increases in macroinvertebrate diversity and decreases in water temperatures" suggest an improvement and restoration of aquatic habitats. JA 6148. The interagency Northwest Forest Plan maintained stream condition and physical habitat—a success in light of the "diversity of federal entities, public and private landowners as well as the multiple use mandates of land management agencies." JA 6060.

The extinction risk for most salmon in the planning area is high to very high, indicating that continued persistence of these species is precarious at best. JA 3380. Describing the baseline condition, NMFS stated "[t]he existing environmental baseline is degraded for all listed species and the quality of habitat … [in the action area] has been substantially reduced." JA 3380-81. NMFS further noted that "[t]he effect of this baseline condition of critical habitat (not fully functioning) is a general and systemic reduction in carrying capacity for each of the anadromous species considered in this opinion." JA 3381.

Despite the precarious state of the species, NMFS discounted anticipated degradation from the 2016 RMPs as minor impacts, given the scale it chose for its review. *See* JA 3379-

3389.[6] While NMFS previously determined in the 1997 Biological Opinion that "there must be a significant improvement in the environmental conditions of their habitat over those currently available under the environmental baseline," JA 10667, the revised RMPs will reverse that trend, and degrade aquatic habitat, *see* JA 3383-84 ("[T]he proposed action would continue to worsen the baseline for suspended sediment and stormwater contaminants"); JA 3385 ("The proposed action is likely to cause a decrease in the rate of egg and fry survival, and injury in juveniles and adults as a result of increased suspended sediment").

> 2.    *Abandonment Of The ACS And Best Available Science Exposes Aquatic Habitat To Harm From New Road Construction.*

Analysis of the impacts of roads on aquatic habitat provides another example of how departure from the best available science, embodied in the ACS objectives and standards, weakens protections for imperiled salmon. Roads are the greatest source of fine sediment in aquatic habitat, and all life stages of salmon can die from high concentrations of suspended sediments, or suffer sub-lethal chronic impacts from lower concentrations. Pacific Rivers Opening Br. at 28. "Roads are ecologically problematic in any environment because they affect biota, water quality, and a suite of biophysical processes through many physical, chemical, and biological pathways." JA 7580.

The ACS restricted the impact of roads by prohibiting creation of net new roads in key watersheds. JA 12184, JA 12192, JA 12452. Judge Russo misunderstood this standard when she found that the Northwest Forest Plan only limited new road construction in roadless areas.[7]

---

[6] The Ninth Circuit previously rejected such an approach, holding that NMFS cannot "assume away significant habitat degradation." *PCFFA v. NMFS*, 265 F.3d at 1037. The court invalidated biological opinions that "acknowledge[] . . . degradations but then deem[ed] that degradation inconsequential." *Id.*

[7] Judge Russo also improperly reached a scientific conclusion, finding that "the 1995 RMPs would result in greater net impacts due to new road construction." F&R at 31. The Final EIS,

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

F&R at 30. Yet even outside of roadless areas, the Northwest Forest Plan and ACS prioritized reducing "existing system and nonsystem road mileage." As such, the Plan prohibited a "net increase in the amount of roads" in Key Watersheds. JA 12192, JA 12452. The ACS explained this as requiring that "for each mile of new road constructed, at least one mile of road should be decommissioned, and priority given to roads that pose the greatest risks to riparian and aquatic ecosystems." JA 12192; *see also* JA 7554 (Key Watersheds "are subject to a 'no net increase' mandate for road density[.]"). The ACS objectives, which required BLM to "maintain and restore" the physical and biological features of aquatic ecosystems, further discouraged road construction in riparian reserves. JA 7580; JA 12184-92.

NMFS found that road construction from the 2016 RMPs would adversely impact imperiled salmon. The NMFS 2016 Biological Opinion found that increased suspended sediments from implementation of the RMPs would cause adverse physical and behavioral responses in salmon that rear in streams within the action area. JA 3302-03, 3383-3387. NMFS found that timber extraction, which includes new road construction, would adversely affect protected salmon through temperature increases, sediment delivery into streams, stormwater contaminants, reduction in woody debris, and changes in stream flow. JA 3322. NMFS estimated that 66 miles of new roads would be constructed within 200 feet of streams. JA 3113.

Despite these acknowledged harms, the 2016 RMPs allow new road construction in Riparian Reserves if there are "no operationally feasible and economically viable" alternatives. JA 3235. This trade-off places the protection of threatened and endangered salmon at the whim

---

referenced in the F&R, does not conclude that roads from the 1995 RMPs will have a greater net adverse impact on imperiled salmonids. *See* JA 4121-24. Furthermore, the 2016 BiOp reached the opposite conclusion. JA 3302 ("All species in the planning area will be exposed to increased sediments due to the implementation of the proposed RMP"); JA 3303, 3383-3387.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

of business profitability, impermissibly placing the burden of risk on imperiled species rather than federal action. *Marsh*, 816 F.2d at 1386 ("Congress clearly intended that the [agency] give the highest of priorities and the benefit of the doubt to preserving endangered species") (citations and internal quotation marks omitted). Under the 2016 RMPs, BLM can construct new roads even if it will degrade downstream aquatic habitat, and road construction can now occur in key watersheds without a corresponding reduction in the existing road network; both actions were prohibited under the ACS. By failing to use the best available science of the ACS, NMFS weakened protections for imperiled salmonids.

While site-specific new road construction may be subject to further Section 7 consultation, *see* F&R at 29-30 (citing 50 C.F.R. § 402.14(i)(6)), cumulative impacts across all watersheds on BLM lands from roadbuilding activities will not. "[A] programmatic forest plan does have an effect upon subsequent land use decisions and therefore upon the land itself." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 623 F. Supp. 2d 1044, 1053 (N.D. Cal. 2009). NMFS ignored best available science when it failed to set enforceable programmatic sideboards, like the aquatic conservation objectives and no net new roads policy. Without programmatic controls, there is no way to ensure that future site-specific consultations will consider landscape level impacts. What may be an individually discountable could be a cumulatively significant adverse impact. "[I]t does not follow that NMFS is free to ignore site degradations because they are too small to [protect forest and water resources] . . . at the watershed scale." *PCFFA v. NMFS*, 265 F.3d at 1035.

*       *       *

"Although the Court must defer to an agency's expertise, it must do so only to the extent that the agency utilizes, rather than ignores, the analysis of its experts." *Defenders of Wildlife v.*

PLAINTIFFS' OBJECTIONS TO FINDINGS
AND RECOMMENDATION  – Page 14
(No. 6:16-cv-01598-JR)

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

*Babbitt*, 958 F. Supp. 670, 685 (D.D.C. 1997). NMFS failed to comply with the statutory

mandate to consider the best available science in making its jeopardy determination, and on this

basis alone this Court should invalidate the NMFS 2016 Biological Opinion. *See Conner v.*

*Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988); *PCFFA v. NMFS,* 265 F.3d at 1034 ("A biological

opinion may also be invalid if it fails to use the best available scientific information.").

      B.      <u>NMFS Invalidly Deviated Without Explanation From Its Prior Policy Requiring</u>
<u>ACS Consistency As The Best Available Science.</u>

Pacific Rivers argued on summary judgment that NMFS failed to explain why it deviated

from the mandatory conditions in the 1997 Biological Opinion requiring ACS compliance and

from consideration of ACS requirements to avoid jeopardy. *See* Pacific Rivers' Summary

Judgment Memo., Dkt. No. 62-1 at 14-31; Pacific Rivers' Reply Br., Dkt. No. 82 at 7-21. Judge

Russo rejected this claim holding "neither FWS nor NMFS are proposing agency action" and

that NMFS was not "endorsing any change to [its own] policies" because it was merely

"reviewing another agency's action," namely BLM's adoption of the 2016 RMPs, for

compliance with section 7 of the ESA. F&R at 23. Both these contentions are incorrect: an

argument that NMFS need not consider the Northwest Forest Plan or ACS ignores bedrock

principles of administrative law, and adoption of this position by the Court would create a wholly

new standard of review for biological opinions.

Judge Russo (F&R at 23) cited to a district court opinion that itself cites no case law as

authority for its reasoning. *See AquAlliance v. U.S. Bureau of Reclamation*, 287 F. Supp. 3d 969,

1068 (E.D. Cal. 2018). *AquAlliance* is not binding precedent for this Court, nor are the facts

similar to those presented here. In *AquAlliance*, plaintiffs challenged a biological opinion for a

threatened snake, contending that FWS failed to include protective measures that it had required

in prior biological opinions. 287 F. Supp. 3d at 1067. The district court rejected the challenge,

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

holding that "conservation measures incorporated into the BiOp are not FWS policy." *Id.* (emphasis removed). Here, in contrast, the ACS has been NMFS's policy for almost 25 years, and the agencies have worked together for decades with the ACS as the planning background. To abandon the ACS now, without explanation, is quintessential arbitrary and capricious action.

Moreover, this *AquAlliance* court holding was incorrect.[8]  A biological opinion constitutes a final agency action subject to judicial review because it marks the consummation of the Section 7 consultation process. *See PCFFA v. NMFS*, 265 F.3d at 1034. Courts review such final agency actions under the arbitrary, capricious, and contrary to law standard of the Administrative Procedure Act ("APA"). *Or. Natural Res. Council v. Allen*, 476 F.3d 1031, 1036 (9th Cir. 2007). Under this standard, an agency "changing its course … is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Mfr. Ass'n v. State Farm Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). The Supreme Court affirmed this principle in *F.C.C. v. Fox Television Studios*, holding that an agency cannot silently depart from a prior policy.  556 U.S. 502, 515 (2009).

While NMFS can depart from prior policy (embodied in the 1997 Biological Opinion and FEMAT, among other documents), this standard requires that, "an agency changing its course must supply a reasoned analysis" that "cogently explain[s]" its reasons for abandoning its prior policy. *Motor Vehicle*, 463 U.S. at 48-57. There is nothing unique about biological opinions such that this requirement would not apply to them as well as other types of agency decisions.  In

---

[8] In fact, *AquAlliance* ultimately found that FWS failed to use the best science for the conservation measures in the challenged biological opinion.  "So far as the Court can determine, the BiOp does not explain how, in light of these findings, the conservation measures avoid jeopardy.  A BiOp is arbitrary and capricious if it fails to 'consider the relevant factors and articulate a rational connection between the facts found and the choice made.'" *Id.* at 1073 (citing *Ctr. for Biological Diversity v. U.S. BLM*, 698 F.3d 1101, 1121 (9th Cir. 2012)).

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

fact, other district courts have invalidated biological opinions that rescind protective measures from a prior biological opinion without explanation. *See Grand Canyon Trust v. U.S. Bureau of Reclamation*, 623 F. Supp. 2d 1015, 1033–34 (D. Ariz. 2009) (invalidating biological opinion that departed from longstanding prior opinion without directly addressing why prior protections were no longer needed).

It is undisputed that NMFS fundamentally shifted from its prior precedent. The NMFS's 1997 Biological Opinion found that to avoid jeopardy BLM and the U.S. Forest Service must ensure that each site-specific action complies with the aquatic conservation objectives and standards—imposing this condition as a reasonable and prudent measure. JA 010717; *PCFFA I*, No. 97-CV-775 at *10. NMFS has used the ACS for years as the default jeopardy standard. In stark contrast, the 2016 Biological Opinion approved plans that eliminated the ACS objectives as mandatory aquatic conservation measures, reduced the width of riparian reserves, and eliminated the no net new roads policy in key watersheds.

Yet despite this dramatic departure from its prior biological opinion finding the Northwest Forest Plan and the ACS necessary to avoid jeopardy, NMFS provided no explanation for its swerve from past precedent. Initially, NMFS objected in comment letters and internal emails that elimination of key protections of the ACS would weaken protection for listed fish. JA 7545-7604, 7354-56, 7286 (noting BLM ignored "many" of NMFS's comments on the Forest Management section of the RMPs). However, despite these objections, NMFS ultimately ignored the ACS in the 2016 Biological Opinion. The Northwest Forest Plan is described in passing on three pages, but the agency gave no explanation of why it diverged from its prior finding that the ACS standards, guidelines, and objectives embody the best available science. *See* JA 3057-3404; *id*. at 3110, 3224, 3230. Two conclusory sentences in a PowerPoint

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

presentation, cited by Judge Russo, fail to provide the necessary analysis. *See* F&R at 27 (citing NMFS1 5014-16). To the contrary, email correspondence shows NMFS was intentionally tight-lipped, defying its obligation to provide such an explanation. JA 7286 (NMFS email stating it would not "compar[e] the proposed action to the NW Forest Plan"). This silence was arbitrary and capricious.

The court in *Grand Canyon Trust* invalidated a biological opinion issued by the Fish & Wildlife Service because it sharply departed from a biological opinion issued ten years earlier finding dam operation would jeopardize the continued existence of the humpback chub. *Grand Canyon Trust*, 623 F. Supp. 2d. at 1031-1035. The court held that because the agency, "never explain[ed] why [its] long-held position is incorrect[,]" it acted arbitrarily. *Id.* at 1032. Here, NMFS was silent about its departure from the ACS, and failed to provide even a paragraph of discussion about why its policy of thirty years was no longer relevant. *See Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687–88 (9th Cir. 2007) ("[I]f an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.").

Eleven years ago, a Washington district court rejected a similar attempt by NMFS to depart without explanation from the ACS. At that time, the Forest Service and BLM moved to amend the ACS to eliminate the requirement that each action proceeding under the Northwest Forest Plan had to meet the ACS objectives. NMFS and FWS both issued "no jeopardy" biological opinions on that ACS Amendment. Both were challenged by conservation groups because they reversed the positions taken by NMFS and FWS in their previous biological opinions without an adequate explanation; they deviated from the best available scientific

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

information in FEMAT and the ACS; and they put off detailed analysis to subsequent site-specific NEPA analyses and ESA § 7 consultations.

The district court agreed and set aside the ACS Amendment, which was nearly identical to the 2016 RMP changes here. *See PCFFA v. NMFS*, No. C04-1299-RSM, Report and Recommendation (W.D. Wash. March 28, 2006), *adopted in part,* 482 F. Supp. 2d 1248 (W.D. Wash. 2007) ("*PCFFA IV*"). The district court held that the Services departed from the best available science embodied in FEMAT and past biological opinions without a sound basis or rational explanation, holding that NMFS was "not excused from supplying a reasoned analysis in changing their course." 482 F. Supp. 2d at 1270.[9]

*Motor Vehicle* and related case law requires an agency to "display[] awareness that it is changing its position . . . [and] if the new policy rests upon factual findings that contradict those which underlay its prior policy," the agency must provide a "reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (internal quotation marks and citations omitted). Necessarily this means comparing how departure from the Northwest Forest Plan will affect ESA listed salmon, and providing a reasoned explanation as to why the ACS is no longer needed to avoid jeopardy. NMFS provided no such explanation.

---

[9] The F&R (at 23) also incorrectly found that "actions under ESA review are not held to a comparative standard[,]" citing *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 926-930 (9th Cir. 2008). In *National Wildlife Federation*, the Ninth Circuit upheld the district court decision that the biological opinion on operation of dams on the Columbia River was structurally flawed. *Id.* at 922-923. The Ninth Circuit held that when conducting the jeopardy analysis NMFS could not compartmentalize parts of the proposed action and compare those individual impacts. *Id.* at 926. Rather, NMFS must consider impacts in the aggregate. *Id.* The case does not stand for the broad proposition that ESA review does not require comparison.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

While NMFS can depart from its prior biological opinion concluding that the Northwest Forest Plan and ACS embody the best available science, the agency must provide a reasoned explanation justifying that departure. The record in this case lacks such an explanation. Rather, it shows concern by NMFS scientists over lost aquatic protections that the agency later ignored. This intentional blindness to the ACS was arbitrary and capricious. *Nw. Envt'l Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687 (9th Cir. 2007) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored[.]") (citation omitted).

### 1. *Reduced Riparian Reserves Are An Example Of NMFS's Unexplained Shift In Policy.*

Riparian reserves were a vital part of the ACS's aquatic habitat conservation scheme. "Riparian reserves are used to maintain and restore riparian structures and functions of intermittent streams, confer benefits to riparian-dependent and associated species other than fish, enhance habitat conservation for organisms that are dependent on the transition zone between upslope and riparian areas, improve travel and dispersal corridors for many terrestrial animals and plants, and provide for greater connectivity of the watershed." JA 12186. Logging and land-disturbing activities were generally prohibited in riparian reserves, to protect fish habitat, water quality, stream flows, sediment filtering, and wood recruitment. JA 7550.

The Northwest Forest Plan and its ACS created riparian reserves of two site-potential-tree-heights ("SPTH") or 300 feet slope distance from the streambank in width for perennial fish-bearing streams, one SPTH or 150 feet for perennial non-fishbearing, and one SPTH or 100 feet for intermittent streams. JA 7551. In contrast, BLM's 2016 RMPs shrinks riparian reserves to one SPTH from the streambank for perennial streams; intermittent streams

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

with high quality habitat have one SPTH reserves, those with poor quality habitat have 50 foot reserves.  JA 307.

In its August 21, 2015 letter, NMFS expressed great concern over BLM's proposal, now adopted, to shrink riparian reserves and allow timber harvest within them, noting that NMFS "should explain the basis for concluding that smaller Riparian Reserves are adequate when FEMAT and the subsequent accumulation of scientific evidence suggests otherwise."  JA 7556. Specifically,

> Unexplained in the DEIS is the scientific basis for concluding that the proposed, substantially smaller Riparian Reserves and the proposed increased timber harvest activities within the smaller Reserves are sufficient for the needs of salmon and other riparian-dependent species. … The DEIS is (implicitly) making an extraordinary claim: that the FEMAT science team … were in error, and that up to 81% of the existing Riparian Reserve network can be opened for substantially increased levels of timber harvest. … It is an axiom in science that extraordinary claims require extraordinary proof, yet the DEIS provides little data or even logical cohesion in support of this extraordinary shift in fundamental scientific assumptions.

JA 7553.[10]

On December 18, 2015, NMFS submitted a letter clarifying its position, stating that a narrower riparian reserve width of one SPTH could protect listed salmon.  However, NMFS qualified this statement by observing that such an option should draw on the experience of implementing the Northwest Forest Plan, and should integrate recommendations from NMFS's August 21, 2015 letter.  JA 7354-56. "[N]one of the DEIS alternatives contain such a landscape strategy."  JA 7354. The August 21, 2015 comment letter recommended adopting binding aquatic conservation objectives that applied outside of riparian reserves and prohibiting a net

---

[10] The August 21, 2015 letter also raised concerns about the importance of large riparian reserves for lowering groundwater temperatures.  *See* Pacific Rivers Reply Br. at 19. This benefit is ignored in the 2016 Biological Opinion.  JA 3231-34, 3297-98.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

increase in road density.  JA 7581, 7589.  BLM adopted neither of these recommendations, yet

only a few months later, NMFS issued a no-jeopardy biological opinion on the revised RMPs.

     Judge Russo pointed to these letters as evidence of adequate consideration, but these

letters of dissent fail to show that NMFS believed the RMPs are a "better" policy.  F&R at 26-

27; *see Organized Village of Kake*, 795 F.3d at 966.  Nor do they provide a "reasoned

explanation" for disregarding the protections of the Northwest Forest Plan and its ACS.  *Id.*  To

the contrary, these letters objected to the removal of ACS protections, and vociferously called on

BLM to keep them in place.[11]

     C.     <u>Even If Not Considered A Prior Policy, Findings And Mandatory Conditions In
The 1997 Biological Opinion Are Relevant Facts NMFS Invalidly Ignored.</u>

     Even if mandatory conditions regarding ACS compliance in the 1997 Biological Opinion

are not considered a policy, they constitute relevant contradictory facts that must be discussed in

the biological opinion.  *See Rock Creek Alliance v. U.S. Fish & Wildlife Serv.*, 390 F. Supp. 2d

993, 1010 (D. Mont. 2005) (invalidating bull trout biological opinion that failed to explain

change in conclusion from previous biological opinions);  *Humane Soc'y of U.S. v. Locke*, 626

F.3d 1040 (9th Cir. 2010).  In *Humane Society*, the appellate court specifically held that prior

factual findings constitute "relevant data" to consider in the face of new, contrary findings, even

where an agency does not change from its prior precedent.  626 F.3d at 1050-51. As the Ninth

Circuit held in *Village of Kake*, it is arbitrary and capricious to fail to explain "why an action that

[an agency] found posed a prohibitive risk" in a previously issued decision, "now merely poses a

minor one."  795 F.3d at 969.  NMFS's previously found that application of the ACS objectives

---

[11] Judge Russo also cited to an internal email that stated, "Proposed action about riparian
reserves greatly improved."  F&R at 26; JA 7286.  However, this cursory statement also provides
no explanation or analysis.  Furthermore, the email goes on to state that BLM ignored many of
NMFS's comments.  *Id.*

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

was necessary for all forest management actions, and that failure to comply with ACS objectives and standards risked extinction for listed fish. In stark contrast, the 2016 Biological Opinion found such conditions unnecessary, imposing no mandatory conditions on BLM action beyond preparation of travel management plans for existing roads. JA 3397. This unexplained and unjustifiable departure from NMFS's prior determinations was arbitrary.

*        *        *

Despite acknowledging that the ACS is the best available science, nowhere in the record or in the biological opinion does NMFS explain why the protections that the nation's top scientists previously found essential to preventing extinction of imperiled anadromous fish are no longer necessary. To the contrary, the record shows that NMFS intentionally chose <u>not</u> to compare the proposed 2016 RMPs with the ACS, despite it being a highly successful scientific management approach that governed BLM forests for more than two decades and has reversed the slide towards extinction for many aquatic species. NMFS failed to provide a "reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy," *Organized Village of Kake,* 795 F.3d at 966, and the Court should vacate the biological opinion as arbitrary and capricious.

II.    BLM FAILED TO CONSIDER THE CUMULATIVE IMPACT OF WITHDRAWING FROM THE NORTHWEST FOREST PLAN.

Judge Russo fundamentally misunderstood Pacific Rivers' claim that BLM violated NEPA when it failed to assess the direct, indirect, and cumulative effects of its unilateral secession from the interagency Northwest Forest Plan on nonfederal and other federal landowners and resources shared across administrative boundaries. BLM's decision challenged here was not an ordinary land management decision written on a blank slate. Instead, BLM's decision to secede from the Northwest Forest Plan came after decades of litigation that ultimately

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

affirmed the requirement that BLM work with the Forest Service to develop an interagency land management plan that spanned three states. And each time that the federal agencies have attempted to alter the Northwest Forest Plan, the courts have held that they have a NEPA obligation to explain rejections of Northwest Forest Plan components once determined essential to meet legal obligations. *Nw. Ecosystem Alliance v. Rey,* 380 F. Supp. 2d 1175, 1193 (W.D. Wash. 2005) (attempted elimination of the Survey and Manage program) ("the Agencies have an obligation under NEPA to disclose and explain on what basis they deemed the standard necessary before but assume it is not now"); *Conservation Nw. v. Rey*, 674 F. Supp. 2d 1232 (W.D. Wash. 2009) (same); *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Servs.*, 482 F. Supp. 2d 1248, 1252–53, 1270 (W.D. Wash. 2007) (same).

The obligation to explain why an agency is shifting its policy position is particularly acute when other parties have relied upon that agency position. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016) ("In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account") (*citing FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Smiley v. Citibank*, 517 U.S. 735, 742 (1996)). In this case, the Forest Service, as well as nonfederal landowners, have relied on interagency participation in the Northwest Forest Plan when making land management decisions. AR 266815 (Forest Service spotted owl researcher raising concern that BLM's modeling erroneously assumes no changes on national forestlands from BLM's secession), 515294-515295 ((non)response to public comment regarding effects on other landowners of BLM's secession), AR IND 0779928, IND 0136153, IND 0136155, IND 0659762 – IND 0659769, IND 0039461 – IND 0039467. Now that BLM has dramatically

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

altered its approach, these decisions will need to be revisited, and it is reasonably foreseeable that any new decisions will affect natural resources that span different jurisdictions in new ways.

Judge Russo rejected these arguments, and observed that the BLM did not "move alone" when it seceded from the Northwest Forest Plan because BLM worked with other land managers as "formal cooperators" in the planning process. F&R at 16. However, simply because other federal and nonfederal entities participated in "cooperative" closed-door meetings does not mean that the environmental consequences of one entity withdrawing from an interagency plan on natural resources shared in common by several entities were analyzed as required by NEPA. Neither the opposing parties nor Judge Russo cite any legal authority for the proposition that meetings (which were not open to the public) can substitute for the environmental analysis and public participation required by NEPA. *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 998 (9th Cir. 2004) (reliance on non-NEPA document or process inadequate to comply with NEPA's requirements); *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1073 (9th Cir. 2002) (same); *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 811 (9th Cir. 1999) (same). Nor does the Findings and Recommendation cite any actual environmental analysis undertaken by these coordinators.

Similarly, although Judge Russo pointed to the existence of the Regional Interagency Executive Committee ("RIEC") as evidence that BLM coordinated its efforts with other entities, "coordination" is not equivalent to environmental analysis and public review, and there is no indication in the record that the RIEC undertook any NEPA analysis. AR 75647-75648 (explaining the RIEC's role in forest plan revision and that the analysis obligation lies with the agency undertaking revision), 89812-89813 (observing that the coordination function of the RIEC was served by a "high level summary" of the contents of the RMPs), 105901 (stating that

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

BLM is "replacing the NWFP as a whole" and that co-decision making was not welcomed). In fact, now that BLM has seceded from the Northwest Forest Plan, it will no longer be required to participate in the RIEC. *See* Regional Ecosystem Office, Northwest Forest Plan Regional Interagency Executive Committee, https://www.fs.fed.us/r6/reo/nwfp/riec/ (last visited Nov. 3, 2018) ("The Regional Interagency Executive Committee (RIEC) serves as the senior regional entity to assure the prompt, coordinated, and successful implementation of the Northwest Forest Plan (NWFP) at the regional level").

The Findings and Recommendation holds that the BLM adequately considered the cumulative (and presumably direct and indirect) effects of BLM's decision to adopt the 2016 RMPs because the Final Environmental Impact Statement ("FEIS") addressed the effects of the action on 25 natural resources across the planning area. F&R at 18. Judge Russo also pointed out that "only 11% (or 2.5 million acres) are managed by the BLM," such that anticipating the responses of other landowners to BLM's action "would be unduly conjectural." *Id*. This Court should reject BLM's argument, upheld by Judge Russo, that conducting the type of analysis Pacific Rivers seeks is unduly speculative.

As an initial matter, "NEPA requires that an [environmental impact statement] engage in reasonable forecasting. Because speculation is...implicit in NEPA, we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as crystal ball inquiry." *N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1079 (9th Cir. 2011) (internal punctuation and citation omitted); *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 99 F. Supp. 3d 1033, 1063 (N.D. Cal. 2015) (same); *City of Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir. 1975) ("While 'foreseeing the unforeseeable' is not required, an agency must use its best efforts to find out all

that it reasonably can"). In fact, BLM explicitly stated that while it would be "speculative" for BLM to "presume knowledge of site-specific actions that would occur in the future" on lands not managed by BLM, the agency could make "assumptions about future management on other ownerships on existing plans or current trends," and that while "these assumptions are broad and general in nature," they nonetheless "are sufficient to provide context for evaluating the incremental effect of the alternatives." JA 3836. Despite this acknowledgement, the BLM's subsequent analysis only focused on how the RMPs would affect BLM-managed resources, and did not address how BLM's decision would affect "future management on other ownerships." AR 215824-215825 ("with the original NWFP drafted as [sic] a landscape level, "100 year plan," it's realistic to expect that we will collectively be asked what BLM's changes could mean at the landscape/interagency level. It's not too early for us to begin to think/talk about what these changes may mean to all of us and how we collectively talk about them"). Ultimately, BLM erroneously concluded that considering how BLM's decision may affect other landowners was "outside the scope" of its revision effort. AR 156398-156399.

The particular nature of the lands at issue here demands that kind of analysis: BLM lands are arranged in a "checkerboard" pattern, meaning that in most cases BLM manages alternating square-mile sections of land, where the intermingled lands may be managed by the Forest Service, private timberland owners, the State of Oregon, or other landowners. Effective checkerboard land management is particularly daunting, and by necessity must take into consideration the land management regimes of intermingled lands. A stream flowing across different ownerships will receive differing amounts of protection along its route that may affect water quality in that stream, perhaps requiring downstream – or upstream – landowners to change their management practices in order to comply with other laws such as the Clean Water

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

Act. Similarly, at-risk species such as amphibians, red tree voles, or great grey owls will require and receive surveys and protective buffers on some of those intermingled lands (such as those managed by the Forest Service under the Northwest Forest Plan), but not on those parcels managed by BLM. These types of disparate effects on wildlife may result in a trend toward listing for these species, which would require of landowners some management response to comply with the Endangered Species Act. BLM did not consider these types of effects in its NEPA analysis, even though the issue was repeatedly raised by the public throughout the revision process.

BLM also should have conducted this analysis because it has done so in the past. JA 13596-14737. The Findings and Recommendation suggests that the Forest Service and BLM undertook a cumulative effects analysis in the past as to effects to Forest Service and BLM lands only, *see* F&R at 19 n.11 ("the NWFP EIS pinpointed reasonably foreseeable changes to the management of these lands"), but this misses not only Pacific Rivers' argument that the analysis should have looked at how <u>other</u> landowners would respond to BLM's secession from the Northwest Forest Plan, but also the actual nature of that original analysis. In the Northwest Forest Plan FEIS, the agencies prefaced their cumulative effects analysis with the statement:

> When an action takes place on federal forests, it may cause direct, indirect, or cumulative effects on nonfederal lands. While the alternatives of this SEIS have no discernible environmental effects on nonfederal nonforest lands, there are both environmental and economic interactions with adjacent nonfederal forests.... This SEIS also considers the likely effects of reasonably foreseeable management actions on nonfederal forest land.

JA 13597. The Northwest Forest Plan FEIS analyzed how the adoption of the Plan in the first instance would likely compel other landowners to respond. There is no authority in law to suggest that BLM cannot now repeat the same analysis in reverse, and, in fact, the courts regularly require federal agencies to assess third-party responses to federal actions. *See Ctr. for*

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

*Biological Diversity v. Bureau of Land Mgmt.*, 937 F. Supp. 2d 1140, 1155 (N.D. Cal. 2013) (increase in third party oil and gas development); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 867-70 (9th Cir. 2005) (increase in third party tanker traffic); *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1132-39 (9th Cir. 2011) (increase in third party air traffic).

The Findings and Recommendation faults Pacific Rivers for the lack of BLM analysis of effects on other landowners, observing that "plaintiffs here have not identified, and the Court is not aware of, any reasonably foreseeable changes to the Forest Service's management plans of those of any other land manager arising out of the proposed action." F&R at 19 n. 11; *id.* at 12 ("Plaintiffs have not shown that undefined adverse consequences ensuring from non-BLM landowners' reliance interests are so substantial that Defendants should be precluded under APA from implementing the 2016 RMPs"). But this is not the law. It is not Pacific Rivers' obligation to conduct this analysis: that is BLM's task. *City of Davis,* 521 F.2d at 670-71 ("Were we to agree with the district court that a NEPA plaintiff's standing depends on "proof" that the challenged federal project will have particular environmental effects, we would in essence be requiring that the plaintiff conduct the same environmental investigation that he seeks in his suit to compel the agency to undertake. Compliance with NEPA is a primary duty of every federal agency; fulfillment of this vital responsibility should not depend on the vigilance and limited resources of environmental plaintiffs. It is the federal agency, not environmental action groups or local government, which is required by NEPA to produce an EIS.") Instead, it is Pacific Rivers' obligation to raise the issue before the agency in the administrative process, which Plaintiffs (and others) repeatedly did. AR IND 0779928, IND 0136153, IND 0136155, IND 0659762 – IND 0659769, IND 0039461 – IND 0039467. It is BLM that is in the unique position to assess these kinds of effects, particularly given the fact that it has done so in the past. Failing

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

in this obligation, the BLM's decision to approve the 2016 RMPs is arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A).

III.    THE 2016 RESOURCE MANAGEMENT PLANS VIOLATE THE OREGON AND CALIFORNIA LANDS ACT.

Finally, Pacific Rivers argued that the 2016 RMPs violated the Oregon and California Lands Act, 43 U.S.C. § 2601 ("O&C Act"), which states that the O&C lands:

> [S]hall be managed...for permanent forest production, and the timber thereon shall be sold, cut, and removed in conformity with the principal [principle] of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facilities.

According to the plain language of the statute, the primary purpose of the lands ("shall be managed...for...") is "permanent forest production," *i.e.,* producing forests in perpetuity. *See Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 475 (1992). When standing timber is "sold, cut, and removed" from those lands, it must be done "in conformity with the principle of sustained yield" for the five Congressionally enumerated "purpose[s] of" "providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facilities." 43 U.S.C. § 2601. Neither BLM, Timber Industry Intervenors, nor Judge Russo suggested that this language is sufficiently unclear that a plain meaning reading of the statutory language is inappropriate. *Chevron, U.S.A. v. Nat. Res. Def. Council,* 467 U.S. 837, 842-43 (1984).

Consequently, an agency action on O&C lands that would forever remove all forest cover and not provide a "permanent source of timber supply" would violate the O&C Act. Similarly, an action that closed the lands to all recreation would also violate the O&C Act because that action would preclude management of the O&C lands so as to "provid[e] recreational facilities." In the same way, BLM's decision to implement the 2016 RMPs violated the O&C Act because

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

the agency itself concluded that "alternatives and the Proposed RMP with harvest volumes that exceed current levels are likely to <u>introduce greater instability into local economies</u>, based on past business cycles." JA 4443 (emphasis added). In short, BLM concluded that its decision would cause greater economic instability, the polar opposite of the O&C Act's command that the lands shall be managed to as to "contribut[e] to the economic <u>stability</u> of local communities and industries." 43 U.S.C. § 2601 (emphasis added).

Pacific Rivers acknowledges that plaintiffs are not the usual parties stressing the importance of timber harvest on local economies. And it is true, as Judge Russo observed (and Pacific Rivers acknowledged in its briefing), that other economic drivers such as the recreation economy may partially mitigate the effect of BLM's economic destabilization, F&R at 36. Yet the agency's final conclusion – after specifically acknowledging the economic counterbalancing that recreation jobs may provide to communities that are more dependent on timber harvest – is that putting more timber on the market under the selected alternative will increase market instability over and above the stabilizing influence of recreation-based jobs. In sum, implementation of the 2016 RMPs will destabilize the economies of local communities and industries, and this result is inconsistent with the purpose of the O&C Act. JA 4442-44.

This Court does not need to determine whether the O&C Act is a multiple-use law in order to hold that BLM's decision was arbitrary and capricious and in violation of the O&C Act. Pacific River's claim is based on a plain reading of the statute and of BLM's own conclusions in the FEIS.[12] This Court need only look to BLM's own conclusions that the 2016 RMPs are likely

---

[12] It is worth pointing out that the Findings and Recommendation repeats the erroneous contention that the O&C Act is a "dominant use" statute. F&R at 34. As Pacific Rivers explained in its briefing, this misunderstanding began with the holding in *Headwaters v. Bureau of Land Mgmt., Medford District,* which states without citation that the legislative history of the Act demonstrates that the law is a dominant use statute. 914 F.2d 1174, 1183 (9th Cir. 1990). In

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

to increase economic instability for local communities and industries, and compare that conclusion with the statutory language of the O&C Act that requires BLM to manage the O&C lands so as to contribute to economic stability. Because BLM's action will result in an outcome inconsistent with statutory direction, the BLM's decision is arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A).

IV.    PACIFIC RIVERS DID NOT WAIVE ARGUMENTS IN ITS REPLY BRIEF.

Four times in her Findings and Recommendation pertaining to Pacific Rivers' ESA and NEPA claims, Judge Russo stated that Pacific Rivers advanced a new line of reasoning in its reply brief, and as such waived those arguments. F&R at 16, n. 10, 19. Judge Russo misunderstood the nature of the arguments presented.

First, Pacific Rivers' reply arguments responded to arguments in BLM's responsive brief; they did not advance new claims not pled in Pacific Rivers' First Amended Complaint. The fact that a party has fleshed out its arguments in a reply brief (as opposed to raising a new claim not presented in a complaint) does not warrant filing a surreply or rejected those arguments. *See*, *e.g.*, *Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001). As long as the opening brief raised the issues, even if tersely, they were not waived. *See Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) ("While arguments made for the first time in a reply brief are generally treated as waived, it does not necessarily follow that arguments that are better developed in a reply brief are waived."). There is an important distinction between truly new

---

fact, the legislative history cited by Pacific Rivers is plain that Congress considered the statute it crafted to be the first law to take a holistic view of natural resource management, in what lawmakers today would term multiple-use management. *See generally* Pacific Rivers' Summary Judgment Memo., Dkt. No. 62-1 at 42; Pacific Rivers Summary Judgment Reply, Dkt. No. 82 at 40-43. Internal agency policy statements, legal interpretations, and more than 80 years of implementation of the O&C Act also indicate that the agency itself believes the O&C Act is a multiple-use law. *Id.*

PLAINTIFFS' OBJECTIONS TO FINDINGS
AND RECOMMENDATION – Page 32
(No. 6:16-cv-01598-JR)

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

arguments and refinement of arguments already made. *American Civil Liberties Union of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1006 n.14 (9th Cir. 2003). Indeed, opposition briefing that "logically compel[s] a response" from Pacific Rivers does not constitute an impermissible "new" argument. *Gold v. Wolpert*, 876 F.2d 1327, 1331 (7th Cir. 1989).

Second, with regard to Pacific Rivers' ESA claims, Pacific Rivers' Summary Judgment Memorandum raised the argument that the ACS Objectives no longer apply to all management activities, regardless of whether they take place inside or outside of Riparian Reserves. Pacific Rivers' Summary Judgment Memorandum, Dkt. No. 62-1 at 1-2, 6-7, 15-22, 26-27. *Cf.* F&R at 28, n.17. Adding nuance by distinguishing arguments raised in Federal Defendants' Cross-Motion for Summary Judgment, as Plaintiffs did, does not constitute raising a "new" issue. *See* Pacific Rivers' Summary Judgment Reply, Dkt. No. 82 at 11-15. Furthermore, Plaintiffs did not waive their argument about degradation to the aquatic habitat baseline for endangered salmon. Pacific Rivers' Summary Judgment Memorandum, Dkt. No. 62-1 at 29-31; *Cf.* F&R at 32, n.18. Pacific Rivers properly used its Reply Brief to correct a few citations in its opening brief that were incorrect; corrected citations do not raise new issues. *See In re FCC 11-161*, 753 F.3d 1015, 1137-38 (10th Cir. 2014) (providing additional record-specific citations in a reply brief does not constitute raising a new issue).

Third, regarding Pacific River's NEPA claims, Plaintiffs raised the issue of the requirement that the BLM provide a "reasoned explanation" for its decision to depart from the NFP in its opening brief in the Standard of Review and throughout the NEPA sections of its brief, culminating with citations to *Navarro*, 136 S. Ct. at 2125-27 and *Kake*, 795 F.3d at 966-70, which expressly discuss the concept of agency departure from prior policy without a reasoned explanation. Pacific Rivers' Opening Br., Dkt. No. 62-1 at 7-14; *Cf.* F&R at 16, n.10. In

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

response to BLM's rebuttal in its brief on this point, Pacific Rivers replied with additional analysis involving these cases, and included additional authority specifically addressing the "reliance" issue implicated by this argument. Pacific Rivers' Reply Br., Dkt. No. 82 at 21-22 (citing *Navarro* that internally cites *Smiley v. Citibank*, 517 U.S. at 742); *Cf.* F&R at 19, n.12. These are not "new" arguments raised on reply, but rather exhibit the natural progression of responsive legal analysis common in summary judgment briefing.

Finally, Plaintiff's Reply Brief also functioned as an opposition to Federal Defendant's Cross-Motion for Summary Judgment. The waiver rule does not apply to an opposition brief precisely because opposing counsel has an opportunity to respond: the notions of fairness and equity underlying the doctrine of waiver of a new issue in a reply brief apply only when defendants have no opportunity to respond. *See Von Brimer v. Whirlpool Corp.*, 536 F.2d 838, 846 (9th Cir. 1976). Indeed, in *Alaska Wildlife Alliance v. Jensen,* 108 F.3d 1065, 1068 n.5 (9th Cir. 1997), the appellate court found that a motion for surreply was the appropriate remedy for new evidence submitted in reply. Here, Federal Defendants needed no surreply, as they had the final word in their cross-motion reply brief, and Federal Defendants utilized their opportunity to address all of Pacific Rivers' arguments in that reply brief.[13] Because Federal Defendants had an opportunity to respond, and because Pacific Rivers raised its arguments in context of an opposition brief, it did not waive any issues.

---

[13] Pacific Rivers' Summary Judgment Reply (Dkt. No. 82) is both Plaintiffs' summary judgment reply and their opposition to the Federal Defendants' cross-motion for summary judgment. Joint Parties' Stipulation, Dkt. No. 73.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*

CONCLUSION

For the foregoing reasons, Pacific Rivers objects to the Findings and Recommendation issued by Judge Russo and respectfully asks the Court to vacate the Findings and Recommendation and grant summary judgment in favor of Plaintiffs on all claims.

Respectfully submitted this 16th day of November, 2018.

/s/ Kristen L. Boyles
KRISTEN L. BOYLES (WSB #23806)
*(Admitted Pro Hac Vice)*
JAIMINI PAREKH (CSB #309983)
*(Admitted Pro Hac Vice)*
TODD D. TRUE (WSB #12864)
*(Admitted Pro Hac Vice)*
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA. 98104
kboyles@earthjustice.org
jparekh@earthjustice.org
ttrue@earthjustice.org
Ph: (206) 343-7340
Fax: (206) 343-1526

SUSAN JANE M. BROWN, OSB #054607
Western Environmental Law Center
4107 NE Couch St.
Portland, OR. 97232
brown@westernlaw.org
Ph: (503) 914-1323
Fax: (541) 485-2457

*Attorneys for Plaintiffs Pacific Rivers, Cascadia Wildlands, Coast Range Association, Klamath-Siskiyou Wildlands Center, Oregon Wild, The Wilderness Society, Pacific Coast Federation of Fishermen's Associations, Institute for Fisheries Resources, and Umpqua Watersheds*

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 10,128 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

DATED this 16th day of November, 2018.

/s/ Kristen L. Boyles
KRISTEN L. BOYLES

Earthjustice
705 Second Ave., Suite 203
Seattle, WA 98104-1711
(206) 343-7340

# CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2018, I electronically filed the foregoing *PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION* with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

*/s/ Kristen L. Boyles*
Kristen L. Boyles

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104-1711*
*(206) 343-7340*